UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x
                                                    :     Civil Action No. 17-CV-1105 (JMA) (ARL)
In re: GRAÑA Y MONTERO S.A.A.                       :
SECURITIES LITIGATION                               :
                                                    :
                          Defendants.               :
———————————————————— :
                                                    :
This Document Relates To:                           :
                                                    :
          ALL ACTIONS.                              :
                                                    :
———————————————————— x


**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ...................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 5

PARTIES ................................................................................................................... 6

ADDITIONAL KEY NON-PARTIES ...................................................................... 9

DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT ........ 10

    Graña and Odebrecht Partner Together on Public Works Projects in Perú ..................... 10

    A.    IIRSA North ......................................................................................... 10

    B.    IIRSA South Concession ..................................................................... 11

    C.    The Lima Metro Concession ................................................................ 13

    D.    The Chavimochic Concession ............................................................. 13

    E.    Southern Gas Pipeline Project ............................................................. 15

ODEBRECHT PLEADS GUILTY TO BRIBERY CHARGES ................................. 16

    A.    Odebrecht Admits Making Bribes in Connection with Two Different Government Contracts in Perú ............................................................. 17

THE TRUTH BEGINS TO EMERGE: THE PERÚVIAN GOVERNMENT TERMINATES THE SOUTHERN GAS PIPELINE CONCESSION ........................... 18

GRAÑA'S INVOLVEMENT IN THE BRIBERY SCHEME IS REVEALED AND ITS STOCK TUMBLES ................................................................................................... 22

    A.    Graña Immediately Denies Involvement in the Bribery Scheme ......................... 22

    B.    Former Odebrecht Executive Jorge Barata Reveals That Graña Was Aware of, and Participated in, the Corrupt Payments .............................. 24

POST CLASS PERIOD EVENTS ............................................................................. 25

    A.    Senior Graña Executives Resign Within Days of Barata's Disclosure ................ 25

    B.    Peruvian Judge Orders the Arrest of Top Graña Executives .............................. 25

    C.    Graña is Formally Charged in Connection with the IIRSA Bribes ...................... 28

**Page**

    D.     Graña's Self-Serving Internal Investigation is Rejected by the Peruvian Court ....................................................................................................29

    E.     Law No. 30737: Graña is Further Penalized by Peru's New Anticorruption Law ......................................................................................................32

THE STRUCTURE OF GRAÑA'S PAYMENT FOR ITS SHARE OF THE BRIBES .............33

    A.     The Bribes for the IIRSA South Concession ........................................37

    B.     The Bribes for the Lima Metro ............................................................38

         (i)     The February 29, 2012 Profit Distribution Agreement.............................39

         (ii)    The May 4, 2015 Liquidation Agreement.................................40

ETHICS CHARTER, CODE OF CONDUCT, AND ANTI-CORRUPTION POLICY ...............41

    A.     Ethics Charter (1995) ...........................................................................41

    B.     Code of Conduct (2012).........................................................................42

    C.     Anti-Corruption Policy (2015)...............................................................44

EFFECTIVE INTERNAL CONTROLS ARE AN INTEGRAL COMPONENT OF PUBLIC CORPORATIONS....................................................................................46

GRAÑA ADMITS THAT IT CREATED A CULTURE OF FRAUD ......................................49

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD.....................................................51

    A.     Fiscal Year 2013 False and Misleading Statements and Omissions.....................52

         (i)     The Registration Statement and Prospectus...............................52

         (ii)    2Q13 Quarterly Results..................................................60

         (iii)   3Q13 Quarterly Results..................................................60

         (iv)   4Q13 Quarterly Report and Conference Call..............................61

         (v)    Consolidated Financial Statements FY 2011, 2012, 2013........................61

         (vi)   2013 Form 20-F ................................................................61

**Page**

B. Fiscal Year 2014 False and Misleading Statements and Omissions ...................67

    (i) 1Q2014 Quarterly Results and Conference Call........................................67

    (ii) 2Q14 Quarterly Results and Conference Call.............................................68

    (iii) 3Q14 Press Release and Conference Call ..................................................69

    (iv) 4Q14 Results Report and Conference Call ................................................69

    (v) The 2014 Form 20-F ................................................................................70

C. Fiscal Year 2015 False and Misleading Statement and/or Omissions .................75

    (i) 1Q15 Press Release and Conference Call ..................................................75

    (ii) 2Q15 Press Release and Conference Call ..................................................75

    (iii) 3Q15 Press Release and Conference Call ..................................................76

    (iv) 4Q15 Results Report and Conference Call ................................................76

    (v) 2015 Form 20-F .......................................................................................77

D. Fiscal Year 2016 False and Misleading Statements and/or Omissions ................83

    (i) 1Q16 Press Release and Conference Call ..................................................83

    (ii) 2Q16 Press Release and Conference Call ..................................................83

    (iii) 3Q16 Press Release and Conference Call ..................................................84

    (iv) 4Q16 Results Report and Conference Call ................................................84

E. Fiscal Year 2017 False and Misleading Statement and Omissions ......................86

    (i) The January 27, 2017 Conference Call.....................................................86

GRAÑA'S MATERIALLY FALSE AND MISLEADING FINANCIAL REPORTING ...........88

Misleading Representations About Graña's Profit or Loss Associated with the
Operations of the Minority Interests in Its Subsidiaries ........................90

Misleading Representations About Graña's Contingencies .............................94

**Page**

DEFENDANTS ACTED WITH SCIENTER ...............................................................95

    A.    As a Key Member of the IIRSA South Consortium, Graña Was Involved in All Major Corporate Decisions............................................................96

    B.    Graña Knew About the Bribes, and Contributed Its Proportional Share...............97

    C.    Graña Executives Resign Within Three Days of the Disclosure of Graña's Role in the Bribery Scheme ....................................................................98

    D.    Graña Executives Are Formally Charged in Connection with the Odebrecht Bribery Scheme ..................................................................98

    E.    Defendants violated Graña's Ethics Charter, Code of Conduct, and Anti-Corruption Policy .........................................................................99

LOSS CAUSATION.................................................................................................100

APPLICABILITY OF PRESUMPTION OF RELIANCE ..........................................101

CLASS ACTION ALLEGATIONS ..........................................................................103

NO SAFE HARBOR ...............................................................................................105

    COUNT I .........................................................................................................105

    Violation of §10(b) of the Exchange Act and Rule 10b-5 Against Graña y Montero.......................................................................................105

    COUNT II ........................................................................................................107

    Violation of §10(b) of the Exchange Act and Rule 10b-5 Against the Individual Defendants .................................................................107

    COUNT III.......................................................................................................109

    Violation of §20(a) of the Exchange Act Against the Individual Defendants.................109

PRAYER FOR RELIEF ..........................................................................................110

JURY DEMAND.....................................................................................................111

CERTIFICATE OF SERVICE ....................................................................................1

Lead Plaintiff Treasure Finance Holding Corp. and Plaintiff Marcia Goldberg (collectively "Plaintiffs"), by and through their undersigned counsel, allege the following against Defendants Graña y Montero S.A.A. ("Graña" or the "Company"), Mario Alvarado Pflucker ("Alvarado"), Monica Miloslavich Hart ("Hart"), Jose Graña Miro Quesada ("Graña Miro Quesada"), and Hernando Graña Acuna ("Graña Acuna") (collectively "Defendants"), upon information and belief as to those allegations concerning Plaintiffs, and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Graña and other publications by certain Defendants and other related non-parties; (b) review of news articles and shareholder communications; and (c) review of other publicly available information concerning Graña, the other Defendants, and related non-parties.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all those who purchased the American Depositary Shares ("ADSs") of Graña y Montero between July 24, 2013 and February 24, 2017, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act").

2.      Graña is a Perúvian corporation that serves as the holding corporation for the Graña y Montero Group.  Through its subsidiaries, Graña provides engineering and construction, infrastructure, real estate, and technical services in Latin America.  Graña ADSs have traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GRAM" since the Company's July 24, 2013 initial public offering ("IPO").

3.      Between 2005 and 2011, Graña, through its subsidiaries, participated in multiple consortia led by Odebrecht S.A., a global construction conglomerate based in Brazil, in the

concessions[1] for high-value public works projects, including the Interoceanica Norte and Interoceanica Sur highways, and the engineering and construction of Line 1 of the Lima Metro.

4.      Throughout the Class Period, Graña maintained that these highly-lucrative public works projects were obtained through a competitive bidding process, and that its history of performance and its reputation (and Odebrecht's reputation) as an industry leader was an indispensable component of its winning bid.  In truth, however, these public works projects were obtained through the payment of bribes to former Perúvian presidents by Odebrecht, to which Graña contributed approximately $16 million.

5.      Graña concealed the illicit means of procuring numerous projects, which generated millions of dollars in lucrative additional business, and, as a result, Graña ADSs traded at artificially inflated prices, reaching a Class Period high of more than $22 per ADS by September 19, 2013. Based on Defendants' deception, Graña was able to cash in, selling more than 22.4 million Graña ADSs at artificially inflated prices in the July 24, 2013 IPO, generating approximately $475 million in gross proceeds.

6.      On December 21, 2016, the U.S. Department of Justice ("DOJ") announced that Odebrecht and Braskem S.A. ("Braskem"), a Brazilian petrochemical company in which Odebrecht is the controlling shareholder, pled guilty and agreed to pay a combined total penalty of at least $3.5 billion to resolve charges with U.S., Brazilian and Swiss authorities for paying millions of dollars in bribes to government officials around the world.  According to a one-count criminal information filed the same day by the Fraud Section of the DOJ's Criminal Division and the U.S. Attorney's Office for the Eastern District of New York, which charged Odebrecht with conspiracy to violate the

---

[1]      A concession agreement is a negotiated contract between a company and a government that gives the company the right to operate a specific enterprise, such as infrastructure or mining, within the government's jurisdiction, subject to certain conditions.

anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), Odebrecht paid approximately $29 million in bribes to Perúvian government officials to secure public works contracts between 2005 and 2014. Graña had been one of Odebrecht's most important Perúvian partners, working with it on half a dozen public works contracts worth more than $10 billion.

7.     On this news, the price of Graña ADSs began to decline precipitously, closing from $7.75 per ADS on December 21, 2016, down to $5.02 per ADS by January 11, 2017.

8.     On January 12, 2017, Graña announced that it was withdrawing from its partnership with Odebrecht, calling the partnership a "mistake." On this news, the price of Graña ADSs continued to decline, falling $0.61 per ADS, or 12%, and closing at $4.41 per ADS on January 12, 2017.

9.     On January 20, 2017, *Reuters* reported that "[a] consortium controlled by Brazilian builder Odebrecht S.A. [would] miss a financing deadline . . . for a natural gas pipeline project in Perú" valued at $5 billion in which Graña y Montero owned a 20% interest. According to *Reuters*, Odebrecht had "spent months trying to sell its 55 percent in the project as a condition from banks that would provide $4.1 billion for construction," but that "worries about liability for potential crimes committed ha[d] thwarted possible deals and the government ha[d] said it would not extend the financing deadline."

10.     When Graña missed the January 23, 2017 financing deadline, the Perúvian government terminated the pipeline concession the next day.

11.     On January 25, 2017, citing the termination of the pipeline concession, Graña disclosed it would ask its Board of Directors to approve the sale of $300 million in assets to help it meet its obligations after losing the Odebrecht partnership as a result of its participation in the bribery.

12.     On February 16, 2017, Reuters reported that an "ombudsman" had "called for prosecutors to investigate other partners of Odebrecht "in a corruption probe that has already sunk Graña's shares."

13.     On February 24, 2017, a Perúvian news magazine, *Hildebrandt en sus trece*, reported that Graña knew about the $20 million in bribes paid to former President Alejandro Toledo by Odebrecht. The *Hildebrandt* article published four pages of testimony given by former-Odebrecht executive-turned-whistleblower Jorge Barata ("Barata") confirming that Graña knew about the bribes and had committed to repay its proportional share. Barata was the director or Odebrecht's operations in Perú and was personally involved in negotiating the bribes.

14.     On this news, the price of Graña's ADSs declined precipitously, falling approximately 35%, from a close of $5.09 per ADS on February 23, 2017, to a close of $3.32 per ADS on February 24, 2017, or $1.77 per ADS, on unusually high trading volume of more than 1.9 million shares traded.

15.     This stunning disclosure, however, was only the tip of the iceberg. Within three days, three senior Graña executives, including the Company's long-time chairman and director, abruptly resigned. The Peruvian special prosecutor overseeing the corruption investigation began investigating the Company and corporate-suite. A Peruvian judge subsequently determined that there was ample evidence that Graña executives participated in the bribery, found that these executives posed a flight risk, and ordered their immediate preventative detention for a period of 18 months. In addition, the Company and its oldest and most profitable subsidiary were formally incorporated as criminal subjects in the corruption probe.

16.    Thereafter, Graña failed to timely file its Form 20-F for 2016 with the SEC (the "2016 Form 20-F").  On May 16, 2018, after conducting "substantial additional procedures" and a complete audit of its 2015 and 2016 financial statements, Graña finally filed the 2016 Form 20-F.

17.    The 2016 Form 20-F revealed that during the Class Period, Graña operated with widespread internal-control deficiencies.  Among other things, the Company disclosed that an "inconsistent and ineffective tone at the top was present," that there was "inadequate oversight by [Graña's] Audit and Process Committee," and that the control environment was insufficient to ensure that fraud monitoring mechanisms were in place, "including that the relevant risk/control activities were carried out properly and that corrective actions were taken on a priority basis and in timely manner."

18.    On May 17, 2018, the NYSE announced that it had determined to commence proceedings to delist Graña ADSs from the NYSE based on the Company's failure to file its 2017 Form 20-F.  Trading in the Company's ADSs was suspended immediately.

19.    As alleged below, Graña's financial reporting during the Class Period was in complete disarray, due in significant part to senior management who created an inappropriate operating environment whereby the Company was ready, willing, and able to contribute to the illegal payment of bribes and then manipulate its financial statements to hide its participation in the illegal activity.  Defendants knowingly, and at a minimum recklessly, made materially false and misleading statements to investors, resulting in an artificial inflation of Graña's ADS prices that caused significant harm to investors when the truth was ultimately revealed.

**JURISDICTION AND VENUE**

20.    The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5].  This

Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

21.     Venue is proper in this District pursuant Section 27 of the Exchange Act and 28 U.S.C. §1391(b).

22.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

23.     As set forth in its previously-filed certification, Lead Plaintiff Treasure Finance Holding Corp. purchased Graña ADSs during the Class Period, and has been damaged thereby.

24.     As set forth in her certification previously filed with the Court, Plaintiff Marcia Goldberg purchased Graña ADSs during the Class Period, and has been damaged thereby.

25.     Defendant Graña y Montero S.A.A. is the holding corporation for the Graña y Montero Group.   Through its subsidiaries, Graña provides engineering and construction, infrastructure, real estate, and technical services.   In addition, Graña offers concessions for constructing, operating, and supplying major infrastructure and energy projects.  Graña ADSs traded in an efficient market on the NYSE throughout the Class Period under the ticker symbol "GRAM."

26.     Defendant Alvarado was, until March 2, 2017, Graña's Chief Executive Officer and a member of its Board of Directors.

27.     Defendant Hart is and was, at all relevant times, Graña's Chief Financial Officer.

28.     Defendant Graña Miro Quesada is a former member of the Board of Directors of Graña. Mr. Graña Miro Quesada joined the Company in 1968, and was a Director and Chairman of the Board of Directors from 1996 until his abrupt resignation on February 27, 2017, in the immediate wake of the revelations that Graña was aware of, and participated in, the Odebrecht bribery scheme.

- 6 -

Graña Miro Quesada also served as the executive president of the Company from 1996 until March 2011. Graña Miro Quesada was later arrested by the Perúvian authorities, charged with money laundering and collusion with governmental authorities, and placed in pretrial detention based on a judicial determination that he was likely involved in illicit activities relating to the bribery scheme.

29.     Defendant Graña Acuna is a former member of the Board of Directors of the Company. Graña Acuna joined the Company in 1977, and served as a Director from August 1996 until his abrupt resignation on February 27, 2017, in the immediate wake of the revelations that Graña was aware of, and participated in, the Odebrecht bribery scheme. Graña Acuna also served as the Chairman of the Board of Directors of numerous Graña subsidiaries, including GyM S.A. and Stratcon GyM S.A. Graña Acuna was later arrested by the Perúvian authorities, charged with money laundering and collusion with governmental authorities, and placed in pretrial detention based on a judicial determination that he was likely involved in illicit activities relating to the Odebrecht bribery scheme.

30.     Defendants Alvarado and Hart are referred to herein collectively as "Officer Defendants." Defendants Graña Miro Quesada and Graña Acuna are referred to herein collectively as the "Director Defendants." Defendants Alvarado, Hart, Graña  Miro Quesada and Graña Acuna are collectively referred to as the "Individual Defendants."

31.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Graña, were privy to confidential and proprietary information concerning Graña, its operations, finances, financial condition, and present and future business prospects. Because of their positions with Graña, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and

employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

32.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Graña's business.

33.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of Graña's reports, press releases, and presentations to securities analysts, and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

34.     As controlling persons of a publicly traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Graña's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or

untrue, so that the market price of Graña ADSs would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

35. Each of the Defendants is liable for: (i) making false or misleading statements; and/or (ii) failing to disclose adverse facts known to them about Graña. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Graña ADSs was a success, as it: (i) deceived the investing public regarding Graña's prospects and business; (ii) artificially inflated the price of Graña ADSs; and (iii) caused Plaintiffs and other members of the Class to purchase Graña ADSs at inflated prices.

## ADDITIONAL KEY NON-PARTIES

36. GyM S.A. is the oldest and most profitable subsidiary in Graña's Engineering and Construction segment. As of December 31, 2016, Graña held a 98.23% interest in GyM S.A. As described below, Graña, through GyM S.A., participated in the IIRSA South and Lima Metro concessions as a minority stakeholder.[2]

37. Odebrecht is a Brazilian conglomerate consisting of diversified businesses in the fields of construction, engineering, chemicals, and petrochemicals. It is the holding company for Constructora Norberto Odebrecht S.A., the largest engineering and contracting company in Latin America, and holds a controlling interest in Braskem S.A., the fifth largest petrochemicals producer in the world. Odebrecht operates in 27 countries worldwide, and, until recently, had a major operating presence in Perú. In 2015, Odebrecht's former CEO, Marcello Odebrecht, was convicted of money laundering and bribery charges and was sentenced to 19 years in jail. His sentence was

---

[2]   The pertinent documents and records inconsistently refer to both Grana y Montero and GyM S.A. as the minority stakeholder in the IIRSA South and Lima Metro consortia. As used in this Complaint, the terms "Grana" and the "Company" shall refer to both entities interchangeably.

later reduced to 10 years after he agreed to cooperate with prosecutors in an investigation codenamed Operation Car Wash (in Spanish, *Lava Jato*).

38.     Jorge Henrique Simoes Barata ("Barata") is the former executive director of Odebrecht Latinvest, which managed Odebrecht's operations in Perú.  Barata was the "right hand" of businessman Marcelo Odebrecht, until he became an effective collaborator in the Odebrecht investigation.  As described herein, Barata testified under oath that Graña was aware that Odebrecht was making corrupt payments to secure public works projects, and had committed to pay its proportional share of the bribes.

39.     Gonzalo Ferraro Rey joined the Company in 1996.  In April 2013, Ferraro Rey was promoted to president of the infrastructure segment and manager of business development.  He held these positions until his unexpected resignation on November 27, 2017, several months after Graña's participation in the bribery was disclosed.  Ferraro Rey was later arrested, charged with money laundering and collusion with governmental authorities, and placed under pretrial preventative house arrest based on a judicial determination that he likely participated in the Odebrecht bribery scheme.

## DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT

### Graña and Odebrecht Partner Together
### on Public Works Projects in Perú

40.     Since 2005, Graña and Odebrecht have been involved in several major infrastructure and construction projects in Perú, including (1) the IIRSA North concession; (2) the IIRSA South concession, sections 2 and 3; (3) the Lima Metro Line 1 concession; (4) the Chavimochic concession; and (5) the Southern Gas Pipeline project.

### A.  IIRSA North

41.     The Initiative for the Integration of the Regional Infrastructure of South America ("IIRSA") was a multi-country effort to integrate South America through a series of infrastructure

and transportation projects.  In Perú, the IIRSA project consisted of seven parts, two of which—IIRSA North and IIRSA South—are relevant to this action.  IIRSA North involved the construction, operation, and maintenance of toll highways across Northern Perú.  IIRSA South involved the construction, maintenance, and conservation of certain road tranches of the Perú-Brazil South Interoceanic toll highway.

42.     In early 2005, a consortium called Concesionaria IIRSA Norte S.A. was formed by Odebrecht, Constructora Andrade Gutierrez S.A. ("Andrade Gutierrez"), and Graña to present a bid proposal for IIRSA North.  Stock ownership in the concessionaire entity was awarded as follows: Odebrecht (49.8%), Andrade Gutierrez (40%), and Graña (10.2%).

43.     The consortium was awarded the project in May 2005.  Odebrecht was designated as the group's leading company.

44.     A construction entity called Consorcio Constructor IIRSA Norte ("CONCIN") was formed.  The parties' equity interests in CONCIN were the same as for the concessionaire: Odebrecht (49.8%), Andrade Gutierrez (40%), and Graña (10.2%).

