UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— x

In re GRAÑA Y MONTERO S.A.A.  :   Civil Action No. 2:17-cv-01105-JMA-ARL
SECURITIES LITIGATION  :
  :   <u>CLASS ACTION</u>
————————————————————  :
  :
This Document Relates To:  :
  :
    ALL ACTIONS.  :
———————————————————— x

 

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT GRAÑA Y MONTERO S.A.A.'S
MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS .................................................................................. 2

     A.  The Company and Its Business Relationship with Odebrecht ................................ 2

     B.  Odebrecht's Bribes and the Use of a Fictitious Accounting Concept to Conceal Graña's Active Participation ................................................................ 3

     C.  Odebrecht Pleads Guilty to Bribery Charges in the United States, and Graña's Participation Is Revealed ............................................................... 4

     D.  Graña and Its Top Executives Are Criminally Charged .......................................... 5

     E.  Graña Acknowledges It Ignored Red Flags and Accounting Irregularities ............ 5

     F.  Graña Admits Widespread Internal Control Failures ............................................... 6

III.  THE AC STATES A CLAIM UNDER §10(b) OF THE EXCHANGE ACT ................... 7

     A.  Plaintiffs Have Adequately Alleged Materially False and Misleading Statements and Omissions ................................................................................ 8

         1.  Statements Regarding Competition and Bidding Are Actionable ............. 8

         2.  Statements Falsely Attributing Graña's Success to Legitimate Sources Are Actionable .......................................................................... 9

         3.  Statements Regarding Legal Compliance Are Actionable ...................... 11

             a.  The Allegations Support that Graña Did Not Believe Its Legal Compliance Statements ......................................................... 11

             b.  The Allegations Support that Graña Had No Reasonable Basis for Its Legal Compliance Statements .................................... 12

         4.  Statements Regarding Internal Controls Are Actionable .......................... 12

         5.  Statements Denying Illegal Conduct and Affirming Graña's Compliance with Its Code of Ethics Are Actionable ................................ 14

         6.  Statements Regarding Graña's Financials Are Actionable ....................... 15

     B.  Plaintiffs Have Adequately Alleged a Strong Inference of Scienter .................... 17

**Page**

1.   Barata's and Marcelo Odebrecht's Incriminating Statements Raise a Strong Inference of Graña's Scienter ......................................................17

2.   The Dividend Distribution Agreements Raise a Strong Inference of Graña's Scienter ..........................................................................................19

3.   Graña Ignored Red Flags of Fraud............................................................22

4.   Graña Possessed the Requisite Motive to Commit Fraud..........................23

5.   Additional Indicia of Fraud Contribute to Graña's Scienter.....................23

6.   Plaintiffs' Strong Inference of Scienter Is at Least as Compelling as Graña's Opposing Inference ..................................................................24

C.   Plaintiffs Have Adequately Pled Loss Causation, Including in Connection with Graña's Internal Control Deficiencies ...........................................................24

IV.   CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................7

*Ballan v. Wilfred Am. Educ. Corp.*,
    720 F. Supp. 241 (E.D.N.Y. 1989) ........................................................................16

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014)...................................................................................25

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)....................................................................18

*Dobina v. Weatherford Int'l Ltd.*,
    909 F. Supp. 2d 228 (S.D.N.Y. 2012).....................................................................13

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) .................................................................................17

*IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of
    Scotland Grp., PLC*,
    783 F.3d 383 (2d Cir. 2015)...................................................................................18

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
    693 F. Supp. 2d 241 (S.D.N.Y. 2010)...............................................................11, 17

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017)........................................................10, 15, 21

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017).....................................................8, 9, 14, 16

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)....................................................................10

*In re Eletrobras Securities Litigation*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017).....................................................................14

*In re Gentiva Sec. Litig.*,
    932 F. Supp. 2d 352 (E.D.N.Y. 2013) ....................................................................24

*In re Lions Gate Entm't Corp. Sec. Litig.*,
    165 F. Supp. 3d 1 (S.D.N.Y. 2016)........................................................................16

*In re Nortel Networks Corp. Sec. Litig.*,
238 F. Supp. 2d 613 (S.D.N.Y. 2003)....................................................................11

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)....................................................................25

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014)....................................................9, 18, 24

*In re Par Pharm., Inc. Sec. Litig.*,
733 F. Supp. 668 (S.D.N.Y. 1990)....................................................................10, 16

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015)............................................................ *passim*

*In re PetroChina Co. Ltd. Sec. Litig.*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015)....................................................................14

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
930 F. Supp. 68 (S.D.N.Y. 1996)....................................................................15

*In re Salix Pharmaceuticals, Ltd.*,
2016 WL 1629341
(S.D.N.Y. Apr. 22, 2016)....................................................................23

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016)....................................................................16

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007)....................................................................14

*In re Sotheby's Holdings, Inc. Securities Litigation*
2000 U.S. Dist. LEXIS 12504
(S.D.N.Y. Aug. 30, 2000)....................................................................9

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008)....................................................................25

*In re Time Warner Inc. Sec. Litig.*,
9 F.3d 259 (2d Cir. 1993)....................................................................23

*In re Van der Moolen Holding N.V. Sec. Litig.*,
405 F. Supp. 2d 388 (S.D.N.Y. 2005)....................................................................10

*In re VEON Ltd. Sec. Litig.*,
2017 U.S. Dist. LEXIS 152240
(S.D.N.Y. Sept. 19, 2017)....................................................................10

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    195 F. Supp. 3d 528 (S.D.N.Y. 2016) ....................................................8, 9, 10, 14

*Kaplan v. S.A.C. Capital Advisors, L.P.*,
    40 F. Supp. 3d 332 (S.D.N.Y. 2014) ..................................................................20

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
    902 F. Supp. 2d 329 (S.D.N.Y. 2012) ................................................................23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ..............................................................................25

*Martinez v. LVNV Funding LLC*,
    2016 U.S. Dist. LEXIS 136613
    (E.D.N.Y. Oct. 2, 2016) .....................................................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ...............................................................................................7

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) ...........................................................8, 10

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .........................................................................17, 18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) ..................................................................................11, 12

*Picard v. Merkin*,
    515 B.R. 117 (Bankr. S.D.N.Y. 2014) ..........................................................13, 23

*Rombach v. Chang*,
    355 F. 3d 164 (2d Cir. 2004) .............................................................................12

*Speakes v. Taro Pharm. Indus.*,
    2018 U.S. Dist. LEXIS 163218
    (S.D.N.Y. Sept. 24, 2018) .....................................................................................9

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) .....................................................................7, 11, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................................*passim*

*Thomas v. Roach*,
    165 F.3d 137 (2d Cir. 1999) ...........................................................................9, 23

*Van Dongen v. CNinsure Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013)....................................................................................23

**STATUTES, RULES AND REGULATIONS**

Exchange Act ............................................................................................................................19

15 U.S.C.
  §78j(b)......................................................................................................................1, 7, 16
  §78t(a) ............................................................................................................................1

Federal Rules of Evidence
  Rule 201(b)(2) ..............................................................................................................19

Federal Rules of Civil Procedure
  Rule 10b-5.......................................................................................................................1
  Rule 12(b)(6) ..................................................................................................................7

Foreign Corrupt Practices Act ........................................................................................4, 6, 7

## I.   INTRODUCTION[1]

This case is about materially false and misleading statements and omissions regarding Defendants' undisclosed scheme to bribe two Peruvian presidents in order to secure lucrative public-works construction projects.  Plaintiffs' case is based on first-hand accounts of Graña's active role in the bribery scheme; contemporaneous written agreements of those bribes; and an admission by Graña that its senior management maintained an "inconsistent and ineffective tone at the top" that allowed it to disregard international accounting standards.  Plaintiffs' claims are further supported by suspiciously timed "resignations" of three of the defendants; an ongoing government investigation in Peru; factual findings of a Peruvian court; and an IPO that enabled Graña to cash in on its deception.