45.     In 2008, Andrade Gutierrez withdrew from the IIRSA North concession, and its interest in both the concessionaire entity and the construction entity was distributed among the remaining members of the concession.  As a result, Graña's interest in the concessionaire and CONCIN increased to 27.2%; Odebrecht's interest in both entities increased to 72.8%.

46.     In December 2011, Graña sold its interest in IIRSA North.

**B.  IIRSA South Concession**

47.     In or about 2005, Odebrecht and Graña began discussing bidding for sections 2 and 3 of the IIRSA South system.  Odebrecht was interested in the construction component of the IIRSA roads, whereas Graña was primarily focused on operating and maintaining the roads after the construction phase.  These talks resulted in a letter of understanding between the two entities dated

- 11 -

February 9, 2006, in which Odebrecht committed to support Graña's appointment as operator of the IIRSA South concession upon completion of the construction.

48.    In or about 2005, a consortium called Concesionaria Interoceanica Sur Tramos 2 y 3, S.A., was formed by Odebrecht, Graña, JJC Contratistas Generales S.A. ("JCC"), and Ingenieros Civiles y Contratistas Generales S.A. ("ICCGSA"), to present a bid for tranches 2 and 3 of the IIRSA South project.   Stock ownership in the concessionaire entity was awarded as follows: Odebrecht (70%), Graña (18%), JCC (7%), and ICCGSA (5%).

49.    The consortium was awarded the concessions for the maintenance and operation of Sections 2 and 3 of IIRSA South in June 2005.

50.    A construction entity called CONIRSA S.A. was created.   Stock ownership in both the concessionaires and CONIRSA was as follows: Odebrecht (70%), Graña (18%), JCC (7%), and ICCGSA (5%).

51.    The Shareholders Agreement for the IIRSA South concession gave Graña and the other minority stakeholders the authority to "jointly appoint the person who will act as the Administration and Finance Manager."[3]   Aside from that, Graña had no decision-making authority. Indeed, the Shareholders Agreement for the concession required a supermajority vote of 82% for certain major corporate actions.   Based on this provision, Graña, which held just 18% of all shares, was effectively excluded from the decision-making process.

52.    In 2006, however, during a General Meeting of Shareholders, the shareholders resolved to provide Graña with a voice in the decision-making process.   To that end, the shareholders approved the transfer of a 1% interest from ICCGSA to Graña "due to the different

---

[3]    The minority stakeholders ultimately appointed Fernando Almenara, a Graña employee, to serve as the Administration and Finance Manager.

- 12 -

commercial and operational benefits that such operation would entail to the participating companies."

53.     The minutes of the meeting, however, do not describe the expected "commercial and operational benefits."  Furthermore, the transfer was entirely gratuitous, and Graña never paid ICCGSA any consideration for the transfer of that critical 1% interest.

54.     Following the transfer, stock ownership in both the concessionaire entity and CONIRSA was as follows: Odebrecht (70%), Graña (19%), JCC (7%), and ICCGSA (4%).

55.     In 2011, Graña sold its interest in IIRSA South.

**C.  The Lima Metro Concession**

56.     The Lima Metro project contemplated civil and electromechanical work for two sections of the Line 1 mass electric transport system of Lima and Callao, Perú.  In 2008, Odebrecht and Graña formed an entity called Consorcio Tren Electrico Lima and submitted a bid for the concession of the Lima Metro Line 1 project.

57.     Stock ownership in the concessionaire entity was awarded as follows: Odebrecht (67%), and Graña (33%).

58.     In December 2009, the Consorcio Tren Electrico Lima was awarded concession.

59.     The first stretch of Line 1 was completed in 2011, and opened for operation in early 2012.  The second stretch of Line 1 opened for operation in July 2014.

60.     The concession then wound up its affairs and signed a final profit distribution and liquidation agreement in May 2015.

**D.  The Chavimochic Concession**

61.     The Chavimochic project involved the construction of an irrigation system that extends to Perú's northern region of La Libertad.  The Chavimochic project involved multiple phases.  The third phase of the project included works for the design and construction of irrigation

infrastructures, the operation and maintenance of hydraulic works for all three stages of the project, and water-supply services for end-users of the irrigation infrastructures.

62.     In April 2013, an entity called Consortium Río Santa – Chavimochic, formed by Graña, Odebrecht, and an Odebrecht subsidiary, presented a bid for phase 3 of the Chavimochic project.  The consortium was awarded the project on December 19, 2013.

63.     In March 2014, Odebrecht and Graña entered into a concession constitution establishing the entity Concesionaria Chavimochic S.A.C. and a separate shareholders agreement establishing ownership in the concessionaire as follows: Odebrecht (73.5%) and Graña (26.5%).  In May 2014, a construction entity called Consorcio Constructor Chavimochic was created with the same ownership percentages as Concesionaria Chavimochic S.A.C.

64.     In December 2016, the Chavimochic project was put on hold amidst the revelations of Odebrecht's corruption.

65.     During a conference call on January 27, 2017, Graña announced its intention to sell its shares in the concession and exit the project.

66.     On January 25, 2018, Perúvian newspaper *Gestion* reported that the Regional Council of La Libertad and the Ministry of Economy and Finance had approved an addendum which would permit the transfer of the concession to a new interested company.  The addendum, however, had not yet been approved by the state comptroller.

67.     On February 14, 2018, *Gestion* reported that the concession has still not found a buyer, and that the comptroller had still not approved the addendum.

68.     The Chavimochic concession is still on hold.

- 14 -

### E. Southern Gas Pipeline Project

69.     The Gasoducto Sur Perúano ("GSP") project involved the construction and operation of the Southern Perú Gas Pipeline, which would transport natural gases from central Perú to the Pacific coast.

70.     In June 2014, the GSP concession was awarded to a consortium comprised of Odebrecht and Enagás Internacional, S.L.U. ("Enagás").  GSP then entered into an agreement with Consorcio Constructor Ductos del Sur ("CCDS"), a construction consortium formed by a group of Odebrecht companies, for CCDS to perform works required for the GSP project.

71.     Graña was not directly involved in either the Gasoducto Sur Perúano bid process or the formation of the GSP or CCDS entities.  Graña, however, from time to time since 2011 had discussions and negotiations with Odebrecht regarding entering into a joint project relating to Gasoducto Sur Perúano, and the parties had signed certain agreements relating to such a potential joint project including a joint participation agreement.  Although Graña entered into a joint participation agreement with Odebrecht and other agreements relating to participation in a potential bid, Graña was not part of the consortium that submitted a bid and was awarded the project in June 2014.  Graña did not acquire any interest in the Gasoducto Sur Perúano project until August 2015.

72.     In August and September 2015, Graña and Odebrecht executed a memorandum of understanding and addendum, by which Graña, through its subsidiary Negocios del Gas S.A., joined GSP as a minority shareholder with 20% of stock ownership and acquired a 29% interest in the construction consortium, CCDS.  As a result, Odebrecht retained a 55% ownership stake in GSP, with Enagás (25%) and Graña (20%) as minority shareholders.  After Graña acquired an interest in CCDS, Odebrecht and Graña had ownership stakes of 71% and 29%, respectively.

73.     On January 24, 2017, following public reports of corruption in the bidding process, and the consortium's related failure to meet a key financing deadline, Peru's Ministry of Energy and

Mines notified GSP of the termination of the concession contract due to the failure to achieve the financial closing of the project.

## ODEBRECHT PLEADS GUILTY TO BRIBERY CHARGES

74.     On May 17, 2014, Brazilian authorities initiated Operation Car Wash.  Though Operation Car Wash initially began as a local money laundering investigation, it rapidly "built momentum on the testimony of informants and an avalanche of plea bargains as those caught in the net of justice" began to cooperate with the government.[4]   By March 2016, the Lava Jato investigation, already in its *twenty-sixth phase*, turned its focus to Odebrecht's operation in Brazil.[5]

75.     On December 21, 2016, Odebrecht and Braskem (a Brazilian petrochemical company in which Odebrecht holds a controlling interest) pled guilty to a one-count criminal Information charging them with conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act, and agreed to pay a combined criminal penalty of approximately $3.5 billion (the "Plea Agreement").  *See United States v. Odebrecht S.A.*, Cr. No. 16-643, Plea Agreement, available at https://www.justice.gov/opa/press-release/file/919916/download (last visited May 29, 2018).

76.     The Plea Agreement described Odebrecht's massive bribery and bid-rigging scheme in detail.   Between 2001 and 2016, Odebrecht and its co-conspirators paid approximately $788 million in bribes to government officials, their representatives, and political parties in association with more than 100 projects in twelve different countries in order to win business in those countries.  The criminal conduct was directed by the highest levels of Odebrecht, with bribes

---

[4]     http://www.miamiherald.com/news/nation-world/world/americas/article171222962.html.

[5]     Former Odebrecht CEO Marcelo Odebrecht was arrested in June 2015 during the fourteenth phase of the investigation, and was accused of bribing ex-directors of Brazilian oil giant Petrobas for contracts.  Marcelo Odebrecht, along with two of his executives, were sentenced to more than nineteen years in jail at the beginning of March 2016 for money laundering and taking part in a criminal organization related to a corruption scandal.  *See* http://riotimesonline.com/brazil-news/rio-politics/brazils-lava-jato-focuses-on-odebrecht-in-its-26th-phase/.

paid through a complex network of shell companies, off-book transactions, and off-shore bank accounts.

77.     As part of the criminal scheme, Odebrecht created and funded an elaborate financial structure that operated to account for and disburse corrupt bribe payments to public officials, political parties, party officials, and political candidates.  Over time, the development and operation of its financial structure evolved, and in 2006, Odebrecht established the Division of Structured Operations as a standalone division of its company.   The Division of Structured Operations effectively functioned as a bribery department within Odebrecht and its related entities.

78.     The funds for Odebrecht's sophisticated bribery operation were generated by the Odebrecht Finance Department, and then funneled by the Division of Structured Operations to a series of off-shore entities that were not included on Odebrecht's balance sheet as related entities. The Division of Structured Operations then directed the disbursement of the funds from the off-shore entities to the bribe recipients, through the use of wire transfers through one or more of the off-shore entities, as well as through cash payments both inside and outside Brazil, which were sometimes delivered using packages or suitcases left at predetermined locations.

79.     In all, Odebrecht and its co-conspirators paid more than $788 million in bribes to illegally secure projects in multiple countries, with ill-gotten benefits to Odebrecht and its co-conspirators amounting to approximately $3.336 billion.

**A.  Odebrecht Admits Making Bribes in Connection with Two Different Government Contracts in Perú**

80.     The Plea Agreement describes two instances where Odebrecht made corrupt payments to win government contracts in Perú.   Between 2005 and 2014, Odebrecht made approximately $29 million in corrupt payments to government officials in Perú in order to secure

public works contracts, including the Lima Metro and IIRSA concessions. Odebrecht realized benefits of more than $143 million as a result of these corrupt payments.

81.     In 2005, Odebrecht participated in a tender for the IIRSA South concession. During the tender process, Odebrecht communicated with an intermediary of then-President of Perú Alejandro Toledo, who offered to support Odebrecht's bid in exchange for bribes. Odebrecht eventually won the tender, and made corrupt payments totaling approximately $20 million with unrecorded funds from the Division of Structured Operations.

82.     In or about 2008, Odebrecht participated in a bid for the construction of the Lima Metro concession. In order to influence the high-bid committee to help Odebrecht secure the contract, Odebrecht agreed to pay $9 million to then-President of Perú Alan Garcia and members of the tender committee for the project.

83.     As described above, Graña was Odebrecht's partner in both concessions.

84.     The corrupt payments had the desired effect, and in 2009, Odebrecht won the contract, valued at approximately $400 million.

### THE TRUTH BEGINS TO EMERGE: THE PERÚVIAN GOVERNMENT TERMINATES THE SOUTHERN GAS PIPELINE CONCESSION

85.     While the Brazilian authorities were turning their investigative efforts to Odebrecht, the Odebrecht-led GSP concession was seeking nearly $4.1 billion in financing from Perúvian banks, as required under the concession's agreement with the Perúvian government.

86.     As the investigative spotlight on Odebrecht in Brazil began to intensify, so did the concern that Odebrecht might have been involved in corrupt activities in Perú. As a result, the Perúvian banks decided to withhold financing for the GSP concession unless and until Odebrecht sold its 55% stake in the concession.

87.     In early April 2016, Odebrecht announced that it would sell its share in the GSP concession.  Analysts following the story observed that Odebrecht's departure from the consortium was directly related to its corruption activities.  In a report dated April 5, 2016, Scotiabank analysts explained, in pertinent part, as follows:

> Odebrecht announced that the company plans to sell an additional stake in the operation of the Southern Gas Pipeline (SGP). ***Odebrecht, which currently holds the controlling stake in the SGP project, has already handed the management of this concession to Enagas and Graña, as the company is under investigation due to a corruption scandal in Brazil.***  Odebrecht losing control of the operation should be positive news for Graña, as this should facilitate the financing closure of the project (the consortium is currently negotiating with a pool of 14 banks).

88.     Similarly, an April 13, 2016 report from *Kallanish Energy* explains that Odebrecht's participation in the pipeline was put in jeopardy as a result of revelations of corruption in Brazil and the investigations of corruption in Perú, stating, in pertinent part, as follows:

> At the center of the Lava Jato corruption scandal, the decade-long scheme involving Petrobras' contracts and other Brazilian procurement deals, Odebrecht gave up control of the consortium in early March.

> Partners Enagás (25%) and Graña y Montero (20%) took over the roles of general manager and finance and investments manager previously occupied by Odebrecht's representatives, in a bid to "distance" the pipeline project from all the corruption the Brazilian conglomerate is involved in.

> ***The company's operations on the pipeline were put in jeopardy last year when a $4.2 billion loan from a consortium of 15 banks was held up by the corruption revelations.***  Odebrecht's former CEO, Marcelo Odebrecht, has been sentenced to 19 years in prison under the Lava Jato investigation, and ***there are also allegations of bribery in Perú***.

89.     An April 26, 2016 report from energy consulting website *Enerdata* stated, in pertinent part, as follows:

> Brazilian engineering company Odebrecht has decided to sell its 55% stake in the US$5bn Gasoducto Sur Perúano (GSP) gas pipeline project in southern Perú.  A consortium of Odebrecht (75%) and Spanish gas transmission system operator Enagas (25%) won the project in mid-2014, through an international tender organized by the State agency Proinversion, which had disqualified the other competing consortium of GDF SUEZ and Sempra.  Odebrecht, which is at the center

of a massive graft probe in Brazil, has already transferred a 20% stake to Graña y Montero, which took over project management in March 2016. *Perú's attorney general is now investigating possible wrongdoings in the attribution of the pipeline to Odebrecht in 2014*.

90.     On June 14, 2016, *Reuters* reported that "Odebrecht . . . is in advanced talks to sell a 55 percent stake in a Perúvian gas pipeline project, and Ferrovial SA and another three companies have emerged as potential bidders." *Reuters* further reported that "Odebrecht is exiting the pipeline and another three Perú projects as a corruption probe in its home country, Brazil, undercuts its access to credit."

91.     On October 26, 2016, *Reuters* reported that "Brazilian engineering group Odebrecht SA's plans to sell its 55 percent stake in a $5 billion natural gas pipeline project in Perú to a Sempra Energy-led consortium collapsed in the final stage of negotiations."  According to the author, "[a] group of banks had asked that Odebrecht fully exit the project before providing a $4.1 billion syndicated loan needed for the pipeline's construction."  On November 23, 2016, Graña issued a press release announcing that Sempra had officially backed out of talks to purchase Odebrecht's shares in the GSP.

92.     A BTG Pactual analyst report dated November 24, 2016 reported that Sempra International had backed out of talks to buy Odebrecht's 55% stake in the GSP project when the government insisted on a clause making Sempra liable if corruption related failings are found in the tender process.  The report stated that "Sempra's exit enables Perú's government to ax the contract and re-auction the concession."

93.     On December 21, 2016, the Plea Agreement was made public.

94.     On January 11, 2017, Perú's comptroller general issued a statement on irregularities detected in infrastructure contracts awarded to Odebrecht. *Reuters* reported, in pertinent part, as follows:

Irregularities detected include unjustified cost overruns, improperly forgiven penalties for breaking contractual obligations and higher price tags for projects that competitors offered to do cheaper, Comptroller Edgar Alarcon told a news conference.

95.    Odebrecht's efforts to sell its stake in the GSP were unsuccessful, and as the financing deadline approached, it became apparent that the consortium would not meet its financing deadline. On January 20, 2017, Graña issued a press release informing the public that it would not meet the impending deadline:

As it is known, the concessionaire in charge of the Perúvian Southern Gas Pipeline project has been working for months to make the financial closing feasible and allow the project to continue its course. The deadline to reach this is January 23rd. However, as a matter of public knowledge, one requirement to achieve the financial closing was that Odebrecht had to sell its shares in the project, which has not yet occurred.

Today we can confirm that the financial closing will not occur before January 23rd, which is the deadline that had been stipulated in the contract, therefore the Perúvian Government is entitled to terminate the concession contract, whose shareholders are Odebrecht (55%), Enagás (25%) and Graña y Montero (20%).

96.    As expected, the consortium did not meet its January 23, 2017 financing deadline.

97.    On January 24, 2017, the Perúvian government terminated the concession. Graña announced the termination in a Form 6-K filed with the SEC that same day:

Today, Gasoducto Sur Perúano S.A. ("GSP"), company owner of the concession "Improvements to the Energy Security of the Country and Development of the Perúvian Southern Gas Pipeline" (the "Concession"), and of which our subsidiary Negocios de Gas S.A. is a shareholder with 20%, received a notification from the Ministry of Energy and Mines, as Grantor of the Concession, by which it terminated the concession agreement signed on July 23, 2014 (the "Concession Contract") and requested as well the execution of the Guarantee of Fulfillment of the Concession Contract.

98.     On January 25, 2017, Graña disclosed it would ask its Board of Directors to approve the sale of $300 million in assets to help it meet its obligations after the termination of the GSP concession.

- 21 -

99.     Thereafter, on January 27, 2017, Graña reported its fourth quarter and fiscal 2016 financial results for the year ended December 31, 2016, reporting revenues of S/.6,055.3 million[6] for fiscal 2016, a 22.7% decrease compared to fiscal 2015.

100.    On January 30, 2017, Graña filed a Form 6-K with the SEC describing its minimum expected losses.  According to the filing, Graña assumed $423 million in obligations in relation to the GSP concession, consisting of (i) capital investments in GSP in the amount of $241 million; (ii) a corporate guarantee worth $129 million in favor of the syndicate of banks that granted the bridge loan to GSP; and (iii) the assumption of a $52 million guaranty of fulfillment on its credit lines in favor of the Perúvian State.

101.    Although Graña may be contractually entitled to recover some of these sums, the Company nevertheless stated that it expected to lose a minimum of $38 million[7], consisting of (i) a $21 million loss of capital investment; (ii) a $4 million loss to discount the future recovery receivable; (iii) $7 million, based on the deferred income tax considered for the loss generated; and (iv) an additional $20 million, based on the equity value of the GSP, which the Company had already recorded in its financial statements.

### GRAÑA'S INVOLVEMENT IN THE BRIBERY SCHEME IS REVEALED AND ITS STOCK TUMBLES

**A.  Graña Immediately Denies Involvement in the Bribery Scheme**

102.    On January 12, 2017, in response to an inquiry by the Lima Stock Exchange that asked the Company to disclose "any facts that may be affecting [your] stock prices," Graña stated in

---

[6]     Peruvian Nuevos Soles ("S/.") is the currency in Peru.  The exchange rate on January 27, 2017 was PNS/USD=3.23.

[7]     Although the Form 6-K indicates that the Company expects to suffer a minimum loss of $38 million, the itemized losses identified in the filing add up to $52 million.

a Form 6-K filed with the SEC that "*we have no knowledge of any relevant information that could directly affect or could indirectly affect the price of our shares*."

103.     On January 27, 2017, one month after Odebrecht pled guilty to bribery charges, Graña hosted a conference call for investors.  During the conference call, Defendant Alvarado expressly stated that Graña was not involved in the bribery scheme, stating, in pertinent part, as follows:

> First of all, let me explain the position taken by Graña y Montero in the Odebrecht case:
>
> It is important to note that **the Graña y Montero Group does not authorize, recommend, or make irregular payments of any kind** because these conducts disobey the values and principles that have guided our behavior for more than 83 years.
>
> In the 6 projects we developed in partnership with Odebrecht throughout our history, **we have never seen, experienced, witnessed, or participated in any irregular actions related to the projects.  We could not imagine that there was a system specifically designed to pay bribes.**

104.     Alvarado then cited Graña's ethics policies and Code of Conduct as evidence that Graña was not involved in the bribery scheme:

> For the last 22 years, the Group has had different tools to encourage ethical principles at all organizational levels, including the Ethics Charter, the Code of Conduct, and the Anti-Corruption Policy.

105.     In early February 2017, Defendant Alvarado testified before a Perúvian Congressional commission investigating the Odebrecht bribery scheme, stating, in pertinent part, as follows:

> **It is clear that we were duped**, we now know it was a bad decision.  **If we had known before, we would not have become their associates**.  We have lost a great deal, and we have paid the consequences of that ruse.