Between 2005 and 2015, Graña participated in multiple consortia led by Odebrecht S.A., a global construction conglomerate, in the concessions[2] for several public works projects in Peru. Throughout the Class Period, Graña maintained that it obtained these projects through a competitive bidding process.  In actuality, these projects were secured by Odebrecht bribing Peruvian presidents, for which Graña and others in the Odebrecht consortia contributed their proportional share.

On December 21, 2016, the U.S. Department of Justice ("DOJ") announced that Odebrecht and one of its affiliated companies pled guilty and agreed to pay a $3.5 billion penalty for paying hundreds of millions of dollars in bribes to government officials around the world.  According to a criminal information filed that day, Odebrecht paid approximately $29 million in bribes to Peruvian

---

[1]  This action is brought against Graña y Montero S.A.A. ("Graña" or the "Company"), Mario Alvarado Pflucker ("Alvarado"), Monica Miloslavich Hart, Jose Graña Miro Quesada ("Jose Graña"), and Hernando Graña Acuna ("Hernando Graña") (collectively "Defendants") on behalf of purchasers of Graña ADSs traded on the NYSE between July 24, 2013 and February 24, 2017 (the "Class Period").  Plaintiffs allege that Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  Plaintiffs have served process only on Graña and have moved the Court for an order directing service of the Consolidated Amended Class Action Complaint ("AC" or "¶__") (ECF No. 22) on the Individual Defendants by alternative means.  *See* ECF No. 34.  "Mem. at _" refers to Graña's memorandum of law in support of its motion to dismiss the AC, dated July 30, 2018.  "Pl. Ex." refers to exhibits to the Declaration of David A. Rosenfeld, filed herewith.  Capitalized terms not defined herein have the meaning ascribed to them in the AC.  All emphasis is added unless otherwise specified, and internal citations and quotations are omitted unless otherwise noted.

[2]  A concession agreement is a type of negotiated contract between a company and a government.

government officials to secure public works contracts between 2005 and 2014.  On February 24, 2017, a Peruvian news magazine, *Hildebrandt en sus trece*, published four pages of testimony from former Odebrecht executive-turned-whistleblower Jorge Barata ("Barata") stating that Graña knew about $20 million in bribes paid by Odebrecht to former President Alejandro Toledo and had committed to repay its proportional share.  Barata, Odebrecht's director of operations in Peru, was personally involved in negotiating the bribes.  On this news, Graña's ADSs declined 35%.

The next business day, three Graña executives – the CEO, the Chairman, and a Director – abruptly resigned.  The Peruvian special prosecutor overseeing the corruption investigation began investigating Graña.  A Peruvian judge subsequently determined there was ample evidence that Graña executives participated in the bribery, found that they posed a flight risk, and ordered their immediate preventative detention for a period of 18 months.  In addition, Graña and a subsidiary were formally incorporated as criminal subjects in the corruption probe.  Even Marcelo Odebrecht, the jailed former Odebrecht CEO, implicated Graña and Jose Graña in Odebrecht's scheme.

Despite these allegations, Graña moved to dismiss the AC, arguing that Plaintiffs have not adequately pled falsity and scienter, as well as loss causation (for one subset of alleged misstatements).  As more fully discussed below, Plaintiffs' detailed accounts of who knew what and when, and particularized allegations of why Defendants' statements were false and misleading, give rise to a cogent and compelling inference that Defendants' misstatements and omissions were made with scienter.  Plaintiffs respectfully submit that Graña's motion should be denied in its entirety.

## II.     STATEMENT OF FACTS

### A.     The Company and Its Business Relationship with Odebrecht

Graña is a Peruvian corporation that provides, *inter alia*, engineering and construction services throughout Latin America.  ¶25.  From 2005 to 2015, Graña participated in multiple Odebrecht-led consortia, including Sections 2 & 3 of the IIRSA South highway system (the "IIRSA

South Concession") and Line 1 of the Lima Metro (the "Lima Metro Concession").  ¶¶40, 47-60.

The IIRSA South Concession: In 2005, Graña, Odebrecht, and other construction companies formed a consortium to present a bid for the IIRSA South Concession.  ¶47.  They won the bid in June 2005, ¶49, and created a construction entity called CONIRSA to perform the work.  ¶50.  Fernando Almenara, a Graña employee, was appointed as the Administration and Finance Manager for CONIRSA.  ¶51 n.3.  In 2011, Graña sold its interest in the IIRSA South Concession.  ¶55.

The Lima Metro Concession: In December 2009, an entity created by Odebrecht (67% interest) and Graña (33% interest) was awarded the contract for the Lima Metro Concession.  ¶58.  The Lima Metro opened for operation in July 2014.  ¶¶58-59.  The Lima Metro Concession made eight profit distributions during that period, including the final distribution in May 2015.  ¶¶60, 154.

Throughout the Class Period, Graña maintained that these two highly lucrative public works projects were obtained through a competitive bidding process, and that its history and reputation as an industry leader were indispensable components of its winning bids.  ¶4.  In truth, however, these concessions were obtained through the payment of bribes to former Peruvian presidents by Odebrecht, with Graña contributing millions of dollars to these bribes.  ¶¶137-63.

### B.   Odebrecht's Bribes and the Use of a Fictitious Accounting Concept to Conceal Graña's Active Participation

To win the IIRSA South and Lima Metro Concessions, Odebrecht, acting upon Graña's advice (¶141), made illegal payments totaling $29 million to two Peruvian presidents.  ¶¶137, 145, 153.  The bribes were directly negotiated by Barata and agreed to by Defendant Jose Graña.  ¶142.

Graña was then required to, and did, reimburse Odebrecht for its proportional share of the bribes through the transfer of differential dividends – in other words, increased dividends paid to Odebrecht relative to its equity interest in the concessions, and reduced dividends paid to Graña relative to its equity interest.  ¶138.  These differential dividend payments were documented in

- 3 -

shareholder meeting minutes and profit distribution agreements over the lives of the projects, by reference to purported "additional risks" that Odebrecht incurred on behalf of the consortia. ¶139.

During a June 30, 2011 Shareholders Meeting for the IIRSA South Concession, for example, Graña agreed to forfeit 24.8% of its profits, and yielded approximately $1.9 million of the $6.6 million to which it was entitled, to Odebrecht. ¶147. In a February 29, 2012 Profit Distribution Agreement for the Lima Metro, Graña yielded 11.49% of its profits to Odebrecht – or approximately $1.4 million of the $12.1 million to which it was entitled. ¶155. And in a May 4, 2015 agreement regarding Lima Metro, Graña surrendered a staggering 52.4% of its profits, approximately $2.1 million, to Odebrecht. ¶¶153, 159-60. The explanation offered to justify Graña's reduced distribution was that Odebrecht had assumed "additional risks" and was "instrumental" in obtaining the profits. ¶¶148, 157, 161. In total, Graña contributed approximately $16 million to the bribes for these two concessions. ¶¶151, 163.

### C.   Odebrecht Pleads Guilty to Bribery Charges in the United States, and Graña's Participation Is Revealed

On December 21, 2016, Odebrecht pled guilty to violating the anti-bribery provisions of the Foreign Corrupt Practices Act, and agreed to pay a $3.5 billion criminal penalty. ¶75. In its Plea Agreement, Odebrecht detailed the $29 million in corrupt payments to government officials in Peru to secure the IIRSA South and Lima Metro Concessions. ¶80.