### B. Former Odebrecht Executive Jorge Barata Reveals That Graña Was Aware of, and Participated in, the Corrupt Payments

106.    Then, on February 24, 2017, a Perúvian news magazine, *Hildebrandt en sus trece*, reported that Graña knew about the $20 million in bribes paid to former President Alejandro Toledo by Odebrecht in exchange for the IIRSA project.

107.    According to the article, entitled *Barrata Con Todo*, or *Barata with Everything*,[8] Jorge Barata, the former executive director of Odebrecht in Perú, testified that top Graña executives knew about Odebrecht's $20 million bribery payment to President Toledo to win the IIRSA South concession.

108.    The article included four pages of the transcript of Barata's testimony before Perúvian prosecutor Hamilton Castro, which included the following exchange:

> Castro:     What is the extent of intervention in the illicit agreement and in the payments made to Alejandro Toledo, from the other companies in the Interoceanic Project, Stretches 2 and 3?
>
> Barata:     The payment has been [made] by Odebrecht but ***the rest of the companies did not know the details, but they knew there was an agreement ... What I do know is certain, is that it was distributed among the partners, I do not remember the exact formula***, I will verify this.  It was more or less like this, ***they knew that we had paid and they knew that they had to assume what would correspond to them.***

109.    As alleged in ¶¶47-54, Graña was a member of the IIRSA South consortium.

110.    On February 24, 2017, in response to the *Hildebrandt* article, Graña immediately filed Form 6-K filed with the SEC in which it denied any involvement in the Odebrecht bribery, stating, in pertinent part, as follows:

> With respect to the statements made by the former representative of Odebrecht in Perú, Mr. Jorge Barata, published today, February 24, 2017 in a local publication:

---

[8]    A certified translation of *Barata Con Todo*, along with the original version, is annexed hereto as Exhibit 1.

- 24 -

*We categorically deny such statements and reiterate that our Company and executives were not aware of, participated in, nor made any payments in connection with any type of bribe or reimbursement of any such payments made by Odebrecht.*

111.    Nevertheless, shares of Graña ADSs fell 27% on the NYSE, closing at $3.23 per ADS on Friday, February 24, 2017, down from a price of $5.23 per ADS the day before.

## POST CLASS PERIOD EVENTS

### A.  Senior Graña Executives Resign Within Days of Barata's Disclosure

112.    Despite Graña's denial, the impact of the *Hildebrandt* article continued to be felt through the weekend, and on Monday evening, February 27, 2018, three of Graña's top officers – long-time Chairman Jose Graña Miro Quesada, CEO Mario Alvarado Pflucker, and Director Hernando Graña Acuna – resigned.

113.    The resignations were announced the next morning in a press release issued before an emergency shareholder meeting, and attributed the resignations to the "termination of the South Perú Gas Pipeline, the fall of share prices, and the false allegations made by the former representative of Odebrecht in Perú."

### B.  Peruvian Judge Orders the Arrest of Top Graña Executives

114.    On May 16, 2017, Graña announced in a Form 6-K filed with the SEC that Perú's State Attorney had formally moved to initiate preliminary investigations against several Perúvian companies associated with Odebrecht.  The request sought to include Graña and its former director for having participated in the bribery related to the IIRSA South and Lima Metro concessions.  On June 6, 2017, the Peruvian prosecutor's request was denied as premature, with leave to renew after it completed its investigation and corroborated Barata's accusations.

115.    And so the investigation continued.  By November 2017, the prosecution obtained sufficient critical evidence corroborating Barata's claim that Graña and its senior management were

- 25 -

involved in the bribery. That evidence consisted of testimony by none other than Marcelo Odebrecht, the former CEO of Graña's partner in the IIRSA projects. According to a November 24, 2017 article entitled "*Odebrecht Cae Sobre GyM*", or "Odebrecht Falls on GyM," *Hildebrandt* reported as follows:

> "The Prince" [Marcelo Odebrecht] corroborated to the group of Peruvian prosecutors that ***Graña y Montero was fully aware of the payment of bribes and that it participated in this corrupt scheme that helped them to earn millions of dollars.*** Odebrecht guaranteed that it used to visit the offices of Graña y Montero in Peru at least twice a year and stated that it was received personally by José Graña Miró Quesada, former president of the board of GyM and important shareholder of the daily paper "El Comercio."
>
> ***The former CEO of the Brazilian builder said that there was a 30-year relationship between both groups, and that the role of Graña y Montero in materializing the business in Peru was vital.***[9]

116.    Armed with this evidence and more, the prosecution sought the pretrial investigative detention of three current and former Graña executives, including Defendant Graña Miro Quesada (former Chairman), Defendant Graña Acuna (former Director) and Gonzalo Ferraro Rey (former corporate manager of business development), so it could complete its investigation and prepare formal criminal charges.

117.    On Monday, December 4, 2017, Judge Richard Concepcion Carhuancho determined that the prosecution had established a *prima facie* case of money laundering and collusion with a public official by Graña Miro Quesada, Graña Acuna, and Mr. Gonzalo Ferraro Rey, and granted the Prosecutor's request. He then directed that Defendants Graña Miro Quesada and Graña Acuna be immediately placed in preventative detention for an 18-month period. Ferraro Rey, who was ill, was placed under immediate house arrest for a similar 18-month period. According to *Reuters*, "[t]he

---

[9]    A certified translation of *Odebrecht cae sobre GyM* is annexed hereto as Exhibit 2.

decision marked the first time executives from major Perúvian companies [had] been jailed in the 'Car Wash' scandal."

118.    Graña acknowledged Judge Concepcion's decision in a Form 6-K filed with the SEC on December 6, 2017.  The Company nevertheless took the position that Judge Concepcion's decision was "not a decision of substance" and did not "suppose confirmation of an act, crime, occurrence, or premise of any kind," and determined not to take any action against its former board members.

119.    On February 23, 2018, Judge Conception released an opinion (hereinafter, "Resolution No. 2") detailing his findings that Defendant Graña Acuna had likely participated in the bribery, and explaining that the evidence obtained thus far, combined with an analysis of pertinent risk factors, justified the pretrial investigative detention of Defendant Graña Acuna.  In Resolution No. 2, Judge Concepcion rejected the claim that the phrase "additional risks," which was used in Graña 's written agreements with Odebrecht, referred to any legitimate payment in the construction industry, and concluded that the phrase "additional risks" was a "legal dressing to cover the reimbursement of a bribe" and was "used to justify the payment of covert bribes."[10]

120.    That same day, February 23, 2018, Judge Concepcion released a separate opinion (hereinafter, "Resolution No. 4") detailing his finding that Defendant Graña Miro Quesada had likely participated in the bribery, and explaining that the evidence obtained thus far, combined with an analysis of pertinent risk factors, justified the pretrial investigative detention of Defendant Jorge

---

[10]    A certified translation of Resolution No. 2 is annexed hereto as Exhibit 3.

Graña Miro Quesada.  In Resolution No. 4, Judge Concepcion also concluded that the term "additional risks" was a euphemism for bribery.[11]

### C.  Graña is Formally Charged in Connection with the IIRSA Bribes

121.    On December 26, 2017, the Perúvian Public Ministry announced on Twitter that it had requested, in the context of a preparatory framework, to investigate Graña as a legal entity involved in the crimes of aggravated collusion and asset laundering regarding the IIRSA South Project.

122.    The next day, December 27, 2017, Graña announced in a Form 6-K filed with the SEC that it "received a request from the Adhoc Attorney's Office to include the company in the investigation as a civilly responsible third party within the framework of the process followed by the Public Prosecutor's Office for the Interoceanic Project Section 2 and Section 3."

123.    On January 30, 2018, Graña announced in a Form 6-K filed with the SEC that it was summoned to a hearing before Judge Concepcion to determine whether it or any of its subsidiaries should be included as "investigated subjects" in the far-reaching bribery probe.

124.    On February 19, 2018, Graña announced in a Form 6-K filed with the SEC that the Adhoc Procurator's Office of the First National Preparatory Investigation had moved to include its subsidiary GyM S.A. as a civilly responsible third party for the illicit payment made in connection with the tender for the Lima Metro project.

125.    On March 6, 2018,  Graña announced in a Form 6-K filed with the SEC that the Perúvian First National Investigation Court had adopted a resolution adding Graña and three other companies as defendants in the criminal investigation into the IIRSA South tender process.

---

[11]    Resolution No. 4 was vacated in an April 2018 opinion by the First Criminal Appeals Chamber (*La Sala Nacionale de Apelaciones*) based on a procedural finding that the lower court applied the incorrect standard in ruling on the motion for pretrial investigative detention.

126.     In sum: criminal charges have been brought against: (i) Defendant Graña Miro Quesada; (ii) Defendant Graña Acuna; (iii) Defendant Graña y Montero S.A.A.; and (iv) GyM S.A. in connection with the bribes for the IIRSA South project.  The Peruvian government has also moved to hold Graña civilly liable in connection with the same project.  It has separately moved to hold GyM S.A. civilly liable in connection with the Lima Metro project.

### D.  Graña's Self-Serving Internal Investigation is Rejected by the Peruvian Court

127.     On January 9, 2017, Graña retained the law firm Simpson, Thacher & Bartlett LLP to conduct an internal investigation "to determine if any manager, executive or current employee, or an ex-executive, former executive or former employee, of the Company . . . had knowledge or knowingly participated in related acts of corruption with certain public projects in Peru with Odebrecht or its subsidiaries." (the "Simpson Thacher Report").  On November 2, 2017, Graña filed a Form 6-K with the SEC in which it announced that "[t]he investigation identified no evidence to conclude that any Company personnel engaged in bribery" or "was aware of or knowingly participated in any corrupt payments made in relation to the Projects."

128.     But the Simpson Thacher Report was plainly self-serving.  As Graña itself disclosed in the Form 6-K, the Simpson Thacher Report "*did not include interview of employees of Odebrecht or the consortia or a review of Odebrecht's or the consortia's internal documents or financial information.*"

129.     The self-serving nature of the Simpson Thacher Report was so transparent that Judge Concepcion, in Resolution No. 2, considered it a key factor justifying the preventative detention of Defendant Graña Acuna.  Specifically, Defendant Graña Acuna presented the Simpson Thacher Report to undermine the criminal charges against him.  After noting that the Simpson Thacher Report was inherently flawed and "made with intrinsic limitations," Judge Concepcion determined

- 29 -

that presentation of the report was designed to "mislead the court" and obstruct the investigation, stating, in pertinent part, as follows:

### 5.5. *Conduct of having attended when summoned by the authorities:*

With regard to his procedural conduct of having attended when summoned by the authorities (Congress of the Republic, Public Prosecutor's Office and Judicial Power), they [sic: it] become insufficient to prove unfounded the procedural risk in its entirety, because of being weighed against the other criteria used as the basis and with greater weight (to constitute the procedural risk), so we have:

\*      \*      \*

**5.6. The obstruction to the gathering of evidence** materialized in the fact that the accused Hernando Alejandro Constancio Graña Acuña would have presented documents to justify the legality of the assignment of profits, that would have served to ***disguise the unlawful origin of said funds*** (reimbursement of the bribe), among them we have:

a)      He cited two concepts to justify the assignment of profits as additional risks: on the one hand, the concept of ***Leader fee*** (folio 1045 of the separate proceedings concerning the accused being remanded in custody of separate proceedings 16-2017-74), and on the other hand, the concept of ***Risks inherent to the execution of Additional and Accessory Works*** (folio 1052 of the separate proceedings concerning the accused being remanded in custody 16-2017-74), with the aim of misleading the investigation of the truth, with respect to the facts that are being investigated in the case at hand.

b)      ***He presented a report signed by Simpson, Thacher & Barlett LLP dated November 1, 2017, where it was concluded that the accused could not identify any evidence to conclude that the Company's staff considered that the payment of the leadership fees or the use of differentiated dividends was related to corruption activities (point 4c in folio 1071 of separate proceedings 16-2017-74), despite the fact that this investigation was made with intrinsic limitations, such as the fact that a significant amount of incorporation documents, contracts and other operational documents were missing or not available, which limited the ability to fully analyze the financial transactions in question during the investigation (folio 1664 of separate proceedings 16-2917-74), from which it follows that the accused would be using a favorable report to cover up the unlawful acts he is charged with (having disguised the payment of bribes through the concept of additional risks), in order to mislead the court***.

c)      In effect, said procedural conduct of the accused to invoke two different concepts to justify the assignment of profits, ***and to present a Report to generate the procedural appearance that there was no evidence of***

- 30 -

*the payment of differentiated dividends related to acts of corruption, reveals an objective circumstance of deviation from the truth concerning the facts that are being investigated against him, due to demanding that he has a positive conduct, and that, consequently, would reflect an obstruction to the gathering of evidence*, the Constitutional Court ruled in the same sense in Folio 6 of File 2748-2010-HC Alexander Mosquera Izquierdo, saying that:

> *"(…), It should be noted that the obstructionist attitude of the latter can be demonstrated in: (…), and 4) in general, all those conducts carried out in order to divert or prevent the acts leading to the formalization of the criminal complaint."*

5.7. That being the case, and evaluating all in all the procedural risk of the accused Hernando Alejandro Constancio Graña Acuña, it can be ascertained that the procedural risk of the latter still persists, *as well as his conduct of hindering the ascertainment of the truth adopted by the accused*, the severity of the sentence, the magnitude of the damage caused and his involvement with a transnational criminal organization, these having a greater weight than his personal circumstances of age, state of health and of not having a criminal record.

130. Moreover, in announcing the findings of the Simpson Thacher Report, Graña also disclosed that it ignored numerous red flags raised by Odebrecht regarding accounting irregularities. Specifically, Graña stated, in pertinent part, as follows:

5. As a minority shareholder, the Company only received summary financial statements from the Projects, and had almost no visibility into the Projects' underlying expenses, payments to suppliers or other third parties, or other cash outflows. *While the Company did on occasion ask Odebrecht to provide additional documentation or detail for such costs, Odebrecht typically would only provide general information*. Given the minority stake, asymmetrical relationship between the parties, and absence of contractual rights, *the Company had limited leverage to demand additional information.*

\* \* \*

20. The minority shareholders made efforts to get from Odebrecht a better understanding of the project's financial statements and costs. *There were periodic meetings relating to the IIRSA projects, but the minority shareholders were consistently unable to obtain detailed information on project financials and cash flows.* In discussions among minority shareholders in 2010 concerning IIRSA South Concessions, for example, *the parties voiced frustration about the persistent losses and lack of information and said that, while the minority shareholders recognized they had no voice in management, fiscal, and accounting aspects, they discussed that as a minimum courtesy, they should at least be informed about this situation.*

- 31 -

Case 2:17-cv-01105-JMA-ARL   Document 22   Filed 05/29/18   Page 37 of 117 PageID #: 528

\*        \*        \*

24.     The Company received IIRSA South unaudited financials from Odebrecht on a monthly basis and audited financials on an annual basis. ***The Company and other minority shareholders sometimes struggled to understand the financials and asked Odebrecht to clarify or explain.  Odebrecht was resistant, and the Company had limited leverage to push back.***

131.     Graña disregarded similar red flags with respect to the Lima Metro concession.  As Graña stated in the November 2, 2017 Form 6-K:

35.     ***The Company was unable to secure from Odebrecht documentation or support for its costs, expenses and risks that were the basis for the increased dividend payments to Odebrecht.***  The Company received only very summary descriptions for these costs claimed by Odebrecht.

36.     The Company received annual audited financials in certain years and unaudited monthly financials, ***but they provided only summary information.*** They did not include any detail on management costs, warranties or other costs claimed by Odebrecht as a basis for differential dividends.  The balance sheet listed the project's current and non-current assets, including line items such as "Advance to Subcontractors" and "Advance to Suppliers."  The Statement of Profits and Losses included items such as "Costs and Operating Expenses."  The monthly financials did not contain a detailed breakdown of these line items[.]

37.     Odebrecht's lack of transparency regarding its costs and expenses was not viewed by the Company as suggestive of corruption, but instead as consistent with Odebrecht's more general effort to use its power and leverage over minority shareholders to maximize profit margin for itself.

**E.  Law No. 30737: Graña is Further Penalized by Peru's New Anticorruption Law**

132.     In addition to bringing criminal charges against individuals accused of corruption, the Perúvian government responded to the *Lava Jato* scandal by issuing Legislative Decree Nos. 1341 and 1352 in January 2017, which introduced severe administrative sanctions towards companies convicted of corrupt practices and money laundering.

133.     In February 2017, the Perúvian government's executive branch issued Urgency Decree No. 003-2017 which effectively froze the assets of companies that were convicted of, or

admitted to, crimes of corruption. As Graña had neither been convicted of, nor pled guilty to, any such crime, it fell outside the scope of the Urgency Decree.

134.  On November 13, 2017, however, the Perúvian Congress passed Bill 1410/2016-CR, which amended Urgency Decree No. 003 and expanded the scope of covered entities to include any companies that had at least a five percent stake in any organization or consortium with companies that admitted or were convicted on corruption, money laundering, or similar charges. The bill also sought to ensure the immediate repayment of civil compensation in favor of the Perúvian State in cases of corruption and related crimes. The bill was passed into law on March 12, 2018 as Law No. 30737.

135.  As a company with at least a five percent stake in concessions led by Odebrecht, a company that pled guilty to a corruption and money laundering charges, Graña is now included in the scope of Law No. 30737, and is subject to all applicable sanctions and penalties. Graña admitted the same in a Form 6-K filed with the SEC on March 14, 2018.

136.  On May 10, 2018, the Peruvian government issued Supreme Decree 096-2018-EF, which implements Law No. 30737. The regulations require covered companies, such as Graña, to set up a trust with sufficient funds to cover any potential judgment. Graña estimates that it will need to deposit approximately $41 million to the trust to cover any potential liabilities.

**THE STRUCTURE OF GRAÑA'S PAYMENT FOR ITS SHARE OF THE BRIBES**

137.  To win the IIRSA South and Lima Metro concessions, Odebrecht made illegal payments totaling $29 million to Perúvian public officials ($20 million for the IIRSA South concession and $9 million for the Lima Metro concession). The minority stakeholders in the concessions were then required to reimburse Odebrecht for their proportional share of the bribe. Graña was one such stakeholder.

138.     The relative portion of each stakeholder's bribe was paid to Odebrecht through the receipt of differential dividends – in other words, increased dividends paid to Odebrecht relative to Odebrecht's equity interest in the concession, and reduced dividends paid to the minority stakeholders relative to their respective equity interests.

139.     These differential dividend payments were documented in shareholder meeting minutes and profit distribution agreements, by reference to purported "***additional risks***" that Odebrecht incurred on behalf of, and for the benefit of, the consortiums.

140.     The July 2017 edition of the Brazilian magazine *Piaui*, reported, in pertinent part, as follows:

> [T]he Brazilian giant did not pay that account alone.  According to Barata's account to the MP, the owners of the Perúvian construction companies who joined the Interoceanic consortium were informed about the agreement and at the end of each year they contributed their share in the bribe.  The value was deducted from the annual dividends and was recorded in the consortium balance sheets under the "additional risk" item assumed by Odebrecht on behalf of the other companies.  This information would serve as a basis for future lawsuits against Odebrecht's local partners, which were not initially targeted by the investigations.

141.     An article in the November 24, 2017 edition of *Hildebrandt en sus trece* entitled "*Odebrecht Cae Sobre GyM*", or "Odebrecht Falls on GyM" describes how the minority stakeholders would reimburse Odebrecht for their proportional shares of the illicit payments.  Citing the sworn testimonies of four Odebrecht executives, *Hildebrendt* reported as follows:

> A fourth and recent witness is Marcelo Odebrecht, who last Thursday the 9th declared before three Peruvian prosecutors that Graña y Montero helped Jorge Barata to establish contact with Peruvian politicians. ***The businessman guaranteed that the role of the Peruvian builder was decisive in choosing the projects in which "bribes" could be paid,*** and in suggesting the name of presidential candidates that should receive financing.

> The four collaborators all state that Odebrecht was in charge of carrying out the payment of bribes, and at the end of the year, when the balance sheets were presented, received from its partners their proportional part of the bribes.

- 34 -

The Brazilian builder left nothing to chance, and charged up to the very last cent, from the bribes properly paid to the "complementary expenses" that triangulating the transfers of cash in its long travels through offshore countries and tax havens. ***The total sums were discounted from the annual dividends of the consortiums, and entered under the heading "additional risks."***[12]

142.    A later edition of the *Hildebrandt* magazine contained an article entitled *Barata Negocia Para Hablar en Enero*, or Barata Negotiates to Talk in January, which described the "criminal pact" between the IIRSA concession entities as follows:

This weekly newspaper accessed the full report of the Special Investigation Team in the case that Lava Jato which describes in detail, how members of the "CONIRSA" consortium (Odebrecht, Graña y Montero, JJC and ICCGSA) assumed and divided among themselves the payment of bribes to former president Alejandro Toledo to win the concession of Interoceánica Sur, tramos (stretches) 2 and 3. Odebrecht transferred 20 million to Josef Maiman, the presumed figurehead of Toledo, and recovered 41,499,688.356 million soles from its three partners.