Graña, however, firmly denied any involvement in the bribery. ¶¶102-05. During a conference call with investors on January 27, 2017, for example, Alvarado stated that "*we have never seen, experienced, witnessed, or participated in any irregular actions related to the projects . . . [and] could not imagine that there was a system specifically designed to pay bribes.*" ¶103.

Then, on Friday, February 24, 2017, *Hildebrandt* reported that Graña knew about Odebrecht's $20 million bribery payment to win the IIRSA South Concession. ¶¶106-07.

According to *Hildebrandt*, Barata, who had turned state's witness, testified that Graña and the other IIRSA South stakeholders "knew there was an agreement . . . knew that [Odebrecht] had paid and . . . knew that they had to assume what would correspond to them." ¶¶108-09.

Graña denied its involvement in the bribery in an SEC filing (¶110), but the market reacted swiftly nonetheless. By the close of business on February 24, 2017, Graña ADSs fell 35%. ¶406.

On Monday, February 27, 2018, Graña Chairman Jose Graña, CEO Alvarado, and Director Hernando Graña (all defendants in this Action) "resigned." ¶112.

### D.    Graña and Its Top Executives Are Criminally Charged

By November 2017, the Peruvian authorities obtained sufficient evidence to corroborate Barata's testimony, including testimony of the former Odebrecht CEO, Marcelo Odebrecht, who confirmed that Graña paid its share of the bribes to Odebrecht in the form of differential dividends, referring to the discount to Graña's profits as "additional risks" borne by Odebrecht. ¶¶114-15, 141.

Armed with this evidence and more, the prosecution sought the provisional arrest of Defendants Jose Graña and Hernando Graña while it completed its investigation and formalized the criminal charges. ¶116. On December 4, 2017, Peruvian Judge Richard Concepcion granted the application and ordered the immediate provisional arrest of Jose Graña and Hernando Graña. ¶117.

Thereafter, Jose Graña and Hernando Graña moved to vacate the provisional arrest order, offering evidence purporting to show that "additional risks" was a legitimate term used in the construction industry. On February 23, 2018, Judge Concepcion rejected that claim, finding that the phrase "additional risks" was a "legal dressing to cover the reimbursement of a bribe" and was "used to justify the payment of covert bribes." ¶¶119-20. On March 6, 2018, the Peruvian court formalized criminal charges against Graña for its role in the IIRSA South Concession bribes. ¶125.

### E.    Graña Acknowledges It Ignored Red Flags and Accounting Irregularities

On January 7, 2017, Graña retained Simpson, Thacher & Bartlett LLP to investigate, *inter*

*alia*, if any Graña employees were involved in the Odebrecht bribery scheme.  But the investigation was severely flawed, and "did not include interview[s] of employees of Odebrecht or the consortia or a review of Odebrecht's or the consortia's internal documents or financial information."  ¶128. Nevertheless, on November 2, 2017, Graña announced that the investigation was complete, and that the resulting report (the "Simpson Thacher Report") "identified no evidence to conclude that any Company personnel engaged in bribery."  ¶127.

Tellingly, the Simpson Thacher Report revealed that Graña ignored numerous red flags raised by Odebrecht's behavior.  The Simpson Thacher Report stated, for example, that Graña "had almost no visibility" into the consortia's finances – even though its own employee was Finance Manager for CONIRSA (*see supra* at 3) – and that Odebrecht "consistently" refused to provide "detailed information on project financials and cash flows."  ¶130.  As for the IIRSA South Concession, Graña was rebuffed when it "voiced frustration about the persistent losses and lack of information" or demanded to be informed about "management, fiscal and accounting aspects[.]"  *Id.* Odebrecht's accounting practices were similarly opaque for the Lima Metro Concession.  ¶¶130-31. Despite these red flags, Graña did nothing to ensure that its concerns were addressed by Odebrecht.

The Simpson Thacher Report further stated that Graña could not "secure from Odebrecht documentation or support for its costs, expenses and risks that were the basis for the increased dividend payments to Odebrecht," but instead "received only very summary descriptions for these costs claimed by Odebrecht" that "did not include any detail on management costs, warranties or other costs claimed by Odebrecht as a basis for differential dividends."  ¶131.  Yet, the Company still agreed to award Odebrecht differential dividends under the guise of "additional risks."

## F.    Graña Admits Widespread Internal Control Failures

On May 16, 2018, Graña belatedly filed its 2016 Form 20-F and disclosed that it had identified material weaknesses in four of the five established criteria for measuring internal control,

including: (i) control environment; (ii) risk assessment; (iii) information and communication; and (iv) monitoring and evidential matter.   ¶¶191, 193.   The material weaknesses in Graña's control environment included "an inconsistent and ineffective tone at the top [that] was present, under then-existing senior management, that was not effective to ensure adherence to IFRS and our accounting policies and procedures."[3]   ¶194.   Additionally, Graña's control environment was insufficient to ensure that: (i) "adequate enterprise risk management (including fraud risk) and monitoring mechanisms were in place"; (ii) its "internal control over financial reporting operated effectively"; and (iii) "the relevant risk/control activities were carried out properly," and "corrective actions were taken on a priority basis and in timely manner."   *Id.*

## III.   THE AC STATES A CLAIM UNDER §10(b) OF THE EXCHANGE ACT

On a Rule 12(b)(6) motion, a court must "accept all factual allegations in the complaint as true" and draw all reasonable inferences in favor of the plaintiff.   *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).   To avoid dismissal, "a complaint must contain sufficient factual matter, accepted as true," to state a plausible claim to relief.   *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   To state a claim under §10(b), a plaintiff must adequately allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."   *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).   The complaint must also "state with particularity facts giving rise to a strong inference" of scienter, *i.e.*, "actual intent" or "recklessness."   *Tellabs*, 551 U.S. at 314, 321; *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("*Dynex*").   The court must assess holistically all the allegations pertaining to

---

[3]  The "tone at the top," or the corporate culture established by an entity's board of directors and senior management within which financial reporting occurs, is of "overriding importance in preventing fraudulent financial reporting" and is "the most important factor contributing to the integrity of the financial reporting process."   ¶183.

scienter, not scrutinize each in isolation. *Tellabs*, 551 U.S. at 326. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences,'" but must merely be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Graña moved to dismiss the AC on the grounds that, in its view, the AC fails to adequately allege misrepresentations, scienter, and loss causation (for Graña's internal control deficiencies). *See generally* Mem. (contesting only these elements). Graña is wrong.

### A.   Plaintiffs Have Adequately Alleged Materially False and Misleading Statements and Omissions

Graña incorrectly asserts that it was free to conceal its role in a bribery scheme because "the securities laws do not impose a general duty to disclose wrongdoing or unproven criminal conduct." Mem. at 10. Rather, "a corporation may be compelled to disclose uncharged wrongdoing if its statements are or become materially misleading in the absence of disclosure." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016). Here, Graña's misconduct is sufficiently connected to its statements to make those statements misleading. *See In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016).

### 1.   Statements Regarding Competition and Bidding Are Actionable

The AC alleges numerous statements by Defendants concerning its competition. *See* ¶¶213, 215, 219-20, 236-38, 270-72, 299-301. These statements are "classic half-truth[s]" because, in reality, Defendants' depiction of a competitive landscape was a sham. *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 760 (S.D.N.Y. 2017). For example, Graña stated: "We face significant competition in each of our markets. . . .We compete on the basis of, among other factors, price, performance, product and service quality, skill and execution capability, client relations, reputation and brand, and health, safety and environmental record. . . . In addition, a portion of our business is derived from open bidding processes which can be highly competitive." ¶213. Graña even

- 8 -

referenced its competitors' inclination to engage in bribery, but implied it did not. *See id.* ("Our competitors may be more inclined to take greater or unusual risks or accept terms and conditions in a contract that we might not deem acceptable."). Graña was, however, then profiting from bribery.