Prosecutor Castro and his team compared the initial confession of Jorge Barata, published by this magazine in February of this year, with the statements of other witnesses, internal minutes, expert reports and bank reports that record the cash movements of the consortium.

The document confirms that the company Odebrecht provided the Public Prosecutor's Office with confidential information to bury its former Peruvian partners in an effort to show that it did not bribe alone.

The prosecutor's resolution reveals that in November of 2004, after Barata met in Rio de Janeiro with the emissaries of Maiman, the Odebrecht man travelled to Lima and convened a special appointment with the group of Peruvian businessmen. "Simoes Barata communicated with José Alejandro Graña Miró Quesada, José Fernando Castillo Dibós and Fernando Camet Piccone regarding its negotiations with Alejandro Toledo Manrique to obtain the tender for project Interoceánica Sur in exchange for an unlawful payment," according to prosecutor's provision No. 19. And adds: "Barata, Miró Quesada, Castillo and Camet agreed to pay the illegal commissions to Alejandro Toledo … In such a manner that the partners assumed their portion of the payment of the bribes, a situation that materialized itself in the distribution of profits."

How was the payment scheme carried out? The company Odebrecht delivered to prosecutor Castro three minutes of the general shareholder council of the mentioned consortium. The first of them was closed on June 1 of 2011, when Odebrecht had

---

[12]    *See* Exhibit 2, *supra.*

just finished transferring the 20 million to the companies of Josef Maiman. The deposits of the businessman Israeli were made between 2006 and 2010.

In this first minutes, the partners "unanimously" agreed to divide amongst themselves the net accumulated dividend of 94,318,519.47 soles, but in a disproportionate manner so as to reimburse Odebrecht.

From that amount, GyM, JJC and ICCGSA contributed 12,517,458.14 soles to the Brazilians for "additional risks and/or larger risks," according to the resolution of the Public Prosecutor's Office.

The is repeated in a second minutes: the net profits of the consortium amounted to 20,888,249.68 soles, but the split of the dividends was not done according to the percentages of shares of the partners. The three Peruvian companies paid 3,129,947.77 soles from their profits to the Brazilians. A third minutes, closed also in 2011, record a net profit of 157,535.282 soles. From this amount, the Peruvian companies transferred 25,853,255.46 soles to Odebrecht. In total, what the Brazilian builder received from its Peruvian partners amounted to 41,499,688.35 soles, with which the total debt for the payment of the bribes to Toledo was settled. This sum in soles, converted into dollars, was converted into 15,083,805.

The Prosecutor's Office states that, from this total number, Graña y Montero were to pay an equivalent to 6,219,627.15 dollars. JJ Camet paid 5,641,151.70 dollars and ICCGSA delivered 3,223,026.39 dollars.

The profits "ceded" to the Odebrecht Group were transferred from the accounts of Banco de Crédito del Peru from the "Concesionaria Interoceánica Sur Tramo 2."

"This allows the reasonable proposal that the amounts ceded are 'compensation' linked to illegal payments made by Odebrecht," concludes prosecutor Hamilton Castro.

The Public Prosecutor states that the distribution of payments was made following this singular scheme since "the Odebrecht group had the facility of an international financial structure that would allow it to make the payment of undue advantages surreptitiously." The prosecutor's document adds: "On the other hand, there was a difficulty in the associated companies justifying the outgoing money. In this regard, the mechanism used (the ceding of profits) was an opportunity to carry out the illegal purposes."[13]

143.    Likewise, in Resolution No. 2, Judge Concepcion rejected the claim that "additional risks" referred to any legitimate payment in the construction industry, and concluded that the phrase "additional risks" was a "legal dressing to cover the reimbursement of a bribe" and was "used to

---

[13]    A certified translation of *Barata Negocia Para Hablar en Enero* is annexed hereto as Exhibit 4.

justify the payment of covert bribes."  (*See* Ex. 3).  These same legal conclusions were repeated in Resolution No. 4.

144.    As discussed herein, the consortia's records, agreements, and documents corroborate these holdings.

**A.  The Bribes for the IIRSA South Concession**

145.    To win the IIRSA South concession, Odebrecht made corrupt payments totaling $20 million to Perúvian President Alejandro Toledo.  The minority stakeholders in the project – Graña, JJC, and ICCGA – were each required to reimburse Odebrecht for their proportional share of the bribe.

146.    The relative portion of each stakeholder's bribe was paid to Odebrecht through the receipt of differential dividends – in other words, increased dividends paid to Odebrecht relative to Odebrecht's 70% equity interest in the concession, and reduced dividends paid to the minority stakeholders relative to their respective equity interests.

147.    At the IIRSA South Concession General Meeting of Shareholders on June 30, 2011, the shareholders approved the distribution of S/. 94,318,519 (approximately $34,810,303.75). Rather than being distributed in accordance with the shareholders' respective equity interests, the profits were distributed as follows:

| | |
|---|---|
| Odebrecht | 83.27% (instead of 70%) |
| Graña | 14.29% (instead of 19%) |
| JCC | 1.55% (instead of 7%) |
| ICCGSA | 0.88% (instead of 4%) |

148.    The minutes explain that Odebrecht was entitled to a higher distribution because it had assumed "***additional risks***" on behalf of the consortium:

## 2. Distribution of Profits and Approval of Dividends

The Chairman submitted to the approval of the Meeting the decision to agree on the distribution of profits to the shareholders, taking into account the profits accumulated to be distributed as recorded in the Financial Statements as of the 2010 year end approved in paragraph 1 above.

The Chair proposed that, *considering that the shareholder CONSTRUTORA NORBERTO ODEBRECHT S.A. had assumed additional risks due to the execution of the Construction Works charged to the Company and considering that its role had been decisive in obtaining the profits, assuming even additional risks, it was appropriate that it receives a greater percentage of the profits to be distributed*. Additionally, the risks assumed by ODEBRECHT PARTICIPAÇÕES E INVESTIMENTOS S.A. Therefore, it was unanimously agreed that the latter was to receive [a fee] according to the percentage of its share.[14]

149. In total, the three minority stakeholders paid Odebrecht approximately S/. 12,517,548.14 (approximately $4,619,873.83).

150. The board minutes were signed by Antonio Carlos Nostre Junior on behalf of Graña.

151. In total, Graña paid approximately $7 million for its share of the Odebrecht bribes that won them the IIRSA South project.

## B. The Bribes for the Lima Metro

152. To win the Lima Metro concession, Odebrecht made corrupt payments of approximately $9 million to former Perúvian President Alan Garcia. Graña—the sole minority stakeholder in the project, was required to reimburse Odebrecht for its proportional share of the bribe.

153. The relative portion of each of Graña's bribe was paid to Odebrecht through the receipt of differential dividends – in other words, increased dividends paid to Odebrecht relative to Odebrecht's 67% equity interest in the concession, and reduced dividends paid to Graña relative to its 33% equity interest.

---

[14] A certified copy of the minutes of the IIRSA South, Section 2 General Shareholders' Meeting, along with the original version, is annexed hereto as Exhibit 5.

154.    There were a total of eight profit distribution agreements for the Lima Metro project. Four of those agreement provide for allocations equal to the parties' equity interests.  The other four provide for a reduced distribution percentage for Graña.  Three of the four differential dividend agreements include "additional risks" language.

### (i)  The February 29, 2012 Profit Distribution Agreement

155.    On February 29, 2012, the parties entered into an agreement entitled "Agreement for the Distribution of Results of the Electric Train Consortium" (the "February 29, 2012 Profit Distribution Agreement"), formalizing the distributions for profits for the Lima Metro consortium as of December 31, 2011.[15]

156.    The consortium realized net profits of   S/. 128,317,005 (approximately $47,761,858.99), and approved the partial distribution of S/. 97,381,813.30 (approximately $36,247,231.93) which was distributed as follows:

Odebrecht        S/. 68,654,178.37 (approximately $25,554,298.51)

Graña            S/. 28,727,634, (approximately $10,692,933.07)

157.    The February 29, 2012 Profit Distribution Agreement justified the distribution of differential dividends based on Odebrecht's assumption of "***additional risks***":

> The Consortium Members, having analyzed the profit and loss account obtained by the Consortium based on the Financial Statements approved by the Administrative Technical Committee (CTA, Comité Técnico Administrativo), which in turn approved the Profit or Loss Sharing, by means of the minutes dated February 29, 2012, agree as follows:
>
> > i.      The Consortium Members recognize that, as of December 31, 2011, the cumulative profit of the Electric Train Consortium amount to S/. 128,317,540.66 (One Hundred and Twenty-Eight Million Three Hundred and Seventeen Thousand Five Hundred and Forty-Six, and 66/100 Nuevos Soles).

---

[15]    A certified translation of the February 29, 2012 profit distribution agreement, along with the original version, is annexed hereto as Exhibit 6.

> ii.       *Additionally, the Parties recognize that Constructora Norberto Odebrecht S.A. Sucursal del Perú has assumed additional risks to those it would be responsible for due to its participation in the Consortium, in the execution of the Construction Works entrusted to the Consortium*.

> ii.       *In this sense, considering that the role of Constructora Norberto Odebrecht S.A. Sucursal del Perú has been instrumental in obtaining the profit of the Consortium, assuming even additional risks, it is appropriate that it receives a higher percentage than its share of the profits of the Consortium as of December 31, 2011.*

158.       The February 29, 2012 Profit Distribution Agreement was signed on behalf of Graña by Juan Manuel Lambarri Hierro and Defendant Graña Acuna.

### (ii) The May 4, 2015 Liquidation Agreement

159.       On May 4, 2015, the parties entered into an agreement entitled "Agreement for the Distribution and Liquidation of Results of the Electric Train Consortium" (the "Liquidation Agreement"), which formalized the final liquidation of the Lima Metro concession.[16]

160.       The consortium approved the final distribution of S/. 39,018,326 (approximately $12,197,419.74) as of April 30, 2015, which was distributed as follows:

Odebrecht       S/. 35,104,103 (approximately $10,973,804.43)

Graña       S/. 3,914,326 (approximately $1,914,647)

161.       The Liquidation Agreement justified the distribution of differential dividends based on Odebrecht's assumption of "*additional risks*":

### <u>CLAUSE THREE.-</u> DISTRIBUTION OF PROFITS

The Consortium Members, having analyzed the profit and loss account obtained by the Consortium based on the Financial Statements approved by the Administrative Technical Committee (CTA, Comité Técnico Administrativo), which in turn approved the Profit or Loss Sharing, by means of the minutes dated May 04, 2015, agree as follows:

---

[16]       A certified translation of the May 4, 2015 Liquidation Agreement, along with the original version, is annexed hereto as Exhibit 7.

> i. Approving the distribution of the final profit of the Electric Train Consortium, amounting to S/. 39,018,326.56 (Thirty-Nine Million Eighteen Thousand Three Hundred and Twenty-Six and 56/100 nuevos soles).
>
> ii. ***Additionally, the Parties recognize that [Construstructora Norberto Odebrecht S.A. Sucursal del Perú] has assumed additional risks to those it would be responsible for due to its participation in the Consortium, in the execution of the Construction Works entrusted to the Consortium.***
>
> iii. ***In this sense, considering that the role of [Construstructora Norberto Odebrecht S.A. Sucursal del Perú] has been instrumental in obtaining the profit of the Consortium, assuming even additional risks, it is appropriate that it receives a higher percentage than its share of the profits of the Consortium as of April 30, 2015***, profit that amounts to S/. 35,104,013.53 (Thirty-Five Million One Hundred and Four Thousand and Thirteen and 53/100 Nuevos Soles).

162. The Liquidation Agreement was signed on behalf of Graña by Juan Manuel Lambarri Hierro and Defendant Graña Acuna.

163. In total, Graña's share of the bribe for the Lima Metro concession was approximately $9 million.

## ETHICS CHARTER, CODE OF CONDUCT, AND ANTI-CORRUPTION POLICY

164. Graña has three separate written policies that prohibit bribery: the Ethics Charter, the Code of Conduct, and the Anti-Corruption Policy.

### A. Ethics Charter (1995)

165. Graña originally adopted its Ethics Charter in 1995. It reaffirmed the Ethics Charter in 2008, on the 75th anniversary of Graña's founding.

166. The Ethics Charter purports to set the performance guidelines for the company within the framework of the Company's value system:

> As we celebrate 75 years since the founding of Graña y Montero, we wish to reaffirm the commitment of all of the companies in the Group to our 1995 Ethics Charter.
>
> We believe that we have achieved 75 years of prestige as a result of our strict respect for our values of Quality, Compliance, Seriousness and Efficiency, as summarized in the main concepts of this charter.

These values are the foundation of our culture and must guide the conduct of each and every one of the companies that make up Graña y Montero. We are aware that the best way to transmit these values is through personal example and that in the actions of each of us, the image, prestige and seriousness of our organization is in play.

The leadership achieved by the Group in the past few years gives us more visibility, requiring us to focus on maintaining the integrity of the image that we have worked so hard to achieve and on taking on this new responsibility of corporate leadership for our country.

Every member of the Group's personnel must assume individual responsibility for complying with the values and standards defined in this document, committing to make these rules known and observed at all levels of the organization, and collaborating by setting an example both within and outside the company.

167.    According to the "Business Practices" section of the Ethics Charter, Graña is committed to "transparency and honesty" and prohibits all forms of bribery:

The Group upholds both the laws and transparency and honesty in its business practices.  Every agreement must be formalized in a written document and accounting documents must strictly reflect services as actually performed.

***The Group rejects any possibility of making payments in cash or in kind to obtain contracts or benefits that would otherwise not be theirs by moral right.***

Likewise, employees may not accept payments in cash or in kind in order to grant contracts or requests to suppliers, subcontractors or service companies.

The Group is committed to becoming the industry leader in pursuing its business activities according to ethical values.

168.    The Ethics Charter has been posted on Graña's website since its IPO and throughout the entire Class Period.

### B.  Code of Conduct (2012)

169.    In 2012, Graña adopted a Code of Conduct "to complement and explain[] the Ethics Charter."  With respect to the "Business Practices" section of the Ethics Charter, the Code of Conduct provides the following elaboration:

***Graña y Montero complies with the Constitution and applicable laws of the countries in which we operate.*** Likewise, the Company strives for doing business in good faith, the morals and good customs.

- 42 -

To that end, collaborators of the Graña y Montero Group must take into account the following:

1.    Relationship with Suppliers

Only suppliers that fulfill the standards of safety, quality, service and fair price shall be hired, to allow us to maintain the values of the Graña y Montero Group and good relationships with our Clients. Also, unnecessary comments on the proposals submitted by our suppliers must be avoided.

2.    Bribes

All the collaborators of Graña y Montero are prohibited to offer bribes, payments and in general, facilitation payments of any kind to public officers, their relatives or representatives, clients and/or suppliers to obtain benefits to which they are not entitled by moral right.

Each collaborator of Graña y Montero shall avoid getting involved in any kind of acts of corruption at any level. Any collaborator of the Group that becomes aware or suspect of an inappropriate conduct shall report such misconduct to his/her Boss or the Human Management Manager of the Company in which such collaborator works.

3.    Competition

The Graña y Montero Group must, at any time, avoid practices related to unfair competition; therefore, their contractual relationships must always be based on good faith and reliability.

4.    Transparency in business operations

The Graña y Montero Group encourages the transparency and compliance of accounting, financial and legal standards. Therefore, the Group shall demand transparency in the recording of business operations, in such a way that every record is made to reflect the actual operation.

Similarly, every business activity of the companies of the Graña y Montero Group must be reflected in the Financial Statements, the Annual Report, the Market Reports and in general, any information provided by any of the companies to external third parties.

Every collaborator has the obligation to behave transparently in their acts and work, avoiding misrepresentations and concealed information.

170.    The Code of Conduct has been posted on Graña's website since its IPO and throughout the entire Class Period.

- 43 -

### C. Anti-Corruption Policy (2015)

171.    On October 29, 2015, the Board of Directors of Graña y Montero, which included the

Director Defendants, approved the adoption of an Anti-Corruption Compliance Program, designed to

"sensitize, prevent, and provide the guidelines to avoid, any act of corruption in our business and

relationships with the government," which stated, in pertinent part, as follows:

> Our corporate values, our Ethics Charter (1995), Code of Conduct (2012) and Asset
> Laundering and Financing of Terrorism Prevention Manual (2010) emphatically
> reject any form of bribery or corruption.  Additionally, we set forth this policy to
> sensitize, prevent, and provide the guidelines required to avoid, any act of corruption
> in our business and relationships with the government.

172.    The Anti-Corruption Policy broadly defines "public officials" to include:

> [A]ny person who holds a position in any governmental entity, whether an officer, an
> elected official, full- or part-time employee or representative.  This concept also
> comprises political parties, political advocates or candidates, international
> organization employees and members of the armed forces.

173.    In addition, the Anti-Corruption Policy broadly applies to the following individuals

and entities:

> The Anti-Corruption Policy applies to all companies of that make up the Group, their
> directors, managers and collaborators, regardless of their nationality, contractual
> status or place of residence. It also extends to suppliers, contractors, agents and third
> parties who may represent us or act on our behalf.  Furthermore, this Anti-Corruption
> Policy applies to all companies or consortia controlled by any company of the Group.
> In companies not controlled by them, the companies of the Graña y Montero Group
> shall deliver this policy to the controlling shareholder and/or the general
> management, making recommendations in this connection.

174.    The Anti-Corruption Policy requires the Compliance Officer, the Internal Audit

Committee, and the Audit and Process Committee to ensure compliance with its anti-corruption

provisions, and to report directly to the Board of Directors on compliance matters.

175.    With respect to bribery, the Anti-Corruption Policy sets forth the following

"Guidelines and Principles" to be followed:

Making payments, promises to pay or rewards –whether direct or indirectly, in cash or in kind– to public officials or their family members, for purposes of exerting improper influence on decision making, generating or maintaining a business or securing benefits, is prohibited.  This prohibition applies to all Group collaborators, and to third parties acting on our behalf ("third-party representatives"), such as, but not limited to, customs agents, attorneys, subcontractors and document handlers.

Group collaborators are responsible for ensuring that the "third-party representatives" with whom they relate comply with this policy.  For such purpose, collaborators shall enter a written agreement that formally reflects the scope of the services that such third-party representatives will perform, the compensation terms, and includes an express clause on the knowledge of and compliance with this Anti-Corruption Policy.

176.    Upon information and belief, the Anti-Corruption Policy has been continually posted on Graña's website since its adoption on October 29, 2015.

177.    In January 2016, the Company posted its 2015 Integrated Annual Report on its website, which highlighted its Anticorruption Policy, stating, in pertinent part, as follows:

Also in 2015, the Board of Directors approved the Group's Anticorruption Program, which includes the Anticorruption Policy that complements our Ethics Charter (1995) and Code of Conduct, thereby reaffirming our commitment to ethics in business.

*        *        *

In the Group, we are committed to responsible, upright, transparent conduct.  We have a management system that enables us to communicate our fundamental principles to every level of the organization, offer confidential communication channels, and have a governance structure to investigate and remedy potential breaches.  Our Ethics Charter, Code of Conduct, and Anticorruption Policy stand out among the main tools of the system.

178.    The 2015 Integrated Annual Report described the new Anticorruption Policy, stating, in pertinent part, as follows:

Our conduct is based on compliance with the laws of the countries where we operate, including Peruvian legislation on the Prevention of Asset Laundering and Financing of Terrorism (2010) and the U.S. Foreign Corrupt Practices Act (FCPA), which applies to us because our shares are listed on the New York Stock Exchange.

In 2015, we reinforced our ethics management system as a preventative measure.  Therefore, the Graña y Montero Board of Directors approved the Anticorruption

- 45 -

Compliance (FCPA) program, which establishes the leadership and commitment of senior management on this matter, defines supervisory bodies and the reporting line, establishes new policies and procedures, identifies additional internal controls, and proposes training plans for the entire organization. This program applies to all companies in the Group and any third parties that may act on our behalf.

Within the program, the Anticorruption Policy stands out. It provides the guidelines required to avoid any act of corruption in our business or in relations with the State, and reinforces the obligation to have precise accounting records and internal controls.

179.    The 2015 Integrated Annual Report also contained a certification signed by Defendant Alvarado and the Company's general accountant, attesting to the accuracy of the entire report, including the statements describing the Anticorruption Policy. The certification stated:

This document contains true and sufficient information on the operations of Graña y Montero S.A.A. during the year 2015. Not with standing [sic] the responsibility of the issuer, the undersigned assume full responsibility for the contents here of in accordance with applicable laws.

180.    The annuals reports for years 2013 and 2014 contained identical certifications signed by the Company's general accountant and Defendant Alvarado.

## EFFECTIVE INTERNAL CONTROLS ARE AN INTEGRAL COMPONENT OF PUBLIC CORPORATIONS

181.    The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") is a joint initiative of five private sector organizations, established in the United States, dedicated to providing thought leadership to executive management and governance entities on critical aspects of, among other things, internal control, fraud, and financial reporting. COSO is supported by five supporting organizations, including the Institute of Management Accountants ("IMA"), the American Accounting Association ("AAA"), the American Institute of Certified Public Accountants ("AICPA"), the Institute of Internal Auditors ("IIA"), and the Financial Executives International ("FEI").

182.     As described below, Graña's independent auditors audited Graña's management's assessment of internal control over financial reporting based on the COSO Internal Control Framework (defined below).