*In re Sotheby's Holdings, Inc. Securities Litigation* is on point. 2000 U.S. Dist. LEXIS 12504, at *10-*11 (S.D.N.Y. Aug. 30, 2000). In *Sotheby's*, a statement about "intense" competition was deemed misleading for not disclosing that defendant had entered a price-fixing agreement. *Id.* at *11 ("A jury could conclude that these statements could have led reasonable investors to believe that Sotheby's and Christie's were competing with each other in the usual manner, that is, through price."); *see also Speakes v. Taro Pharm. Indus.*, 2018 U.S. Dist. LEXIS 163218, at *15 (S.D.N.Y. Sept. 24, 2018) (statements that industry was 'intensely competitive[,]' were misleading in the absence of a disclosure that company engaged in anticompetitive conduct). Similarly, in *Braskem*, the plaintiffs challenged statements describing the bases for the purchase price for naphtha, a raw material. 246 F. Supp. 3d at 745. The Court found the statements were false and misleading because the naphtha prices were actually set through the payment of bribes. *Id.* at 745-47.

Graña did not address this category of statements in its motion to dismiss, even though it was expressly pled as a basis for falsity. *See* ¶¶249(b), 283(g), 316(h), 332(i). Therefore, Graña has conceded the falsity of these statements at this stage. *See Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 634 (S.D.N.Y. 2014).

### 2.    Statements Falsely Attributing Graña's Success to Legitimate Sources Are Actionable

A company must disclose uncharged wrongdoing when it "puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices." *Virtus Inv. Partners*, 195 F. Supp. 3d at 536. "Under these circumstances, the company is 'obligated to disclose information concerning the source of its success,' including illegal

sources."[4] *In re VEON Ltd. Sec. Litig.*, 2017 U.S. Dist. LEXIS 152240, at *15-*16 (S.D.N.Y. Sept.

19, 2017) (quoting *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401

(S.D.N.Y. 2005)); *see also Menaldi*, 164 F. Supp. 3d at 581 (same); *In re Banco Bradesco S.A. Sec.

Litig.*, 277 F. Supp. 3d 600, 653 (S.D.N.Y. 2017) (same); *In re Par Pharm., Inc. Sec. Litig.*, 733 F.

Supp. 668, 675, 677-78 (S.D.N.Y. 1990) (statements suggesting that defendant had particular ability

to obtain FDA approval was misleading when approval was due to bribery of FDA employees).

Here, Defendants put the reasons for Graña's success at issue by claiming several "principal

strengths" provide Graña with "significant competitive advantage[s]," *see* ¶¶207-08,[5] including

"[r]obust backlog and significant additional potential projects" and "[c]omplementary lines of

business which generate more stable cash flows and create additional business opportunities across

our segments." Pl. Ex. 1. The AC, however, alleges a material reason for Graña's success was the

Odebrecht bribery scheme, which enabled Graña to procure the IIRSA South and Lima Metro

projects. ¶4. Defendants thus misled investors by omitting the actual reason for Graña's success.

*See Virtus Inv. Partners*, 195 F. Supp. 3d at 537 (stating investment performance was a "key driver"

of revenues was a "half-truth" that triggered duty to disclose the illegal trades impacting revenues);

*Van der Moolen*, 405 F. Supp. 2d at 401 (omitting that "true source" of revenue was illegal trading).

Graña argues that comments regarding its "robust backlog" are protected by the safe harbor

and bespeaks caution doctrine because they were accompanied by meaningful cautionary language

warning that "backlog may not always be an accurate indicator of future revenues." *See* Mem. at 16.

This failed to warn that statements of the reasons for Graña's success could be misleading and, in

any case, the risk disclosures are insufficient because Defendants knew that Graña was participating

---

[4] While Graña cites *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), that "there is no duty for a company to disclose that past revenue was derived from illegal . . . sources." Mem. at 12-13, the defendant there was not alleged to have put the source of its revenue at issue. *See Virtus Inv. Partners*, 195 F. Supp. 3d at 536.

[5] The Company's Prospectus and Forms 20-F each provided a detailed description of Graña's seven "principal strengths." *See* Pl. Ex. 1 (attaching excerpt of Prospectus).

in bribery.  *See In re Nortel Networks Corp. Sec. Litig*., 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003).

### 3.     Statements Regarding Legal Compliance Are Actionable

Graña's Forms 20-F repeatedly stated: "we believe we are in compliance with all applicable concessions, other similar contracts, laws and regulations in all material respects."  ¶¶216, 240, 274, 303; *see also* ¶221.  This claim was false; at the time, Graña was engaged in a scheme to bribe Peruvian presidents to obtain contracts in violation of law.[6]  *See supra* at 3-6.  The AC also pleads facts sufficient to show the compliance misrepresentations are actionable under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318 (2015), in which the Supreme Court held that a statement of belief about legal compliance is actionable where the facts show the opinion was not honestly held, or even if honestly held, lacked a reasonable basis. *Id.* at 1326-27.

### a.     The Allegations Support that Graña Did Not Believe Its Legal Compliance Statements

As explained below, *see infra* at 17-19, 22, 24, Plaintiffs allege a strong inference that Jose Graña, Chairman of Graña's Board, and Hernando Graña, a board member, were directly involved in paying bribes for construction contracts.  ¶¶28-29.  "When the defendant is a corporate entity, this means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Dynex*, 531 F.3d at 195; *see also In re Ambac Fin. Grp., Inc. Sec. Litig.,* 693 F. Supp. 2d 241, 265 (S.D.N.Y. 2010) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority.").  Because their scienter is imputed to Graña, Plaintiffs adequately allege that Graña did not believe it was in compliance with "laws and regulations in all material respects" when the

---

[6]  Graña argues that the statements of Barata and Marcelo Odebrecht "do not plead collusion in bribery under Peruvian law because neither [of them] stated that anyone at Graña knew about or was involved in the bribery payments before they were made by Odebrecht." Mem. at 3.  As explained below, however, that is not true because Plaintiffs allege that in November 2004, before the IIRSA South contract was executed, Jose Graña and Barata agreed to pay bribes to President Alejandro Toledo.  *See infra* at 19; *see also Tellabs*, 551 U.S. at 322 (a court must "accept all factual allegations in the complaint as true" and draw all reasonable inferences in favor of the plaintiff).

statements were made.[7]

### b. The Allegations Support that Graña Had No Reasonable Basis for Its Legal Compliance Statements

Even if the Court finds that Graña did believe that the Company was legally compliant (a highly implausible inference), the statements are still actionable under *Omnicare* because Graña "omit[ted] material facts about [its] inquiry into or knowledge concerning [the] statement of opinion" and because "those facts conflict with what a reasonable investor would take from the statement itself." 135 S. Ct. at 1329. The *Omnicare* Court stated that "the investor . . . expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at the time." *Id.* Here, the AC pleads "facts about the inquiry [the Company] . . . did not conduct," *id.* at 1332, namely, Graña's post-Class Period admissions that it was "consistently unable to obtain detailed information on project financials and cash flows" from Odebrecht and "voiced frustration about the persistent losses and lack of information." ¶130. Graña also acknowledged that it was "unable to secure from Odebrecht documentation or support for its costs, expenses and risks that were the basis for the increased dividend payments to Odebrecht" (¶131) – the same dividend payments that are alleged to be the "legal dressing" that was "used to justify the payment of covert bribes." ¶119. Thus, during the Class Period, Graña assured investors of its legal compliance but did not perform any meaningful inquiry of Odebrecht's activities – precisely the scenario the Supreme Court described as actionable in *Omnicare*.[8] 135 S. Ct. at 1328.