183.     According to COSO, the "tone at the top," or the corporate culture established by an entity's board of directors and senior management within which financial reporting occurs, is of "***overriding importance***[17] in preventing fraudulent financial reporting" and is "***the most important factor*** contributing to the integrity of the financial reporting process."

184.     COSO has developed a model for evaluating internal control (the "COSO Internal Control Framework").  This model has been adopted as the generally accepted framework for internal control and is widely recognized as the definitive standard against which organizations measure the effectiveness of their systems of internal control.

185.     The COSO Internal Control Framework is designed to provide an effective framework for public companies to use to analyze the internal control systems implemented in these organizations.  The five components of the COSO Internal Control Framework are as follows:

(a)     Control environment: (i) the organization demonstrates a commitment to integrity and ethical values; (ii) the board of directors demonstrates independence from management and exercises oversight of the development and performance of internal control; (iii) management establishes, with board oversight, structures, reporting lines, and appropriate authorities and responsibilities in the pursuit of objectives; (iv) the organization demonstrates a commitment to attract, develop and retain competent individuals in alignment with objectives; and (v) the organization holds individuals accountable for their internal control responsibilities in the pursuit of objectives.

---

[17]     All emphasis is added unless stated otherwise.

(b)    <u>Risk assessment</u>: (i) the organization specifies objectives with sufficient clarity to enable the identification and assessment of risks relating to objectives; (ii) the organization identifies risks to the achievement of its objectives across the entity and analyzes risks as a basis for determining how the risks should be managed; (iii) the organization considers the potential for fraud in assessing risks to the achievement of objectives; and (iv) the organization identifies and assesses changes that could significantly impact the system of internal control.

(c)    <u>Control activities</u>: (i) the organization selects and develops control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels; (ii) the organization selects and develops general control activities over technology to support the achievement of objectives; and (iii) the organization deploys control activities through policies that establish what is expected and procedures that put policies into action.

(d)    <u>Information and communication</u>: (i) the organization obtains or generates and uses relevant, quality information to support the functioning of other components of internal control; (ii) the organization internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control; and (iii) the organization communicates with external parties regarding matters affecting the functioning of other components of internal control.

(e)    <u>Monitoring</u>: (i) the organization selects, develops and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning; and (ii) the organization evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate.

186. According to COSO, in an effective internal control system, all five components of the COSO Internal Control Framework work to support the achievement of an entity's mission, strategies and related business objectives.

## GRAÑA ADMITS THAT IT CREATED A CULTURE OF FRAUD

187. As a direct result of the alleged bribery scheme, Graña failed to timely file its 2016 Form 20-F. On May 17, 2017, Graña issued a press release explaining that "[t]he company is currently in the process of evaluating its financial presentation to be included in the [2016] 20-F," and that "the company is carrying out additional procedures in connection with the finalization of its consolidated financial statements." On November 17, 2017, Graña filed a Form 6-K stating that the New York Stock Exchange had decided to grant the Company an extension to file the 2016 Form 20-F through May 16, 2018, which extension was subject to reassessment on an ongoing basis.

188. On April 17, 2018, Graña filed a Form 6-K stating that the 2016 Form 20-F was delayed because its prior auditors, a member of the Price Waterhouse Coopers International Limited ("PwC") network, would not authorize the use of the previously issued audit opinions for the year 2015 without conducting substantial additional procedures. According to the filing, the Company was seeking Board approval to appoint the auditing firm Moore Stephens Peru ("Moore Stephens") to audit the 2015 financial statements and complete "substantial additional procedures" before reissuing an audit opinion on the 2015 financial statements.

189. In the same filing, Graña announced for the first time that, as a result of the aforementioned additional auditing procedures, "the previously issued consolidated financial statements of the Company for the 2015 fiscal year (and the related audit opinion of PwC) should no longer be relied upon."

190. The Company also announced that PwC was in the process of performing additional procedures for the authorization of the use of its audit opinion related to Graña's 2014 financial

statements.  Each of these tasks were required to be completed before Graña could file its 2016 Form

20-F.  The Company stated that it expected to complete these tasks and file its 2016 Form 20-F by

May 15, 2018.

191.    Graña filed its 2016 Form 20-F on May 16, 2018.

192.    In the 2016 Form 20-F, Graña  explained how it used the COSO criteria to assess its

internal controls over financial reporting:

> Management is responsible for establishing and maintaining adequate internal
> control over financial reporting for our company as such term is defined by
> Exchange Act rules 13(a)-15(f) and 15(d)-15(f).  In order to evaluate the
> effectiveness of internal control over financial reporting, as required by Section 404
> of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), management has
> conducted an assessment, including testing, using the criteria in Internal Control-
> Integrated Framework (2013), issued by the Committee of Sponsoring Organizations
> of the Treadway Commission (COSO).  Our company's system of internal control
> over financial reporting is designed to provide reasonable assurance regarding the
> reliability of financial reporting and the preparation of financial statements for
> external purposes in accordance with generally accepted accounting principles.
> Because of its inherent limitations, internal control over financial reporting may not
> prevent or detect misstatements.  Also, projections of any evaluation of effectiveness
> to future periods are subject to the risk that controls may become inadequate because
> of changes in conditions, or that the degree of compliance with the policies or
> procedures may deteriorate.

193.    The 2016 Form 20-F then disclosed that Graña failed to satisfy four of the five criteria

set forth by COSO for measuring internal control, and stated that the Company had identified

material weaknesses in the following areas: (i) control environment; (ii) risk assessment;

(iii) information and communication; and (iv) monitoring and evidential matter.

194.    With respect to material weaknesses in the control environment, the 2016 Form 20-F

stated, in pertinent part, as follows:

> The control environment, which is the responsibility of senior management, helps set
> the tone of the organization, influence the control consciousness of its officers and
> employees, and is an important component affecting how the organization performs
> risk management, financial analysis, accounting and financial reporting.  A proper
> organizational tone can be promoted through a variety of means, such as policies and
> codes of ethics, a commitment to hiring competent employees, the manner and

content of oral and written communications, and structures that promote and reward openness, strong internal controls, effective governance, risk management, compliance, and ethical behavior.

As of December 31, 2016, we did not maintain an effective control environment primarily attributable to the following identified material weakness:

***Our assessment found that an inconsistent and ineffective tone at the top was present, under then-existing senior management, that was not effective to ensure adherence to IFRS and our accounting policies and procedures.*** This resulted in an environment which in some instances may have led to incorrect accounting decisions and the failure to disclose information that may be necessary for an effective review of transactions and accounting entries to the appropriate finance and accounting personnel, our Board, our Audit and Process Committee, and/or independent registered public accounting firm. ***In addition, we identified an inadequate oversight by the Audit Committee regarding the role of the Internal Audit Department. The Control environment was not always sufficient to ensure that adequate enterprise risk management (including fraud risk) and monitoring mechanisms were in place to secure that our internal control over financial reporting operated effectively, including that the relevant risk/control activities were carried out properly and that corrective actions were taken on a priority basis and in timely manner.***

195.    Thus, Graña admitted that the single most important factor contributing to the integrity of its financial reporting, the tone at the top, was "inconsistent and ineffective" during the Class Period.

196.    On May 17, 2018, the NYSE suspended the trading of Graña ADS's because Graña failed to timely file its 2017 consolidated financial statements.  Graña's common stock was delisted from the Lima Stock Exchange the next day.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

197.    Defendants' fraudulent scheme and false and misleading statements and omissions operated as a fraud or deceit on purchasers of Graña ADSs, as Defendants: (i) deceived the investing public regarding Graña's financial position, operations, and compliance with the law; (ii) artificially inflated the price of Graña ADSs; and (iii) caused Plaintiffs and other members of the Class (as defined herein) to purchase Graña ADSs at artificially inflated prices.

### A. Fiscal Year 2013 False and Misleading Statements and Omissions

#### (i) The Registration Statement and Prospectus

198.　On June 4, 2013, Graña filed with the SEC a registration statement on Form F-1 for the IPO, which, after several amendments, was declared effective on July 23, 2013 (the Form F-1, together with all amendments, is referred to herein as the "Registration Statement"). The Registration Statement was signed by the Officer Defendants and the Director Defendants, among others.

199.　The next day, Graña filed a prospectus for the IPO on Form 424B4 which incorporated and formed part of the Registration Statement (the "Prospectus"). Together, the Registration Statement and Prospectus were used to sell to the investing public approximately 19,534,774 Graña ADSs, as well as an additional 2,960,233 ADSs to the underwriters, representing a total of 112,325,585 Graña common shares, at $21.13 per share.

200.　The Prospectus included consolidated financial statements for years ended December 31, 2010, 2011, and 2012. For fiscal year ended December 31, 2010, the Company reported net income of S/. 252,082,000 (approximately $97,644,650). For fiscal year ended December 31, 2011, the Company reported net income of S/. 289,076,000 (approximately $111,655,465.43). For fiscal year ended December 31, 2012, the Company reported net income of S/. 289,954,000 (approximately $111,994,592.51).

201.　The Prospectus also included unaudited consolidated financial statements for the first quarter of 2013, for which the Company reported net income of approximately S/. 64,300,00 (approximately $24,922,480.62).

202.　According to the Prospectus, the "consolidated financial statements included in this prospectus have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB")."

203. The Prospectus touted Graña's commitment to its "core corporate values" and "high[] corporate governance standards":

> With 80 years of operations, we have a long track record of successfully completing the engineering and construction of many of Perú's landmark private- and public-sector infrastructure projects, such as the Lima International Airport and the Perú LNG gas liquefaction plane, and we believe we have earned a reputation for operational excellence in our markets. We have developed a highly-experienced management team, a talented pool of more than 3,500 engineers, and a skilled work force that share our *core corporate values of quality, professionalism, reliability, and efficiency*. *As a company listed on the Lima Stock Exchange since 1997, we also abide by the highest corporate governance standards for listed companies in Perú.*

204. The Prospectus also highlighted specific achievements relating to Graña's corporate governance standards:

> We have been listed on the Lima Stock Exchange since 1997. *We abide by the highest corporate governance standards in Perú*, and we are one of only 17 companies in Latin America, and one of only three in Perú, that form part of the Company's Circle, which recognizes companies for their high corporate governance standards and is sponsored by the International Finance Corporation (IFC), the Organization for Economic Cooperation and Development (OECD) and the Global Corporate Governance Forum. In addition, *we have developed a strong corporate culture based on principles of high-quality, professionalism, reliability and efficiency*.

205. Likewise, the Prospectus declared that Graña's commitment to its corporate values was a "key strateg[y]" to its "vision" of becoming "the most reliable engineering services company in Latin America":

> *We will continue to instill our core corporate values throughout our organization,* while also transmitting these values to surrounding communities. We will continue to attract and develop our human capital through various training, mentorship and reward programs in order to maintain our position as the best company in Perú to learn and work in the engineering and construction field. We also seek to promote social welfare by fostering relationships with the communities that surround our areas of operation. In 2012, the Inter-American Federation of the Construction Industry recognized us for our corporate strategy and promotion of citizenship with the Latin American Social Responsibility award. *We strive to promote our corporate values to strengthen our organization* and improve our performance as well as to have a positive impact on the markets where we operate.

206.    According to the Prospectus, Graña had the ability to bypass the open bidding process in certain engineering and construction projects:

> Although contracting for engineering and construction usually consists of open bidding processes, we are often able to enter into direct bilateral contract negotiation with select clients, thanks to our reputation for quality of service, which helps mitigate competitive pricing measures.

207.    According to the Prospectus, one of Graña's "principal strengths" which provided it "significant competitive advantage" was Graña's "robust backlog" of approximately US$4,291.3 million:

> **We have a robust backlog which amounted to US$4,165.9 million as of December 31, 2012**, 67.0% higher than as of December 31, 2011, **and US$4,291.3 million as of March 31, 2013**, 3.0% higher than as of December 31, 2012.  **We believe that our backlog**, which as of December 31, 2012 represented approximately 2.2x our related 2012 revenues, **provides visibility as to our potential for growth in the coming years, although backlog may not always be an accurate indicator of future revenues**.

208.    The Prospectus emphasized that its "core corporate values" represented a key strength:

> **Highly experienced management, talented engineers, and skilled workforce, with shared core corporate values**.
>
> We have been listed on the Lima Stock Exchange since 1997.  **We abide by the highest corporate governance standards in Perú**, and we are one of only 17 companies in Latin America, and one of only three in Perú, that form part of the Company's Circle, which recognizes companies for their high corporate governance standards and is sponsored by the International Finance Corporation (IFC), the Organization for Economic Co-operation and Development (OECD) and the Global Corporate Governance Forum.  **In addition, we have developed a strong corporate culture based on principles of high-quality, professionalism, reliability and efficiency.**  We employ rigorous safety standards and procedures and emphasize environmental sustainability and social responsibility.

209.    This "vision" was repeated throughout the Prospectus:

> **We will continue to instill our core corporate values throughout our organization, while also transmitting these values to surrounding communities**.  We will continue to attract and develop our human capital through various training, mentorship and reward programs in order to maintain our position as the best company in Perú to

- 54 -

learn and work in the engineering and construction field.  We also seek to promote social welfare by fostering relationships with the communities that surround our areas of operation.  *We strive to promote our corporate values to strengthen our organization* and improve our performance as well as to have a positive impact on the markets where we operate.

210.    In the "Overview" of the "Business" section, the Prospectus stated:

We have developed a highly-experienced management team, a talented pool of more than 3,500 engineers and a skilled work force that share *our core corporate values* of quality, professionalism, reliability, and efficiency.  *As a company listed on the Lima Stock Exchange since 1997, we also abide by the highest corporate governance standards in Perú*.

211.    Similarly, the section entitled "Employees" stated that Graña adopted a "Code of Conduct and Charter of Ethics" to regulate the conduct of its employees:

*We place significant emphasis on instilling our core corporate values of quality, professionalism, reliability, and efficiency and on promoting safety, environmental sustainability and social responsibility throughout the entire organization.  Our Code of Conduct and Charter of Ethics regulate the conduct of our employees while promoting the foregoing values.*  In addition, our employees participate in ethics seminars on a periodic basis.

212.    The Prospectus stated that the Company had experienced "rapid growth . . . in recent years" and that the Company's "strategy [was] to continue our growth operations," but stated that certain factors such as "increased competition" may adversely affect its upward trajectory.

213.    Another Risk Factor noted in the Prospectus was the "significant competition in each of [Graña's] markets":

*We face significant competition in each of our markets.*

Each of the markets in which we operate is competitive.  *We compete on the basis of, among other factors, price, performance, product and service quality, skill and execution capability, client relations, reputation and brand, and health, safety and environmental record.*  We face significant competition from both local and international players.  Some of these competitors may have greater resources than us or specialized expertise in certain sectors. In addition, *a portion of our business is derived from open bidding processes which can be highly competitive*.  Certain of our markets are highly fragmented with a large number of companies competing for market share. Our competitors may be more inclined to take greater or unusual risks or accept terms and conditions in a contract that we might not deem acceptable.

- 55 -

Moreover, we cannot assure you that we will not face new competition from industry players entering or expanding their operations in our markets. If we are unable to compete effectively, our ability to continue to grow our business or maintain our market share would be affected.

214.    Yet another "Risk Factor" was that Graña's "backlog and [its] ratio of historical

backlog to revenues may not be a reliable indicator of future revenues or profit":

Our backlog amount is subject to revision over time and *our ability to realize revenues from our backlog is subject to a number of uncertainties*. Cancellations, scope adjustments or deferrals may occur, from time to time, with respect to contracts reflected in our backlog and could reduce the amount of our backlog and the revenue and profits that we actually earn . . . .

Our backlog may not grow at recent historic rates and may decline. *We cannot assure you that we will be able to continue obtaining sufficient contracts in the future in number and magnitude to continue to grow our backlog*. Additionally, the amount of new contracts signed can fluctuate significantly from period to period due to factors that are beyond our control.

*The ratio of our historical backlog to revenues earned in subsequent years is volatile and substantially affected by a number of factors, some of which are outside our control*, including levels of contract scope adjustments and our ability to enter into new contracts (which are substantially influenced by general economic conditions), delays and cancellations, foreign exchange rate movements, and our ability to increase the scale of our operations to expand the amount of work we carry out beyond that previously contracted. Accordingly, historical correlations between backlog and revenues may not recur in future periods.

215.    In the Prospectus, Graña also disclosed that its "[d]ebarment from participating in

government bidding processes would have a material adverse effect on our business and financial

performance":

*We would face debarment from participating in government bidding processes for one to three years if we were found to have violated certain provisions of the Perúvian State Contracting Law* (Ley de Contrataciones del Estado). We are required to comply with a large number of contractual obligations with the government in our business, and we cannot assure you that we will be in full compliance at all times. Moreover, such a debarment would affect the ability of our entire company (including any of our subsidiaries), and not just the line of business where the alleged violation took place, to participate in government bids under the Perúvian State Contracting Law . . . *A significant part of our revenues on a consolidated basis is derived from public sector contracts in Perú. As a result, if*

- 56 -

*our company is debarred from participating in government bidding processes, our business and financial performance would be materially and adversely affected*.

216.    The Prospectus warned that "[f]ailure to comply with . . . law or regulations could have a material adverse effect on our business and financial performance." Despite these concerns, the Company stated that it believed it is "in compliance with all applicable concessions, other similar contracts, laws and regulations in all material respects," stating, in pertinent part, as follows:

> *Failure to comply with, or changes in, laws or regulations could have a material adverse effect on our business and financial performance.*
>
> We operate in highly regulated industries. Our business and financial performance depends on our and our clients' ability to comply on a timely and efficient basis with extensive national, regional and municipal laws and regulations relating to, among other matters, environmental, health and safety, building and zoning, labor, tax and other matters. The cost of complying with these laws and regulations can be substantial. In addition, compliance with these laws and regulations can cause scheduling delays. Although *we believe we are in compliance with all applicable concessions, other similar contracts, laws and regulations in all material respects*, we cannot assure you we have been or will at all times be in full compliance.

217.    With respect to its internal controls, the Prospectus reported that Graña and its independent accounting firm had identified only material weakness in its internal control over financial reporting which related to the training and experience of certain of its accounting personnel. Specifically, the Prospectus stated:

> A "material weakness" is a deficiency, or combination of deficiencies, in internal controls such that there is a reasonable possibility that a material misstatement in financial statements will not be prevented or timely detected. The material weaknesses in our internal control over financial reporting that we identified related to the insufficient training and experience of certain of our accounting personnel with respect to the application of IFRS. *We are not aware of any other material weaknesses in our internal control over financial reporting.*

218.    In the Prospectus, Graña expressed confidence that it would be able to win public work contracts and concessions from the Perúvian government:

> The Perúvian government is encouraging public-private partnerships for infrastructure concessions as a way to promote the improvement of the country's infrastructure. Proinversion, a Perúvian state agency engaged in the promotion of

- 57 -

private investments in Perú which is the Perúvian State agency engaged in the promotion of business opportunities, estimated public and private investments in infrastructure in Perú of US$20 billion from 2011 through 2016. **We believe we are well-positioned to win contracts related to these concessions.**

219.    The Prospectus described the process by which Graña engages in competitive bidding, which includes "review[ing] and evaluat[ing] potential projects in order to estimate costs," performing "a detailed costs analysis using sophisticated software, "determining whether the project is viable and cost-effective," and "prepar[ing] the offer that is eventually presented" to the potential client:

> **We win new engineering and construction contracts through public bidding processes** or direct negotiation, from a variety of sources, including potential client requests, proposals from existing or former clients, opportunities sought out by our commercial team, and from requests by the Perúvian government.  More than 80% of our 2012 revenues came from private-sector projects.
>
> **The Perúvian government and its agencies typically award construction contracts through a public bidding process conducted in accordance with the Perúvian State Contracting Law (Ley de Contratacions del Estado)** . . . .
>
> We have a designated team that oversees the management of project proposals and a commercial team that **reviews and evaluates potential projects in order to estimate costs**.  In considering whether to bid for a potential project, we principally consider the following factors: competition and the probability of being awarded the project; project size; the client; our experience undertaking similar projects; and the availability of resources, including human resources.  As part of the project selection process, **our commercial team performs a detailed cost analysis** utilizing sophisticated software we developed to assist in **determining whether the project is viable and cost-effective**.  If we choose to pursue a project, **a budget leader is assigned to prepare the offer that is eventually presented to our potential client**.

220.    The Prospectus contained a section describing the regulatory framework applicable to its Engineering and Construction segment for contracts with the public sector, as well as the Peruvian government's selection process for public works projects.  That section stated, in pertinent part, as follows:

**Engineering and Construction**

**Regulatory Framework Applicable to Contracts with the Public Sector**

- 58 -

Perú's State Contracting Law, approved by Legislative Decree No. 1017 (Ley de Contrataciones del Estado) and its regulation approved by Supreme Decree No. 184-2008-EF, govern services and construction agreements entered into with public entities. Article 10 of the Supreme Decree No. 184-2008-EF establishes that, at the beginning of the contracting process, the contracting public entity must prepare a technical file describing the characteristics of the services it intends to purchase and the selection process for its counterparts, among other specifications such as a feasibility statement in accordance with the Perúvian Public Investment National System.