### 4. Statements Regarding Internal Controls Are Actionable

Graña told investors that, based on its assessment, "management ha[d] concluded that the Company maintained effective internal control over financial reporting" as of December 31, 2014

---

[7] Graña asserts that Plaintiffs' claim concerning legal compliance statements fails "because Plaintiffs do not contend that Graña's statement was not an 'opinion . . . honestly held.'" Mem. at 16 (quoting *Omnicare*, 135 S. Ct. at 1327). Plaintiffs clearly contend that Graña did not honestly believe it was in compliance with laws and regulations. ¶¶216, 240.

[8] While Graña argues that it warned that its stated belief of legal compliance *may* be mistaken, *see* Mem. at 16, these warnings were not meaningful because "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk *has transpired*." *Rombach v. Chang*, 355 F. 3d 164, 173 (2d Cir. 2004).

and 2015, "based on the 1992 criteria in Internal Control-Integrated Framework, issued by the COSO." ¶¶281, 312; *see also* ¶¶247, 282, 315. Plaintiffs have adequately alleged the falsity of these statements based on Graña's admission in the 2016 Form 20-F that it "did not maintain an effective control environment," primarily because "an inconsistent and ineffective tone at the top was present, under then-existing senior management, that was not effective to ensure adherence to IFRS and our accounting policies and procedures."[9] ¶194. According to COSO, the "tone at the top" is "the most important factor contributing to the integrity of the financial reporting process." ¶183. The 2016 Form 20-F also disclosed that Graña failed to satisfy four of the five criteria set forth by COSO for measuring internal control. ¶193; *see also supra* at 6-7.

Graña contends that there are "no factual allegations that dispute the statements in the Form 20-F annual reports that Graña employees utilized specific criteria for effective internal controls . . . ." Mem. at 18. To the contrary, because Graña's senior management failed to exhibit a consistent and effective tone at the top, *ipso facto* they failed to utilize the COSO criteria when assessing Graña's internal controls. Moreover, at the time Graña's "management was professing its opinion that the company's internal controls were effective, that same management was well aware" that they were exhibiting an inconsistent and ineffective tone at the top. *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380 (S.D.N.Y. 2015). Additionally, the presence of unheeded, serious red flags raised by Odebrecht's refusal to provide important financial information to Graña, *see supra* at 5-6, meant that Defendants were at least reckless in certifying the effectiveness of Graña's internal controls. *See Picard v. Merkin*, 515 B.R. 117, 144 (Bankr. S.D.N.Y. 2014) (red flags showed scienter where defendants "saw [red flags of fraud], understood them and purposely ignored them."). These allegations are sufficient to infer that Defendants did not believe the statements at the time

---

[9] Although Graña acknowledged it did not maintain an effective control environment as of December 31, 2016, ¶194, "one reasonably may infer that [Graña's] internal controls in fact were inadequate throughout the class period," *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 245 (S.D.N.Y. 2012), as its internal controls had not changed. *See* ¶314.

they were made.[10]  *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007).

### 5. Statements Denying Illegal Conduct and Affirming Graña's Compliance with Its Code of Ethics Are Actionable

Defendants specifically denied Graña's involvement in the Odebrecht bribery scheme and pointed to its code of ethics to reassure the market of Graña's integrity.  *See* ¶¶103-05, 110, 167, 169, 298, 308, 333-34.  Defendants made these statements despite Graña's payment of bribes to Peruvian presidents, rendering them false and/or misleading.[11]  *See Virtus Inv. Partners*, 195 F. Supp. 3d at 536 (duty to disclose uncharged misconduct arises "when a defendant makes a statement that can be understood, by a reasonable investor, to deny that the illegal conduct is occurring").

Similarly, courts have held that statements concerning commitment to ethical conduct are actionable when made to reassure the market about a company's integrity.  For example, in *In re Eletrobras Securities Litigation*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017), the defendant, like Graña, was facing press inquiries about alleged corruption.  In response, the defendant "repeatedly emphasized and reasserted the strength of its internal controls and its commitment to transparency and ethical conduct," and made reference to its Code of Ethics.  *Id.*  The court held the statements were actionable because they were "made specifically in response to damaging media reports about bribery and bid-rigging[.]"  *Id.*; *see also Petrobras*, 116 F. Supp. 3d at 381.

Graña argues statements about corporate governance and ethics are inactionable puffery.  *See* Mem. at 14-15.  "Whether a representation is 'mere puffery' depends, in part, on the context in which it is made."  *Petrobras*, 116 F. Supp. 3d at 381.  In *Petrobras*, the court rejected a similar argument, explaining that when "the statements were made repeatedly in an effort to reassure the

---

[10]  Graña's reliance on *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359-60 (S.D.N.Y. 2015), is unavailing because there, unlike here (¶194), "the plaintiffs did not plead[] 'that the Company had flawed internal controls over financial reporting.'"  Mem. at 18 (quoting *PetroChina*, 120 F. Supp. 3d at 359-60); *see also id.* (citing *Braskem*, 246 F. Supp. 3d at 757 (no allegations of undisclosed control deficiencies affecting financial reporting)).

[11]  Graña argues that it "had no obligation to disclose any alleged misconduct merely because it was aware of a broader government investigation into [Odebrecht's] wrongdoing involving projects in which Graña participated."  Mem. at 11-12.  Plaintiffs make no such claim.  Rather, Plaintiffs allege that Graña's disclosure obligation was triggered because it discussed Odebrecht's plea agreement ***and*** knew that it had participated in Odebrecht's misconduct.

investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company." *Id.*; *see also Banco Bradesco*, 277 F. Supp. 3d at 660 (same).[12]  Graña's cases, *see* Mem. at 15, where statements about reputation and integrity were not made to reassure the market about allegations of criminality, are not to the contrary.

### 6.    Statements Regarding Graña's Financials Are Actionable

Graña misstated its net income, in violation of IFRS, because the bribes paid to obtain the Lima Metro and IIRSA South concessions were not expensed as incurred.  ¶345.  Graña's share of the bribes to obtain the Lima Metro and IIRSA South concessions, which totaled $10.4 million and $5.8 million, respectively (¶354), were general administration costs for which reimbursement by the Peruvian government was not specified in the contracts, and, accordingly, were required to be expensed as incurred under accrual accounting and International Accounting Standard ("IAS") 11. ¶¶349-50.  Graña improperly delayed the recognition of these bribes and reported them in its financial statements from 2011 to 2015, *see* ¶346, as a reduction of its share of the profit distributions on these concessions.  ¶351.

Graña argues that "Plaintiffs make no attempt to explain how bribes paid by Odebrecht over a decade ago somehow render Graña's statements during the Class Period . . . false or misleading in any way," and that "[a]ny failure to account for or expense those payments would have no impact on Graña's financial statements issued in and after 2013."  Mem. at 1-2; *see also id.* at 14.  However, Judge Concepcion expressly found that Graña's financial statements were misstated ***during the Class Period*** because they failed to immediately expense the bribes paid on the IIRSA South

---

[12]  Graña also argues that it sufficiently warned investors that it could be affected by the criminal convictions of Odebrecht executives, and that Graña itself could become subject to a government investigation, such that "Graña cannot be held liable for failing to disclose what was in fact disclosed."  Mem. at 17 & n.13.  The crucial fact that Graña failed to disclose, however, is that it participated in Odebrecht's bribery scheme – a glaring omission that renders its so-called risk warnings insufficient.  *See In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (the "doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away").