The selection processes are established in Articles 15, 16, 17 and 18 of Perú's State Contracting Law as follows:

- public biddings (licitación pública) applicable to goods, supplies and works;

- public tenders (concurso público) applicable to services;

- direct award (adjudicación directa) applicable to goods, services and works, which can be public or directed at select participants depending if the value is equal to or higher than 50% of the maximum amount set forth in the state budget regulation for direct award; and

- lowest amount award (adjudicación de menor cuantía) applicable to goods, services and works whose value is lower than one-tenth of the minimum limit established by the state budget regulation

With the exception set forth in Article 22 of the Supreme Decree No. 184-2008-EF, the selection processes include the following phases: notice; registration of participants; submission and reply of inquiries; submission and reply of comments; preparation of the terms and conditions of the selection process; submission of bids; evaluation and qualification of bids; and adjudication.

Article 9 of Perú's State Contracting Law establishes that participants of any of the foregoing selection processes must be registered in the Perúvian National Registry of Suppliers (Registro Nacional de Proveedores) and must not be disqualified from contracting with the state. Article 252 of the Supreme Decree No. 184-2008-EF establishes that this registration is renewable as long as a request is submitted to the Perúvian National Registry of Suppliers 60 days prior to expiration of the registry.

221. According to the Prospectus, the Company believed it was "***in compliance, in all material respects, with applicable laws and regulations***" in all of its business segments.

### (ii) 2Q13 Quarterly Results

222.    On August 9, 2013, Graña filed a Consolidated Results Report for the first semester of 2013 on a Form 6-K (the "2Q13 Results Report").  Graña reported net income of S/. 122.3 million for the quarter.

223.    That same day, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the financial results as presented in the 2Q13 Results Report.

224.    On August 10, 2013, Graña issued a press release reporting its quarterly results for the second quarter of 2013 (the "2Q13 Press Release").  The 2Q13 Press Release similarly reported a net income of S/. 122.3 million for the quarter.

225.    According to the 2Q13 Press Release, the quarterly results were prepared in accordance with IFRS.

### (iii)    3Q13 Quarterly Results

226.    On October 29, 2013, Graña issued a press release reporting its quarterly results for the third quarter of 2013 (the "3Q13 Press Release").  Graña reported net income of S/. 203.7 million for the quarter, an increase of 1.5% compared to the same period in 2012.

227.    According to the 3Q13 Press Release, the quarterly results were prepared in accordance with IFRS.

228.    That same day, Graña filed its Consolidated Results Report for 3Q13 with the SEC on a Form 6-K.

229.    The next day, October 30, 2013, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly financial results as presented in the 3Q13 Press Release and the Consolidated Results Report.

### (iv) 4Q13 Quarterly Report and Conference Call

230.    On January 31, 2014, Graña filed its Consolidated Results Report with the SEC on Form 6-K for the fourth quarter and year ended December 31, 2013 (the "FY13 Results Report"). The FY13 Results Report reported net income of S/. 319 million for the entire year.

231.    On February 2, 2013, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly results for 4Q13 and the full year results as reported in the FY13 Results Report.

### (v) Consolidated Financial Statements FY 2011, 2012, 2013

232.    On February 28, 2014, Graña filed its consolidated financial statements FY 2011, 2012, and 2013 on a Form 6-K with the SEC (the "Consolidated Financial Statements").[18]   The Company's net income for fiscal years 2011 and 2012 remained unchanged.  For fiscal year 2013, the Company reported net income of S/. 320,363,000 (approximately $114,538,076).

233.    According to the filing, "[t]he consolidated financial statements of the Company have been prepared in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board."

### (vi) 2013 Form 20-F

234.    On April 30, 2014, Graña filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2013, which was signed by the Officer Defendants (the "2013 Form 20-F").  Graña reported a net profit of S/. 319,680,000. Gross profit was S./1,004,700,00, and diluted earnings per share ("EPS") on common shares was S./0.534.

---

[18]   The Prospectus included consolidated audited financial statements for fiscal years 2010, 2011, and 2012, and _**unaudited**_ consolidated financial statements for the first quarter of 2013.  This filing now includes the _**audited**_ financials for the entire fiscal year 2013.

235.    According to the 2013 Form 20-F, the "consolidated financial statements included in this annual report have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB")."

236.    The 2013 Form 20-F described various factors that form the basis of competition:

Each of the markets in which we operate is competitive. ***We compete on the basis of, among other factors, price, performance, product and service quality, skill and execution capability, client relations, reputation and brand, and health, safety and environmental record.*** We face significant competition from both local and international players. Some of these competitors may have greater resources than us or specialized expertise in certain sectors. In addition, a portion of our business is derived from open bidding processes which can be highly competitive. Certain of our markets are highly fragmented with a large number of companies competing for market share. Our competitors may be more inclined to take greater or unusual risks or accept terms and conditions in a contract that we might not deem acceptable. Moreover, we cannot assure you that we will not face new competition from industry players entering or expanding their operations in our markets. If we are unable to compete effectively, our ability to continue to grow our business or maintain our market share would be affected. In addition, because one of the factors on which we generally compete is price, increased competition could impact our operating margins. Accordingly, our business and financial performance could be adversely affected by competition in our markets.

237.    In the section entitled "Project Selection and Bidding," the 2013 Form 20-F described the competitive bidding process by which Graña is awarded public sector projects:

***We win new engineering and construction contracts through public bidding processes*** or direct negotiation, from a variety of sources, including potential client requests, proposals from existing or former clients, opportunities sought by our commercial team and ***from requests by the Perúvian government***. More than 80% of our 2013 revenues came from private-sector projects. The Perúvian government and its agencies typically award construction contracts through a public bidding process conducted in accordance with the Perúvian State Contracting Law (Ley de Contrataciones del Estado) . . . .

238.    The 2013 Form 20-F further describes the process by which the Company engages in competitive bidding, which included "review[ing] and evaluat[ing] potential projects in order to estimate costs," performing "a detailed costs analysis using sophisticated software," "determining

- 62 -

whether the project is viable and cost-effective," and "prepar[ing] the offer that is eventually presented" to the potential client:

> We have a designated team that oversees the management of project proposals and a commercial team that *reviews and evaluates potential projects in order to estimate costs*. In considering whether to bid for a potential project, we principally consider the following factors: competition and the probability of being awarded the project; project size; the client; our experience undertaking similar projects; and the availability of resources, including human resources. As part of the project selection process, *our commercial team performs a detailed cost analysis* utilizing sophisticated software we developed to assist in *determining whether the project is viable and cost-effective*. If we choose to pursue a project, *a budget leader is assigned to prepare the offer that is eventually presented to our potential client*.

239. In the 2013 Form F-20, Graña stated that its "strategy is to continue to grow out operations," but cautioned that that "[a] major change in Perúvian government policies could affect our business." It also noted that "*[g]overnmental entities may terminate prematurely our concessions and similar contracts under various circumstances, some of which are beyond our control*."

240. The 2013 Form 20-F also contained a representation that Graña and the Officer Defendants "believe we are in compliance with all applicable concessions, other similar contracts, laws and regulations in all material aspects," stating, in pertinent part, as follows:

> We operate in highly regulated industries. Our business and financial performance depends on our and our clients' ability to comply on a timely and efficient basis with extensive national, regional and municipal laws and regulations relating to, among other matters, environmental, health and safety, building and zoning, labor, tax and other matters. The cost of complying with these laws and regulations can be substantial. In addition, compliance with these laws and regulations can cause scheduling delays. Although *we believe we are in compliance with all applicable concessions, other similar contracts, laws and regulations in all material respects*, we cannot assure you we have been or will be at all times in full compliance. Failure by us or our clients to comply with our concessions, similar contracts or these laws and regulations could result in a range of adverse consequences for our business, including subjecting us to significant fines, civil liabilities and criminal sanctions, requiring us to comply with costly restorative orders, the shutdown of operations, and revocation of permits and termination of concessions or similar contracts. In addition, we cannot assure you that future changes to existing laws and regulations, or stricter interpretation or enforcement of existing laws and regulations, will not

impair our ability to comply with such laws and regulations or increase our compliance costs. Accordingly, existing or future regulation in our markets could have a material adverse effect on our business and financial performance.

241. Graña highlighted its commitment to "corporate values of quality, professionalism, reliability, and efficiency," and reiterated its commitment to "abide by the highest corporate governance standards in Perú," stating, in pertinent part, as follows:

> With 80 years of operations, we have a long track record of successfully completing the engineering and construction of many of Perú's landmark private- and public-sector infrastructure projects, such as the Lima International Airport and the Perú LNG gas liquefaction plan, and we believe we have earned a reputation for operational excellence in our markets. *We have developed a highly-experienced management team, a talented pool of more than 3,800 engineers and a skilled work force that share our corporate values of quality, professionalism, reliability, and efficiency. As a company listed on the Lima Stock Exchange since 1997, we also abide by the highest corporate governance standards in Perú.*

242. The 2013 Form 20-F continued to tout Graña's "shared corporate values" and "high corporate governance standards," stating, in pertinent part, as follows:

> We have been listed on the Lima Stock Exchange since 1997. *We abide by the highest corporate governance standards in Perú*, and we are one of only 19 companies in Latin America, and one of only three in Perú, that form part of the Company's Circles, which recognizes companies for their *high corporate governance standards* and is responsible for the International Finance Corporation (IFC), the Organization for economic Co-operation and Development (OCED) and the Global Corporate Governance Forum. In addition, *we have developed a strong corporate culture based on the principles of high-quality, professionalism, reliability and efficiency* . . . .

243. The 2013 Form 20-F also stated that the Company had implemented a number of the corporate governance guidelines set forth in the "Principles of Good Governance for Perúvian Companies":

> The New York Stock Exchange's listing standards also require U.S. listed companies to adopt and disclose corporate governance guidelines. In July 2002, the *Perúvian Securities Commission and a committee comprised of regulatory agencies and associations prepared and published a list of suggested non-mandatory corporate governance guidelines called the "Principles of Good Governance for Perúvian Companies.*" These principles are disclosed on the Perúvian Securities Commission web page http://www.smv.gob.pe and the Lima Stock Exchange web page

http://www.bvl.com.pe. Although *we have implemented a number of these measures and have been selected to form part of the Best Corporate Governance Practices Index of the Lima Stock Exchange*, we are not required to comply with the referred corporate governance guidelines by law or regulation.

244. In addition, the 2013 Form 20-F referenced its code of ethics applicable to its directors, officers, and employees, and stated that "[d]uring the year ended December 31, 2013, no such amendment was made or waiver granted."

245. The 2013 Form 20-F discussed Graña's "key strategies to achieve" their vision of becoming "the most reliable engineering services company in Latin America." One of Graña's "key strategies" to becoming one of "the most reliable engineering services company in Latin America" was to "[c]ontinue fostering [its] core corporate values throughout the organization."

246. Also in the 2013 Form 20-F, Graña discussed its creation of an "Audit and Process Committee" responsible for maintaining adequate internal controls: "Our Audit and Process Committee oversees our corporate accounting and financial reporting process." Among other things, the Audit and Process Committee is charged with "reviewing our financial statements", "evaluating our internal controls, and procedures, and identifying deficiencies", "evaluating the company's compliance with the Board of Director's internal regulation, as well as with general principles of corporate governance," "informing our board of directors regarding any issues that arise with respect to the quality or integrity of our financial statements, [and] our compliance with legal or regulatory requirements".

247. The Company informed investors that its CEO and CFO, *i.e.*, the Officer Defendants, evaluated Graña's disclosure controls and procedures, and concluded they were effective, stating, in pertinent part, as follows:

> *As of the end of the period covered by this annual report, management, with the participation of the company's Chief Executive Officer and Chief Financial Officer, performed an evaluation of the design and operation of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the*

*Exchange Act.* Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, to allow timely decisions regarding required disclosures. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objective. ***Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2013, the design and operation of our disclosure controls and procedures were effective at a reasonable assurance level***.

248.    The 2013 Form 20-F was signed by the Officer Defendants.

249.    The statements referenced in ¶¶198-248 were materially false and misleading when they were made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants:

(a)    that the consolidated financial statements included in the Prospectus materially misstated the Company's net income based on Graña's payment of its proportional share of bribery to Odebrecht by means of differential dividend distributions;

(b)    that Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

(c)    that the unlawful practices perpetrated by Graña and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations;

(d)    that the unlawful practices perpetrated by Graña and the Director Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing contracts, risks associated with the Company's expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

(e)     that Graña's financial statements had not been prepared in accordance with IFRS;

(a)     that the unlawful practices perpetrated by Graña and the Director Defendants were reasonably likely to have a material adverse effect on the Company's future operating results;

(b)     that the competitive bidding process described in the Prospectus failed to disclose that the bidding process was undermined by the corrupt payments made to elected officials;

(c)     that Defendants failed to disclose that Graña's "rapid growth" was due, in large part, to the bribery of government leaders, and misled investors into believing that the rapid growth was wholly organic and would continue on its upward trajectory;

(d)     that Graña failed to disclose that Perúvian governmental policies were being shaped, in a material way, by the bribes that were being paid to it;

(e)     that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy; and

(f)     that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Graña's future financial prospects.

**B.  Fiscal Year 2014 False and Misleading Statements and Omissions**

**(i)  1Q2014 Quarterly Results and Conference Call**

250.     On April 30, 2014, Graña issued a press release reporting its quarterly results for the first quarter of 2014 (the "1Q14 Press Release").  Graña reported net income of S/. 71.1 MM.

251.     According to the 1Q14 Press Release, the quarterly results were prepared in accordance with IFRS.

252.     Also on April 30, 2014, Graña's 1Q14 Consolidated Results Report was filed with the SEC on Form 6-K which repeated the same quarterly results.

253.    That same day, April 30, 2014, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly financial results as presented in the 1Q14 Press Release and the Consolidated Results Report.

254.    During the conference call, an analyst asked whether Graña's decision days earlier[19] to withdraw its bid for the Lima Metro Line 2 concession was a reflection of heightened competition in the bidding process.  In response, Defendant Alvarado stated:

> *We are seeing a lot of competition the same that we have seen in the last 20 years*.  *It's [a] totally open market.*  Many companies come and go. *And we are seeing the same kind of competition.*

### (ii) 2Q14 Quarterly Results and Conference Call

255.    On July 24, 2014, Graña issued a press release reporting its quarterly results for the second quarter of 2014 (the "2Q14 Press Release").  Graña reported net income of S/. 135.1 million for the quarter.

256.    According to the 2Q14 Press Release, the quarterly results were prepared in accordance with IFRS.

257.    Also on July 24, 2014, Graña's Consolidated Results Report for the second quarter of 2014 was filed with the SEC on Form 6-K which repeated the financial results reported in the 2Q14 Press Release.

258.    The next day, July 25, 2014, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly financial results as presented in the 2Q14 Press Release and the Consolidated Results Report for the first semester of 2014.

---

[19]    On March 24, 2014, Grana announced in a Form 6-K filing with the SEC that the Consortium Metro de Lima – Linea 2 (in which Grana held a minority stake) was withdrawing its bid for the concession of the Lima Metro Line 2.  This is not the same project as the Lima Metro Line 1 concession which Grana and Odebrecht participated in.

### (iii) 3Q14 Press Release and Conference Call

259.    On October 30, 2014, Graña issued a press release reporting its quarterly results for the third quarter of 2014 (the "3Q14 Press Release").  Graña reported net income increase of 15.4%, reaching S/. 235.3 million for the quarter.

260.    According to the 3Q14 Press Release, the quarterly results were prepared in accordance with IFRS.

261.    The next day, October 31, 2014, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly results presented in the 3Q14 Press Release.

262.    On October 31, 2014, Graña filed its unaudited condensed interim financial statements with the SEC on Form 6-K.

263.    On November 3, 2014, Graña filed its complete quarterly results report with the SEC on Form 6-K.

### (iv) 4Q14 Results Report and Conference Call

264.    On January 29, 2015, Graña issued a press release reporting its consolidated results for the fourth quarter of 2014 (the "4Q14 Press Release").  The Company reported S/. 299.6 million in net income, a decrease of 6% from the previous year.

265.    According to the 4Q14 Press Release, the consolidated quarterly results presented therein were prepared in accordance with IFRS.

266.    On February 2, 2015, Graña filed its consolidated results report for the year 2014 with the SEC on Form 6-K (the "FY14 Results Report").  The FY14 Results Report repeated the financial results as presented in the 4Q14 Press Release.

- 69 -

267.    That same day, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same consolidated financial results as presented in the 4Q14 Press Release.

### (v) The 2014 Form 20-F

268.    On April 30, 2015, Graña filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2014, which was signed by the Officer Defendants (the "2014 Form 20-F").  Graña reported a net loss of S/. 20.1 million. Gross profit was $951.3 million, and diluted earnings per share on common shares was S/. 454.

269.    According to the 2014 Form 20-F, the "consolidated financial statements included in this annual report have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB")."

270.    The 2014 Form 20-F disclosed various factors that form the basis of competition in Graña's business, using language similar to the language quoted in ¶236.

271.    In the section entitled "Project Selection and Bidding," the 2014 Form 20-F described several methods by which Graña is awarded public works projects, including competitive bidding, using language similar to the language quoted in ¶237.

272.    The 2014 Form 20-F provides a detailed description of the competitive bidding process, similar to the process described in ¶238.

273.     In the 2014 Form F-20, Graña stated that its "strategy is to continue to grow out operations," but cautioned that "[a] major change in Perúvian government policies could affect our business."  It also noted that **"[g]overnmental entities may terminate prematurely our concessions and similar contracts under various circumstances, some of which are beyond our control."**

274.    In the 2014 Form F-20, the Company represented that it believed it was "in compliance with all applicable concessions, other similar contracts, laws and regulations in all material aspects," similar to the representation quoted in ¶240.

275.    The 2014 Form 20-F stated that these "core corporate values" were a key component of its business model, and reiterated its commitment to "abide by the highest corporate governance standards in Perú," using language similar to that quoted in ¶241.

276.    Indeed, according to the 2014 Form 20-F, one of Graña's greatest "[s]trengths" was its "high corporate governance standards" and "strong corporate culture based on the principles of high-quality, professionalism, reliability and efficiency," similar to the language quoted in ¶242.

277.    The 2014 Form 20-F also stated that Graña had adopted "a number" of corporate governance guidelines set forth in the "Principles of Good Governance for Perúvian Companies."

278.    In addition, the 2014 Form 20-F referenced its code of ethics applicable to its directors, officers, and employees, and stated that "[d]uring the year ended December 31, 2014, no such amendment was made or waiver granted."

279.    The 2014 Form 20-F also touted Graña's "core corporate values" as an integral component of its "vision" of becoming "the most reliable engineering services company in Latin America":

> We will continue to instill our ***core corporate values*** throughout our organization, while also transmitting these values to surrounding communities. We will continue to attract and develop our human capital through various training, mentorship and reward programs in order to maintain our position as the best company in Perú to learn and work in the engineering and construction field. We also seek to promote social welfare by fostering relationships with the communities that surround our areas of operation. In 2012, the Inter-American Federation of the Construction Industry recognized us for our corporate strategy and promotion of citizenship with the Latin American Social Responsibility award. In addition, in 2014, KPMG ranked us eleventh among the most responsible companies and ***with the best corporate governance in Perú. We strive to promote our corporate values to strengthen our***

- 71 -

*organization and improve our performance as well as to have a positive impact on the market where we operate*.

280.    Also in the 2014 Form 20-F, Graña discussed its creation of an "Audit and Process Committee" responsible for maintaining adequate internal controls:

> Our Audit and Process Committee oversees our corporate accounting and financial reporting process. The Audit and Process Committee is responsible for . . . "reviewing our financial statements", "evaluating our internal controls, and procedures, and identifying deficiencies", "evaluating the company's compliance with the Board of Director's internal regulation, as well as with general principles of corporate governance," "informing our board of directors regarding any issues that arise with respect to the quality or integrity of our financial statements, [and] our compliance with legal or regulatory requirements".

281.    The 2014 Form 20-F stated that management evaluated Graña's disclosure controls and procedures and found them to be effective, stating, in pertinent part, as follows:

> *Management is responsible for establishing and maintaining adequate internal control over financial reporting for our company as such term is defined by Exchange Act rules 13(a)-15(f) and 15(d)-15(f).* In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, *management has conducted an assessment, including testing, using the 1992 criteria in Internal Control-Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).* Our company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate . . . .
>
> *Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2014, based on the 1992 criteria in Internal Control-Integrated Framework, issued by the COSO*.

282.    The 2014 Form 20-F included signed certifications by Defendants Alvarado and Hart, representing that the financial information contained therein was accurate and that the Company's

internal and disclosure controls were effective.  Alvarado's and Hart's certifications stated, in

pertinent part, as follows:

I, [Defendant Alvarado and Hart], certify that:

1.      I have reviewed this annual report on Form 20-F of Graña y Montero S.A.A.

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.      The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect the company's internal control over financial reporting; and

5.      The company's and other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the

company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

> (a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

> (b)     any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal     control     over financial reporting

283.    The statements referenced in ¶¶250-282 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Graña and the Officer Defendants:

> (a)     that the Company's net income was materially misstated as a result of the dividend income Graña yielded to Odebrecht to compensate for its proportional share of the bribery;

> (b)     that Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

> (c)     that the unlawful practices perpetrated by Graña and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations;

> (d)     that the unlawful practices perpetrated by Graña and the Director Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing contracts, risks associated with the Company's expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

> (e)     that Graña's financial statements had not been prepared in accordance with IFRS;

(f)      that the unlawful practices perpetrated by Graña and the Director Defendants were reasonably likely to have a material adverse effect on the Company's future operating results;

(g)      that the competitive bidding process described in the Form 20-F failed to disclose that the bidding process was undermined by the corrupt payments made to elected officials;

(h)      that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy; and

(i)      that Defendants failed to disclose that Graña's "rapid growth" was due, in material part, to the bribery of government leaders, and misled investors into believing that the rapid growth was organic and would continue on its upward trajectory.