Concession.[13]  ¶352.  This finding makes sense.  By failing to account for the bribe payments when they were incurred – as opposed to during the duration of the concessions (through 2011 for IIRSA South and through 2015 for the Lima Metro) – Graña misstated its net income during the Class Period.  ¶353.  Indeed, Graña made bribe payments to Odebrecht during the Class Period itself. ¶¶159-61.  Thus, Graña's financial statements during the Class Period improperly recorded the bribe payments for the Lima Metro through 2015.  Even though Graña sold its interest in IIRSA South in 2011, Graña incorporated its 2011 financial statements into the Prospectus during the Class Period (¶200); accordingly, the 2011 financial statements are also actionable.[14]

In addition, during the Class Period, Graña represented that its financial statements were presented in conformity with IFRS.  These representations were materially false and misleading because Graña: (i) improperly accounted for illegal bribes, explained above; and (ii) failed to disclose contingent liabilities associated with its unlawful acts.  ¶360.  While Graña argues that "[t]he securities laws do not impose an obligation on a company to predict the outcome of investigations," Mem. at 14, Plaintiffs do not allege that Graña improperly failed to predict the outcome of ongoing investigations.  Rather, the AC alleges that Graña materially misled investors by stating its Class Period financial statements complied with IFRS when they failed to set forth the disclosure required by IFRS about the ***existence*** of its unlawful bribery scheme and the ***potential*** adverse ramifications, including fines, criminal penalties and/or other sanctions ensuing therefrom.[15]

---

[13]  The impact of subsequent appellate court decisions on Judge Concepcion's rulings is addressed *infra* at 20-22. Importantly, none of those decisions criticized his findings concerning Graña's improper accounting, and Graña does not argue to the contrary.  Also, Graña incorrectly asserts that Plaintiffs' allegations "revolve[] around" Judge Concepcion's rulings and "center on" Graña's financial statements.  Mem. at 2, 13.  While Plaintiffs cite Judge Concepcion's rulings for support and allege that Graña issued false financial statements, Plaintiffs' case is far broader.

[14]  Because Plaintiffs allege that Graña ***improperly*** recorded net income, the cases cited by Graña – which lack similar allegations – are inapposite.  *See* Mem. at 13 (quoting *Braskem*, 246 F. Supp. 3d at 753 ("a corporation, ***by reporting its income***, does not take on a duty to disclose that some of that income may be due, in part, to unlawful conduct.") and *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 404 (S.D.N.Y. 2016) ("allegation that a corporation ***properly*** reported income that is alleged to have been, in part, improperly obtained is insufficient to impose" §10(b) liability)).

[15]  As such, *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016), *Par Pharm.*, 733 F. Supp. at 678, and *Ballan v. Wilfred Am. Educ. Corp.*, 720 F. Supp. 241, 248 (E.D.N.Y. 1989), are inapposite.  *See* Mem. at 14.

### B.     Plaintiffs Have Adequately Alleged a Strong Inference of Scienter

A plaintiff may plead scienter by alleging motive and opportunity or facts raising a strong inference of conscious misbehavior or recklessness.  *See Dynex*, 531 F.3d at 195.  The Second Circuit has held that scienter is sufficiently pled based on allegations that defendants deliberately engaged in illegal behavior, knew facts or had access to information suggesting their public statements were not accurate, failed to check information they had a duty to monitor, or benefitted in a concrete or personal way from the purported fraud.  *See Novak v. Kasaks*, 216 F.3d 300, 308-09 (2d Cir. 2000).  Courts routinely impute to the corporation the intent of its directors.  *See Ambac,* 693 F. Supp. 2d at 265.  The AC adequately pleads each of these bases of scienter.

### 1.     Barata's and Marcelo Odebrecht's Incriminating Statements Raise a Strong Inference of Graña's Scienter

An executive's participation in a bribery scheme has been found to be probative of scienter in securities fraud actions.  *See, e.g.*, *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) ("evidence of bribery by a top company official" probative of scienter); *Petrobras*, 116 F. Supp. 3d at 382.  Here, Barata and Marcelo Odebrecht both made sworn statements to Peruvian prosecutors that ***Graña knew Odebrecht was bribing Peruvian presidents to obtain contracts that benefited Graña***, and that Graña had committed to, and did, pay its share of the bribes.  ¶¶108, 115, 140-42.

Graña argues these statements are insufficient because they are uncorroborated by underlying evidence.  Mem. at 3.  As a threshold matter, the factual allegations in the AC must be accepted as true, *see Tellabs*, 551 U.S. at 322, and Graña does not point to anything supporting a corroboration requirement.  In any case, these statements – by two different individuals – corroborate each other, and Peruvian Prosecutor Hamilton Castro corroborated Barata's statements in his investigation.  *See* ¶142 ("Prosecutor Castro . . . compared the initial confession of . . . Barata . . . with the statements of other witnesses, internal minutes, expert reports and bank reports that record the cash movements of the consortium.").  Furthermore, as explained *infra* at 19-22, these statements are corroborated by

- 17 -

the dividend distribution agreements (describing Graña's bribes through Odebrecht).[16]

Graña also asserts that Barata's and Marcelo Odebrecht's statements "are not sufficiently trustworthy" and "cannot be used to plead an inference of conscious misbehavior." Mem. at 21. The Second Circuit, however, has held that witness accounts must only include "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 313-14. Their statements are sufficiently particularized because they: (1) were senior Odebrecht executives who, admittedly, engaged in a scheme to bribe Peruvian presidents on behalf of Odebrecht and the minority stakeholders in its Peruvian consortia; and (2) explained their direct interactions with Graña and Jose Graña regarding the bribery scheme. *See supra* at 3, 18-19. Graña contends that neither of them specifically identify Graña or any individual at Graña as having prior knowledge of the alleged misconduct. *See* Mem. at 22. Not so. Barata and Marcelo Odebrecht both explained that Graña as a corporate entity and/or a member of the consortium was aware of the bribes (¶¶108, 115, 141),[17] and that Jose Graña personally was aware of the bribes (¶¶115, 142).

Graña complains that Plaintiffs "copied" these allegations "from unproven sources," and did not conduct an "independent investigation[.]" Mem. at 21-22.[18] To the contrary, Plaintiffs rely on testimony from Barata and Marcelo Odebrecht to Peruvian prosecutors, which, as the Second Circuit has held, must be credited on this motion. *See IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 390 (2d Cir. 2015) (the

---

[16] Graña contends that Plaintiffs are unable to "plead any valid evidence" that Graña was aware of bribery by Odebrecht. Mem. at 2. Plaintiffs have no such obligation at the pleading stage. *See, e.g., Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 423 (S.D.N.Y. 2010) ("A plaintiff is not required to plead evidence."). And, despite Graña's contention, Mem. at 23, Plaintiffs are not required to allege statements by Graña employees to corroborate Barata or Marcelo Odebrecht.

[17] Graña understood Barata's statements in *Hildebrandt* to refer to Graña, as evidenced by its denial of them. ¶110.

[18] Graña's cases are inapposite because they involved allegations in complaints, not sworn testimony to governmental authorities, as here. *See* Mem. at 21-22. In any event, many courts have held that allegations from another lawsuit may be relied on at the pleading stage. *See, e.g., Martinez v. LVNV Funding LLC*, 2016 U.S. Dist. LEXIS 136613, *10 (E.D.N.Y. Oct. 2, 2016); *OSG*, 12 F. Supp. 3d at 622.

"complaint relies heavily on [the FSA Report] and on testimony given in a parliamentary inquiry on RBS's collapse for its factual allegations regarding misleading statements by RBS made with scienter. Both the FSA Report and the testimony are cited in the [complaint], and their contents as public documents are not subject to reasonable dispute") (citing Fed. R. Evid. 201(b)(2)); *see also Petrobras*, 116 F. Supp. 3d at 378-379 (crediting allegations based on testimony).