## C.  Fiscal Year 2015 False and Misleading Statement and/or Omissions

### (i)  1Q15 Press Release and Conference Call

284.    On April 28, 2015, Graña issued a press release announcing its quarterly results for the first quarter of 2015 (the "1Q15 Press Release"). The Company reported a 75.2% decrease in net income, or S/. 17.9 million, for the quarter.

285.    According to the 1Q15 Press Release, the consolidated statements presented therein were prepared in accordance with IFRS.

286.    On April 30, 2015, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same quarterly financial results as presented in the 1Q15 Press Release.

### (ii) 2Q15 Press Release and Conference Call

287.    On July 24, 2015, Graña issued a press release announcing its consolidated results for the second quarter of 2015 (the "2Q15 Press Release").  The Company reported a 70.3% decrease in net income, or S/. 39.9 million, for the quarter.

288.     According to the 2Q15 Press Release, the consolidated financial results presented therein, filed with the SEC on Form 6-K on July 23, 2015, were prepared in accordance with IFRS.

289.     That same day, July 24, 2015, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same quarterly financial results as presented in the 2Q15 Press Release and 2Q15 Results Report.

**(iii)     3Q15 Press Release and Conference Call**

290.     On October 30, 2015, Graña issued a press release announcing its consolidated results for the third quarter of 2015 (the "3Q15 Press Release").  The Company reported a 97.1% decrease in net income, or S/. 6.7 million, for the quarter.

291.     According to the 3Q15 Press Release, the consolidated financial results presented therein, filed with the SEC on Form 6-K on that same day, were prepared in accordance with IFRS.

292.     That same day, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same quarterly financial results as presented in the 2Q15 Press Release and 2Q15 Results Report.

293.     Defendant Hart also stated that the Southern Gas Pipeline project had been added to the Company's backlog, and represented an addition of $1 billion to its backlog.

**(iv) 4Q15 Results Report and Conference Call**

294.     On January 29, 2016, Graña issued a press release announcing its consolidated results for the fourth quarter of 2015 (the "4Q15 Press Release").  The Company reported a 70.3% decrease in net income, or S/. 89.1 million, for 2015.

295.     On February 1, 2016, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same financial results as presented in the 4Q15 Press Release.

### (v) 2015 Form 20-F

296.    On May 2, 2016, Graña filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2015, which was signed by the Officer Defendants (the "2015 Form 20-F").  Defendants reported a net profit of S/. 205.5 million ($41.5 million). Gross profit was S/. 702.8 million ($205.9 million), and diluted earnings per share on common shares was S/. 0.134.

297.    According to the 2015 Form 20-F, the "consolidated financial statements included in this annual report have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB")."

298.    The 2015 Form 20-F cited as a "risk factor" that Graña's "reputation could be affected by [its] past and current consortia with Odebrecht's affiliates in Perú," stating:

> We have participated in the past, and are currently participating, in consortia controlled and operated by Odebrecht affiliates in Perú. Our reputation may be affected due to the recent criminal convictions by Brazilian courts of the ex-president and other former executives of Odebrecht S.A. for charges of corruption, money laundering and criminal organization. In addition, according to news reports, the Perúvian congress has initiated an investigation into the dealings of Odebrecht's affiliates in Perú. We cannot assure you that these investigations will not be broadened to include other entities relating to Odebrecht's consortia in the country, including, among others, our subsidiary GyM. Although we have not received any notification of this investigation, news reports indicate that the investigation includes the concessions for Interoceanica Norte and Interoceanica Sur highways, in which our subsidiary GyM held a minority non-operating participation in consortia led by Odebrecht affiliates from 2005 to 2011, when we sold our stakes. We cannot assure you that our reputation will not be affected by our consortia with Odebrecht.

299.    The 2015 Form 20-F disclosed various factors that form the basis of competition, using language similar to the language quoted in ¶26.

300.    In the section entitled "Project Selection and Bidding," the 2015 Form 20-F describes several methods by which it is awarded public works projects, including competitive bidding, using language similar to the language quoted in ¶237.

301.    The 2015 Form 20-F then provided a detailed description of the competitive bidding process, similar to the process described in ¶238.

302.    In the 2015 Form 20-F, Graña and the Officer Defendants stated that Graña's "strategy is to continue to grow out operations," but cautioned that that "[a] major change in Perúvian government policies could affect our business." It also noted that "*[g]overnmental entities may terminate prematurely our concessions and similar contracts under various circumstances, some of which are beyond our control.*"

303.    In the 2015 Form 20-F, Graña and the Officer Defendants represented that they believed they were "in compliance with all applicable concessions, other similar contracts, laws and regulations in all material aspects", similar to the representation quoted in ¶240.

304.    The 2015 Form 20-F stated that these "core corporate values" were a key component of Graña's business model, and reiterated its commitment to "abide by the highest corporate governance standards in Perú", using language similar to the language quoted in ¶241.

305.    Indeed, according to the 2015 Form 20-F, one of Graña's greatest "[s]trengths" was its "high corporate governance standards" and "strong corporate culture based on the principles of high quality, professionalism, reliability and efficiency," using language similar to the language quoted in ¶242.

306.    The 2015 Form 20-F also stated that Graña had adopted "a number" of corporate governance guidelines set forth in the "Principles of Good Governance for Perúvian Companies," with language similar to the language quoted in ¶243.

307.    In addition, the 2015 Form 20-F referenced Graña's code of ethics applicable to its directors, officers, and employees and stated that "[d]uring the year ended December 31, 2015, no such amendment was made or waiver granted."

308. Critically, the 2015 Form 20-F announced Graña's adoption of an anti-corruption compliance program "as a preventative measure":

> *In 2015, we reinforced our ethics management system as a preventative measure. Our Board of Directors approved an anti-corruption compliance (FCPA) program, which establishes the leadership and commitment of senior management on this matter, defines supervisory bodies and the reporting lines, establishes new policies and procedures, identifies additional internal controls, and proposes training plans for the entire organization.* This program applies to all companies in the group and to any third parties that may act on our behalf.
>
> *Within the program, the anti-corruption policy provides the guidelines required to avoid any act of corruption in our business or in our relations with any state entity, and reinforces the obligation to have precise accounting records and internal controls.*

309. The 2015 Form 20-F also touted Graña's "core corporate values" as an integral component of its "vision" of becoming "the most reliable engineering services company in Latin America":

> *We will continue to instill our core corporate values throughout our organization, while also transmitting these values to surrounding communities.* We will continue to attract and develop our human capital through various training, mentorship and reward programs in order to maintain our position as the best company in Perú to learn and work in the engineering and construction field. We also seek to promote social welfare by fostering relationships with the communities that surround our areas of operation. In 2012, the Inter-American Federation of the Construction Industry recognized us for our corporate strategy and promotion of citizenship with the Latin American Social Responsibility award. In addition, in 2014, KPMG ranked us eleventh among the most responsible companies and with the best corporate governance in Perú. *We strive to promote our corporate values to strengthen our organization and improve our performance as well as to have a positive impact on the markets where we operate.*

310. Also in the 2015 Form 20-F, Graña discussed its "Audit and Process Committee" responsible for maintaining adequate internal controls, with duties similar to those described in ¶246.

311. The 2015 Form 20-F disclosed that Graña's Audit and Process Committee had identified one material weakness in the Company's internal controls, relating to "inadequate controls over segregation of duties in certain activities within four of our subsidiaries."

312. Thus, the 2015 Form 20-F stated that management evaluated Graña's disclosure controls and procedures and found them to be ineffective, stating, in pertinent part, as follows:

> ***Management is responsible for establishing and maintaining adequate internal control over financial reporting for our company as such term is defined by Exchange Act rules 13(a)-15(f) and 15(d)-15(f).*** In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, ***management has conducted an assessment, including testing, using the 1992 criteria in Internal Control-Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).*** Our company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
>
> In our assessment of the effectiveness of internal controls over financial reporting as of December 31, 2015, we determined that a control deficiency existed that constituted a material weakness, ***as a result of inadequate controls over segregation of duties in certain activities within four of our subsidiaries . . . .***
>
> ***As a result of the material weakness described above, management has concluded that we did not maintain effective internal control over financial reporting as of December 31, 2015, based on the 1992 criteria included in Internal Control-Integrated Framework, issued by COSO.***

313. Despite this weakness, the 2015 Form 20-F stated that the financial statements fairly presented Graña's financial position, stating, in pertinent part, as follows:

> ***Management has concluded that, regardless of the material weakness described above, the financial statements fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented in this report.***

314. The 2015 Form 20-F further stated that there were "no other changes in our internal control" that affected its internal control over financial reporting, stating, in pertinent part, as follows:

- 80 -

We identified a material weakness in our internal control as described in Item 15 B above. ***There were no other changes in our internal control over financial reporting*** (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) ***that occurred during the year ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting***.

315.    The 2015 Form 20-F included signed certifications by Defendants Alvarado and Hart, similar to the certifications quoted in ¶282 above, representing that the information contained therein was accurate and that the Company's internal and disclosure controls were effective.

316.    The statements referenced in ¶¶284-315 were materially false and misleading when they were made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Graña and the Officer Defendants:

(a)    that the Company's net income was materially misstated as a result of the dividend income Graña yielded to Odebrecht to compensate for its proportional share of the bribery;

(b)    that, contrary to statements that Graña abides by the highest corporate governance standards,  Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

(c)    that the unlawful practices perpetrated by Graña and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations;

(d)    that the unlawful practices perpetrated by Graña and the Director Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing contracts, risks associated with the Company's expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

(e)    that Graña's disclosure controls were either (1) inadequately designed and insufficient to ensure that Graña's participation in the bribery scheme was made known to Defendants, or (2) sufficient and Graña became aware of the bribery scheme, in which case Defendants knew about the improper payments but failed to disclose these material facts;

(f)    that Graña's financial statements had not been prepared in accordance with IFRS;

(g)    that the unlawful practices perpetrated by Graña and the Director Defendants were reasonably likely to have a material adverse effect on the Company's future operating results;

(h)    that the competitive bidding process described in the Form 20-F failed to disclose that the bidding process was undermined by the corrupt payments made to elected officials;

(i)    that Graña failed to disclose that its "rapid growth" was due, in material part, to the bribery of government leaders, and misled investors into believing that the rapid growth was organic and would continue on its upward trajectory;

(j)    that Graña failed to disclose that Perúvian governmental policies were being shaped, in a material way, by the bribes that were being paid to it;

(k)    that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy; and

(l)    that, based on the foregoing, Graña and the Officer Defendants lacked a reasonable basis for their positive statements about Graña's then-current business and future financial prospects.

### D. Fiscal Year 2016 False and Misleading Statements and/or Omissions

#### (i) 1Q16 Press Release and Conference Call

317. On April 28, 2016, Graña posted its consolidated results report for the first quarter of 2016 on its website (the "1Q16 Results Report").

318. On April 29, 2016, Graña issued a press release reporting its quarterly results for the first quarter of 2016 (the "1Q16 Press Release"). The Company reported a net income of S/. 70.9 million. According to the 1Q16 Press Release, the consolidated statements contained therein were prepared in accordance with IFRS.

319. That same day, Graña filed its condensed interim financial statements for the first quarter of 2016 on a Form 6-K filed with the SEC (the "1Q16 Financial Statements").

320. Also on April 29, 2016, Graña hosted a conference call with investors and analysts, during which the same financial results presented in the 1Q16 Press Release and the 1Q16 Financial Statements were repeated by Luis Diaz Olivero, Graña's Chief Operating Officer.

#### (ii) 2Q16 Press Release and Conference Call

321. On July 25, 2016, Graña issued a press release in which it released its consolidated results for the second quarter of 2016. (the "2Q16 Press Release"). The Company reported net income of S/. 104.9 million.

322. According to the 2Q16 Press Release, the consolidated statements contained therein were prepared in accordance with IFRS.

323. On July 26, 2016, Graña filed its condensed interim consolidated financial statements for the second quarter of 2016 on a Form 6-K filed with the SEC (the "2Q16 Financial Statements").

324. The same day, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same financial results.

### (iii)    3Q16 Press Release and Conference Call

325.    On October 26, 2016, Graña issued a press release announcing its consolidated financial results for the third quarter of 2016 (the "3Q16 Press Release"). The Company reported net income of S/. 138.6 million.

326.    According to the 3Q16 Press Release, the consolidated financial statements presented therein were prepared in accordance with IFRS.

327.    That same day, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same financial results as presented in the 3Q16 Press Release.

328.    On November 1, 2016, Graña filed its consolidated results report for 3Q16 with the SEC on Form 6-K.

### (iv)    4Q16 Results Report and Conference Call

329.    On January 27, 2017, Graña issued a press release reporting its consolidated financial results for the fourth quarter of 2016 (the "4Q16 Press Release"). The Company reported net income of S/.8.6 million.

330.    According to the 4Q16 Press Release, the financial results presented therein were prepared in accordance with IFRS.

331.    In addition, during the 4Q16 Conference Call, Defendant Hart repeated the financial results presented in the 4Q16 Press Release. Defendant Alvarado also participated in the call.

332.    The statements referred to in ¶¶317-331 were materially false and misleading when they were made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Graña and the Officer Defendants:

(a)    that Graña's disclosure about potential reputational harm to the Company as a result of Odebrecht's conviction failed to disclose that Graña participated in Odebrecht's bribery scheme;

- 84 -

(b)     that the Company's net income was materially misstated as a result of the dividend income Graña yielded to Odebrecht to compensate for its proportional share of the bribery;

(c)     that, contrary to statements that Graña abides by the highest corporate governance standards, Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

(d)     that the unlawful practices perpetrated by Graña and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations;

(e)     that the unlawful practices perpetrated by Graña and the Director Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing contracts, risks associated with the Company's expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

(f)     that Graña's disclosure controls were either (1) inadequately designed and insufficient to ensure that Graña's participation in the bribery was made known to Defendants, or (2) sufficient and Graña became aware of the bribery, in which case Defendants knew about the improper payments but failed to disclose these material facts;

(g)     that Graña's financial statements had not been prepared in accordance with IFRS;

(h)     that the unlawful practices perpetrated by Graña and the Director Defendants were reasonably likely to have a material adverse effect on the Company's future operating results;

(i) that the competitive bidding process described in the Form 20-F failed to disclose that the bidding process was undermined by the corrupt payments made to elected officials;

(j) that Graña failed to disclose that its "rapid growth" was due, in large part, to the bribery of government leaders, and misled investors into believing that the rapid growth was organic and would continue on its impressive upward trajectory;

(k) that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy;

(l) that Graña failed to disclose that Perúvian governmental policies were being shaped, in a material way, by the bribes that were being paid to it; and

(m) that, based on the foregoing, Graña and the Officer Defendants lacked a reasonable basis for their positive statements about Graña's then-current business and future financial prospects.

**E. Fiscal Year 2017 False and Misleading Statement and Omissions**

**(i) The January 27, 2017 Conference Call**

333. On January 27, 2017, Graña hosted a conference call with investors and analysts. Defendant Alvarado opened the conference call, which was the first conference call since Odebrecht pled guilty to bribery charges in the United States, by stating the Company's position with respect to the Odebrecht case:

First of all, let me explain the position taken by Graña y Montero in the Odebrecht case:

***It is important to note that the Graña y Montero Group does not authorize, recommend or make irregular payments of any kind because these conducts disobey the values and principles that have guided our behavior for more than 83 years***.

- 86 -

*In the 6 projects we developed in partnership with Odebrecht throughout our history, we have never seen, experienced, witnessed, or participated in any irregular actions related to the projects.*

*We could not imagine that there was a system specially designed to pay bribes.*

334.    Graña also pointed to its Code of Ethics, Anti-Corruption Policy, and Ethics Charter

as evidence that it was not involved in the Odebrecht bribery scheme:

The Graña y Montero Group is listed on the Lima Stock Exchange since 1997 and is the only Latin American construction company to trade on the New York Stock Exchange since 2013, where *we are subject to the most demanding international standards.*

*The United States Foreign Corrupt Practices Act (FCPA), to which we have voluntarily adhered to on the stock exchange, is very strict about compliance with anti-corruption and corporate governance policies.*

*For the last 22 years, the Group has had different tools to encourage ethical principles at all organizational levels, including the Ethics Charter, the Code of Conduct and the Anti-Corruption Policy.*

In addition, the Group has an Ethical Channel (toll free number) that has received more than 211 cases and none has been related to corruption with public workers. This channel is administered by an external and independent company and the cases are evaluated by an ethical committee.

However, today we know that our efforts were not enough. Following the problem with Odebrecht, we are strengthening our policies and procedures for the selection of partners. We will be much more severe in our demands to integrate companies in the future.

335.    The statements referenced in ¶¶333-334 were materially false and misleading when

they were made because they misrepresented and/or failed to disclose the following adverse facts,

which were then known to, or recklessly disregarded by, Graña and the Officer Defendants:

(a)    that Graña's statement on January 27, 2017 was false and misleading because

Graña did, in fact, participate in bribes related to the projects at issue;

(b)     that, contrary to statements that Graña abides by the highest corporate governance standards, Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

(c)     that the unlawful practices perpetrated by Graña and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations; and

(d)     that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy.

## GRAÑA'S MATERIALLY FALSE AND MISLEADING FINANCIAL REPORTING

336.    Defendants represented that each of the financial statements, and the financial disclosures related thereto, issued by Graña during the Class Period (collectively referred to herein as the "Class Period financial statements") were presented in conformity with IFRS issued by the IASB.  These representations were materially false and misleading when made because the Class Period financial statements contained materially false and misleading representations and omissions of material fact associated with the unlawful bribery scheme perpetrated by Defendants.

337.    First, Graña's financial reporting related to the minority interests associated with IIRSA South and Lima Metro included in its financial statements were materially false and misleading and presented in violation of IFRS, because the profit or loss associated with the operations of its minority interests in these projects were improperly consolidated in the Class Period financial statements under the captions "[s]hare of the profit or loss in associates and joint ventures under the equity method of accounting."

338.    Second, the Class Period financial statements were materially false and misleading because they failed to disclose, in accordance with IFRS, the potential fines, penalties and other

contingent liabilities ensuing from the unlawful practices perpetrated by Graña's senior management.

339.    Compliance with applicable accounting standards is a basic fundamental obligation of publicly traded companies.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [IFRS] will be presumed to be misleading or inaccurate . . . ."  17 C.F.R. §210.4-01(a)(1).

340.    During the Class Period, Graña filed its annual financial statements with the SEC on Form 20-F for the years ended December 31, 2011, 2012, 2013, 2014, and 2015.  These annual financial statements falsely represented, in pertinent part, and in all material respects, the following:

> Our consolidated financial statements included in this annual report have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB").

341.    Similarly, during the Class Period, Graña published its interim financial results for the periods ended: March 31, 2012, 2013, 2014, 2015, 2016; June 30, 2012, 2013, 2014, 2015, 2016; September 30, 2012, 2013, 2014, 2015, 2016; and December 31, 2012, 2013, 2014, 2015, 2016. These interim financial statements falsely represented, in pertinent part, and in all material respects, the following:

> These results have been prepared in accordance with International Financial Reporting Standards ("IFRS") and are stated in nominal Perúvian Nuevos Soles (S/.).

342.    The representations in ¶¶340-341 above were materially false and misleading when made because, in violation of IFRS, Defendants knowingly or recklessly caused Graña to issue the financial statements that: (i) included materially misleading representations about Graña's profit or loss associated with the operations of the minority interests in its subsidiaries; and (ii) misrepresented Graña's contingent liabilities associated with the unlawful bribery scheme perpetrated by Graña's senior management.

**Misleading Representations About Graña's Profit or Loss**
**Associated with the Operations of the Minority Interests in Its Subsidiaries**

343. During the Class Period, the Forms 20-F Graña filed with the SEC disclosed in, pertinent part:

> Results of our subsidiaries, joint operations and associated companies are reflected in our financial results.

*     *     *

> We consolidate the results of our subsidiaries in our financial statements and we reflect the profit corresponding to the minority interests in our subsidiaries under "net profit attributable to non-controlling interests" in our income statement. With respect to our joint operations, we recognize in our financial statements the revenue and expenses including our share of any asset, liability, revenue or expense we hold jointly with partners. We reflect the results of our associated companies under the equity method of accounting in our financial statements under the line item "share of the profit and loss in associates" in our income statement.

344. As detailed herein, Graña, though its GyM S.A. subsidiary, owned a 33% interest in the Lima Metro concession and a 19% interest in IIRSA South concession. Accordingly, Defendants represented to investors that Graña's financial reporting included the results of the Lima Metro and the IIRSA concessions in its financial statements in a manner consistent with the requirements of IFRS.