Graña also argues that Barata's and Marcelo Odebrecht's statements "do not plead collusion in bribery under Peruvian law because neither [of them] stated that anyone at Graña knew about or was involved in the bribery payments before they were made by Odebrecht." Mem. at 3. Again, Graña is wrong. According to Prosecutor Castro, in "***November of 2004***" – before the IIRSA South contract was executed in 2005 – "Barata communicated with Jose Alejandro Graña Miró Quesada [and others] regarding its negotiations with Alejandro Toledo Manrique to obtain the tender for project [IIRSA South] in exchange for an unlawful payment[.] Barata, Miró Quesada [and the others] agreed to pay the illegal commissions to Alejandro Toledo." ¶142. Even assuming, *arguendo*, that Graña executives did not know about the bribery payments before Odebrecht made them and that collusion in bribery under Peruvian law requires prior knowledge, the issue here is not whether Defendants violated Peruvian law – it is whether they violated the federal securities laws. Because Defendants made false and misleading statements and omissions to investors regarding a bribery scheme that they knowingly participated in, they violated the Exchange Act.

### 2.    The Dividend Distribution Agreements Raise a Strong Inference of Graña's Scienter

The contemporaneous dividend distribution agreements documenting Graña's payment of its share of the bribes to Odebrecht for the IIRSA South and Lima Metro concessions further support a strong inference of scienter. *See* ¶¶146, 153; *see also supra* at 3-4. The minutes of the IIRSA South Concession General Meeting of Shareholders on June 30, 2011, explain that Odebrecht was entitled

- 19 -

to a higher distribution because it assumed "additional risks" for the consortium.  ¶¶147-48; *see also*

¶¶137-63.  Plaintiffs allege that the ceding of profits to Odebrecht through the "additional risks"

mechanism enabled Graña and the other minority stakeholders to surreptitiously pay Odebrecht their

share of the bribes needed to secure the concessions.  *See* ¶142 ("[T]here was a difficulty in the

associated companies justifying the outgoing money.  In this regard, the mechanism used (the ceding

of profits) was an opportunity to carry out the illegal purposes."); *see also* ¶¶120, 140-43, 380, 392.

Graña's countervailing explanation of the "additional risks" language, stated in passing in its

Factual Background (*see* Mem. at 6), presents a "question of fact that cannot be resolved at the

pleading stage."  *Kaplan v. S.A.C. Capital Advisors, L.P.*, 40 F. Supp. 3d 332, 341 (S.D.N.Y. 2014).

Moreover, Graña's alternate meaning of "additional risk" is dubious at best because, by Graña's own

admission, "[t]he Company was unable to secure from Odebrecht documentation or support for its

costs, expenses and risks that were the basis for the increased dividend payments to Odebrecht."

¶131.  Thus, Graña's defense rests on an argument that it agreed to cede $16 million to Odebrecht

for assuming additional risks in connection with these concessions even though it could not

substantiate support for those risks.  *See supra* at 6.  In view of this, Graña's competing explanation

of "additional risks" – notwithstanding its impropriety at the pleading stage – is not credible.[19]

Plaintiffs' allegations of scienter are also supported by Judge Concepcion's factual finding

that the term "additional risks" was a "legal dressing to cover the reimbursement of a bribe" and was

"used to justify the payment of covert bribes."  ¶¶119-20.  Graña asserts that decisions from Peru's

First National Appellate Court undermine Plaintiffs' reliance on resolutions issued by Judge

Concepcion.  Mem. at 2.  Graña does not – and cannot – argue Judge Concepcion's conclusion

regarding the meaning of the term "additional risks" was overturned by the Peruvian appellate court.

---

[19]   While Graña claims that Plaintiffs fail to plead any "specific contemporaneous statements or conditions" for scienter, Mem. at 21, the dividend distribution agreements and Barata's and Marcelo Odebrecht's statements plead just that.

Graña's reliance on the appellate decisions to counter the allegations in the AC is overstated and improper.[20]  *See* Def. Exs. 7-10.  Courts may not take judicial notice of documents filed in other courts for the truth of the matters asserted therein.  *See Banco Bradesco*, 277 F. Supp. 3d 600.  In a strikingly similar case, the plaintiffs in *Banco Bradesco* relied heavily on a criminal complaint filed in Brazil and the Brazilian court's finding of just cause to prosecute the action.  *Id.*  After the motion to dismiss was briefed in the U.S. district court, the Brazilian appellate court issued a decision dismissing the criminal charges against the defendants.  *Id.* at 636.  The defendants in *Banco Bradesco* argued that the Brazilian appellate decision negated the allegations in the complaint.  *Id.*

The district court disagreed and held that the Brazilian appellate decision had "no impact at the pleading stage" for three main reasons: (1) judicial notice of a foreign judgment is limited, and appears not to include the "reasoning and factual recitations contained within a foreign judgment for their truth"; (2) the appellate decision turned "in large part" on the sufficiency of the allegations and the applicable standard of proof in Brazil; and (3) "most importantly," on a motion to dismiss, all facts are accepted as true, and all inferences are drawn in the plaintiff's favor.  *Id.*

The reasoning in *Banco Bradesco* is even more applicable here because, unlike there, the underlying criminal charges remain intact, and the appellate court just replaced the provisional arrest orders with ordinary summonses.  *See* Def. Ex. 7 at 10; Ex. 8 at 21; Ex 9 at 27.  Moreover, the reversals here were because the high standard applicable to provisional arrest applications – which requires the prosecution to demonstrate to "a high degree of probability that the defendant has committed the offense and that all the presuppositions of the punishability and prosecutability are present . . . [to] a high level of certainty and credibility[]" (Def. Ex. 8, §2.1.4) – had not been met.  Indeed, in directing the issuance of criminal summonses, the appellate court necessarily determined that the prosecution had sufficiently established a "revealing suspicion" of criminality, which

---

[20] Plaintiffs are concurrently filing a request for a pre-motion conference for a motion to strike Defendants' Exs. 7-10.

"requires the existence of facts or basic data that rationally serve as evidence of the commission of a crime[.]" *Id.* Thus, the appellate decisions bolster, rather than undercut, the AC's allegations.

In any case, none of the appellate decisions affect the substantive merits of Plaintiffs' claims:

- <u>Def. Ex. 7</u>: The appellate court held that charging Hernando Graña with money laundering was a "viable" theory (§4.6) and ruled that the evidence sufficiently established to "a high degree of probability" that "additional risks" was a fraudulent accounting term designed "to launder the illegal money resulting from the alleged act of Collusion[.]" (§4.11). The appellate court nevertheless held that preventative detention was inappropriate because (i) Barata did not mention Hernando Graña by name; and (ii) although he agreed to a reduced dividend distribution on behalf of the Company, he did so through a power of attorney. (§§4.11, 4.12).

- <u>Def. Ex. 9</u>: The appellate court found that the accusatory instrument charged Jose Graña under an older version of the collusion statute that narrowly defined criminal collusion as a direct agreement made with a public official. Because Jose Graña did not directly participate in the meeting where the bribe was negotiated, he could not be held liable under that statute. Judge Concepcion found that provisional arrest was justified because Jose Graña was likely guilty under the amended collusion statute which broadly defined collusion to include even indirect agreements. (§3.2.2.2). The appellate court revoked the provisional arrest order, which it determined was "*inconexo*," or incoherent, as presented. (§3.3.2.5).