345. These representations were materially false and misleading when made because, in violation of IFRS, the bribes paid to obtain the Lima Metro and IIRSA South concessions were not expensed when incurred.

346. Specifically, the results of the Lima Metro concession, which was liquidated in May 2015, were falsely represented to have reported conformity with IFRS in Graña's annual financial statements for the years ended December 31, 2011, 2012, 2013, 2014 and in Graña's interim financial statements for the periods ended March 31, 2012, 2013, 2014, 2015; June 30, 2012, 2013, 2014, 2015; September 30, 2012, 2013, 2014; and December 31, 2012, 2013, 2014. The results of

the IIRSA South concession, which was sold in 2011, were falsely represented to have been reported in conformity with IFRS in Graña's annual financial statements for the year ended December 31, 2011.

347.    In 2010, the IASB issued *The Conceptual Framework for Financial Reporting* ("Conceptual Framework") setting forth the fundamental concepts upon which internal accounting standards and financial reporting are based.

348.    According to IASB's Conceptual Framework, financial performance is to be reported based upon accrual accounting, which depicts the effects of transactions and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period.

349.    IFRS, in International Accounting Standard ("IAS") 11, *Construction Contracts*, requires that, when the outcome of a construction contract can be estimated reliably, such as the Lima Metro and IIRSA South construction contracts, both construction contract revenue and costs are to be recognized by reference to the stage of completion of the contract activity at the end of each reporting period.  However, IAS 11 further provides that "general administration costs for which reimbursement [by the customer] is not specified in the contract" are to be "excluded from the costs of the construction contract."

350.    Here, Graña's share of the bribes to obtain the Lima Metro and IIRSA South concessions were general administration type costs for which reimbursement by the Perúvian government was not specified in the contracts.  As such, the bribes paid by Graña were required to be expensed as incurred in accordance with accrual accounting.

351.    In violation of IFRS, Graña's share of the bribes it paid to secure favorable rulings on the Lima Metro and IIRSA South concessions were falsely and misleadingly reported by Graña in

the financial statements set forth in ¶346 above as a reduction of its share of the profit distributions on the Lima Metro and IIRSA South concessions over the term of the arrangements.

352.     Indeed, on February 23, 2018, Perúvian Judge Concepcion Carhuancho Richard Augusto, on a motion seeking to suspend the custody of Hernando Alejandro Constancio Graña Acuña, found that Graña's financial statements were presented in violation of IFRS because the bribes paid on the IIRSA South concession were not immediately expensed, stating, as translated, and, in pertinent part, as follows:

> *The accounting provision for said concept (additional risks) [bribes] was not recorded in 2011, despite being required, given that accounting and tax matters are governed by the accrual rule, in the sense that any expected loss must be recognized as such immediately*, in accordance with paragraph 22 of the International Accounting Standard IAS 11 Construction Contracts, and cited in the Accounting, Financial and Economic Expert Report No. 2-2017 Interoceánica Sur Tramo 2 and 3-IIRSA SUR.

353.     Thus, Graña materially misstated its financial results in the annual financial statements for the years ended December 31, 2011, 2012, 2013, 2014 and in the interim financial statements for the periods ended March 31, 2012, 2013, 2014, 2015; June 30, 2012, 2013, 2014, 2015; September 30, 2012, 2013, 2014; and December 31, 2012, 2013, 2014 by failing to report as an expense as incurred the bribes it paid to obtain the Lima Metro and IIRSA South concessions.

354.     As detailed herein, Graña's share of the bribes on the Lima Metro and IIRSA South concessions totaled approximately $10.4 million and $5.8 million, respectively.

355.     As set forth in the SEC's Staff Accounting Bulletin No. 99 ("SAB No. 99"), materiality in the context of financial information not only includes an assessment of the magnitude of the misstatement in numerical terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial information (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

356.     Thus, SAB No. 99 notes, in pertinent part, that:

The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions" in favor of an approach that takes into account all the relevant considerations. In so doing, it made clear that - [M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment. [Footnotes omitted.]

357. SAB No. 99 further provides "the staff [of the SEC] believes that there are numerous circumstances in which [financial] misstatements below 5% [of earnings] could well be material. *Qualitative factors* may cause [financial] misstatements of quantitatively small amounts to be material." (emphasis added).

358. In this regard, SAB No. 99 notes "*[w]hether the misstatement involves concealment of an unlawful transaction*" is a qualitative factor that may well render material a quantitatively small misstatement of a financial statement item. As noted herein, Jorge Barata, former-Odebrecht executive-turned-whistleblower, testified that Graña was a willful participant with Odebrecht in the bribery scandal.

359. Accordingly, the failure to properly account for approximately $16.2 million in bribes on the Lima Metro and IIRSA South concessions rendered the financial statements identified in ¶346 above materially false and misleading.

360. Moreover, the financial statements set forth in ¶346 above, and Defendants' financial disclosures concerning the operations of Graña's minority interests, including Graña's minority interests in the Lima Metro and IIRSA South concessions, were materially false and misleading because, as Defendants knew, such representations failed to disclose material facts associated with the then on-going, multi-year bribery conspiracy perpetrated by the Company and its senior management.

361.     Once Defendants choose to speak about the operations of Graña's minority interests, it had a duty to speak completely and truthfully, including speaking about the effects of the illegal bribery scheme on Graña's current and future operating results.

### Misleading Representations About Graña's Contingencies

362.     IFRS, in IAS 37, Provisions, Contingent Liabilities and Contingent Assets, defines a "contingent liability" as a possible obligation arising from past events whose existence is to be confirmed only by the occurrence (or non-occurrence) of one or more uncertain future events not wholly within the control of the entity.

363.     IFRS requires financial statements to disclose contingent liabilities when the possibility of their settlement is greater than remote.  *See, e.g.*, IAS 37, *Provisions, Contingent Liabilities and Contingent Assets*.  This disclosure is to include a description of the nature of the obligations and "adequate information" and the "major assumptions" concerning the uncertain future events.

364.     The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. §210.10-01], which provides that disclosures in interim-period financial statements may be abbreviated and need not duplicate the disclosure contained in the most-recent audited financial statements, *except* that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

365.     Defendants, in violation of IFRS, caused the Company to issue the Class Period financial statements that failed to disclose contingencies associated with the unlawful bribery scheme perpetrated by Graña's senior management.

366.     As detailed herein, the Company and its senior management engaged in a multi-year conspiracy whereby they bribed governmental officials to secure project rulings in Graña's favor.

These unlawful acts subjected Graña to massive contingent liabilities, including fines, criminal penalties and/or other sanctions which, in violation of IFRS, were not disclosed in the Class Period financial statements.

367.    As a result, the Class Period financial statements issued by Defendants were presented in violation of IFRS and included materially false and misleading representations and omissions of material fact associated with the unlawful bribery scheme described herein.

### DEFENDANTS ACTED WITH SCIENTER

368.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of such statements or documents as primary violations of the federal securities law.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Graña, their control over, and/or receipt and/or modification of Graña's materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

369.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The multi-year fraudulent activity alleged herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company.

370.    The Officer Defendants were executive officers at Graña and, at a minimum, should have been aware of key facts related to the Company's operations, while the Director Defendants are alleged to have been directly involved in the bribery scheme described herein.

371.     The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

### A. As a Key Member of the IIRSA South Consortium, Graña Was Involved in All Major Corporate Decisions

372.     As described in ¶¶51-54 above, the Shareholder Agreement for the IIRSA South concession required a supermajority vote of 82% for major corporate actions. Although Graña originally held an 18% interest in the concession, it later orchestrated the gratuitous transfer of a 1% interest by its fellow minority stakeholder ICCGSA to it due to some unspecified "commercial and operational benefits" that Graña was to provide to the consortium.

373.     Following this transfer, it was impossible for the IIRSA South consortium to take any action without Graña's affirmative input and vote.

374.     Thus, contrary to Graña's claim that it was a passive minority stakeholder in the IIRSA South consortium, Graña was actually a key consortium member with the ability to unilaterally veto any proposed resolution or corporate action.

375.     Graña's status as a key member of the consortium with the authority to veto any corporate action contributes to a strong inference that Graña acted with scienter.

376.     Moreover, the minority stakeholders in the IIRSA South consortium were granted the authority to appoint the Administration and Finance Manager for the consortium. The minority stakeholders, which included Graña, ultimately appointed Fernando Almenara, a Graña employee, to fill that role.

377. The fact that a senior Graña employee served as the Finance Manager for the entire consortium, coupled with the fact that the entire scheme rested on the improper accounting and diversion of corporate profits, support that Graña knew about the bribes all along. This, too, strongly contributes to an inference of scienter.

### B. Graña Knew About the Bribes, and Contributed Its Proportional Share

378. Defendants were aware that Odebrecht made illicit payments to top public officials, including former President Alejandro Toledo and former Peruvian President Alan Garcia, to win the concessions for the IIRSA South and Lima Metro projects.

379. Graña then paid its proportional share of the bribes in the form of differential dividends. The parties attempted to characterize these payments as legitimate payments for the "*additional risks*" Odebrecht allegedly incurred for the benefit of the concession. The term "additional risks" appears in numerous corporate documents in the context of the distribution of differential dividends in favor of Odebrecht, including: (1) the June 30, 2011 Minutes of the General Meeting of Shareholders of the IIRSA South concession; (2) the February 29, 2012 Profit Distribution Agreement for the Lima Metro concession; and (3) the May 4, 2015 Agreement for the Distribution and Liquidation of Results of the Lima Metro concession. These documents were signed by senior Graña employees, including Defendant Graña Acuna.

380. On February 23, 2018, it was judicially determined by Perúvian Judge Concepcion that the term "additional risks," as used in the relevant agreements between Odebrecht and Graña, is a euphemism for bribery, and that there was no legitimate business reason for Graña to have yielded such a large part of its share of profits to Odebrecht.

381. Likewise, according to the reporting in Perúvian newspaper *Hildebrandt en sus trese* and Brazilian magazine *Piaui*, the term "additional risks" refers to bribery.

382. These facts were corroborated by numerous insider sources, including Jorge Barata, Odebrecht's director of operations in Perú, and former Odebrecht CEO Marcelo Odebrecht.

383. In total, Graña contributed approximately $7 million to the bribe which produced the IIRSA South concession and approximately $9 million to the bribe which produced the Metro Lima Concession.

### C. Graña Executives Resign Within Three Days of the Disclosure of Graña's Role in the Bribery Scheme

384. The resignation of three Graña executives just three days after its involvement in the bribery scheme was disclosed supports a strong inference of scienter.

385. Although Graña attributed these resignations to "termination of the South Perú Gas Pipeline, the fall of share prices, and the false allegations made by the former representative of Odebrecht in Perú," that explanation does not withstand scrutiny.

386. These three executives had been with Graña for decades and successfully listed the Company on the NYSE in 2013. It strains credulity to claim that these coterminous and abrupt resignations were unrelated to the disclosure of their participation in the bribery.

### D. Graña Executives Are Formally Charged in Connection with the Odebrecht Bribery Scheme

387. As detailed above, in the months following the release of the *Hildebrandt* article, Perúvian prosecutors investigated Jorge Barata's accusations to obtain corroborating evidence.

388. By December 4, 2017, Judge Concepcion determined that there was enough evidence to suggest that high-level Graña executives had participated in the Odebrecht bribery scheme, and ordered the pretrial detention of Defendant Graña Miro Quesada and Defendant Graña Acuna, as well as Gonzalo Ferraro Rey.

389. By the end of the month, the Attorney General's Office had formally moved to include Graña in the investigation of the bribes made in connection with the IIRSA South tender.

390.     On January 12, 2018, prosecutors raided Graña's Lima offices in connection with its ongoing investigation.

391.     On February 19, 2018, the prosecutor moved to formally include Graña in the investigation of the bribes made in connection with the tender for the Lima Metro concession.

392.     On February 23, 2018, Judge Conception released a two separate legal opinions (*i.e.*, Resolution Nos. 2 and 4) finding that the Director Defendants had likely participated in the bribery scheme, and that the term "additional risks," as used in the relevant agreements between Odebrecht and Graña, was a euphemism for bribes.

393.     On March 6, 2018, after nearly a year of investigation, the Perúvian First National Investigation Court adopted a resolution formally adding Graña and its subsidiary GyM S.A. as defendants in the criminal investigation into the IIRSA South tender process.

### E.  Defendants violated Graña's Ethics Charter, Code of Conduct, and Anti-Corruption Policy

394.     Prior to the Class Period, Graña adopted an Ethics Charter and a Code of Conduct. According to the Company, the Ethics Charter embodied the "values [that] are the foundation of [Graña's] culture."

395.     The Ethics Charter prohibits bribery and "rejects any possibility of making payment in cash or in kind to obtain contracts or benefits that would otherwise not be theirs by moral right."

396.     Similarly, the Code of Conduct prohibits Graña and its employees from "offer[ing] bribes, payments, and in general, facilitat[ing] payment of any kind to public officers . . . to obtain benefits to which they are not entitled by moral right."  The Code of Conduct further cautions Graña to "avoid practices related to unfair competition." Finally, the Code of Conduct "encourages transparency and compliance of accounting, financial, and legal standards."

397.    In 2015, Graña adopted an Anti-Corruption Policy which "emphatically reject[s] any form of bribery or corruption," and provides additional "Guidelines and Principles" as to which activities constitute bribery.

398.    In violation of their obligations under the Ethics Charter, the Code of Conduct, and the Anti-Corruption Policy, Defendants knew but failed to disclose that the Company was engaging in prohibited conduct, specifically, making improper payments to reimburse Odebrecht for its share of the illicit payments.  Moreover, the Director Defendants themselves were directly involved in the bribery scheme, and Defendant Graña Acuna signed several agreements (including the February 29 2012 Profit Distribution Agreement and the May 4, 2015 Liquidation Agreement for the Lima Metro) which illegally diverted the Company's proportional share of the bribe to Odebrecht.

## LOSS CAUSATION

399.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Graña ADSs and operated as a fraud or deceit on Class Period purchasers of Graña ADSs.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Graña ADSs fell precipitously as the artificial inflation was removed.

400.    As a result of their purchases of Graña ADSs during the Class Period, Plaintiffs and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements throughout the Class Period had the intended effect and caused Graña ADSs to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of more than $22 per ADS on September 19, 2013.

401.    On December 21, 2016, Odebrecht pled guilty to bribery charges in the United States in connection with, among other projects, its tender for the IIRSA South and Lima Metro

concessions in Perú.  On this news, the price of Graña ADSs began to decline precipitously, closing down at $5.02 per ADS by January 11, 2017.

402.    On January 12, 2017, Graña announced that it was withdrawing from its partnership with corruption-plagued Odebrecht, calling the partnership a "mistake."  On this news, the price of Graña ADSs continued to decline, falling $0.61 per ADS, or 12%, on January 12, 2017.

403.    On January 20, 2017, Graña disclosed that the GSP consortium would miss a key upcoming financing deadline of January 23, 2017.

404.    On January 25, 2017, citing the loss of the Odebrecht partnership, Graña disclosed it would ask its Board of Directors to approve the sale of $300 million in assets to help it meet its obligations.  Thereafter, on January 27, 2017, Graña reported its fourth quarter and fiscal 2016 financial results for the year ended December 31, 2016, reporting revenues of S/. 6,055.3 million for fiscal 2016, a 22.7% decrease compared to fiscal 2015.

405.    On February 24, 2017, local news magazine *Hildebrandt* released four pages of Jorge Barata's testimony before Prosecutor Hamilton Castro, in which he alleged that Graña knew about the bribery and had committed to paying its proportional share of the bribe.

406.    On this news, the price of Graña's ADSs declined precipitously again, falling approximately 35%, from a close of $5.09 per ADS on February 23, 2017, to a close of $3.32 per ADS on February 24, 2017, a decline of $1.77 per ADS, on unusually high trading volume of more than 1.9 million shares traded.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

407.    Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

408.    With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the ADSs traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the ADSs; and

(e)    Plaintiffs and other members of the Class purchased the ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

(f)    At all relevant times, the market for the ADSs was efficient for the following reasons, among others:

(g)    the ADSs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(h)    as a regulated issuer, Graña filed periodic public reports with the SEC and the NYSE;

(i)    Graña regularly communicated with public investors via established market communications mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- 102 -

(j)     Graña was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

409.    As a result of the foregoing, the market for Graña ADSs promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Graña ADSs.  Under these circumstances, all purchasers of Graña ADSs during the Class Period suffered similar injury through their purchase of such ADSs at artificially inflated prices, and a presumption of reliance applies.

410.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also applicable in this action under the Supreme Court's holding in *Affiliated Ute*, because the claims alleged are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Graña's business operations and financial prospects and performance – information Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

411.    Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in a sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

412.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Graña ADSs during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, as well as the officers and directors of the Company and the members

of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

413.     The members of the Class are so numerous that joinder is impracticable.  Throughout the Class Period, Graña ADSs were actively traded on the NYSE.  While the exact number of class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe there are hundreds, if not thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Graña or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

414.     Plaintiffs' claims are typical of the claims of members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

415.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

416.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and practices of Graña;

(c)     whether the trading price of Graña ADSs was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

417.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

418.    The statutory safe harbor provided for certain forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause any actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of the Company who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Against Graña y Montero

419.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-418 as if set forth in full herein.

420.    During the Class Period, Graña knowingly or recklessly made, participated in the preparation of and/or caused to be disseminated, false and misleading statements of material fact, and omitted material facts necessary to make the statements about Graña's financial results, operations, and legal compliance, in light of the circumstances in which they were made, not misleading.  Plaintiffs specifically refer to statements identified in the sections entitled: "Defendants' False and Misleading Statements During the Class Period" and "Graña's Materially False and Misleading Financial Reporting."

421.    In addition to the duties of full disclosure imposed on the Company as a result of its affirmative statements and reports, Graña had a duty to promptly disseminate truthful information that would be material to investors, including truthful, complete, and accurate information with respect to the Company's operations and financial results.

422.    Graña had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them, or made those misrepresentations and omissions of material fact without a reasonable belief in their accuracy. Graña's misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Graña's operating condition and financial status from the investing public, and supporting the artificially inflated price of its ADS shares.

423.    As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Graña ADSs was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's ADSs was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's ADSs traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Graña, but

not disclosed in Graña's public statements during the Class Period, Plaintiffs and other Class members purchased Graña ADSs during the Class Period at artificially high prices and were ultimately damaged thereby.

424.    At the time of said misrepresentations and omissions, Plaintiffs and other Class members were ignorant of their falsity, and believed them to be true.  Had Plaintiffs or other Class members and the marketplace known the truth regarding Graña, which Graña did not disclose, Plaintiffs and other Class members would not have purchased Graña ADSs, or, if they had purchased Graña ADSs during the Class Period, would not have done so at the artificially inflated prices which they paid.

425.    As a direct and proximate result of Graña's false and misleading statements, Plaintiffs and the other Class members suffered losses and damages in connection with their Class Period purchases of Graña ADSs.

426.    By reason of the foregoing, Graña has violated §10(b) of the Exchange Act and Rule 10b-5.

### COUNT II

**Violation of §10(b) of the Exchange Act and
Rule 10b-5 Against the Individual Defendants**

427.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-426 as if set forth in full herein.

428.    During the Class Period, the Individual Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

429.     The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

430.     The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Graña ADSs during the Class Period.

431.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Graña ADSs.  Plaintiffs and the Class would not have purchased Graña ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Individual Defendants' misleading statements.

432.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Graña ADSs during the Class Period and the Individual Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder

**COUNT III**

**Violation of §20(a) of the Exchange Act
Against the Individual Defendants**

433.     Plaintiffs repeat and reallege the allegations set forth in ¶¶1-432 as if set forth in full herein.

434.     During the Class Period, the Individual Defendants participated in the operation and management of Graña, and conducted and participated, directly and indirectly, in the conduct of Graña's business affairs.  Because of their senior positions, they knew the adverse non-public information about Graña's false statements and omissions, as well as its materially weak internal controls.

435.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Graña's financial condition and results of operations, and to correct promptly any public statements issued by Graña that had become materially false or misleading.

436.     Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that Graña disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Graña to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Graña within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Graña ADSs.

437.     Each of the Individual Defendants, therefore, acted as a controlling person of Graña. By reason of their senior management positions and/or being directors of Graña, each of the

Individual Defendants had the power to direct the actions of, and exercised the same to cause, Graña to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Graña and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

438.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Graña.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  May 29, 2018

ROBBINS GELLER RUDMAN & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ALAN I. ELLMAN
MOSHE O. BOROOSAN

/s/ David A. Rosenfeld
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, New York 11747
Telephone:  (631) 367-7100
(631) 367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
aellman@rgrdlaw.com
mboroosan@rgrdlaw.com

HOLZER & HOLZER, LLC
COREY D. HOLZER, ESQ.
MARSHALL P. DEES, ESQ.
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Lead Counsel for Plaintiffs*

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO, ESQ.
16 West 46th Street, 7th Floor
New York, NY  10036
Telephone:  (212) 490-9550
(212) 986-0158 (fax)
ctrinko@trinko.com

*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such public filing to all counsel registered to receive such notice.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 29, 2018.

/s/ David A. Rosenfeld

DAVID A. ROSENFELD