- <u>Def. Ex. 8</u>: Gonzalo Rey, Graña's former corporate manager of business development, was charged with (i) criminal collusion under the older version of the statute, and (ii) the derivative crime of money laundering. Because he was not directly involved in negotiating the bribe, the prosecution could not make the showing necessary to sustain a provisional arrest order. (§3.2.12). The appellate court also found that the record was insufficient to sustain the provisional arrest order based on the remaining charge of money laundering because the primary source of evidence, Barata's plea bargain testimony, failed to comply with certain procedural safeguards, and could not be considered on an application for provisional arrest. (§3.3.5).

- <u>Def. Ex. 10</u>: Judge Concepcion incorporated the entities Graña and GyM S.A. into the existing investigation. (Ex. 10 at 1). The appellate court reversed and dismissed the entities from the action ***without prejudice***, based on a failure to acquire jurisdiction over the entities. (*Id.* §3.8.).

### 3.    Graña Ignored Red Flags of Fraud

Assuming, *arguendo*, that Graña did not know that Odebrecht was paying bribes to two Peruvian presidents in order to secure contracts that benefited the Company, Plaintiffs have nevertheless adequately alleged Graña's recklessness because it purposely ignored serious red flags of Odebrecht's bribery. *See supra* at 5-6. A "red flag" theory of scienter is satisfied where, as here, a plaintiff alleges that defendants "saw [red flags of fraud], understood them and purposely ignored

them."[21] *Picard*, 515 B.R. at 144.  Graña does not even address these allegations and, therefore, has

conceded them at this stage.  *See, e.g.*, *Thomas*, 165 F.3d at 145.

### 4.       Graña Possessed the Requisite Motive to Commit Fraud

In addition to adequately alleging Defendants' conscious misbehavior and/or recklessness,

Plaintiffs adequately allege Defendants' motive to commit fraud.  The bribery scheme allowed

Graña "to cash in, selling more than 22.4 million Graña ADSs at artificially inflated prices in the

July 24, 2013 IPO, generating approximately $475 million in gross proceeds."  ¶5.  Misstatements

that artificially inflate a stock price in advance of an offering are sufficient to support a corporation's

scienter on a motion to dismiss.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 270 (2d Cir.

1993); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474-75 (S.D.N.Y. 2013).  Graña ignores

these allegations, *see* Mem. at 20, and, therefore, has conceded them.  *See Thomas*, 165 F.3d at 145.

Graña notes that there are no allegations of insider stock sales.  *See* Mem. at 20.  This is a red

herring because, as a Peruvian company, Graña is not required to publicly report insider stock trades,

and, therefore Plaintiffs were unable to analyze the Individual Defendants' stock transactions.  *See*

Pl. Ex. 2 (Graña 2015 Form 20-F) ("[T]he Peruvian Securities Market Law . . . imposes disclosure

requirements that are more limited than those in the U.S. in certain important respects.").  In any

case, suspicious stock sales are not necessary for scienter.  *See Tellabs*, 551 U.S. at 325.

### 5.       Additional Indicia of Fraud Contribute to Graña's Scienter

**Defendant resignations**.  "For executive resignations to raise a strong inference of scienter,

they must be highly unusual and suspicious."  *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.,*

*PLC*, 902 F. Supp. 2d 329, 343 (S.D.N.Y. 2012).  For example, in *In re Salix Pharmaceuticals, Ltd.*,

2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016), it was suspicious that one defendant resigned

"the day [the company] announced its true . . . inventory numbers," and another "two months later,

---

[21]  For this reason, Graña is incorrect when it asserts that Plaintiffs do not "plead any facts showing that Defendants ignored contradictory information at the time the alleged misstatements were made."  Mem. at 21.

during investigations." *See also OSG*, 12 F. Supp. 3d at 632-633.  Here, Defendants Alvarado, Jose Graña, and Hernando Graña all "resigned" within one business day of the *Hildebrandt* article.

**Governmental investigation**. *See, e.g.*, ¶15.  "Certainly, courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter."  *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013).

### 6. Plaintiffs' Strong Inference of Scienter Is at Least as Compelling as Graña's Opposing Inference

The inference that the defendant acted with scienter must merely be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  Graña's opposing inference is that "Odebrecht concealed its widespread bribery from everyone, including Graña," because "it would have been self-defeating, or at least counter-productive, for Odebrecht to disclose its scheme to and discuss it with its many minority partners, including Graña."  Mem. at 23-24.  Graña's opposing inference is flatly contradicted by Plaintiffs' allegations.  According to Marcelo Odebrecht, rather than being counter-productive for Odebrecht to discuss its scheme with Graña, Graña's role "was ***decisive*** in choosing the projects in which 'bribes' could be paid, and in suggesting the name of presidential candidates that should receive financing." ¶141; *see also* ¶115.  Additionally, Marcelo Odebrecht explained that Odebrecht benefited financially from Graña's role in the scheme so that Odebrecht could "charge[] up to the very last cent" for the expenses it incurred in connection with the bribes.  *Id.*  Indeed, had Odebrecht not required Graña to contribute its share of the bribes, Graña would effectively get a free ride while Odebrecht would bear the expense and risk of the bribery.  Accordingly, Plaintiffs' inference of scienter is at least as – if not more – compelling than Graña's opposing inference.

### C. Plaintiffs Have Adequately Pled Loss Causation, Including in Connection with Graña's Internal Control Deficiencies

Loss causation can be pled by alleging "that the market reacted negatively to a corrective

disclosure," or "the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014).  In materialization-of-the-risk, a misstatement or omission is "the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010).

Here, the risk concealed by Graña's misrepresentations concerning the adequacy of its internal controls materialized on February 24, 2017, when *Hildebrandt* reported Barata's testimony that Graña knew about Odebrecht's $20 million bribery payment to win the IIRSA South Concession.  ¶107.  In response to this disclosure, Graña's ADSs declined 35%.  ¶406.  The risk that caused, in part, shareholders' loss – Graña's failure to maintain a consistent and effective tone at the top to ensure adequate fraud-risk mechanisms were in place to prevent bribery – was within the zone of risk concealed by the misrepresentations about Graña's internal controls.  As such, Plaintiffs have adequately alleged loss causation as it relates to Graña's disclosure of inadequate internal controls.

Graña argues that because its ADS price did not decline in response to this specific disclosure regarding its internal controls, Plaintiffs cannot plead loss causation for this claim.  Mem. at 25.  A lack of negative stock-price reaction, however, could signal that "the market already had taken account of such information."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289 (S.D.N.Y. 2008).  Under materialization-of-the-risk, Plaintiffs need not allege a stock-price decline in response to the specific disclosure of Graña's inadequate internal controls, so long as Plaintiffs allege a decline when that risk materialized, *i.e.*, on February 24, 2017 – as Plaintiffs have done.

## IV.   CONCLUSION

For these reasons, Graña's motion to dismiss should be denied in its entirety.  In the event that the Court grants any portion of Graña's motion, Plaintiffs respectfully request leave to amend.  *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015).

DATED:  September 26, 2018

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
ALAN I. ELLMAN
MOSHE O. BOROOSAN

*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, New York 11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
aellman@rgrdlaw.com
mboroosan@rgrdlaw.com

HOLZER & HOLZER, LLC
COREY D. HOLZER, ESQ.
MARSHALL P. DEES, ESQ.
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: 770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Lead Counsel for Plaintiffs*

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO, ESQ.
16 West 46th Street, 7th Floor
New York, NY  10036
Telephone:  212/490-9550
212/986-0158 (fax)
ctrinko@trinko.com

*Additional Counsel for Plaintiffs*

- 26 -

<u>CERTIFICATE OF SERVICE</u>

I, David A. Rosenfeld, hereby certify that on September 26, 2018, I caused true and correct copies of the foregoing document to be served on all defense counsel of record by providing them with copies via electronic mail.

_/s/ David A. Rosenfeld_
DAVID A. ROSENFELD