UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re GRAÑA Y MONTERO S.A.A. SECURITIES LITIGATION | : : : : | Civil Action No. 2:17-cv-01105-LDH-ST<br><br>CLASS ACTION |
| This Document Relates To:<br><br>ALL ACTIONS. | : : : : : | JURY TRIAL DEMANDED |

**SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

**Page**

I.   NATURE OF THE ACTION ...................................................................................1

II.   JURISDICTION AND VENUE ...........................................................................6

III.   PARTIES ..............................................................................................................6

IV.   ADDITIONAL KEY NON-PARTIES ................................................................9

V.   DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT .............14

    A.   Odebrecht Paid, and Graña Contributed, Millions of Dollars in Bribes to Corrupt Public Officials to Win Major Public Works Projects ...........................14

    B.   The Lima Metro Project ...............................................................................16

        1.   Description of the Project .........................................................................16

        2.   The Bribes for the Lima Metro Project....................................................18

        3.   Cost Overruns for the Lima Metro............................................................20

        4.   The Bribes for the Lima Metro Project Are Documented in the Consortium's Profit Distribution Agreements ...........................................21

            a.   The 2012 Profit Distribution Agreement ......................................21

            b.   The 2015 Liquidation Agreement .................................................23

    C.   Odebrecht Paid, and Graña Contributed, Bribes to Win the Contract for the Construction of Sections 2 and 3 of the IIRSA South Highway.....................24

        1.   The IIRSA South Project ..........................................................................24

        2.   The Bribes for the IIRSA South Project ...................................................25

        3.   Bribes to Obtain Fraudulent Work Progress Certifications Needed to Obtain Financing......................................................................................27

        4.   The Bribes to President García to Facilitate the Smooth Completion of the IIRSA South Project ...................................................28

        5.   Odebrecht Bribed Arbitrators to Obtain Favorable Arbitration Awards and Generate Fraudulent Cost Overruns ......................................28

        6.   Graña Documented the Bribes for the IIRSA South Project as Payments for "Additional Risks"...............................................................30

D.    The Construction Club Cartel ................................................................32

E.    The Southern Gas Pipeline Project .......................................................33

F.    The Truth Begins to Emerge: Odebrecht Confesses to Paying Bribes to Win Public Infrastructure Contracts in Peru .....................................34

    1.    The Peruvian Authorities Launch an Investigation into Odebrecht's Peruvian Partners; Graña Repeatedly Denies Involvement in the Bribery Scheme ........................................................36

    2.    Graña's Involvement in the Bribery Scheme Is Revealed and Its Stock Tumbles ........................................................42

VI.    POST CLASS PERIOD EVENTS ........................................................43

A.    Senior Graña Executives Resign Within Days of Barata's Disclosure .................43

B.    Numerous Odebrecht Officials Corroborate Barata's Testimony .........................44

    1.    Background: Peru's Law of Effective Collaboration ................................44

    2.    Odebrecht Officials Sign Final Agreement as Effective Collaborators ........................................................45

    3.    Jorge Barata ........................................................46

    4.    Marcelo Odebrecht ........................................................48

    5.    Carlos Nostre ........................................................52

    6.    Sergio Nogueira ........................................................53

C.    Top Graña Executives Are Criminally Charged ................................................54

    1.    Defendant José Graña Is Charged with Criminal Collusion and Money Laundering ........................................................54

    2.    Defendant Hernando Graña is Charged with Money Laundering ............55

    3.    Gonzalo Rey is Charged with Criminal Collusion ....................................57

    4.    Graña and GyM S.A. Are Incorporated as Civilly Responsible Third Parties in Connection with the Odebrecht Probes ..........................58

5.      Graña Admits that It Ignored Numerous Red Flags ...................................58

6.      Law No. 30737: Graña is Further Penalized by Peru's New
        Anticorruption Law.......................................................................................61

VII.    ETHICS CHARTER, CODE OF CONDUCT, AND ANTI-CORRUPTION
        POLICY ...............................................................................................................62

        A.      Ethics Charter (1995) ................................................................................62

        B.      Code of Conduct (2012)............................................................................63

        C.      Anti-Corruption Policy (2015) ..................................................................64

VIII.   EFFECTIVE INTERNAL CONTROLS ARE AN INTEGRAL COMPONENT
        OF PUBLIC CORPORATIONS.........................................................................67

IX.     GRAÑA ADMITS THAT IT CREATED A CULTURE OF FRAUD ..........................69

X.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS DURING THE CLASS PERIOD ....................................................72

        A.      Fiscal Year 2013 False and Misleading Statements and Omissions....................73

                1.      The Registration Statement and Prospectus................................................73

                2.      2Q13 Quarterly Results..............................................................................81

                3.      3Q13 Quarterly Results..............................................................................81

                4.      4Q13 Quarterly Report and Conference Call.............................................82

                5.      Consolidated Financial Statements FY 2011, 2012, 2013 ........................82

                6.      2013 Form 20-F ..........................................................................................82

        B.      Fiscal Year 2014 False and Misleading Statements and Omissions....................88

                1.      1Q2014 Quarterly Results and Conference Call........................................88

                2.      2Q14 Quarterly Results and Conference Call............................................89

                3.      3Q14 Press Release and Conference Call ..................................................90

                4.      4Q14 Results Report and Conference Call .................................................90

**Page**

5. The 2014 Form 20-F ...................................................................91

C. Fiscal Year 2015 False and Misleading Statement and/or Omissions ..................97

1. 1Q15 Press Release and Conference Call ....................................97

2. 2Q15 Press Release and Conference Call ....................................98

3. 3Q15 Press Release and Conference Call ....................................98

4. 4Q15 Results Report and Conference Call ..................................98

5. 2015 Form 20-F ............................................................................99

D. Fiscal Year 2016 False and Misleading Statements and/or Omissions ...............105

1. 1Q16 Press Release and Conference Call ..................................105

2. 2Q16 Press Release and Conference Call ..................................106

3. 3Q16 Press Release and Conference Call ..................................106

4. 4Q16 Results Report and Conference Call ................................107

E. Fiscal Year 2017 Materially False and Misleading Statements and Omissions ........................................................................................109

1. The *Carretas* Interview ...........................................................109

2. The *RPP Noticias* Interview .....................................................109

3. The January 27, 2017 Conference Call .....................................110

4. The *La República* Interview .....................................................111

5. Form 6-K with Official Agenda ................................................112

XI. GRAÑA'S MATERIALLY FALSE AND MISLEADING FINANCIAL REPORTING ..........................................................................................113

A. Misleading Representations About Graña's Profit or Loss Associated with the Operations of the Minority Interests in Its Subsidiaries .................115

B. Misleading Representations About Graña's Contingencies .................119

- iv -

**Page**

XII.   DEFENDANTS ACTED WITH SCIENTER ...............................................120

    A.   As a Key Member of the IIRSA South Consortium, Graña Was Involved in All Major Corporate Decisions.........................................................121

    B.   Graña Knew About the Bribes, and Contributed Its Proportional Share.............122

    C.   Graña Executives Resign Within Three Days of the Disclosure of Graña's Role in the Bribery Scheme ...................................................................124

    D.   The Ongoing Criminal Proceedings Against Graña, GyM S.A., and Former Graña Executives Contribute to an Inference of Scienter.......................125

    E.   Defendants Violated Graña's Ethics Charter, Code of Conduct, and Anti-Corruption Policy.................................................................................125

XIII.  GRAÑA'S OFFICIAL POSITION REGARDING THE ODEBRECHT SCANDAL CONTINUES TO EVOLVE.......................................................126

XIV.  LOSS CAUSATION.........................................................................137

    A.   Additional Loss Causation Allegations ..................................................139

XV.   APPLICABILITY OF PRESUMPTION OF RELIANCE ..............................139

XVI.  CLASS ACTION ALLEGATIONS .......................................................141

XVII. NO SAFE HARBOR .........................................................................142

COUNT I ...............................................................................................143

Violation of §10(b) of the Exchange Act and  Rule 10b-5 Against Graña y Montero ...............143

COUNT II ..............................................................................................145

Violation of §10(b) of the Exchange Act and  Rule 10b-5 Against the Individual Defendants ....................................................................................145

COUNT III..............................................................................................146

Violation of §20(a) of the Exchange Act Against the Individual Defendants ............................146

PRAYER FOR RELIEF .............................................................................148

JURY DEMAND ......................................................................................148

**Page**

Lead Plaintiff Treasure Finance Holding Corp. and Plaintiff Marcia Goldberg (collectively "Plaintiffs"), by and through their undersigned counsel, allege the following against Defendants Graña y Montero S.A.A. ("Graña" or the "Company"), Mario Alvarado Pflucker ("Alvarado"), Monica Miloslavich Hart ("Hart"), José Graña Miró Quesada ("José Graña"), and Hernando Graña Acuña ("Hernando Graña") (collectively "Defendants"), upon information and belief as to those allegations concerning Plaintiffs, and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Graña and other publications by certain Defendants and other related non-parties; (b) review of news articles and shareholder communications; and (c) review of other publicly available information concerning Graña, the other Defendants, and related non-parties.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This is a securities class action on behalf of all those who purchased the American Depositary Shares ("ADSs") of Graña y Montero between July 24, 2013 and February 24, 2017, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act").

2.      Graña is a Peruvian corporation that serves as the holding corporation for the Graña y Montero Group.  Through its subsidiaries, Graña provides engineering and construction, infrastructure, real estate, and technical services in Latin America.  Graña ADSs have traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GRAM" since the Company's July 24, 2013 initial public offering ("IPO").

3.      Between 2005 and 2011, Graña, through its subsidiaries, participated in multiple consortia led by Odebrecht S.A. ("Odebrecht"), a global construction conglomerate based in

- 1 -

Brazil, in the concessions[1] for high-value public works projects, including the Interoceanic North and Interoceanic South highway systems, and the engineering and construction of Line 1 of the Lima Metro.

4.      Throughout the Class Period, Graña maintained that these highly-lucrative public works projects were obtained through a competitive bidding process, and that its history of performance and its reputation (and Odebrecht's reputation) as an industry leader was an indispensable component of its winning bid.

5.      In truth, however, these public works projects were obtained through illicit means, including:

(a)      the payment of bribes by Odebrecht to high-ranking public officials, including two former Peruvian presidents and other high-ranking government officials, to which Graña contributed approximately $16 million;

(b)      the payment of bribes to arbitrators to justify enormous cost overruns on the public works projects; and

(c)      Graña's participation in a criminal enterprise called the "Construction Club," a business cartel of Peruvian and foreign construction companies that, instead of competing with each other for public works projects, colluded to share the works.

6.      Graña concealed the illicit means of procuring numerous projects, which generated millions of dollars in lucrative additional business, and, as a result, Graña ADSs traded at artificially inflated prices, reaching a Class Period high of more than $22 per ADS by September 19, 2013.  Based on Defendants' deception, Graña was able to cash in, selling more than 22.4

---

[1]      A concession agreement is a negotiated contract between a company and a government that gives the company the right to operate a specific enterprise, such as infrastructure or mining, within the government's jurisdiction, subject to certain conditions.

million Graña ADSs at artificially inflated prices in the July 24, 2013 IPO, generating approximately $475 million in gross proceeds.

7.     On December 21, 2016, the U.S. Department of Justice ("DOJ") announced that Odebrecht and Braskem S.A. ("Braskem"), a Brazilian petrochemical company in which Odebrecht is the controlling shareholder, pled guilty and agreed to pay a combined total penalty of at least $3.5 billion to resolve charges with U.S., Brazilian and Swiss authorities for paying millions of dollars in bribes to government officials around the world.  According to a one-count criminal information filed the same day by the Fraud Section of the DOJ's Criminal Division and the U.S. Attorney's Office for the Eastern District of New York ("E.D.N.Y."), which charged Odebrecht with conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act ("FCPA"), Odebrecht confessed to paying at least $29 million in bribes to Peruvian government officials to secure public works contracts between 2005 and 2014.  Graña had been one of Odebrecht's most important Peruvian partners, working with it on half a dozen public works contracts worth more than $10 billion.

8.     On this news, the price of Graña ADSs began to decline precipitously, closing from $7.75 per ADS on December 21, 2016, down to $5.02 per ADS by January 11, 2017.

9.     On January 12, 2017, during an interview with a weekly news magazine in Peru called *Caretas*, Graña CEO Alvarado stated that "we never knew of any corruption," and called its partnership with Odebrecht a "mistake."  He also stated that the Company's partnership with Odebrecht had jeopardized a lucrative contract for the construction of a natural gas pipeline project, explaining that Peruvian banks were refusing to extend financing for the project because of the Odebrecht scandal, and that a key financing deadline was rapidly approaching.  *See* http://caretas.pe/sociedad/77912-la_respuesta_de_gym (last visited May 9, 2019).

- 3 -

10.     On this news, the price of Graña ADSs continued to decline, falling $0.61 per ADS, or 12%, and closing at $4.41 per ADS on January 12, 2017.

11.     Graña ultimately failed to meet the financing deadline, and on January 23, 2017, the Peruvian government terminated the pipeline project.

12.     On February 16, 2017, *Reuters* reported that an "ombudsman" had called for prosecutors to investigate other partners of Odebrecht "in a corruption probe that has already sunk Graña's shares."

13.     On February 24, 2017, a Peruvian news magazine, *Hildebrandt en sus trece* ("*Hildebrandt*") reported that Graña knew about the $20 million in bribes paid to former President Alejandro Toledo by Odebrecht.  The *Hildebrandt* article published four pages of testimony given by former Odebrecht executive-turned-whistleblower Jorge Barata ("Barata") explaining that the members of Odebrecht's consortium, which included Graña, knew about the bribes and had committed to repay their proportional shares.  Barata was the director of Odebrecht's operations in Peru and was personally involved in negotiating the bribes.

14.     On this news, the price of Graña's ADSs plummeted, falling approximately 35%, from a close of $5.09 per ADS on February 23, 2017, to a close of $3.32 per ADS on February 24, 2017, or $1.77 per ADS, on unusually high trading volume of more than 1.9 million shares traded.

15.     This stunning disclosure, however, was only the tip of the iceberg.  Within three days, three senior Graña executives, including the Company's long-time chairman and director, abruptly resigned.  The Peruvian special prosecutor overseeing the corruption investigation began investigating the Company and corporate-suite.  In addition, criminal charges were formalized against three senior Graña executives, including the Company's former Chairman and member of board of directors and the CEO of its construction subsidiary, GyM S.A.

16.     Thereafter, Graña failed to timely file its Form 20-F for 2016 with the SEC (the "2016 Form 20-F").  On May 16, 2018, after conducting "substantial additional procedures" and a complete audit of its 2015 and 2016 financial statements, Graña finally filed the 2016 Form 20-F.

17.     The 2016 Form 20-F revealed that during the Class Period, Graña operated with widespread internal-control deficiencies.  Among other things, the Company disclosed that an "inconsistent and ineffective tone at the top was present," that there was "inadequate oversight by [Graña's] Audit and Process Committee," and that the control environment was insufficient to ensure that fraud monitoring mechanisms were in place, "including that the relevant risk/control activities were carried out properly and that corrective actions were taken on a priority basis and in timely manner."

18.     On May 17, 2018, the NYSE announced that it had determined to commence proceedings to delist Graña ADSs from the NYSE based on the Company's failure to file its 2017 Form 20-F.  Trading in the Company's ADSs was suspended immediately.

19.     As alleged below, Graña's financial reporting during the Class Period was in complete disarray, due in significant part to senior management who created an inappropriate operating environment whereby the Company was ready, willing, and able to contribute to the illegal payment of bribes and then manipulate its financial statements to hide its participation in the illegal activity.  In addition, the Company later disclosed that it ignored numerous red flags raised by Odebrecht regarding accounting irregularities, but failed to take any action to address those concerns.

20.     Defendants knowingly, and at a minimum recklessly, made materially false and misleading statements to investors, resulting in an artificial inflation of Graña's ADS prices that caused significant harm to investors when the truth was ultimately revealed.

## II.      JURISDICTION AND VENUE

21.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. §240.10b-5].  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

22.      Venue is proper in this District pursuant Section 27 of the Exchange Act and 28 U.S.C. §1391(b).

23.      In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## III.     PARTIES

24.      As set forth in its previously-filed certification, Lead Plaintiff Treasure Finance Holding Corp. purchased Graña ADSs during the Class Period, and has been damaged thereby.

25.      As set forth in her certification previously filed with the Court, Plaintiff Marcia Goldberg purchased Graña ADSs during the Class Period, and has been damaged thereby.

26.      Defendant Graña y Montero S.A.A. is the holding corporation for the Graña y Montero Group.   Through its subsidiaries, Graña provides engineering and construction, infrastructure, real estate, and technical services.   In addition, Graña offers concessions for constructing, operating, and supplying major infrastructure and energy projects.   Graña ADSs traded in an efficient market on the NYSE throughout the Class Period under the ticker symbol "GRAM."

27.      Defendant Alvarado was, until March 2, 2017, Graña's Chief Executive Officer and a member of its Board of Directors.

28.      Defendant Hart is and was, at all relevant times, Graña's Chief Financial Officer.

- 6 -

29. Defendant José Graña is a former member of the Board of Directors of Graña. José Graña joined the Company in 1968, and was a Director and Chairman of the Board of Directors from 1996 until his abrupt resignation on February 27, 2017, in the immediate wake of the revelations that Graña was aware of, and participated in, the Odebrecht bribery scheme. José Graña also served as the executive president of the Company from 1996 until March 2011. José Graña was later arrested by the Peruvian authorities, and charged with money laundering and collusion.

30. Defendant Hernando Graña is a former member of the Board of Directors of the Company. Hernando Graña joined the Company in 1977, and served as a director from August 1996 until his abrupt resignation on February 27, 2017, in the immediate wake of the revelations that Graña was aware of, and participated in, the Odebrecht bribery scheme. Hernando Graña also served as the Chairman of the Board of Directors of numerous Graña subsidiaries, including the Company's oldest and most profitable construction subsidiary, GyM S.A. Hernando Graña was later arrested by the Peruvian authorities, and charged with money laundering and collusion.

31. Defendants Alvarado and Hart are referred to herein collectively as "Officer Defendants." Defendants José Graña and Hernando Graña are referred to herein collectively as the "Director Defendants." Defendants Alvarado, Hart, José Graña, and Hernando Graña are collectively referred to as the "Individual Defendants."

32. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Graña, were privy to confidential and proprietary information concerning Graña, its operations, finances, financial condition, and present and future business prospects. Because of their positions with Graña, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future

- 7 -

business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and *via* reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

33.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Graña's business.

34.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of Graña's reports, press releases, and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

35.     As controlling persons of a publicly traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Graña's financial condition and performance, growth, operations,

financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Graña ADSs would be based upon truthful and accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

36.     Each of the Defendants is liable for: (i) making false or misleading statements; and/or (ii) failing to disclose adverse facts known to them about Graña.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Graña ADSs was a success, as it: (i) deceived the investing public regarding Graña's prospects and business; (ii) artificially inflated the price of Graña ADSs; and (iii) caused Plaintiffs and other members of the Class to purchase Graña ADSs at inflated prices.

## IV.     ADDITIONAL KEY NON-PARTIES

37.     Alan Gabriel García Ludwig Pérez ("President García") served as the president of Peru from 1985 to 1990 and again from 2006 to 2011.  President García accepted at least $1.3 million in bribes from Odebrecht in exchange for the contract for the construction of the Lima Metro project, as was confirmed in testimony given before Peruvian prosecutors on April 26, 2019. President García committed suicide on April 17, 2019 as police officers arrived at his home to arrest him in connection with the bribery investigation, days before his involvement in the bribery was confirmed.

38.     Alejandro Celestino Toledo Manrique ("President Toledo") served as the president of Peru from 2001 to 2006.  Peruvian prosecutors have accused President Toledo of taking at least $31 million in bribes from Odebrecht for the construction of the Interoceanic highway.  In February 2017, a Peruvian judge ordered the provisional arrest of President Toledo, who is currently a fugitive from justice living in California and the subject of an international order of arrest.

39.     Antonio Carlos Nostre Junior ("Nostre") is an engineer and former Odebrecht executive.  From 2008 to 2015, Nostre served as the technical project director for the Electric Train Consortium, and oversaw the design and construction of the Lima Metro.  In that capacity, Nostre signed several key documents on Odebrecht's behalf, including, *inter alia*, the 2012 Profit Distribution Agreement and the 2015 Liquidation Agreement (both defined herein).  In addition, Nostre was personally involved in negotiating the bribes Odebrecht paid to Peruvian public officials in connection with the Lima Metro project.  In October 2018, Nostre testified before Peruvian prosecutors that Odebrecht had paid approximately $24 million in bribes in connection with the Lima Metro project.  Of that amount, Nostre said he had personal knowledge of $10 million of bribes.  Nostre also testified that Graña executive Juan Manuel Lámbarri Hierro knew about the bribes and understood that Graña yielded its share of the bribe to Odebrecht by reference to "additional risks."  On February 15, 2019, Nostre executed a cooperation agreement with the Peruvian authorities.

40.     Edwin Martin Luyo Barrientos ("Luyo") is a Peruvian public official who served as a member of the bidding committee for both phases of Line 1 of the Lima Metro.  Luyo took approximately $1.4 million in bribes from Odebrecht for the Lima Metro contract.  Luyo was arrested on January 21, 2017, charged with money laundering and corruption offenses, and placed in preventative detention for an 18-month period.

41.     Enrique Cornejo Ramírez served as Peru's Minister of Transportation and Communication from 2008 to 2011, and oversaw the tenders for both phases of Line 1 of the Lima Metro project.  Cornejo is alleged to have received $15,000 in cash and two big-screen televisions from Odebrecht.  He turned himself in to the Peruvian authorities on April 17, 2019.

42.     Gonzalo Ferraro Rey ("Rey") served as the president of Graña's infrastructure segment from April 2013 until his unexpected resignation on November 27, 2017.  Rey was later arrested and charged with money laundering and corruption offenses based on his involvement in the Odebrecht bribery scheme.

43.     GyM S.A. is the oldest and most profitable subsidiary in Graña's Engineering and Construction segment.  As of December 31, 2016, Graña held a 98.23% interest in GyM S.A.  As described below, Graña, through GyM S.A., participated in the IIRSA South and Lima Metro concessions as a minority stakeholder.[2]

44.     Jorge Cuba Hidalgo ("Cuba") served as Peru's Vice Minister of Transportation and Communications from 2009 until 2011.  Cuba confessed to accepting over $8 million in bribes to favor the Electric Train Consortium (Odebrecht and Graña) in the tenders for the Lima Metro.

45.     Jorge Henrique Simoes Barata ("Barata") served as the executive director of Odebrecht Latinvest Peru Ductos, S.A., which managed Odebrecht's operations in Peru, from 2001 to 2016.  Barata was the "right hand" of businessman Marcelo Odebrecht, until he became an effective collaborator in the Odebrecht investigation.  As described herein, Barata testified under oath that Graña was aware that Odebrecht was making corrupt payments to secure public works projects, and that Graña had committed to pay its proportional share of the bribes.  Barata testified before Peruvian prosecutors on several occasions, including: (i) December 2016; (ii) January 2017; (iii) February 2018; and (iv) April 2019.  On February 15, 2019, Barata executed a cooperation agreement with the Peruvian authorities.

---

[2]     The pertinent documents and records inconsistently refer to both Graña y Montero and GyM S.A. as the minority stakeholder in the IIRSA South and Lima Metro consortia.  As used in this Complaint, the terms "Graña" and the "Company" shall refer to both entities interchangeably.

46.     Joséf Maiman ("Maiman") is a businessman, the owner of the Merhav Group, and a former confidante of President Toledo.  Maiman was intimately involved in negotiating the terms of the bribes paid by Odebrecht for the IIRSA South project, and designated the accounts to which the funds would be laundered.  According to Barata, $27 million of bribes intended for President Toledo were transferred to offshore accounts controlled by Maiman.  On March 29, 2019, Maiman signed a collaboration agreement with Peruvian prosecutors, pursuant to which he agreed to provide additional testimony regarding the details of the bribes paid to President Toledo.

47.     Juan Manuel Lámbarri Hierro ("Hierro") served as the CEO of GyM, S.A. from 2001 until January 2014, and signed the 2012 Profit Distribution Agreement and the 2015 Liquidation Agreement on behalf of Graña.  In October 2018, former Odebrecht executive Carlos Nostre testified that Hierro knew about the bribes for the Lima Metro project, knew that Graña was contributing its proportional share of the bribes, and understood the accounting mechanism used to conceal the payments.

48.     Juan Carlos Zevallos Ugarte ("Zevallos") is a Peruvian public official who previously headed the Supervisory Organization for Investment in Transportation Infrastructure (in Spanish, *Organismo Supervisor de la Inversión en Infraestructura de Transporte*) ("OSITRÁN").  He was arrested on March 20, 2017 for providing fraudulent work progress certifications to the IIRSA South consortium in exchange for approximately $750,000 in bribes.  Zevallos was arrested in March 2017 and is currently serving an 18-month preventative detention while he awaits trial on corruption and money laundering charges.

49.     Luis Nava Guibert ("Nava") served as the Presidential Secretary under President Alan García.  He was enormously influential and frequently presented himself as "the man who opened the doors to [President] García."  According to Peruvian authorities, Nava accepted

approximately $4.5 million in bribes to favor Odebrecht and expedite key processes related to the Lima Metro and IIRSA South projects.  The payments were transferred into offshore accounts controlled by his son, José Nava Mediola, and by Peruvian businessman Miguel Atala.

50.     Marcelo Odebrecht is a Brazilian billionaire and Odebrecht's former CEO.  He was arrested in 2015 and was accused of bribing ex-directors of Brazilian oil giant Petrobras for contracts.  In March 2016, he was sentenced to 19 years in prison for money laundering and corruption.  In December 2016, his sentence was reduced to 10 years in exchange for paying a fine, admitting guilt, and providing evidence to authorities.

51.     Odebrecht is a Brazilian conglomerate consisting of diversified businesses in the fields of construction, engineering, chemicals, and petrochemicals.  It is the holding company for Constructora Norberto Odebrecht S.A., the largest engineering and contracting company in Latin America, and, until recently, had a major operating presence in Peru where it conducted business through its subsidiaries including: (i) Odebrecht Latinvest Peru Ductos, S.A.; (ii) Inversiones en Infrastructura de Transporte por Ductos S.A.C.; (iii) Odebrecht Peru Ingeniería y Construcción S.A.C.; and (iv) Constructora Norberto Odebrecht S.A., Sucursal Del Peru.

52.     Richard Concepción Carhuancho ("Judge Concepción") is a Peruvian judge of the National Criminal Chamber (in Spanish, *Sala Penal Nacional*).  At all relevant times herein, Judge Concepción headed the First Court for Preliminary Investigation Proceedings (in Spanish, *Juez del Primer Juzgado de Investigacion Preparatoria Nacional*).  Judge Concepción has overseen most of the proceedings in Peru relating to the Odebrecht bribery scandal, and ordered the provisional arrests of numerous criminal defendants implicated in the alleged bribery, including, *inter alia*, Defendants José Graña and Hernando Graña.

- 13 -

53.     Santiago Andrés Chau Novoa ("Chau") is a Peruvian public official who served as a member of the bidding committee for both phases of Line 1 of the Lima Metro.  Chau accepted $800,000 of bribes to award the contracts for both phases of Line 1 to the Electric Train Consortium (*i.e.*, Odebrecht and Graña).

54.     Mariella Huerta Minaya served as the president of the bidding committee for the second phase of Line 1 of the Lima Metro, and accepted a $400,000 bribe to favor the Electric Train Consortium in the bidding process.

55.     Sergio Nogueira Panicali ("Nogueira") is a former Odebrecht official who served as the secretary of CONIRSA, the construction entity formed by Odebrecht, Graña, and two other construction companies to construct the IIRSA South highway.  On February 19, 2019, Nogueira testified that Graña knew about the bribes paid by Odebrecht for the IIRSA South project.

## V.     DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF CONDUCT

### A.     Odebrecht Paid, and Graña Contributed, Millions of Dollars in Bribes to Corrupt Public Officials to Win Major Public Works Projects

56.     Since 2005, Graña and Odebrecht were both members of the consortia involved in several major infrastructure and construction projects in Peru.  To win the contracts for these projects, Odebrecht made millions of dollars of illegal payments to Peruvian public officials, of which Graña was aware and contributed its proportional share.

57.     The bribes were funded by enormous cost overruns, which were achieved by modifying the terms of the original contracts through fraudulent addenda and by arranged arbitrations.  Smaller bribes were paid to public officials, as necessary, to achieve these goals.

58.     The bribes were not paid in lump sum payments at the time of the agreement. Rather, Odebrecht would make payments pursuant to fictitious contracts in installments as each project progressed and as payments were approved by the Peruvian government.

59.     At that point, the minority stakeholders in the consortia (such as Graña) were also required to reimburse Odebrecht for their proportional share of the bribe.  The relative portion of each stakeholder's bribe was paid to Odebrecht through the receipt of differential dividends – in other words, increased dividends paid to Odebrecht relative to Odebrecht's equity interest in the concession, and reduced dividends paid to the minority stakeholders relative to their respective equity interests.

60.     These differential dividend payments were documented in shareholder meeting minutes and profit distribution agreements, by reference to purported "***additional risks***" that Odebrecht incurred on behalf of, and for the benefit of, the consortia.  This scheme was described in the July 2017 edition of the Brazilian magazine *Piauí*, as follows:

> [T]he owners of the Peruvian construction companies who joined the Interoceanic consortium were informed about the agreement and at the end of each year they contributed their share in the bribe.  The value was deducted from the annual dividends and was recorded in the consortium balance sheets under the "additional risk" item assumed by Odebrecht on behalf of the other companies.

61.     Likewise, an article in the November 24, 2017 edition of *Hildebrandt* entitled "Odebrecht Falls on GyM" (in Spanish, *Odebrecht Cae Sobre GyM*) describes how the minority stakeholders would reimburse Odebrecht for their proportional shares of the illicit payments, reporting, in pertinent part, as follows:

> Odebrecht was in charge of carrying out the payment of bribes, and at the end of the year, when the balance sheets were presented, received from its partners their proportional part of the bribes.
>
> The Brazilian builder left nothing to chance, and charged up to the very last cent, from the bribes properly said to the "complementary expenses" that triangulating the transfers of cash in its long travels through offshore countries and tax havens. ***The total sums were discounted from the annual dividends of the consortiums, and entered under the heading "additional risks."***[3]

---

[3]     *See* Exhibit 1.

B.      **The Lima Metro Project**

1.      **Description of the Project**

62.     The Lima Metro project involved the design and construction of Line 1 of Lima's rapid transit metropolitan railway.  The construction of the Lima Metro originally commenced during President García's first presidency in 1986, but was abandoned midway as the country's economy plunged into a deep economic and social crisis.  When President García regained the presidency in 2006, the completion of the Lima Metro, which was widely considered to be emblematic of his first failed presidency, was a top priority.

63.     The García administration initially presented the Lima Metro project as a private investment opportunity.  Peru's Agency for the Promotion of Private Placement, ProInversión, conducted two rounds of private tenders, but failed to secure any private investors, given the difficulties of securing financing for a project of that scope.

64.     By the end of 2008, President García was very worried that he still had not secured a bidder for the project.

65.     In December 2008, Jorge Cuba was appointed as a special advisor to the Ministry of Transportation and Communication to work on the Lima Metro project.  Cuba promptly convened a meeting with the leading construction companies with operations in Peru and asked which company was capable of completing the project before García left office – which was approximately 18 months later.  Odebrecht's representative at the meeting, Carlos Nostre, was the only one who responded, and confidently stated that Odebrecht could meet the deadline.

66.     Cuba subsequently met with President García and informed him that Odebrecht might be the solution to his problem.

67.     Then, on February 19, 2009, while traveling to southern Peru to inspect the status of another project, President García expressed to Barata his desire to inaugurate the Lima Metro

before he left office, and asked what needed to be done for Odebrecht to become involved.  Barata stated that the Lima Metro project should be reconfigured as a government-funded public works project.

68.     President García sprang into action.  That same evening, President García convened the Council of Ministers and signed Emergency Decree No. 032-2009 (the "Emergency Decree"), which redefined the Lima Metro project as a public works project, transferred control of the project to the Ministry of Transportation and Communication, and directed the Ministry of Economy and Finance to assign a budget to the project.  The Emergency Decree was approved on February 28, 2009.

69.     On March 11, 2009, Jorge Cuba was appointed as the Vice Minister of Transportation and Communication.  Shortly thereafter, the Ministry of Transportation and Communication created a bidding and technical committee for the new project, and appointed Edwin Luyo Barrientos and Mariella Huerta Minaya to the panel.

70.     The newly created committee then reformulated the technical specifications for the project, and issued a tender to accept bids for the design and construction of Line 1, now a public works project.

71.     Odebrecht and Graña formed an entity called the Electric Train Consortium to submit bids for the contracts for Line 1 of the Lima Metro.  Stock ownership in the Electric Train Consortium was awarded as follows: Odebrecht (67%), and Graña (33%).

72.     In December 2009, the Bidding Committee determined that the Electric Train Consortium met 100% of the technical qualifications for the project, and awarded it the contract for the construction of the first phase of Line 1, valued at $410 million.  Work on the line started in March 2010 and included the construction of nine new stations and the installation of new

electromechanical equipment for the entire 21.5 kilometer route.  The first phase of Line 1 was completed in 2011, and opened for operations in early 2012.

73.     On June 22, 2011, the Electric Train Consortium was awarded the contract for the construction of the second phase of Line 1, valued at over $600 million.  The project was completed in May 2014, and opened for operation in July 2014.

74.     The Electric Train Consortium then wound up its affairs and signed a final profit distribution and liquidation agreement in May 2015.

### 2.     The Bribes for the Lima Metro Project

75.     The contract for the design and construction of Line 1 of the Lima Metro was awarded in two separate phases.

76.     During the bidding process for the first phase of Line 1, Jorge Cuba approached Carlos Nostre (Odebrecht's director for the Lima Metro project) and offered to support Odebrecht's bid for the contract.

77.     In exchange for his support, Cuba demanded a $1.4 million payment for himself, and additional payments of $400,000 each for Santiago Chau and Edwin Luyo, both of whom served as members of the Line 1, Phase I bidding committee.

78.     To ensure that the Electric Train Consortium would be awarded the contract, Cuba proposed amending the technical specifications for the project to ensure that the Odebrecht-led consortium would be the most suitable for the project.

79.     Carlos Nostre relayed Cuba's proposal to Barata, who authorized the payment of the following bribes:

| NAME | POSITION | AMOUNT |
|------|----------|--------|
| Jorge Cuba | Deputy Minister of Communications | $1.4 million |
| Edwin Luyo | Member of Lima Metro Bidding Committee | $400,000 |

| Santiago Chau | Member of Lima Metro Bidding Committee | $400,000 |
|---|---|---|
| **TOTAL:** | | **$2.2 million** |

80.    Odebrecht also made illegal payments to win the concession for Line 1, Phase II, of the Lima Metro, as follows:

| **NAME** | **POSITION** | **AMOUNT** |
|---|---|---|
| Jorge Cuba | Deputy Minister of Communications | $5 million |
| Edwin Luyo | Member of Bidding Committee for Line 1, Phase II | $1 million |
| Jesus Munive Taquia & Jorge Menacho Perez | Additional Members of the Bidding Committee for Line 1, Phase II | $1 million collectively |
| Santiago Chau | Member of Lima Metro Bidding Committee | $400,000 |
| Mariella Huerta Minaya | President of Bidding Committee for Line 1, Phase II | $400,000 |
| **TOTAL:** | | **$7.8 million** |

81.    The payments to Jorge Cuba were made in installments throughout the life of the Lima Metro project to accounts in the Private Bank of Andorra held by various offshore entities controlled by Cuba and his family members, including, *inter alia*, the following:

(a)    On December 7, 2011, Odebrecht transferred $1 million to Hispamar International Corp. ("Hispamar"), an offshore entity controlled by Cuba's nephew, Víctor Enrique Muñoz Cuba.[4]

(b)    On August 1, 2012, Odebrecht transferred $200,000 to Hispamar.

(c)    On July 11, 2013, Odebrecht transferred $495,000 to Hispamar.

(d)    On July 31, 2013, Odebrecht transferred a total of $1 million to Hispamar.

(e)    On April 11, 2014, Odebrecht transferred $1 million to Hispamar.

---

[4]    In September 2017, Cuba's nephew was arrested for money laundering and placed in pre-trial detention for an 18-month period.

(f)     On January 21, 2015, Odebrecht transferred $200,000 to an offshore account held by Notrex Holding, Inc., a Panamanian entity controlled by Cuba.

(g)     Between January and July 2015, Odebrecht made six transfers to Notrex Holding totaling $685,000.

(h)     An additional $400,000 was transferred to another Bank of Andorra account controlled by Julson International S.A., another offshore entity controlled by Cuba.

82.     The payments to Luyo were made in installments throughout the life of the Lima Metro project to accounts in the Private Bank of Andorra held by offshore entities controlled by Luyo, including, *inter alia*, the following:

(a)     On April 19, 2012, Odebrecht transferred $700,000 to an account held by Oblong International Inc. ("Oblong"), an offshore entity controlled by Luyo and Mariella Huerta Minaya.

(b)     On July 11, 2013, Odebrecht transferred $196,000 to Oblong.

(c)     On April 11, 2014, Odebrecht transferred $304,000 to Oblong.

83.     In total, Odebrecht spent approximately $24 million to win the Lima Metro project. Approximately $13.5 million (55% of the total) was used to pay bribes to public officials. The other 45% of the total allocation was used to camouflage the bribe through offshore companies, fictitious contracts, and all applicable taxes.

### 3.     Cost Overruns for the Lima Metro

84.     The Emergency Declaration created special procedures for the execution of the Lima Metro project. In particular, it provided the contractor with the right to modify the price of the contract via an addendum if its actual costs exceeded the contractor's bid by more than 20%.

85.     The Electric Train Consortium used this provision to generate the funds needed to pay the bribes.

86. The contract for the first phase of Line 1, for example, was initially set at S/. 1.265 billion.  The Consortium incurred incredible cost overruns, and increased the cost of the project by S/. 336 million, or 26.56%.  The final cost was S/. 1.601 billion.

87. Likewise, the contract for the second phase of Line 1 was originally valued at S/. 1.601 billion.  The Consortium successfully generated an additional S/. 828 million – a 51.72% increase – resulting in a final cost of S/. 2.429 billion.

### 4. The Bribes for the Lima Metro Project Are Documented in the Consortium's Profit Distribution Agreements

88. Graña, the sole minority stakeholder in the project, was required to reimburse Odebrecht for its proportional share of the bribes, which it accomplished by assigning a percentage of its proceeds to Odebrecht as compensation for the "additional risks" Odebrecht incurred for the benefit of the consortium.

### a. The 2012 Profit Distribution Agreement

89. On February 29, 2012, Graña and Odebrecht entered into an agreement entitled "Agreement for the Distribution of Results of the Electric Train Consortium," formalizing the distributions for profits for the Lima Metro consortium as of December 31, 2011 (the "2012 Profit Distribution Agreement").[5]

90. The Electric Train Consortium realized net profits of S/. 128,317,005 (approximately $47,913,448), and approved the partial distribution of S/. 97,381,813.30 (approximately $36,362,277) which was distributed as follows:

| | Interest in Consortium | Amount Earned | Percentage Received | Amount Received |
| --- | --- | --- | --- | --- |

---

[5] A certified translation of the 2012 Profit Distribution Agreement, along with the original version, is annexed hereto as Exhibit 2.

| Odebrecht | 67% | S/.65,245,814 $24,362,725.59 | 70.5% | S/. 68,245,814 $25,635,405.29 |
|---|---|---|---|---|
| Graña | 33% | S/32,135,998 $11,999,551.41 | 29.5% | S/. 28,727,634 $10,726,871.72 |

91.    Put differently, Graña yielded **10.6%** of its profits to Odebrecht – or approximately $1,272,679.70 of the $11,999,551.41 to which it was entitled.

92.    The 2012 Profit Distribution Agreement justified the distribution of differential dividends based on Odebrecht's assumption of "***additional risks***":

> The Consortium Members, having analyzed the profit and loss account obtained by the Consortium based on the Financial Statements approved by the Administrative Technical Committee (CTA, Comité Técnico Administrativo), which in turn approved the Profit or Loss Sharing, by means of the minutes dated February 29, 2012, agree as follows:
>
> i.      The Consortium Members recognize that, as of December 31, 2011, the cumulative profit of the Electric Train Consortium amount to S/. 128,317,540.66 (One Hundred and Twenty-Eight Million Three Hundred and Seventeen Thousand Five Hundred and Forty-Six, and 66/100 Nuevos Soles);
>
> ii.     ***Additionally, the Parties recognize that Constructora Norberto Odebrecht S.A. Sucursal del Peru has assumed additional risks to those it would be responsible for due to its participation in the Consortium, in the execution of the Construction Works entrusted to the Consortium***.
>
> ii.     ***In this sense, considering that the role of Constructora Norberto Odebrecht S.A. Sucursal del Peru has been instrumental in obtaining the profit of the Consortium, assuming even additional risks, it is appropriate that it receives a higher percentage than its share of the profits of the Consortium as of December 31, 2011.***

93.    The 2012 Profit Distribution Agreement was signed on behalf of Graña by: (i) Juan Manuel Lámbarri Hierro; and (ii) Defendant Hernando Graña.

94.    Odebrecht's former Institutional Relations Manager, Raymundo Trindade, signed the 2012 Profit Distribution Agreement on behalf of Odebrecht.

**b.** **The 2015 Liquidation Agreement**

95.     On May 4, 2015, Graña and Odebrecht entered into an agreement entitled "Agreement for the Distribution and Liquidation of Results of the Electric Train Consortium," which formalized the final liquidation of the Lima Metro concession (the "2015 Liquidation Agreement").[6]

96.     The Electric Train Consortium approved the final distribution of S/. 39,018,326 (approximately $12,474,687) as of April 30, 2015, which was distributed as follows:

|  | Interest in Consortium | Amount Owed | Percentage Received | Amount Received |
|---|---|---|---|---|
| Odebrecht | 67% | S/. 23,519,749.01 $8,358,040.29 | 89.97% | S/. 35,104,103 $11,223,256.92 |
| Graña | 33% | S/. 12,876,047.58 $4,116,646.71 | 10.03% | S/. 3,914,326 $1,251,211.11 |

97.     Graña thus surrendered a staggering **69.6%** of its profits to Odebrecht based on Odebrecht's purported assumption of "additional risks."  Of the $12,474,687 distributed pursuant to the 2015 Liquidation Agreement, Graña agreed to receive just 10.03% ($1,251,211.11) instead of 33.3% ($4,116,646.71).

98.     The 2015 Liquidation Agreement justified the distribution of differential dividends based on Odebrecht's assumption of "***additional risks***," stating as follows

**<u>CLAUSE THREE.-</u> DISTRIBUTION OF PROFITS**

The Consortium Members, having analyzed the profit and loss account obtained by the Consortium based on the Financial Statements approved by the Administrative Technical Committee (CTA, Comité Técnico Administrativo), which in turn approved the Profit or Loss Sharing, by means of the minutes dated May 04, 2015, agree as follows:

---

[6]     A certified translation of the 2015 Liquidation Agreement, along with the original version, is annexed hereto as Exhibit 3.

i. Approving the distribution of the final profit of the Electric Train Consortium, amounting to S/. 39,018,326.56 (Thirty-Nine Million Eighteen Thousand Three Hundred and Twenty-Six and 56/100 nuevos soles).

ii. *Additionally, the Parties recognize that [Construstructora Norberto Odebrecht S.A. Sucursal del Peru] has assumed additional risks to those it would be responsible for due to its participation in the Consortium, in the execution of the Construction Works entrusted to the Consortium*.

iii. *In this sense, considering that the role of [Construstructora Norberto Odebrecht S.A. Sucursal del Peru] has been instrumental in obtaining the profit of the Consortium, assuming even additional risks, it is appropriate that it receives a higher percentage than its share of the profits of the Consortium as of April 30, 2015*, profit that amounts to S/. 35,104,013.53 (Thirty-Five Million One Hundred and Four Thousand and Thirteen and 53/100 Nuevos Soles).

99. The 2015 Liquidation Agreement was signed on behalf of Graña by: (i) Lámbarri; and (ii) Hernando Graña, and on behalf of Odebrecht by Raymundo Trindade.

100. In total, Graña's share of the bribes for the Lima Metro contract, as represented by payments to Odebrecht for so-called "additional risks," was approximately $9 million.

## C. Odebrecht Paid, and Graña Contributed, Bribes to Win the Contract for the Construction of Sections 2 and 3 of the IIRSA South Highway

### 1. The IIRSA South Project

101. The IIRSA South project involved the construction, maintenance, and conservation of two road tranches of the IIRSA South highway system.

102. In early 2005, the Peruvian government announced a tender for the construction, operation, and maintenance of Sections 2 and 3 of the IIRSA South highway system.

103. A consortium called Concesionaria Interoceanica Sur Tramos 2 y 3, S.A., was formed by Odebrecht, Graña, JJC Contratistas Generales S.A. ("JJC"), and Ingenieros Civiles y Contratistas Generales S.A. ("ICCGSA"), to present a bid for the project, and was awarded the contract in June 2005.

104.    A construction entity called CONIRSA S.A. was created to construct the 656-kilometer highway system.  Stock ownership in CONIRSA was awarded as follows: Odebrecht (70%), Graña (18%), JJC (7%), and ICCGSA (5%).

105.    The Shareholders Agreement for the IIRSA South concession gave Graña and the other minority stakeholders the authority to "jointly appoint the person who will act as the Administration and Finance Manager."  The minority stakeholders ultimately appointed Fernando Almenara, a Graña employee, to serve as the Administration and Finance Manager.

106.    Graña initially had no decision-making authority, however, because the Shareholders Agreement required a supermajority vote of 82% for certain major corporate actions. Based on this provision, Graña, which held just 18% of all shares, was effectively excluded from the decision-making process.

107.    In 2006, however, during a General Meeting of Shareholders, the shareholders resolved to provide Graña with a voice in the decision-making process.  To that end, the shareholders approved the transfer of a 1% interest from ICCGSA to Graña "due to the different commercial and operational benefits that such operation would entail to the participating companies."  The minutes of the meeting, however, do not describe the expected "commercial and operational benefits."  Furthermore, the transfer was entirely gratuitous, and Graña never paid ICCGSA any consideration for the transfer of that critical 1% interest.

108.    Following the transfer, stock ownership in both the concessionaire entity and CONIRSA was as follows: Odebrecht (70%), Graña (19%), JJC (7%), and ICCGSA (4%).

### 2.    The Bribes for the IIRSA South Project

109.    On August 26, 2004, Barata, Marcelo Odebrecht, and then-President Toledo met at Peru's Government Palace to discuss the IIRSA South project.  While they were at the Palace, Avi Danon, President Toledo's head of security, approached Barata as an intermediary of President

Toledo and offered to support Odebrecht's bid for IIRSA South, Sections 2 and 3, in exchange for bribes.

110.     Thereafter, in November 2004, a meeting was held in the presidential suite of the Marriott Hotel in Rio de Janeiro, Brazil, between, *inter alia*, Barata, Joséf Maiman, and President Toledo.  During the meeting, Barata agreed to pay $35 million for the IIRSA South project, which would be deposited in various offshore accounts controlled by Maiman.

111.     The bribe was paid in installments between 2006 and 2010.

112.     On January 18, 2005, Barata entered into a Memorandum of Agreement with the Merhav Group, an entity controlled by Maiman, pursuant to which the Merhav Group supported Odebrecht's bid for the IIRSA North and IIRSA South projects in exchange for 6% of the total contract value.

113.     On July 14, 2005, the parties executed an addendum clarifying that Maiman's commission would be $34.3 million, an amount equivalent to 6.72% of the total value of the contracts for the IIRSA South project.  By that date, the contract for the IIRSA North project had already been awarded to the Odebrecht-led consortium.

114.     In November 2005, Barata and Merhav executed a second addendum which established a 24-installment payment schedule for the bribes, commencing as of June 30, 2006.

115.     Thus, to win the IIRSA South concession, Odebrecht made corrupt payments to President Toledo totaling $31 million.  The first $4 million was delivered while Toledo was still in office.  After Toledo left office in July 2006, Odebrecht paid an additional $27 million to the former president.  The payments were made both in cash and by over 600 wire transfers to offshore bank accounts controlled by Maiman.

### 3.    Bribes to Obtain Fraudulent Work Progress Certifications Needed to Obtain Financing

116.    The Odebrecht-led IIRSA South consortium had a negative cash flow and could not obtain the financing it needed to continue the work uninterrupted.  The solution was to pay bribes to obtain the documentation needed to obtain financing.

117.    In 2007, Odebrecht paid $750,000 to Juan Carlos Zevallos ("Zevallos"), who was then the head of Peru's Supervisory Board for Investment in Public Transport Infrastructure ("OSITRAN"), to issue "Work Advance Certifications" ("CAOs") affirming that the work was progressing on schedule.

118.    The consortium submitted the CAOs to Peru's Ministry of Transportation to receive Certificates of Payment Recognition of the Annual Payment for Work ("CPRAO").

119.    The CPRAOs were then brought to banks and other financial institutions to receive financing and other resources necessary to continue the project.

120.    Between 2007 and 2009, Zevallos issued 18 CAOs.  Barata testified that the pace of the work immediately picked up after the bribe was paid.

121.    Zevallos was arrested in March 2017 and, in February 2018, was placed in preventative detention.

122.    On April 9, 2019, the Peruvian prosecution moved to incorporate Graña as a civilly liable third party in the investigation.  The application is still pending.

123.    This bribe to Zevallos is qualitatively different than the other bribes alleged herein.  Whereas the bribe to President Toledo was necessary to win the contract in the first place, this bribe to Zevallos was used to help facilitate the completion of the project.

4.     **The Bribes to President García to Facilitate the Smooth Completion of the IIRSA South Project**

124.    When President García took office in 2006, the IIRSA South project was already underway.

125.    To facilitate the smooth completion of the project, Odebrecht paid $1.3 million to President García and an additional $3 million to Nava, President García's secretary.

126.    The payments to President García were transferred into an account in the Private Bank of Andorra held by Amarrin Investments Inc., a shell entity controlled by Miguel Atala Herrera ("Atala").  On April 26, 2019, Atala confessed that President García was the ultimate beneficiary of these bribes, and that he delivered the funds to President García in $20,000 or $30,000 increments until 2018.

127.    According to Peruvian authorities, the payments to Nava were made between 2006 and 2009, and were transferred into offshore accounts controlled by his son, José Nava Mendiola, and by Peruvian businessman Miguel Atala.

5.     **Odebrecht Bribed Arbitrators to Obtain Favorable Arbitration Awards and Generate Fraudulent Cost Overruns**

128.    Odebrecht commenced numerous arbitration proceedings throughout the duration of the IIRSA South project, claiming that the technical files approved by the Peruvian authorities failed to anticipate key services relating to the project, and that additional funding was needed to complete the works.

129.    During the construction of Section 2 of the IIRSA South project, for example, Odebrecht commenced an arbitration claiming that the technical specifications for the project (which were prepared by Odebrecht) did not include provisions for road maintenance.  The arbitration panel determined that road maintenance was indispensable to the project and awarded Odebrecht an additional $7 million.

130.     Jorge Horacio Cánepa Torre ("Cánepa") is an arbitrator of the Chamber of Commerce of Lima ("CCL") who was selected by Odebrecht in numerous such arbitrations to justify its cost overruns.

131.     Odebrecht selected Cánepa because it knew that Cánepa would vote in Odebrecht's favor.  Indeed, in 2012, Cánepa met with Odebrecht executive Ronny Loor Campoverde ("Loor") to discuss the status of 13 arbitrations relating to the IIRSA South project.

132.     Loor offered Cánepa 1% of the total amount recovered in the arbitrations in exchange for Cánepa's commitment to use his best efforts to help Odebrecht prevail in those proceedings.  Cánepa was also instructed to inform Odebrecht if another panelist was prepared to rule against Odebrecht, so that an "incentive" could be offered to change the vote.

133.     Odebrecht prevailed in ten of the thirteen proceedings, and paid Cánepa $1.4 million.  The funds were wired to an account in the Bank of Andorra through an offshore shell company called Maxcrane Finance S.A.

134.     In April 2013, Cánepa informed Loor than an arbitrator named Rondol Campos ("Campos") was prepared to vote against Odebrecht in a claim related to the IIRSA South project.  Cánepa persuaded Campos to change his vote, and Loor received three cash payments totaling $20,000.  Thereafter, on April 29, 2019, the panel issued a unanimous award in favor of Odebrecht.

135.     In total, Cánepa was involved in 19 different arbitrations pertaining to the IIRSA South project.  He voted in Odebrecht's favor on 16 such occasions, thereby benefitting Odebrecht and its consortium partners in excess of S/. 500 million (over $150 million).[7]

---

[7]     All currency conversions are calculated using the exchange rate as of the relevant date.

136.    Several arbitral awards relating to the IIRSA South project were made during the Class Period, including the awards on: (i) September 3, 2013; (ii) October 16, 2013; (iii) January 23, 2014; and (iv) February 3, 2014.

137.    In exchange for his efforts, Odebrecht transferred over $3 million to Cánepa.  In March 2018, he was restricted from leaving the country for 18 months.

138.    Several Odebrecht officials have confirmed that Odebrecht paid bribes to Cánepa. On February 22, 2019, for example, Luiz da Rocha Soares, Odebrecht's former international treasurer, testified before Peruvian prosecutors that Odebrecht paid $3 million in bribes to Cánepa in exchange for the favorable arbitration awards used to fund bribes.

139.    In total, Odebrecht generated an additional $682 million in cost overruns for the IIRSA South project, as follows:

(a)    The contract for IIRSA South, Section II was initially valued at $263 million.  Odebrecht generated an additional $391 million in cost overruns, and collected a total of $654 million from the Peruvian state, a 149% increase above the contract price;

(b)    The contract for IIRSA South, Section III was originally valued at $395 million.  Odebrecht generated an additional $291 million, and collected a total of $686 million from the Peruvian government, a 74% increase above the contract price.

### 6.    Graña Documented the Bribes for the IIRSA South Project as Payments for "Additional Risks"

140.    The minority stakeholders of CONIRSA – Graña, JJC, and ICCGSA – were each required to reimburse Odebrecht for their proportional share of the bribes.  The relative portion of each stakeholder's bribe was paid to Odebrecht through the receipt of differential dividends – in other words, increased dividends paid to Odebrecht relative to Odebrecht's 70% equity interest in

the concession, and reduced dividends paid to the minority stakeholders relative to their respective equity interests.

141.    At the IIRSA South Concession General Meeting of Shareholders held on June 1, 2011, the members of the consortium approved the distribution of S/. 94,318,519 (approximately $34,246,584.73).  Rather than being distributed in accordance with the shareholders' respective equity interests, the profits were distributed as follows:

|  | Interest in CONIRSA | Amount Owed | Percentage Received | Amount Received |
|---|---|---|---|---|
| Odebrecht | 70% | S/. 66,022,963.3 $23,972,609.31 | 83.27% | S/. 78,539,030.77 $28,517,131.10 |
| Graña | 19% | S/. 17,920,518.61 $6,506,851.09 | 12.29% | S/. 13,479,985.23 $4,208,905.26 |
| JJC | 7% | S/.6602296.33 $2,397,260.93 | 1.55% | S/. 1,462,086.11 $530,822.06 |
| ICCGSA | 4% | S/. 3,772,740.76 $1,369,863.39 | 0.88% | S/. 836,014.95 $301,369.95 |

142.    Put differently, Graña agreed to a **35.32%** reduction of its profits, and yielded approximately $2,297,945.83 of the $6,506,851.09 to which it was entitled, to Odebrecht.

143.    The minutes explain that Odebrecht was entitled to a higher distribution because it had assumed "***additional risks***" on behalf of the consortium:

**2.  Distribution of Profits and Approval of Dividends**

The Chairman submitted to the approval of the Meeting the decision to agree on the distribution of profits to the shareholders, taking into account the profits accumulated to be distributed as recorded in the Financial Statements as of the 2010 year end approved in paragraph 1 above.

The Chair proposed that, ***considering that the shareholder CONSTRUTORA NORBERTO ODEBRECHT S.A. had assumed additional risks due to the execution of the Construction Works charged to the Company and considering that its role had been decisive in obtaining the profits, assuming even additional risks, it was appropriate that it receives a greater percentage of the profits to be distributed***.  Additionally, the risks assumed by ODEBRECHT PARTICIPAÇÕES

E INVESTIMENTOS S.A.  Therefore, it was unanimously agreed that the latter was to receive [a fee] according to the percentage of its share.[8]

144.    The board minutes were signed by Gonzalo Rey on behalf of Graña, and by Jorge Barata and Eleuberto Antonio Martorelli on behalf of Odebrecht.

145.    In total, Graña paid approximately $7 million for its share of the Odebrecht bribes that won them the IIRSA South project.

### D.    The Construction Club Cartel

146.    The Construction Club was a cartel of Peruvian and foreign construction companies that, instead of competing with each other, colluded to share the public works contracts tendered by Provias Nacionale, an agency of the MTC, involving the construction, improvement, rehabilitation and maintenance of Peru's National Road Network.

147.    The Construction Club was made up of: (i) 30 Peruvian and foreign construction companies; (ii) a businessman and lobbyist named Rodolfo Prialé de la Peña ("Prialé"); and (iii) Carlos Eugenio García Alcázar, the Vice-Minister of Transportation.

148.    Between 2011 and 2014, Graña was represented at the Construction Club by Nicolay Castillo Gutzalenko ("Castillo"), who served as the Company's VP of Business Development.  During that period, Graña was awarded at least one road maintenance contract by Provias.  (Castillo is under a restraining order and is not permitted to leave Peru).

149.    The scheme worked as follows: After the publication of public tenders on the Provias Nacional website, representatives of members of the cartel would hold a meeting with Prialé to determine which company would be the winning firm.  The meetings would be held at various locations in San Isidro, Lima, including the Swissotel and the Balthazar restaurant.

---

[8]    A certified copy of the minutes of the IIRSA South, Section 2 General Shareholders' Meeting, along with the original version, is annexed hereto as Exhibit 4.

150.    Acting as a representative of the cartel, Prialé would convey the identity of the winner to Carlos García, who would ensure that the contract be delivered to that company.

151.    The company that was awarded the project was then required to pay García and Prialé kickbacks equal to 2.92% of the total value of the contract.

152.    García and Prialé are in the process of becoming effective collaborators, and have testified before Peruvian prosecutors on several occasions.

153.    On February 22, 2019, during testimony before Peruvian prosecutors, Graña's involvement in the cartel was confirmed by Raymundo Nonato Trindade Serra ("Trindade"), who served as Odebrecht's Institutional Relations Manager during this period.

154.    Trindade was involved in the Electric Train Consortium and signed many key documents on Odebrecht's behalf, including, *inter alia*, the 2012 Profit Distribution Agreement and the 2015 Liquidation Agreement.  On February 18, 2019, Trindade executed an effective collaboration agreement with the Peruvian authorities.  On February 22, 2019, Trindade testified that Graña was a member of the Construction Club, a cartel of construction companies, lobbyists and government officials that would determine, in advance, the outcome of the competitive bidding process for public works projects in Peru.

**E.    The Southern Gas Pipeline Project**

155.    The Gasoducto Sur Peruano ("GSP") project involved the construction and operation of the Southern Peru Gas Pipeline, which would transport natural gases from central Peru to the Pacific coast.

156.    In June 2014, the GSP concession was awarded to a consortium comprised of Odebrecht and Enagás Internacional, S.L.U. ("Enagás").  GSP then entered into an agreement with Consorcio Constructor Ductos del Sur ("CCDS"), a construction consortium formed by a group of Odebrecht companies, for CCDS to perform works required for the GSP project.

- 33 -

157.    In August and September 2015, Graña and Odebrecht executed a memorandum of understanding and addendum, by which Graña, through its subsidiary Negocios del Gas S.A., joined GSP as a minority shareholder with 20% of stock ownership and acquired a 29% interest in the construction consortium, CCDS.[9]

158.    As a result, Odebrecht retained a 55% ownership stake in GSP, with Enagás (25%) and Graña (20%) as minority shareholders.  After Graña acquired an interest in CCDS, Odebrecht and Graña had ownership stakes of 71% and 29%, respectively.

159.    In April 2016, the Brazilian authorities began investigating Odebrecht for its involvement in corrupt activities in Brazil.  As a result, the Peruvian banks decided to withhold financing for the GSP concession unless Odebrecht sold its stake in the concession.

160.    Odebrecht's efforts to divest were unsuccessful, and, in November 2016, Graña announced that the only serious purchaser had officially backed out of talks to purchase Odebrecht's shares in the GSP, making it inevitable that the consortium would be unable to meet its financing deadline.

161.    On January 24, 2017, following the consortium's failure to meet a key financing deadline, the Peruvian government terminated the GSP concession.

F.    **The Truth Begins to Emerge: Odebrecht Confesses to Paying Bribes to Win Public Infrastructure Contracts in Peru**

162.    In May 2014, Brazilian authorities initiated a sprawling money laundering and corruption probe codenamed Operation Car Wash (in Portuguese, *Operação Lava Jato*).  Though it initially began as a local money laundering investigation, Operation Car Wash rapidly "built momentum on the testimony of informants and an avalanche of plea bargains as those caught in

---

[9]    Notably, Graña decided to partner up with Odebrecht less than six months after the latter's chairman was arrested for corruption-related offenses, including bribery.

the net of justice" began to cooperate with the government.[10]  By March 2016, Operation Car

Wash, already in its twenty-sixth phase, turned its focus to Odebrecht's operations in Brazil.

163.   On December 21, 2016, Odebrecht and Braskem pled guilty to a one-count criminal

Information charging them with conspiracy to violate the anti-bribery provisions of the FCPA, and

agreed to pay a combined criminal penalty of approximately $3.5 billion (the "Odebrecht Plea

Agreement").  *See United States v. Odebrecht S.A.*, Cr. No. 16-643, Plea Agreement, available at

https://www.justice.gov/opa/press-release/file/919916/download (last visited Apr. 3, 2019).

164.   The Odebrecht Plea Agreement described Odebrecht's massive bribery and bid-

rigging scheme in detail.  Between 2001 and 2016, Odebrecht and its co-conspirators paid

approximately $788 million in bribes to government officials, their representatives, and political

parties to illegally secure lucrative contacts in multiple countries, with billions of dollars of ill-

gotten benefits to Odebrecht and its co-conspirators.

165.   In particular, Odebrecht confessed to paying millions of dollars of bribes to win at

least two public infrastructure projects in Peru.  The Odebrecht Plea Agreement describes these

payments as follows:

> In or about and between 2005 and 2014, Odebrecht made and caused to be made
> approximately $29 million in corrupt payments to government officials in Peru in
> order to secure public works contracts.  Odebrecht realized benefits of more than
> $143 million as a result of these corrupt payments.
>
> For example, in or about 2005, Odebrecht participated in a tender for a government
> infrastructure project.  During the tender process, an Odebrecht employee was
> approached by an intermediary of a high-level government official in the Peruvian
> government, who offered to support Odebrecht's bid, if, in the event that Odebrecht
> was awarded the projected, it would make corrupt payments benefitting the
> government official.  The payments were agreed to be paid through companies
> owned by an intermediary who had a relationship with the government official.

---

[10]    *See* Miami Herald, *Brazil engulfed in a corruption scandal with plots as convoluted as a telenova*, available at http://www.miamiherald.com/news/nation-world/world/americas/article171222962.html (last visited May 9, 2019).

- 35 -

After the initial conversations with the intermediary, the Odebrecht employee participated in several meetings, some of which were attended by the government official.   Odebrecht won the tender and made corrupt payments totaling approximately $20 million from approximately 2005 to 2008 to specific companies, as directed by the intermediary, with unrecorded funds from the Division of Structured Operations.

Furthermore, in or about 2008, Odebrecht bid on a government transportation contract in Peru.  In order to influence the bid committee to help Odebrecht secure the contract, Odebrecht agreed to pay $1.4 million to a high-level government official in the Peruvian government and members of the tender committee for the project.  In or about 2009, Odebrecht won the contract, valued at approximately $400 million.  Odebrecht made the corrupt payments, which were approved by Odebrecht Employee 6, with unrecorded funds from the Division of Structured Operations.

166.    Although it did not mention Graña by name, the Odebrecht Plea Agreement indirectly implicated Graña in the bribery.  Indeed, as a foreign company, Odebrecht was required to partner with local Peruvian companies to compete for public infrastructure projects.  Graña, one of the oldest and most prominent engineering and construction companies in Peru, was a key member of the consortia organized by Odebrecht to present bids for public infrastructure projects in 2005 (*i.e.*, the IIRSA South concession) and 2008 (*i.e.*, the concession for Line 1 of the Lima Metro).

### 1.    The Peruvian Authorities Launch an Investigation into Odebrecht's Peruvian Partners; Graña Repeatedly Denies Involvement in the Bribery Scheme

167.    The Peruvian authorities reacted swiftly to the Odebrecht Plea Deal.  On January 2, 2017, Peru's Attorney General announced the formation of a special prosecution task force to investigate corruption linked to Odebrecht's operations in Peru.  Days later, on January 5, 2017, the Attorney General's office announced that it reached a preliminary agreement with Odebrecht, pursuant to which Odebrecht agreed, *inter alia*, to cooperate with the Peruvian authorities in exchange for immunity.

168.    At the same time, then-President Pedro Pablo Kuczynski directed Peru's comptroller to launch an investigation into the tender for the GSP project, warning that he would terminate the GSP contract if Odebrecht's statements regarding its Peruvian operations proved to be true.

169.    By January 7, 2017, it was widely reported in Peruvian news outlets that Odebrecht had agreed to identify the public officials to whom it paid bribes. Three days later, on January 10, 2017, the anti-corruption task force petitioned the Public Ministry for leave to depose 75 different individuals suspected of being involved in crimes in Peru, including, *inter alia*, four former Peruvian presidents, former Odebrecht CEO Marcelo Odebrecht, and Odebrecht's former director of operations in Peru, Jorge Barata.

170.    On January 11, 2017, Peru's comptroller general issued a statement on irregularities detected in infrastructure contracts awarded to Odebrecht. According to *Reuters*, "[i]irregularities detected [in infrastructure projects awarded to Odebrecht] include unjustified cost overruns, improperly forgiven penalties for breaking contractual obligations and higher price tags for projects that competitors offered to do cheaper[.]"

171.    On January 12, 2017, Defendant Alvarado, Graña's then-CEO, was interviewed by Peruvian news magazine *Caretas* to discuss the Odebrecht scandal. During the interview, Defendant Alvarado called the partnership with Odebrecht a "mistake," and disclaimed any knowledge or involvement in the bribery, stating that "we were never aware of any act of corruption that occurred in any of the projects."

172.    In addition, in response to an inquiry from the Lima Stock Exchange that asked the Company to disclose "any fact that may be affecting [its] stock prices," Graña stated that "we have no knowledge of any relevant information that could directly affect or is directly affecting the price

of our shares."  Graña disclosed this correspondence on a Form 6-K filed with the SEC on January 12, 2017.

173.    These assurances, however, did little to assuage the cloud of suspicion hovering over Graña.  On January 17, 2017, in an interview with *Radio San Borja*,[11] Peruvian prosecutor Amado Enco Tirado stated that Graña would likely be incorporated into the criminal investigations, and blasted Peru's Public Ministry for its lack of diligence in processing the government's petition to depose witnesses involved in the Odebrecht graft.  Likewise, Peruvian news website *SEMANAeconomica.com* observed that "the Peruvian construction companies that formed consortiums with Odebrecht and that won tenders . . . are under scrutiny . . . Graña y Montero, for example will be the most questioned."[12]

174.    On January 20, 2017, the investigation reached a new milestone when the Peruvian authorities made the first arrest in connection with the Odebrecht corruption scandal.  Edwin Luyo, the chairman of the Lima Metro Bidding Committee, was arrested for receiving a total of $1.4 million for the Lima Metro, Line 1 contract.

175.    In addition, an arrest warrant was issued for Jorge Cuba for taking $8.1 million in bribes in exchange for the Lima Metro, Line 1 contract.

176.    In the midst of these developments, on January 20, 2017, Defendant Alvarado, Graña's then-CEO, was interviewed by Peruvian outlet *RPP Noticias*.  During the interview, Defendant Alvarado again stated that the Company was "deceived" and that "[w]e were not aware

---

[11]    *See*   https://elcomercio.pe/politica/justicia/procurador-enco-critico-lentitud-fiscalia-caso-odebrecht-401402 (last visited May 9, 2019).

[12]    *See*  http://semanaeconomica.com/article/sectores-y-empresas/conectividad/209841-caso-odebrecht-como-salpica-a-las-empresas-Peruanas/ (last visited May 9, 2019).

of any acts of corruption in our projects," calling its partnership with Odebrecht "a very bad decision."

177.    By that point, it was apparent that the GSP consortium would not meet its impending financing deadline.  On January 20, 2017, Graña issued a press release informing the public that it expected to default on its financing deadline.

178.    As expected, the GSP consortium did not meet its January 23, 2017 financing deadline, and on January 24, 2017, the Peruvian government terminated the contract.   On January 25, 2017, Graña disclosed that it would ask its Board of Directors to approve the sale of $300 million in assets to help it meet its obligations after the termination of the GSP concession.

179.    Over the next several days, additional details regarding the bribes paid to Cuba and Luyo were disclosed by the Peruvian government.

180.    On January 27, 2017, Graña hosted a conference call for investors and analysts. Citing the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy, Defendant Alvarado again disclaimed any knowledge or involvement in the bribery, stating, in pertinent part, as follows:

> First of all, let me explain the position taken by Graña y Montero in the Odebrecht case:
>
> It is important to note that **the Graña y Montero Group does not authorize, recommend or make irregular payments of any kind** because these conducts disobey the values and principles that have guided our behavior for more than 83 years.
>
> In the 6 projects we developed in partnership with Odebrecht throughout our history, **we have never seen, experienced, witnessed, or participated in any irregular actions related to the projects.  We could not imagine that there was a system specially designed to pay bribes.**

181.    On January 29, 2017, Defendant Alvarado gave another interview to *La República*. During the interview, Alvarado again referenced the Company's Ethics Charter, Code of Conduct,

and Anti-Corruption Policy, and dismissed the possibility that any Graña employee participated or was even aware of the bribery.

182.    On January 30, 2017, the *El Comercio* publication called for Graña to be investigated.  *See* https://elcomercio.pe/opinion/editorial/editorial-socios-odebrecht-161831 (last visited May 9, 2019).

183.    On February 1, 2017, Graña announced, on a Form 6-K with the SEC, that an Extraordinary Shareholder Meeting would be held later that month to discuss, *inter alia*, the "[o]fficial position taken by the company [in response to] Odebrecht's corruption acts."  The Company simultaneously filed a formal Agenda for the Extraordinary Shareholder Meeting on a Form 6-K with the SEC, which spelled out the Company's "[o]fficial position," and stated, in pertinent part, as follows:

### 1.    Official position taken by the Company facing Odebrecht's corruption acts

The Graña y Montero Group does not authorize, recommend or make irregular payments of any kind because these conducts disobey the values and principles that have guided our behavior for more than 83 years.

In the 6 projects we developed in partnership with Odebrecht throughout our history, we have never seen, experienced, witnessed, or participated in any irregular actions related to the projects.  We could not imagine that there was a system specially designed to pay bribes.

\*      \*      \*

The Graña y Montero Group is listed on the Lima Stock Exchange since 1997 and is the only South American construction company to trade on the New York Stock Exchange since 2013, where we are subject to the most demanding international standards.

The United States Foreign Corrupt Practices Act (FCPA), to which we have voluntarily adhered to on the stock exchange, is very strict about compliance with anti-corruption and corporate governance policies.

- 40 -

For the last 22 years, the Group has had different tools to encourage ethical principles at all organizational levels, including the Ethics Charter, the Code of Conduct and the Anti-Corruption Policy.

184.     Defendant Alvarado reiterated the Company's innocence on February 2, 2017, when he delivered testimony before a Peruvian Congressional commission investigating the Odebrecht bribery scheme, stating, in pertinent part, as follows:

> *It is clear that we were duped*, we now know it was a bad decision.  *If we had known before, we would not have become their associates*.  We have lost a great deal, and we have paid the consequences of that deception.

185.     On February 3, 2017, the Peruvian authorities issued an arrest warrant for President Toledo.  Peruvian media reported that Barata accused President Toledo of receiving $20 million in bribes in exchange for the lucrative IIRSA South project.

186.     On February 9, 2017, Judge Concepción issued a provisional arrest order, finding, *inter alia*, that the former president appeared to have used the "high office of the presidency" to "make an illegal pact" to sell off the IIRSA South project.  *See* https://www.reuters.com/article/us-Peru-toledo/Peru-judge-orders-international-arrest-warrant-for-ex-president-toledo-idUSKBN15P0B0 (last visited May 9, 2019).

187.     On February 16, 2017, representatives of 11 countries executed an international cooperation agreement with Odebrecht.   *See*  https://elcomercio.pe/politica/justicia/odebrecht-fiscalia-firma-acuerdo-cooperacion-internacional-402343 (last visited May 9, 2019).

188.     On February 21, 2017, Peruvian authorities announced that they would summon Graña's then-CEO Mario Alvarado to testify regarding the circumstances surrounding the Company's decision to take an interest in the GSP project.  *See* https://elcomercio.pe/politica/justicia/gasoducto-fiscalia-citara-representante-grana-montero-402474 (last visited May 9, 2019).

189.     On February 22, 2017, José Graña was summoned to testify before Peruvian authorities.    He  responded  that  he  was  busy  and  needed  to  reschedule.    *See*

https://elcomercio.pe/politica/congreso/lava-jato-director-grana-montero-pide-reprogramacion-405440?foto=2 (last visited May 9, 2019).

190.    On February 23, 2017, Peruvian outlet *El Comercio* published a portion of Barata's testimony regarding an alleged $3 million bribe to finance the campaign of President Ollanta Humala.   *See*   https://elcomercio.pe/politica/justicia/jorge-barata-coordinaba-entregas-dinero-nadine-heredia-402541 (last visited May 9, 2019).

### 2.    Graña's Involvement in the Bribery Scheme Is Revealed and Its Stock Tumbles

191.    Then, on February 24, 2017, the Peruvian news magazine *Hildebrandt en sus trece*, published a bombshell article entitled *Barata with Everything* (in Spanish, *Barata Con Todo*),[13] reporting that top Graña executives knew about Odebrecht's $20 million bribery payment to President Toledo to win the IIRSA South concession.

192.    According to *Hildebrandt*, in January 2017, Barata testified in closed proceedings that members of the IIRSA South consortium both knew about and contributed to the bribe paid to win the IIRSA South project.  Barata explained that Odebrecht would pay the bribes necessary to win the construction contracts and that its construction partners, which include Graña, would reimburse Odebrecht for their proportional share of the bribery.

193.    The *Hildebrandt* article also published a partially redacted transcript of Barata's testimony before Peruvian prosecutor Hamilton Castro, which included the following exchange:

Castro:        What is the extent of intervention in the illicit agreement and in the payments made to Alejandro Toledo, from the other companies in the Interoceanic Project, Stretches 2 and 3?

Barata:        The payment has been [made] by Odebrecht but ***the rest of the companies did not know the details, but they knew there was an agreement . . .***

---

[13]    A certified translation of *Barata Con Todo*, along with the original version, is annexed hereto as Exhibit 5.

- 42 -

> *What I do know is certain, is that it was distributed among the partners, I do not remember the exact formula*, I will verify this.  It was more or less like this, *they knew that we had paid and they knew that they had to assume what would correspond to them.*

194.    Although the published portion of Barata's testimony did not mention Graña by name, it directly implicated Graña – a known member of the IIRSA South consortium – in the bribery, and marked the first time that the public learned about Graña's criminal conduct.

195.    Indeed, Graña itself understood that Barata's testimony incriminated the Company in the bribe, and immediately issued a formal statement categorically denying any involvement in the Odebrecht bribery scheme.  The statement was filed on a Form 6-K with the SEC, and stated, in pertinent part, as follows:

> With respect to the statements made by the former representative of Odebrecht in Peru, Mr. Jorge Barata, published today, February 24, 2017 in a local publication:
>
> *We categorically deny such statements and reiterate that our Company and executives were not aware of, participated in, nor made any payments in connection with any type of bribe or reimbursement of any such payments made by Odebrecht.*

196.    Nevertheless, shares of Graña ADSs fell 27% on the NYSE, closing at $3.23 per ADS on Friday, February 24, 2017, down from a price of $5.23 per ADS the day before.

## VI.    POST CLASS PERIOD EVENTS

### A.    Senior Graña Executives Resign Within Days of Barata's Disclosure

197.    Despite Graña's denial, the impact of the *Hildebrandt* article continued to be felt through the weekend, and on Monday evening, February 27, 2017, three of Graña's top officers – long-time Chairman José Graña, CEO Mario Alvarado Pflucker, and Director Hernando Graña – resigned.

198.    The resignations were announced the next morning, February 28, 2017, in a press release issued before an emergency shareholder meeting, and attributed the resignations to the

- 43 -

"termination of the South Peru Gas Pipeline, the fall of share prices, and the false allegations made by the former representative of Odebrecht in Peru."

**B.    Numerous Odebrecht Officials Corroborate Barata's Testimony**

**1.    Background: Peru's Law of Effective Collaboration**

199.    The United Nations Convention against Transnational Organized Crime, 2225 U.N.T.S. 209 (2000) ("CATOC"), is a multi-lateral treaty specifically designed to target international organized crime.[14]

200.    CATOC requires its signatories to both criminalize and implement affirmative measures against certain cross-border activities.  Articles 6 and 7, for example, require signatories to promulgate legislation criminalizing cross-border money laundering, and to establish measures to combat money laundering.  Articles 8 and 9 require signatories to criminalize corruption and to establish measures against corruption.

201.    Article 26 mandates that each signatory should establish mechanisms for persons involved in organized crime to provide useful and relevant information to combat the crime, and should provide incentives to criminals to cooperate and provide useful information.

202.    In accordance with its international obligations under CATOC, Peru's Effective Collaboration Law (in Spanish, *Ley de Colaboración Eficaz*), codified in Peru's Code of Criminal Procedure at §§472 *et seq.*, creates a special process that allows the prosecution to obtain inside information from individuals involved in organized cross-border criminal activity in exchange for leniency.  These individuals are known as "effective collaborators."

203.    The process for achieving effective collaborator status is strictly controlled.  A request to qualify for effective collaborator status must be made to the prosecutor.  Upon receiving

---

[14]    The United States and Peru are both signatories to CATOC.

the request, the prosecutor must then assess the value of the information provided and determine whether the individual is a suitable candidate for the regime.

204.    If the prosecution is satisfied that the aspiring effective collaborator will be useful, it will negotiate the terms of a preliminary collaboration agreement that sets forth the scope of information and corroborating evidence that will be offered, and the extent of the leniency that will be provided in exchange for the information.

205.    After the execution of the preliminary agreement, the prosecution conducts extensive corroboration procedures to verify the information provided by the collaborator.

206.    Upon the completion of all corroboration procedures, the prosecutor and collaborator sign a Benefit and Collaboration Agreement that describes in detail the information provided, the leniency awarded to the defendant, and the continuing obligations of the collaborator.

207.    The agreement is then submitted to the court for final approval.  Once the court approves the agreement, the status of effective collaborator is formally conferred upon the criminal defendant.

### 2.    Odebrecht Officials Sign Final Agreement as Effective Collaborators

208.    The Peruvian authorities commenced the process for awarding effective collaboration status to Jorge Barata and other senior Odebrecht officials shortly after the Odebrecht Plea Agreement was finalized.

209.    After conducting the first round of interrogations, the Peruvian authorities moved to incorporate Jorge Barata into the criminal investigation relating to the IIRSA South bribes, arguing that he was not entitled to immunity until he achieved final effective collaborator status. In response, Barata declared that he would cease cooperating with the Peruvian authorities.

210.    On November 29, 2017, Judge Concepción ruled that Barata must be excluded from the criminal probe into the bribe for the IIRSA South project, thereby clearing the way for Barata to resume his collaboration efforts.    *See* https://gestion.pe/economia/mercados/acciones-grana-y-montero-caen-minimo-3-meses-medio-investigacion-caso-odebrecht-219752 (last visited May 8, 2019).

211.    On December 8, 2018, Odebrecht officials signed the Preparatory Agreement for Collaboration and Benefits, and committed to deliver all information that is known, but not yet disclosed, to Peruvian authorities.    *See* https://gestion.pe/Peru/politica/10-aspectos-claves-acuerdo-colaboracion-eficaz-odebrecht-Peru-252265 (last visited May 8, 2019).

212.    *Gestion* reported that the agreement was 150 pages, and that Odebrecht admitted paying bribes in connection with seven different projects, including the IIRSA South and Lima Metro projects.    *See* https://gestion.pe/Peru/politica/procuraduria-fiscalia-paso-colaboracion-eficaz-hoy-firma-acuerdo-preliminar-odebrecht-252138 (last visited May 8, 2019).

213.    On February 15, 2019, Odebrecht announced that it reached a cooperation agreement with Peruvian prosecutors.

214.    On February 18, 2019, a 1,056-page cooperation agreement was executed between Peruvian prosecutors and multiple Odebrecht executives involved in Odebrecht's operations in Peru, including: (i) Jorge Barata; (ii) Carlos Nostre; (iii) Renator Ribeiro Bortoletti; (iv) Ricardo Boleira; (v) Luiz Mameri; (vi) Marcelo Odebrecht; and (vii) Fernando Miglaccio.  The cooperation agreement then was submitted to the Peruvian court for final approval.

### 3.    Jorge Barata

215.    Barata testified as an aspiring collaborator in the IIRSA South and Lima Metro probes on several occasions, including, *inter alia*, in: (i) January 2017; (ii) October 2017; (iii) February 2018; and, most recently, (iv) April 2019.

216.   According to numerous Peruvian news outlets, on April 23, 2019, Barata confirmed to Peruvian prosecutors that Graña knew about the bribes and contributed its proportional share disguised as payments for "additional risks."  These reports include, *inter alia*, the following:

(a)   According to *La Republica*, "Jorge Barata confirmed that the companies [that participated in] consortia with Odebrecht, such as Graña y Montero, knew about the bribes paid for the Lima Metro and the Interoceanic Highway."  He also stated "that the construction company Graña y Montero knew of the payment of bribes for the Lima metro during the execution of Section 1 and before the signing of the contract for Section 2."

(b)   According to *Gestion*, "Barata said that US$24 million would have been allocated for the bribes for sections 1 and 2 and that, for example, businessman José Graña, then director of the construction company Graña y Montero, knew about that operation."  Of that amount, "US $14 million would have been paid in bribes . . . under the concept of 'additional profits or risks.'"

(c)   Another *La República* article reported that "Jorge Barata[] confirmed that the construction company Graña y Montero was aware of the bribes paid for sections 1 and 2 of the Lima Metro."

(d)   The *El Comercio* magazine reported: "During his interrogation before the prosecutor José Domingo Pérez, former Odebrecht representative in Peru, Jorge Barata, said that the Peruvian construction company Graña y Montero paid US $3 million as a bribe for the award of the Lima Metro to the consortium formed by both companies. He also stated that Graña y Montero would have learned of the bribe paid by Odebrecht, which occurred between the execution of Section 1 of the work and the signing of the contract for section 2."

(e)    *Peru21* reported: "Barata also said that the consortium company Graña y Montero was aware of the payment of bribes delivered by Line 1 of the Lima Metro and that it contributed to the bribe with a sum of around five million dollars."

217.    Graña responded to Barata's testimony in a press release stating that that Company "does not have any information that corroborates or contradicts the statements made by Odebrecht's former representative in Peru."

### 4.    Marcelo Odebrecht

218.    In November 2017, the Peruvian authorities heard testimony from four former Odebrecht executives, including former CEO Marcelo Odebrecht.  According to a November 24, 2017 *Hildebrandt* article entitled *Odebrecht Falls on GyM* (in Spanish, *Odebrecht Cae Sobre GyM*), Marcelo Odebrecht testified that Graña both knew about the bribes, and was actively involved in identifying the public official to whom bribes should be paid.  *Hildebrandt* reported as follows:

> A fourth and recent witness is Marcelo Odebrecht, who last Thursday, [November] 9th declared before three Peruvian prosecutors that Graña y Montero helped Jorge Barata to establish contact with Peruvian politicians.  ***The businessman guaranteed that the role of the Peruvian builder was decisive in choosing the projects in which "bribes" could be paid, and in suggesting the name of presidential candidates that should receive financing***.
>
> The four collaborators all state that Odebrecht was in charge of carrying out the payment of bribes, and at the end of the year, when the balance sheets were presented, received from its partners their proportional part of the bribes.
>
> *        *        *
>
> ***"The Prince" [Marcelo Odebrecht] corroborated to the group of Peruvian prosecutors that Graña y Montero was fully aware of the payment of bribes and that it participated in this corrupt scheme that helped them to earn millions of dollars***.  Odebrecht guaranteed that it used to visit the offices of Graña y Montero in Peru at least twice a year and stated that it was received personally by José Graña Miró Quesada, former president of the board of GyM and important shareholder of the daily paper "El Comercio."

- 48 -

*The former CEO of the Brazilian builder said that there was a 30-year relationship between both groups, and that the role of Graña y Montero in materializing the business in Peru was vital.*[15]

219.     An article in the December 1, 2017 edition of *Hildebrandt* magazine entitled *Barata Negotiates to Talk in January* (in Spanish, *Barata Negocia Para Hablar en Enero*) described the "criminal pact" between Odebrecht, Graña, and the other IIRSA stakeholders as follows:

> This weekly newspaper accessed the full report of the Special Investigation Team in the case that Lava Jato which describes in detail, how members of the "CONIRSA" consortium (Odebrecht, Graña y Montero, JJC and ICCGSA) assumed and divided among themselves the payment of bribes to former president Alejandro Toledo to win the concession of Interoceánica Sur, [tranches] 2 and 3. Odebrecht transferred 20 million to Joséf Maiman, the presumed figurehead of Toledo, and recovered 41,499,688.356 million soles from its three partners.

> Prosecutor Castro and his team compared the initial confession of Jorge Barata, published by this magazine in February of this year, with the statements of other witnesses, internal minutes, expert reports and bank reports that record the cash movements of the consortium.

> The document confirms that the company Odebrecht provided the Public Prosecutor's Office with confidential information to bury its former Peruvian partners in an effort to show that it did not bribe alone.

> The prosecutor's resolution reveals that in November of 2004, after Barata met in Rio de Janeiro with the emissaries of Maiman, the Odebrecht man travelled to Lima and convened a special appointment with the group of Peruvian businessmen. "*[Jorge] Simoes Barata communicated with José Alejandro Graña Miró Quesada, José Fernando Castillo Dibós and Fernando Camet Piccone regarding its negotiations with Alejandro Toledo Manrique to obtain the tender for project Interoceánica Sur in exchange for an unlawful payment,*" according to prosecutor's provision No. 19.  And adds: "Barata, Miró Quesada, Castillo and Camet agreed to pay the illegal commissions to Alejandro Toledo … In such a manner that the partners assumed their portion of the payment of the bribes, a situation that materialized itself in the distribution of profits."[16]

---

[15]     *See* Ex. 1.

[16]     A certified translation of *Barata Negocia Para Hablar en Enero* is annexed hereto as Exhibit 6.

220.   In February 2018, Marcelo Odebrecht testified before the Peruvian prosecutors as an aspiring effective collaborator.   According to the transcript of his testimony, which was published by *IDL Reporteros*, it was clear that Graña knew about the Odebrecht bribes, as follows:

(a)   Marcello Odebrecht stated that "[i]t is very likely that . . . bribes related to specific projects have been negotiated and paid by Peruvian businessmen," stating, in pertinent part, as follows:

> An important point. It was not Odebrecht who invented the bribes. If we had a political relationship of grade 10, our partners reached 40, 50, 60.  We must put in perspective the following.  If there were bribe payments in a project, that bribe was probably agreed by the local partners. Barata or Boleira will be able to indicate if there were contributions of campaigns to candidates for the presidency.  With regard to bribes related to specific projects, if any; ***It is difficult for a Peruvian businessman or a Peruvian politician to delegate to a Brazilian company the negotiation of something that way.  It is very likely that in the case of bribes related to specific projects have been negotiated and paid by Peruvian businessmen.***  I cannot find how a politician, a governor, mayor, congressman, a public official of a Peruvian state company would negotiate with a Brazilian company, with a Brazilian.  He would probably be more willing to negotiate with a subcontractor or a Peruvian partner; and he warned us and we would reimburse him.

(b)   In response to a question about "the activities that Graña y Montero company has carried out in order to obtain contracts," Marcelo Odebrecht explained how Odebrecht viewed its partnership with Graña as "a unique team," stating as follows:

> ***Q:   I want you to explain what has been the participation in the activities that Graña y Montero company has carried out in order to obtain contracts***.
>
> A:   Graña was our consortium. In general when one makes a consortium, there are two consortium models: defined bod[ies] or single body.  One can consort with companies where each one assumes a certain part of the project, or where everyone can be in the same team, and the project is worked on.  ***With Graña most of our projects were made in a single body. That is, it was a unique team, where there were people from Odebrecht and Graña, and they treated the project as a whole***. As far as I know, Graña was our main partner, consorting in a large part of the projects. It is the largest construction company in Peru.  And that story comes from the time of Trujillo, with Chavimochic, from the 80's.  Then Graña has a history with us of 30 years of consortium, since our first project in Peru.

- 50 -

(c)     Marcelo Odebrecht also confirmed that "[i]f there was some project of ours in which there was a bribe . . . Graña . . . certainly knew it," and explained that Odebrecht fully expected Graña to  contribute its share of the bribe, stating as follows:

*Q:     Was Graña aware of illicit activities*?

A:     There are going to be two separate procedures.  The relationship that our staff had with politicians, who were not linked to projects, was a relationship - as far as I understand - individual.  If Barata or some of our businessmen made some political commitment, donation for a determined politician, congressman or candidate for president, that was a personal relationship of the company.  If something that was agreed on the project, my conception is that it was accepted by the consortium and probably led by the local company.

We have to separate the two things. For example, in the case of Ollanta Humala. None of us knew that we gave Ollanta Humala, from Brazil, 3 million dollars. Graña does not know that, or at least I do not know if she knows.  I never commented on that. ***If there was some project of ours in which there was a bribe related to such a project, and Graña or another company were partners, they certainly knew it.  Nobody was going to accept anything regarding a project and assume a cost for the partners.  That does not exist.  If it was a project from Peru, probably the political relationship of the project was led by the Peruvian partners.***

(d)     Marcelo Odebrecht also expressed that he respected Graña and sought to partner with it, unlike the other companies which he dismissed as mere "minority partners," stating, in pertinent part, as follows:

*Q:     What other Peruvian companies are you aware of that carried out the same activity, as referred to by Graña y Montero*?

*A:     The only company that was a weighty partner with whom I wanted to be when I went to the country, as a deference and visit, was Graña. The others were minority partners*.

(e)     Finally, Marcelo Odebrecht identified Jose Graña and Hernando Graña by name, stating as follows:

*Q:     Can you identify which person you visited from Graña y Montero*?

A:      José Graña and Hernando [Graña], who was his cousin or nephew.

*Q:     Can you name his position*?

- 51 -

A:      José Graña was the president of the Graña Council.  And Hernando or Hernández was the president of the construction company.

### 5.      Carlos Nostre

221.      Carlos Nostre, technical director for the Lima Metro project, testified as an aspiring effective collaborator before Peruvian prosecutors in October 2018.

222.      During his testimony, Nostre confirmed that Graña yielded part of its profits in the Lima Metro project to pay bribes to Peruvian public officials.  In addition, Nostre confirmed that the transfer of profits was made pursuant to the fictitious accounting concept of "additional risks." Finally, Nostre confirmed that Lámbarri Hierro knew of Graña's obligation to contribute to the bribery, and understood that the "additional risks" concept was the mechanism by which Graña would reimburse Odebrecht for its share of the bribe.

223.      An article in *IDL Reporteros* described Nostre's testimony as follows:

In the confessional language of the Lava Jato case, a certain euphemism is often used to refer to the operations of bribes, bribes and similar crimes: "illicit money." In the description of Nostre during the afternoon, it was clear that there was a lot of illicit money in the Lima Metro project.

***The work was made in consortium with Graña y Montero.  The bribes represent a cost that should be shared among the partners.***

They referred to them with another euphemism: "extra expenses."  How did Nostre distribute them with his counterpart of Graña y Montero, Juan Manuel Lámbarry?

Nostre said on Thursday afternoon, when he spoke to Lámbarry about the issue, he asked: "Do you know what that is about the extra costs?"

"Yes, yes, do not tell me," said Lámbarry, according to Nostre.

***How did you know if they had not spoken before? Nostre asked himself***.  The only possibility is that he had been explained in his company, GyM some of the people who dealt directly with Jorge Barata:  José and Hernando Graña.

224.      Similar information was simultaneously reported in other Peruvian media outlets at the time, including, *inter alia*, the following:

(a)      An article in *El Comercio* stated that "[Nostre] also mentioned that Graña y Montero would have had knowledge about the alleged bribes paid through his manager of Engineering and Construction, Juan Manuel Lambarri."   *See* https://elcomercio.pe/politica/ odebrecht-habria-pagado-coimas-us-24-millones-noticia-564687 (last visited May 8, 2019).

(b)      An article in *RCR Peru* reported that "[Nostre] revealed that he coordinated the bribes with the then manager of Graña y Montero, Juan Manuel Lambarri."   *See* https://rcrperu.com/lava-jato-grana-montero-abrira-investigacion-tras-declaracion-de-carlos- nostre/ (last visited May 8, 2019).

### 6.      Sergio Nogueira

225.    Nogueira is a former Odebrecht official who served as the secretary of CONIRSA, the construction entity formed by Odebrecht, Graña, and two other construction companies to construct the IIRSA South highway.

226.    On February 19, 2019, Nogueira testified as an aspiring effective collaborator before Peruvian prosecutors, and confirmed that Graña was involved in the bribery.

227.    In particular, Nogueira explained that Odebrecht had allocated $45 million to pay for bribes and associated expenses relating to the IIRSA South project.  He further explained that Odebrecht paid 70% of the bribe, while the remaining 30% – approximately $14 million – was covered by the Peruvian partner companies: Graña and Montero, JJC and ICCGSA.

228.    Nogueira also testified that he was present at a meeting held at Odebrecht's headquarters in Peru on February 15, 2011, where the bribes for the IIRSA South project were openly discussed.  According to Nogueira, Barata informed representatives of each member of CONIRSA that the $45 million allocation was for the "illicit expenses for the conquest of the project."

229.    The Peruvian partners accepted Barata's comments without requesting any further explanation, and turned to a discussion of how to properly account for the profits that would be yielded to Odebrecht.  Nogueira stated that the partners agreed that the funds would be included under the heading of "additional risks."

### C.    Top Graña Executives Are Criminally Charged

230.    Armed with this evidence and more, the prosecution brought criminal charges and sought the provisional arrest of: (i) José Graña; (ii) Hernando Graña; and (iii) Gonzalo Rey, Graña's former manager of business development.

231.    On Monday, December 4, 2017, Judge Concepción determined that the prosecution had established a *prima facie* case of money laundering and collusion with a public official by José Graña, Hernando Graña, and Gonzalo Rey, and ordered the immediate provisional arrests of Defendants José Graña and Hernando Graña for an 18-month period.  Gonzalo Rey, who was ill, was placed under immediate house arrest for a similar 18-month period.

### 1.    Defendant José Graña Is Charged with Criminal Collusion and Money Laundering

232.    Defendant José Graña was charged with criminal collusion and the derivative crime of money laundering based on the allegations that he was informed about the bribe, he agreed to contribute to the bribery, and he utilized the "additional risks" language to dispose of illegally obtained profits.

233.    On December 4, 2017, Judge Concepción determined that the prosecution had established a *prima facie* case of money laundering and collusion with a public official, and ordered the immediate provisional arrest of José Graña for an 18-month period.

234.     José Graña subsequently moved to vacate the provisional arrest order, citing evidence purporting to show that "additional risks" was a legitimate term used in the construction industry, and was not a euphemism for bribery.

235.     On February 23, 2018, Judge Concepción released an opinion (hereinafter, "Resolution No. 4") affirming his previous order, explaining that the evidence obtained thus far, combined with an analysis of pertinent risk factors, justified the pretrial investigative detention of Defendant José Graña.   In Resolution No. 4, Judge Concepción also affirmed his earlier determination that the term "additional risks" was a euphemism for bribery.

236.     On March 27, 2018, Peru's First Criminal Appeals Chamber vacated Resolution No. 4 based on the procedural finding that Judge Concepción applied the incorrect standard in ordering the provisional arrest order.   In particular, the appellate court found that the accusatory instrument charged José Graña under an older version of the collusion statute that narrowly defined criminal collusion as a direct agreement made with a public official.   Because José Graña did not directly participate in the meeting where the bribe for the IIRSA South project was initially negotiated, he could not be held liable under that statute.

237.     The Appeals Chamber did not, however, dismiss the underlying criminal charges. It simply held that the prosecution could not meet the heightened burden required to imprison José Graña until his trial, and replaced the provisional arrest order with an ordinary summons to appear.

### 2.     Defendant Hernando Graña is Charged with Money Laundering

238.     Defendant Hernando Graña was charged with money laundering, based on the finding that the profits from the IIRSA South project were illegally obtained through bribery, and that the "subsequent acts of disposition" through the "additional risks" provision constituted the crime of money laundering.

- 55 -

239.    On December 4, 2017, Judge Concepción determined that the prosecution had established a *prima facie* case of money laundering and collusion with a public official, and ordered the immediate provisional arrest of Hernando Graña for an 18-month period.

240.    Thereafter, Hernando Graña moved to vacate the provisional arrest order.   In support of his motion, he offered evidence purporting to show that "additional risks" was a legitimate term used in the construction industry.

241.    On February 23, 2018, Judge Conception released an opinion (hereinafter, "Resolution No. 2") detailing his findings that Defendant Hernando Graña had likely participated in the bribery, and explaining that the evidence obtained thus far, combined with an analysis of pertinent risk factors, justified his provisional arrest.[17]

242.    In Resolution No. 2, Judge Concepción rejected the claim that the phrase "additional risks," which was used in Graña's written agreements with Odebrecht, referred to any legitimate payment in the construction industry, and concluded that the phrase "additional risks" was a "legal dressing to cover the reimbursement of a bribe" and was "used to justify the payment of covert bribes."

243.    Resolution No. 2 was vacated by Peru's First Criminal Appeals Chamber by order dated March 27, 2018.   The appellate court held that charging Hernando Graña with money laundering was a "viable" theory and ruled that the evidence sufficiently established to "a high degree of probability" that "additional risks" was a fraudulent accounting term designed "to launder the illegal money resulting from the alleged act of Collusion[.]"   The appellate court nevertheless held that preventative detention was inappropriate because: (i) Barata did not mention

---

[17]    A certified translation of Resolution No. 2 is annexed hereto as Exhibit 7.

Hernando Graña by name; and (ii) although Hernando Graña agreed to a reduced dividend distribution on behalf of the Company, he did so through a power of attorney.

### 3.   Gonzalo Rey is Charged with Criminal Collusion

244.   Gonzalo Rey was charged with criminal collusion based on the allegation that he was informed by Barata that Odebrecht would pay a bribe to President Toledo for the IIRSA concession, and he agreed that Graña would contribute its proportional share of the bribe.  On December 4, 2017, Judge Concepción issued an order mandating Rey's house arrest for a period of 18 months.

245.   By decision dated January 19, 2018, the Peruvian appellate court vacated Judge Concepción's order.  It reasoned that the collusion statute in effect when the bribe was negotiated in 2005 only applied to agreements made directly with a public official, but did not apply to subsequent agreements made in furtherance of the primary agreement.  Because there was no evidence that Rey was actually present when Barata and President Toledo negotiated the bribe, the prosecution fell short of establishing a "serious suspicion" that Gonzalo Rey was guilty of collusion, as required for a provisional arrest order.

246.   Gonzalo Rey was also charged with the derivative crime of money laundering based on the allegation that he utilized the "additional risks" language to launder the illegally obtained profits.  Having disposed of the predicate crime of collusion, the appellate court concluded that the evidence could sustain an independent charge of money laundering.

247.   Specifically, the Appeals Chamber noted that Barata was still an aspiring effective collaborator, and that the prosecution was still in the process of the corroboration phase.  Given the unique nature of the Effective Collaboration Law, which is designed to help combat cross-border organized crime, a provisional arrest order could not be predicated solely on the testimony of an aspiring collaborator before the corroboration phase was completed.  The only admissible

evidence in the record was an audit report issued by Graña's auditors stating that there were no accounting irregularities. That sparse record, the appellate court found, could not justify a provisional arrest.

248. The Appeals chamber therefore vacated Rey's provisional arrest order and replaced it with an ordinary summons to appear.

### 4. Graña and GyM S.A. Are Incorporated as Civilly Responsible Third Parties in Connection with the Odebrecht Probes

249. In addition to the criminal charges pending against top Graña executives, the Company and its construction subsidiary GyM S.A. have been formally incorporated as "Civilly Responsible Third Parties" in several investigations relating to the Odebrecht graft, as follows:

(a) On July 16, 2018, the Peruvian court issued a resolution formally incorporating GyM S.A. as a civilly responsible third party in connection with the bribes paid for the Lima Metro project.

(b) On December 13, 2018, GyM S.A. was incorporated as a civilly responsible third party in the Construction Club probe.

(c) On December 18, 2018, the Peruvian First National Preparatory Investigation Court granted the prosecutor's request and issued a resolution incorporating Graña and GyM S.A. as civilly responsible third parties for their role in the bribes paid for the IIRSA South.

(d) On April 8, 2019, the Peruvian authorities moved to incorporate Graña and GyM S.A. as civilly liable third parties in the probe being carried out against Juan Carlos Zevallos.

### 5. Graña Admits that It Ignored Numerous Red Flags

250. On January 9, 2017, Graña retained the law firm Simpson, Thacher & Bartlett LLP to conduct an internal investigation "to determine if any manager, executive or current employee,

or an ex-executive, former executive or former employee, of the Company . . . had knowledge or knowingly participated in related acts of corruption with certain public projects in Peru with Odebrecht or its subsidiaries." (the "Simpson Thacher Report").

251.    On November 2, 2017, Graña filed a Form 6-K with the SEC in which it announced that "[t]he investigation identified no evidence to conclude that any Company personnel engaged in bribery" or "was aware of or knowingly participated in any corrupt payments made in relation to the Projects."

252.    The Simpson Thacher Report, however, was plainly self-serving.  As Graña itself disclosed in the Form 6-K, the Simpson Thacher Report "*did not include interview of employees of Odebrecht or the consortia or a review of Odebrecht's or the consortia's internal documents or financial information.*"

253.    The self-serving nature of the Simpson Thacher Report was so transparent that Judge Concepción, in Resolution No. 2, described the investigation as "inherently flawed" and "made with intrinsic limitations."

254.    Moreover, in announcing the findings of the Simpson Thacher Report, Graña also disclosed that it ignored numerous red flags raised by Odebrecht regarding accounting irregularities.  Specifically, Graña stated, in pertinent part, as follows:

> 5.      As a minority shareholder, the Company only received summary financial statements from the Projects, and had almost no visibility into the Projects' underlying expenses, payments to suppliers or other third parties, or other cash outflows.  *While the Company did on occasion ask Odebrecht to provide additional documentation or detail for such costs, Odebrecht typically would only provide general information*.  Given the minority stake, asymmetrical relationship between the parties, and absence of contractual rights, *the Company had limited leverage to demand additional information.*
>
> *            *            *
>
> 20.     The minority shareholders made efforts to get from Odebrecht a better understanding of the project's financial statements and costs.  *There were periodic*

*meetings relating to the IIRSA projects, but the minority shareholders were consistently unable to obtain detailed information on project financials and cash flows.*   In discussions among minority shareholders in 2010 concerning IIRSA South Concessions, for example, *the parties voiced frustration about the persistent losses and lack of information and said that, while the minority shareholders recognized they had no voice in management, fiscal, and accounting aspects, they discussed that as a minimum courtesy, they should at least be informed about this situation.*

*   *   *

24.     The Company received IIRSA South unaudited financials from Odebrecht on a monthly basis and audited financials on an annual basis.   *The Company and other minority shareholders sometimes struggled to understand the financials and asked Odebrecht to clarify or explain.   Odebrecht was resistant, and the Company had limited leverage to push back.*

255.     Graña disregarded similar red flags with respect to the Lima Metro concession, as the Company explained in the November 2, 2017 Form 6-K:

35.     *The Company was unable to secure from Odebrecht documentation or support for its costs, expenses and risks that were the basis for the increased dividend payments to Odebrecht*.   The Company received only very summary descriptions for these costs claimed by Odebrecht.

36.     The Company received annual audited financials in certain years and unaudited monthly financials, *but they provided only summary information.*   They did not include any detail on management costs, warranties or other costs claimed by Odebrecht as a basis for differential dividends.   The balance sheet listed the project's current and non-current assets, including line items such as "Advance to Subcontractors" and "Advance to Suppliers."   The Statement of Profits and Losses included items such as "Costs and Operating Expenses."   The monthly financials did not contain a detailed breakdown of these line items[.]

37.     Odebrecht's lack of transparency regarding its costs and expenses was not viewed by the Company as suggestive of corruption, but instead as consistent with Odebrecht's more general effort to use its power and leverage over minority shareholders to maximize profit margin for itself.

256.     Despite these known red flags, Defendants Hart and Alvarado, who served as Graña's CFO and CEO throughout the Class Period, certified that the Company's financial results were accurate and that there were no known material weaknesses in internal controls.

- 60 -

6.   **Law No. 30737: Graña is Further Penalized by Peru's New Anticorruption Law**

257.   In addition to bringing criminal charges against individuals accused of corruption, the Peruvian government responded to the *Lava Jato* scandal by issuing Legislative Decree Nos. 1341 and 1352 in January 2017, which introduced severe administrative sanctions towards companies convicted of corrupt practices and money laundering.

258.   In February 2017, the Peruvian government's executive branch issued Urgency Decree No. 003-2017, which effectively froze the assets of companies that were convicted of, or admitted to, crimes of corruption.  On November 13, 2017, the Peruvian Congress passed Bill 1410/2016-CR, which amended Urgency Decree No. 003 and expanded the scope of covered entities to include any companies that had at least a five percent stake in any organization or consortium with companies that admitted or were convicted on corruption, money laundering, or similar charges.  The bill also sought to ensure the immediate repayment of civil compensation in favor of the Peruvian State in cases of corruption and related crimes.  The bill was passed into law on March 12, 2018 as Law No. 30737.

259.   As a company with at least a five percent stake in concessions led by Odebrecht, a company that pled guilty to a corruption and money laundering charges, Graña is included in the scope of Law No. 30737, and is subject to all applicable sanctions and penalties.  Graña admitted the same in a Form 6-K filed with the SEC on March 14, 2018.

260.   On May 10, 2018, the Peruvian government issued Supreme Decree 096-2018-EF, which implements Law No. 30737.  The regulations require covered companies, such as Graña, to set up a trust with sufficient funds to cover any potential judgment.

261.   On February 27, 2019, Graña announced that it set up a trust and deposited a contingency of S/. 71.5 million soles.

## VII.   ETHICS CHARTER, CODE OF CONDUCT, AND ANTI-CORRUPTION POLICY

262.   Graña has three separate written policies that prohibit bribery: the Ethics Charter, the Code of Conduct, and the Anti-Corruption Policy.

### A.   Ethics Charter (1995)

263.   Graña originally adopted its Ethics Charter in 1995.  It reaffirmed the Ethics Charter in 2008, on the 75th anniversary of Graña's founding.

264.   The Ethics Charter purports to set the performance guidelines for the company within the framework of the Company's value system:

> As we celebrate 75 years since the founding of Graña y Montero, we wish to reaffirm the commitment of all of the companies in the Group to our 1995 Ethics Charter.
>
> We believe that we have achieved 75 years of prestige as a result of our strict respect for our values of Quality, Compliance, Seriousness and Efficiency, as summarized in the main concepts of this charter.
>
> These values are the foundation of our culture and must guide the conduct of each and every one of the companies that make up Graña y Montero.  We are aware that the best way to transmit these values is through personal example and that in the actions of each of us, the image, prestige and seriousness of our organization is in play.
>
> The leadership achieved by the Group in the past few years gives us more visibility, requiring us to focus on maintaining the integrity of the image that we have worked so hard to achieve and on taking on this new responsibility of corporate leadership for our country.
>
> Every member of the Group's personnel must assume individual responsibility for complying with the values and standards defined in this document, committing to make these rules known and observed at all levels of the organization, and collaborating by setting an example both within and outside the company.

265.   According to the "Business Practices" section of the Ethics Charter, Graña is committed to "transparency and honesty" and prohibits all forms of bribery:

The Group upholds both the laws and transparency and honesty in its business practices. Every agreement must be formalized in a written document and accounting documents must strictly reflect services as actually performed.

***The Group rejects any possibility of making payments in cash or in kind to obtain contracts or benefits that would otherwise not be theirs by moral right.***

Likewise, employees may not accept payments in cash or in kind in order to grant contracts or requests to suppliers, subcontractors or service companies.

The Group is committed to becoming the industry leader in pursuing its business activities according to ethical values.

266.     The Ethics Charter has been posted on Graña's website since its IPO and throughout the entire Class Period.

## B.     Code of Conduct (2012)

267.     In 2012, Graña adopted a Code of Conduct "to complement and explain[] the Ethics Charter." With respect to the "Business Practices" section of the Ethics Charter, the Code of Conduct provides the following elaboration:

***Graña y Montero complies with the Constitution and applicable laws of the countries in which we operate***. Likewise, the Company strives for doing business in good faith, the morals and good customs.

To that end, collaborators of the Graña y Montero Group must take into account the following:

1.     Relationship with Suppliers

Only suppliers that fulfill the standards of safety, quality, service and fair price shall be hired, to allow us to maintain the values of the Graña y Montero Group and good relationships with our Clients. Also, unnecessary comments on the proposals submitted by our suppliers must be avoided.

2.     Bribes

All the collaborators of Graña y Montero are prohibited to offer bribes, payments and in general, facilitation payments of any kind to public officers, their relatives or representatives, clients and/or suppliers to obtain benefits to which they are not entitled by moral right.

Each collaborator of Graña y Montero shall avoid getting involved in any kind of acts of corruption at any level. Any collaborator of the Group that becomes aware

or suspect of an inappropriate conduct shall report such misconduct to his/her Boss or the Human Management Manager of the Company in which such collaborator works.

3.      Competition

The Graña y Montero Group must, at any time, avoid practices related to unfair competition; therefore, their contractual relationships must always be based on good faith and reliability.

4.      Transparency in business operations

The Graña y Montero Group encourages the transparency and compliance of accounting, financial and legal standards.  Therefore, the Group shall demand transparency in the recording of business operations, in such a way that every record is made to reflect the actual operation.

Similarly, every business activity of the companies of the Graña y Montero Group must be reflected in the Financial Statements, the Annual Report, the Market Reports and in general, any information provided by any of the companies to external third parties.

Every collaborator has the obligation to behave transparently in their acts and work, avoiding misrepresentations and concealed information.

268.    The Code of Conduct has been posted on Graña's website since its IPO and throughout the entire Class Period.

**C.      Anti-Corruption Policy (2015)**

269.    On October 29, 2015, the Board of Directors of Graña y Montero, which included the Director Defendants, approved the adoption of an Anti-Corruption Compliance Program, designed to "sensitize, prevent, and provide the guidelines to avoid, any act of corruption in our business and relationships with the government," which stated, in pertinent part, as follows:

Our corporate values, our Ethics Charter (1995), Code of Conduct (2012) and Asset Laundering and Financing of Terrorism Prevention Manual (2010) emphatically reject any form of bribery or corruption.  Additionally, we set forth this policy to sensitize, prevent, and provide the guidelines required to avoid, any act of corruption in our business and relationships with the government.

270.    The Anti-Corruption Policy broadly defines "public officials" to include:

- 64 -

> [A]ny person who holds a position in any governmental entity, whether an officer, an elected official, full- or part-time employee or representative.  This concept also comprises political parties, political advocates or candidates, international organization employees and members of the armed forces.

271.    In addition, the Anti-Corruption Policy broadly applies to the following individuals and entities:

> The Anti-Corruption Policy applies to all companies of that make up the Group, their directors, managers and collaborators, regardless of their nationality, contractual status or place of residence.  It also extends to suppliers, contractors, agents and third parties who may represent us or act on our behalf.  Furthermore, this Anti-Corruption Policy applies to all companies or consortia controlled by any company of the Group.  In companies not controlled by them, the companies of the Graña y Montero Group shall deliver this policy to the controlling shareholder and/or the general management, making recommendations in this connection.

272.    The Anti-Corruption Policy requires the Compliance Officer, the Internal Audit Committee, and the Audit and Process Committee to ensure compliance with its anti-corruption provisions, and to report directly to the Board of Directors on compliance matters.

273.    With respect to bribery, the Anti-Corruption Policy sets forth the following "Guidelines and Principles" to be followed:

> Making payments, promises to pay or rewards –whether direct or indirectly, in cash or in kind– to public officials or their family members, for purposes of exerting improper influence on decision making, generating or maintaining a business or securing benefits, is prohibited.  This prohibition applies to all Group collaborators, and to third parties acting on our behalf ("third-party representatives"), such as, but not limited to, customs agents, attorneys, subcontractors and document handlers.

> Group collaborators are responsible for ensuring that the "third-party representatives" with whom they relate comply with this policy.  For such purpose, collaborators shall enter a written agreement that formally reflects the scope of the services that such third-party representatives will perform, the compensation terms, and includes an express clause on the knowledge of and compliance with this Anti-Corruption Policy.

274.    Upon information and belief, the Anti-Corruption Policy has been continually posted on Graña's website since its adoption on October 29, 2015.

275.    In January 2016, the Company posted its 2015 Integrated Annual Report on its website, which highlighted its Anti-Corruption Policy, stating, in pertinent part, as follows:

> Also in 2015, the Board of Directors approved the Group's Anticorruption Program, which includes the Anticorruption Policy that complements our Ethics Charter (1995) and Code of Conduct, thereby reaffirming our commitment to ethics in business.
>
> *       *       *
>
> In the Group, we are committed to responsible, upright, transparent conduct.  We have a management system that enables us to communicate our fundamental principles to every level of the organization, offer confidential communication channels, and have a governance structure to investigate and remedy potential breaches.  Our Ethics Charter, Code of Conduct, and Anticorruption Policy stand out among the main tools of the system.

276.    The 2015 Integrated Annual Report described the new Anti-Corruption Policy, stating, in pertinent part, as follows:

> Our conduct is based on compliance with the laws of the countries where we operate, including Peruvian legislation on the Prevention of Asset Laundering and Financing of Terrorism (2010) and the U.S. Foreign Corrupt Practices Act (FCPA), which applies to us because our shares are listed on the New York Stock Exchange.
>
> In 2015, we reinforced our ethics management system as a preventative measure.  Therefore, the Graña y Montero Board of Directors approved the Anticorruption Compliance (FCPA) program, which establishes the leadership and commitment of senior management on this matter, defines supervisory bodies and the reporting line, establishes new policies and procedures, identifies additional internal controls, and proposes training plans for the entire organization.  This program applies to all companies in the Group and any third parties that may act on our behalf.
>
> Within the program, the Anticorruption Policy stands out.  It provides the guidelines required to avoid any act of corruption in our business or in relations with the State, and reinforces the obligation to have precise accounting records and internal controls.

277.    The 2015 Integrated Annual Report also contained a certification signed by Defendant Alvarado and the Company's general accountant, attesting to the accuracy of the entire report, including the statements describing the Anti-Corruption Policy.  The certification stated:

This document contains true and sufficient information on the operations of Graña y Montero S.A.A. during the year 2015.  Not with standing [sic] the responsibility of the issuer, the undersigned assume full responsibility for the contents here of in accordance with applicable laws.

278.     The annuals reports for years 2013 and 2014 contained identical certifications signed by the Company's general accountant and Defendant Alvarado.

## VIII.   EFFECTIVE INTERNAL CONTROLS ARE AN INTEGRAL COMPONENT OF PUBLIC CORPORATIONS

279.     The Committee of Sponsoring Organizations of the Treadway Commission ("COSO") is a joint initiative of five private sector organizations, established in the United States, dedicated to providing thought leadership to executive management and governance entities on critical aspects of, among other things, internal control, fraud, and financial reporting.  COSO is supported by five supporting organizations, including the Institute of Management Accountants ("IMA"), the American Accounting Association ("AAA"), the American Institute of Certified Public Accountants ("AICPA"), the Institute of Internal Auditors ("IIA"), and the Financial Executives International ("FEI").

280.     As described below, Graña's independent auditors audited Graña's management's assessment of internal control over financial reporting based on the COSO Internal Control Framework (defined below).

281.     According to COSO, the "tone at the top," or the corporate culture established by an entity's board of directors and senior management within which financial reporting occurs, is of "***overriding importance***[18] in preventing fraudulent financial reporting" and is "***the most important factor*** contributing to the integrity of the financial reporting process."

---

[18]     All emphasis is added unless stated otherwise.

282.     COSO has developed a model for evaluating internal control (the "COSO Internal Control Framework").  This model has been adopted as the generally accepted framework for internal control and is widely recognized as the definitive standard against which organizations measure the effectiveness of their systems of internal control.

283.     The COSO Internal Control Framework is designed to provide an effective framework for public companies to use to analyze the internal control systems implemented in these organizations.  The five components of the COSO Internal Control Framework are as follows:

(a)     Control environment: (i) the organization demonstrates a commitment to integrity and ethical values; (ii) the board of directors demonstrates independence from management and exercises oversight of the development and performance of internal control; (iii) management establishes, with board oversight, structures, reporting lines, and appropriate authorities and responsibilities in the pursuit of objectives; (iv) the organization demonstrates a commitment to attract, develop and retain competent individuals in alignment with objectives; and (v) the organization holds individuals accountable for their internal control responsibilities in the pursuit of objectives.

(b)     Risk assessment: (i) the organization specifies objectives with sufficient clarity to enable the identification and assessment of risks relating to objectives; (ii) the organization identifies risks to the achievement of its objectives across the entity and analyzes risks as a basis for determining how the risks should be managed; (iii) the organization considers the potential for fraud in assessing risks to the achievement of objectives; and (iv) the organization identifies and assesses changes that could significantly impact the system of internal control.

(c)      <u>Control activities</u>: (i) the organization selects and develops control activities that contribute to the mitigation of risks to the achievement of objectives to acceptable levels; (ii) the organization selects and develops general control activities over technology to support the achievement of objectives; and (iii) the organization deploys control activities through policies that establish what is expected and procedures that put policies into action.

(d)      <u>Information and communication</u>: (i) the organization obtains or generates and uses relevant, quality information to support the functioning of other components of internal control; (ii) the organization internally communicates information, including objectives and responsibilities for internal control, necessary to support the functioning of internal control; and (iii) the organization communicates with external parties regarding matters affecting the functioning of other components of internal control.

(e)      <u>Monitoring</u>: (i) the organization selects, develops and performs ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning; and (ii) the organization evaluates and communicates internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate.

284.    According to COSO, in an effective internal control system, all five components of the COSO Internal Control Framework work to support the achievement of an entity's mission, strategies and related business objectives.

## IX.    GRAÑA ADMITS THAT IT CREATED A CULTURE OF FRAUD

285.    As a direct result of the alleged bribery scheme, Graña failed to timely file its 2016 Form 20-F.  On May 17, 2017, Graña issued a press release explaining that "[t]he company is currently in the process of evaluating its financial presentation to be included in the [2016] 20-F," and that "the company is carrying out additional procedures in connection with the finalization of

its consolidated financial statements." On November 17, 2017, Graña filed a Form 6-K stating that the New York Stock Exchange had decided to grant the Company an extension to file the 2016 Form 20-F through May 16, 2018, which extension was subject to reassessment on an ongoing basis.

286.   On April 17, 2018, Graña filed a Form 6-K stating that the 2016 Form 20-F was delayed because its prior auditors, a member of the Price Waterhouse Coopers International Limited ("PwC") network, would not authorize the use of the previously issued audit opinions for the year 2015 without conducting substantial additional procedures. According to the filing, the Company was seeking Board approval to appoint the auditing firm Moore Stephens Peru ("Moore Stephens") to audit the 2015 financial statements and complete "substantial additional procedures" before reissuing an audit opinion on the 2015 financial statements.

287.   In the same filing, Graña announced for the first time that, as a result of the aforementioned additional auditing procedures, "the previously issued consolidated financial statements of the Company for the 2015 fiscal year (and the related audit opinion of PwC) should no longer be relied upon."

288.   The Company also announced that PwC was in the process of performing additional procedures for the authorization of the use of its audit opinion related to Graña's 2014 financial statements. Each of these tasks were required to be completed before Graña could file its 2016 Form 20-F. The Company stated that it expected to complete these tasks and file its 2016 Form 20-F by May 15, 2018.

289.   Graña filed its 2016 Form 20-F on May 16, 2018.

290.   In the 2016 Form 20-F, Graña explained how it used the COSO criteria to assess its internal controls over financial reporting:

Management is responsible for establishing and maintaining adequate internal control over financial reporting for our company as such term is defined by Exchange Act rules 13(a)-15(f) and 15(d)-15(f).   In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), management has conducted an assessment, including testing, using the criteria in Internal Control-Integrated Framework (2013), issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).   Our company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.   Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

291.    The 2016 Form 20-F then disclosed that Graña failed to satisfy four of the five criteria set forth by COSO for measuring internal control, and stated that the Company had identified material weaknesses in the following areas: (i) control environment; (ii) risk assessment; (iii) information and communication; and (iv) monitoring and evidential matter.

292.    With respect to material weaknesses in the control environment, the 2016 Form 20-F stated, in pertinent part, as follows:

The control environment, which is the responsibility of senior management, helps set the tone of the organization, influence the control consciousness of its officers and employees, and is an important component affecting how the organization performs risk management, financial analysis, accounting and financial reporting. A proper organizational tone can be promoted through a variety of means, such as policies and codes of ethics, a commitment to hiring competent employees, the manner and content of oral and written communications, and structures that promote and reward openness, strong internal controls, effective governance, risk management, compliance, and ethical behavior.

As of December 31, 2016, we did not maintain an effective control environment primarily attributable to the following identified material weakness:

***Our assessment found that an inconsistent and ineffective tone at the top was present, under then-existing senior management, that was not effective to ensure adherence to IFRS and our accounting policies and procedures***.  This resulted in an environment which in some instances may have led to incorrect accounting decisions and the failure to disclose information that may be necessary for an

- 71 -

effective review of transactions and accounting entries to the appropriate finance and accounting personnel, our Board, our Audit and Process Committee, and/or independent registered public accounting firm. ***In addition, we identified an inadequate oversight by the Audit Committee regarding the role of the Internal Audit Department. The Control environment was not always sufficient to ensure that adequate enterprise risk management (including fraud risk) and monitoring mechanisms were in place to secure that our internal control over financial reporting operated effectively, including that the relevant risk/control activities were carried out properly and that corrective actions were taken on a priority basis and in timely manner***.

293.     Thus, Graña admitted that the single most important factor contributing to the integrity of its financial reporting, the tone at the top, was "inconsistent and ineffective" during the Class Period.  As a member of senior management that created the ineffective tone at the top, Defendant Hart was or should have been aware that the Company was operating with an inappropriate tone at the top, and that its control environment was ineffective to ensure that risk management mechanisms were in place to detect and prevent the fraudulent conduct described herein.

294.     On May 17, 2018, the NYSE suspended the trading of Graña ADS's because Graña failed to timely file its 2017 consolidated financial statements.  Graña's common stock was delisted from the Lima Stock Exchange the next day.

## X.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

295.     Defendants' fraudulent scheme and false and misleading statements and omissions operated as a fraud or deceit on purchasers of Graña ADSs, as Defendants: (i) deceived the investing public regarding Graña's financial position, operations, and compliance with the law; (ii) artificially inflated the price of Graña ADSs; and (iii) caused Plaintiffs and other members of the Class (as defined herein) to purchase Graña ADSs at artificially inflated prices.

- 72 -

A.      **Fiscal Year 2013 False and Misleading Statements and Omissions**

1.      **The Registration Statement and Prospectus**

296.    On June 4, 2013, Graña filed with the SEC a registration statement on Form F-1 for the IPO, which, after several amendments, was declared effective on July 23, 2013 (the Form F-1, together with all amendments, is referred to herein as the "Registration Statement"). The Registration Statement was signed by the Officer Defendants and the Director Defendants, among others.

297.    The next day, Graña filed a prospectus for the IPO on Form 424B4 which incorporated and formed part of the Registration Statement (the "Prospectus"). Together, the Registration Statement and Prospectus were used to sell to the investing public approximately 19,534,774 Graña ADSs, as well as an additional 2,960,233 ADSs to the underwriters, representing a total of 112,325,585 Graña common shares, at $21.13 per share.

298.    The Prospectus included consolidated financial statements for years ended December 31, 2010, 2011, and 2012. For fiscal year ended December 31, 2010, the Company reported net income of S/. 252,082,000 (approximately $97,644,650). For fiscal year ended December 31, 2011, the Company reported net income of S/. 289,076,000 (approximately $111,655,465.43). For fiscal year ended December 31, 2012, the Company reported net income of S/. 289,954,000 (approximately $111,994,592.51).

299.    The Prospectus also included unaudited consolidated financial statements for the first quarter of 2013, for which the Company reported net income of approximately S/. 64,300,00 (approximately $24,922,480.62).

300.    According to the Prospectus, the "consolidated financial statements included in this prospectus have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB")."

301.    The Prospectus touted Graña's commitment to its "core corporate values" and "high[] corporate governance standards":

> With 80 years of operations, we have a long track record of successfully completing the engineering and construction of many of Peru's landmark private- and public-sector infrastructure projects, such as the Lima International Airport and the Peru LNG gas liquefaction plane, and we believe we have earned a reputation for operational excellence in our markets.  We have developed a highly-experienced management team, a talented pool of more than 3,500 engineers, and a skilled work force that share our ***core corporate values of quality, professionalism, reliability, and efficiency***.  ***As a company listed on the Lima Stock Exchange since 1997, we also abide by the highest corporate governance standards for listed companies in Peru.***

302.    The Prospectus also highlighted specific achievements relating to Graña's corporate governance standards:

> We have been listed on the Lima Stock Exchange since 1997.  ***We abide by the highest corporate governance standards in Peru***, and we are one of only 17 companies in Latin America, and one of only three in Peru, that form part of the Company's Circle, which recognizes companies for their high corporate governance standards and is sponsored by the International Finance Corporation (IFC), the Organization for Economic Cooperation and Development (OECD) and the Global Corporate Governance Forum.  In addition, ***we have developed a strong corporate culture based on principles of high-quality, professionalism, reliability and efficiency***.

303.    Likewise, the Prospectus declared that Graña's commitment to its corporate values was a "key strateg[y]" to its "vision" of becoming "the most reliable engineering services company in Latin America":

> ***We will continue to instill our core corporate values throughout our organization,*** while also transmitting these values to surrounding communities.  We will continue to attract and develop our human capital through various training, mentorship and reward programs in order to maintain our position as the best company in Peru to learn and work in the engineering and construction field.  We also seek to promote social welfare by fostering relationships with the communities that surround our areas of operation.  In 2012, the Inter-American Federation of the Construction Industry recognized us for our corporate strategy and promotion of citizenship with the Latin American Social Responsibility award.  ***We strive to promote our corporate values to strengthen our organization*** and improve our performance as well as to have a positive impact on the markets where we operate.

304.     According to the Prospectus, Graña had the ability to bypass the open bidding process in certain engineering and construction projects:

> Although contracting for engineering and construction usually consists of open bidding processes, we are often able to enter into direct bilateral contract negotiation with select clients, thanks to our reputation for quality of service, which helps mitigate competitive pricing measures.

305.     According to the Prospectus, one of Graña's "principal strengths" which provided it "significant competitive advantage" was Graña's "robust backlog" of approximately US$4,291.3 million:

> **We have a robust backlog which amounted to US$4,165.9 million as of December 31, 2012**, 67.0% higher than as of December 31, 2011, **and US$4,291.3 million as of March 31, 2013**, 3.0% higher than as of December 31, 2012.  We believe that our backlog, which as of December 31, 2012 represented approximately 2.2x our related 2012 revenues, **provides visibility as to our potential for growth in the coming years, although backlog may not always be an accurate indicator of future revenues**.

306.     The Prospectus emphasized that its "core corporate values" represented a key strength:

> **Highly experienced management, talented engineers, and skilled workforce, with shared core corporate values**.
>
> We have been listed on the Lima Stock Exchange since 1997.  **We abide by the highest corporate governance standards in Peru**, and we are one of only 17 companies in Latin America, and one of only three in Peru, that form part of the Company's Circle, which recognizes companies for their high corporate governance standards and is sponsored by the International Finance Corporation (IFC), the Organization for Economic Co-operation and Development (OECD) and the Global Corporate Governance Forum.  **In addition, we have developed a strong corporate culture based on principles of high-quality, professionalism, reliability and efficiency**.  We employ rigorous safety standards and procedures and emphasize environmental sustainability and social responsibility.

307.     This "vision" was repeated throughout the Prospectus:

> **We will continue to instill our core corporate values throughout our organization, while also transmitting these values to surrounding communities**.  We will continue to attract and develop our human capital through various training, mentorship and reward programs in order to maintain our position as the best

company in Peru to learn and work in the engineering and construction field.  We also seek to promote social welfare by fostering relationships with the communities that surround our areas of operation.  *We strive to promote our corporate values to strengthen our organization* and improve our performance as well as to have a positive impact on the markets where we operate.

308.    In the "Overview" of the "Business" section, the Prospectus stated:

We have developed a highly-experienced management team, a talented pool of more than 3,500 engineers and a skilled work force that share *our core corporate values* of quality, professionalism, reliability, and efficiency.  *As a company listed on the Lima Stock Exchange since 1997, we also abide by the highest corporate governance standards in Peru*.

309.    Similarly, the section entitled "Employees" stated that Graña adopted a "Code of Conduct and Charter of Ethics" to regulate the conduct of its employees:

*We place significant emphasis on instilling our core corporate values of quality, professionalism, reliability, and efficiency and on promoting safety, environmental sustainability and social responsibility throughout the entire organization.  Our Code of Conduct and Charter of Ethics regulate the conduct of our employees while promoting the foregoing values*.  In addition, our employees participate in ethics seminars on a periodic basis.

310.    The Prospectus stated that the Company had experienced "rapid growth . . . in recent years" and that the Company's "strategy [was] to continue our growth operations," but stated that certain factors such as "increased competition" may adversely affect its upward trajectory.

311.    Another Risk Factor noted in the Prospectus was the "significant competition in each of [Graña's] markets":

*We face significant competition in each of our markets*.

Each of the markets in which we operate is competitive.  *We compete on the basis of, among other factors, price, performance, product and service quality, skill and execution capability, client relations, reputation and brand, and health, safety and environmental record*.  We face significant competition from both local and international players.  Some of these competitors may have greater resources than us or specialized expertise in certain sectors. In addition, *a portion of our business is derived from open bidding processes which can be highly competitive*. Certain of our markets are highly fragmented with a large number of companies

- 76 -

competing for market share. Our competitors may be more inclined to take greater or unusual risks or accept terms and conditions in a contract that we might not deem acceptable.  Moreover, we cannot assure you that we will not face new competition from industry players entering or expanding their operations in our markets.  If we are unable to compete effectively, our ability to continue to grow our business or maintain our market share would be affected.

312.   Yet another "Risk Factor" was that Graña's "backlog and [its] ratio of historical

backlog to revenues may not be a reliable indicator of future revenues or profit":

Our backlog amount is subject to revision over time and *our ability to realize revenues from our backlog is subject to a number of uncertainties*.  Cancellations, scope adjustments or deferrals may occur, from time to time, with respect to contracts reflected in our backlog and could reduce the amount of our backlog and the revenue and profits that we actually earn . . . .

Our backlog may not grow at recent historic rates and may decline.  *We cannot assure you that we will be able to continue obtaining sufficient contracts in the future in number and magnitude to continue to grow our backlog*.  Additionally, the amount of new contracts signed can fluctuate significantly from period to period due to factors that are beyond our control.

*The ratio of our historical backlog to revenues earned in subsequent years is volatile and substantially affected by a number of factors, some of which are outside our control*, including levels of contract scope adjustments and our ability to enter into new contracts (which are substantially influenced by general economic conditions), delays and cancellations, foreign exchange rate movements, and our ability to increase the scale of our operations to expand the amount of work we carry out beyond that previously contracted. Accordingly, historical correlations between backlog and revenues may not recur in future periods.

313.   In the Prospectus, Graña also disclosed that its "[d]ebarment from participating in

government bidding processes would have a material adverse effect on our business and financial

performance":

*We would face debarment from participating in government bidding processes for one to three years if we were found to have violated certain provisions of the Peruvian State Contracting Law* (Ley de Contrataciones del Estado). We are required to comply with a large number of contractual obligations with the government in our business, and we cannot assure you that we will be in full compliance at all times. Moreover, such a debarment would affect the ability of our entire company (including any of our subsidiaries), and not just the line of business where the alleged violation took place, to participate in government bids under the Peruvian State Contracting Law . . . *A significant part of our revenues on a*

*consolidated basis is derived from public sector contracts in Peru. As a result, if our company is debarred from participating in government bidding processes, our business and financial performance would be materially and adversely affected.*

314.   The Prospectus warned that "[f]ailure to comply with . . . law or regulations could have a material adverse effect on our business and financial performance." Despite these concerns, the Company stated that it believed it is "in compliance with all applicable concessions, other similar contracts, laws and regulations in all material respects," stating, in pertinent part, as follows:

> *Failure to comply with, or changes in, laws or regulations could have a material adverse effect on our business and financial performance.*
>
> We operate in highly regulated industries.  Our business and financial performance depends on our and our clients' ability to comply on a timely and efficient basis with extensive national, regional and municipal laws and regulations relating to, among other matters, environmental, health and safety, building and zoning, labor, tax and other matters.  The cost of complying with these laws and regulations can be substantial.  In addition, compliance with these laws and regulations can cause scheduling delays.  Although *we believe we are in compliance with all applicable concessions, other similar contracts, laws and regulations in all material respects*, we cannot assure you we have been or will at all times be in full compliance.

315.   With respect to its internal controls, the Prospectus reported that Graña and its independent accounting firm had identified only material weakness in its internal control over financial reporting which related to the training and experience of certain of its accounting personnel.  Specifically, the Prospectus stated:

> A "material weakness" is a deficiency, or combination of deficiencies, in internal controls such that there is a reasonable possibility that a material misstatement in financial statements will not be prevented or timely detected.  The material weaknesses in our internal control over financial reporting that we identified related to the insufficient training and experience of certain of our accounting personnel with respect to the application of IFRS.  *We are not aware of any other material weaknesses in our internal control over financial reporting.*

316.     In the Prospectus, Graña expressed confidence that it would be able to win public

work contracts and concessions from the Peruvian government:

> The Peruvian government is encouraging public-private partnerships for infrastructure concessions as a way to promote the improvement of the country's infrastructure.  Proinversión, a Peruvian state agency engaged in the promotion of private investments in Peru which is the Peruvian State agency engaged in the promotion of business opportunities, estimated public and private investments in infrastructure in Peru of US$20 billion from 2011 through 2016.  *We believe we are well-positioned to win contracts related to these concessions.*

317.     The Prospectus described the process by which Graña engages in competitive

bidding, which includes "review[ing] and evaluat[ing] potential projects in order to estimate

costs," performing "a detailed costs analysis using sophisticated software, "determining whether

the project is viable and cost-effective," and "prepar[ing] the offer that is eventually presented" to

the potential client:

> *We win new engineering and construction contracts through public bidding processes* or direct negotiation, from a variety of sources, including potential client requests, proposals from existing or former clients, opportunities sought out by our commercial team, and from requests by the Peruvian government.  More than 80% of our 2012 revenues came from private-sector projects.

> *The Peruvian government and its agencies typically award construction contracts through a public bidding process conducted in accordance with the Peruvian State Contracting Law (Ley de Contratacions del Estado)* . . . .

> We have a designated team that oversees the management of project proposals and a commercial team that *reviews and evaluates potential projects in order to estimate costs*.  In considering whether to bid for a potential project, we principally consider the following factors: competition and the probability of being awarded the project; project size; the client; our experience undertaking similar projects; and the availability of resources, including human resources.  As part of the project selection process, *our commercial team performs a detailed cost analysis* utilizing sophisticated software we developed to assist in *determining whether the project is viable and cost-effective*.  If we choose to pursue a project, *a budget leader is assigned to prepare the offer that is eventually presented to our potential client*.

318.     The Prospectus contained a section describing the regulatory framework applicable

to its Engineering and Construction segment for contracts with the public sector, as well as the

- 79 -

Peruvian government's selection process for public works projects.   That section stated, in pertinent part, as follows:

### Engineering and Construction

***Regulatory Framework Applicable to Contracts with the Public Sector***

Peru's State Contracting Law, approved by Legislative Decree No. 1017 (Ley de Contrataciones del Estado) and its regulation approved by Supreme Decree No. 184-2008-EF, govern services and construction agreements entered into with public entities.   Article 10 of the Supreme Decree No. 184-2008-EF establishes that, at the beginning of the contracting process, the contracting public entity must prepare a technical file describing the characteristics of the services it intends to purchase and the selection process for its counterparts, among other specifications such as a feasibility statement in accordance with the Peruvian Public Investment National System.

The selection processes are established in Articles 15, 16, 17 and 18 of Peru's State Contracting Law as follows:

- public biddings (licitación pública) applicable to goods, supplies and works;

- public tenders (concurso público) applicable to services;

- direct award (adjudicación directa) applicable to goods, services and works, which can be public or directed at select participants depending if the value is equal to or higher than 50% of the maximum amount set forth in the state budget regulation for direct award; and

- lowest amount award (adjudicación de menor cuantía) applicable to goods, services and works whose value is lower than one-tenth of the minimum limit established by the state budget regulation

With the exception set forth in Article 22 of the Supreme Decree No. 184-2008-EF, the selection processes include the following phases: notice; registration of participants; submission and reply of inquiries; submission and reply of comments; preparation of the terms and conditions of the selection process; submission of bids; evaluation and qualification of bids; and adjudication.

Article 9 of Peru's State Contracting Law establishes that participants of any of the foregoing selection processes must be registered in the Peruvian National Registry of Suppliers (Registro Nacional de Proveedores) and must not be disqualified from contracting with the state.   Article 252 of the Supreme Decree No. 184-2008-EF establishes that this registration is renewable as long as a request is submitted to the Peruvian National Registry of Suppliers 60 days prior to expiration of the registry.

319.    According to the Prospectus, the Company believed it was "*in compliance, in all material respects, with applicable laws and regulations*" in all of its business segments.

### 2.    2Q13 Quarterly Results

320.    On August 9, 2013, Graña filed a Consolidated Results Report for the first semester of 2013 on a Form 6-K (the "2Q13 Results Report").  Graña reported net income of S/. 122.3 million for the quarter.

321.    That same day, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the financial results as presented in the 2Q13 Results Report.

322.    On August 10, 2013, Graña issued a press release reporting its quarterly results for the second quarter of 2013 (the "2Q13 Press Release").  The 2Q13 Press Release similarly reported a net income of S/. 122.3 million for the quarter.

323.    According to the 2Q13 Press Release, the quarterly results were prepared in accordance with IFRS.

### 3.    3Q13 Quarterly Results

324.    On October 29, 2013, Graña issued a press release reporting its quarterly results for the third quarter of 2013 (the "3Q13 Press Release").  Graña reported net income of S/. 203.7 million for the quarter, an increase of 1.5% compared to the same period in 2012.

325.    According to the 3Q13 Press Release, the quarterly results were prepared in accordance with IFRS.

326.    That same day, Graña filed its Consolidated Results Report for 3Q13 with the SEC on a Form 6-K.

327.    The next day, October 30, 2013, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly financial results as presented in the 3Q13 Press Release and the Consolidated Results Report.

### 4. 4Q13 Quarterly Report and Conference Call

328.   On January 31, 2014, Graña filed its Consolidated Results Report with the SEC on Form 6-K for the fourth quarter and year ended December 31, 2013 (the "FY13 Results Report"). The FY13 Results Report reported net income of S/. 319 million for the entire year.

329.   On February 2, 2013, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly results for 4Q13 and the full year results as reported in the FY13 Results Report.

### 5. Consolidated Financial Statements FY 2011, 2012, 2013

330.   On February 28, 2014, Graña filed its consolidated financial statements FY 2011, 2012, and 2013 on a Form 6-K with the SEC (the "Consolidated Financial Statements").[19]   The Company's net income for fiscal years 2011 and 2012 remained unchanged.  For fiscal year 2013, the Company reported net income of S/. 320,363,000 (approximately $114,538,076).

331.   According to the filing, "[t]he consolidated financial statements of the Company have been prepared in accordance with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board."

### 6. 2013 Form 20-F

332.   On April 30, 2014, Graña filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2013, which was signed by the Officer Defendants (the "2013 Form 20-F").  Graña reported a net profit of S/. 319,680,000. Gross profit was S./1,004,700,00, and diluted earnings per share ("EPS") on common shares was S./0.534.

---

[19]   The Prospectus included consolidated audited financial statements for fiscal years 2010, 2011, and 2012, and **unaudited** consolidated financial statements for the first quarter of 2013.  This filing now includes the **audited** financials for the entire fiscal year 2013.

333.     According to the 2013 Form 20-F, the "consolidated financial statements included in this annual report have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB")."

334.     The 2013 Form 20-F described various factors that form the basis of competition:

Each of the markets in which we operate is competitive. ***We compete on the basis of, among other factors, price, performance, product and service quality, skill and execution capability, client relations, reputation and brand, and health, safety and environmental record***. We face significant competition from both local and international players. Some of these competitors may have greater resources than us or specialized expertise in certain sectors.  In addition, a portion of our business is derived from open bidding processes which can be highly competitive. Certain of our markets are highly fragmented with a large number of companies competing for market share.  Our competitors may be more inclined to take greater or unusual risks or accept terms and conditions in a contract that we might not deem acceptable.  Moreover, we cannot assure you that we will not face new competition from industry players entering or expanding their operations in our markets.  If we are unable to compete effectively, our ability to continue to grow our business or maintain our market share would be affected.  In addition, because one of the factors on which we generally compete is price, increased competition could impact our operating margins.  Accordingly, our business and financial performance could be adversely affected by competition in our markets.

335.     In the section entitled "Project Selection and Bidding," the 2013 Form 20-F described the competitive bidding process by which Graña is awarded public sector projects:

***We win new engineering and construction contracts through public bidding processes*** or direct negotiation, from a variety of sources, including potential client requests, proposals from existing or former clients, opportunities sought by our commercial team and ***from requests by the Peruvian government***.  More than 80% of our 2013 revenues came from private-sector projects.  The Peruvian government and its agencies typically award construction contracts through a public bidding process conducted in accordance with the Peruvian State Contracting Law (Ley de Contrataciones del Estado) . . . .

336.     The 2013 Form 20-F further describes the process by which the Company engages in competitive bidding, which included "review[ing] and evaluat[ing] potential projects in order to estimate costs," performing "a detailed costs analysis using sophisticated software,"

"determining whether the project is viable and cost-effective," and "prepar[ing] the offer that is eventually presented" to the potential client:

> We have a designated team that oversees the management of project proposals and a commercial team that *reviews and evaluates potential projects in order to estimate costs*. In considering whether to bid for a potential project, we principally consider the following factors: competition and the probability of being awarded the project; project size; the client; our experience undertaking similar projects; and the availability of resources, including human resources. As part of the project selection process, *our commercial team performs a detailed cost analysis* utilizing sophisticated software we developed to assist in *determining whether the project is viable and cost-effective*. If we choose to pursue a project, *a budget leader is assigned to prepare the offer that is eventually presented to our potential client*.

337.     In the 2013 Form F-20, Graña stated that its "strategy is to continue to grow out operations," but cautioned that that "[a] major change in Peruvian government policies could affect our business." It also noted that "*[g]overnmental entities may terminate prematurely our concessions and similar contracts under various circumstances, some of which are beyond our control*."

338.     The 2013 Form 20-F also contained a representation that Graña and the Officer Defendants "believe we are in compliance with all applicable concessions, other similar contracts, laws and regulations in all material aspects," stating, in pertinent part, as follows:

> We operate in highly regulated industries. Our business and financial performance depends on our and our clients' ability to comply on a timely and efficient basis with extensive national, regional and municipal laws and regulations relating to, among other matters, environmental, health and safety, building and zoning, labor, tax and other matters. The cost of complying with these laws and regulations can be substantial. In addition, compliance with these laws and regulations can cause scheduling delays. Although *we believe we are in compliance with all applicable concessions, other similar contracts, laws and regulations in all material respects*, we cannot assure you we have been or will be at all times in full compliance. Failure by us or our clients to comply with our concessions, similar contracts or these laws and regulations could result in a range of adverse consequences for our business, including subjecting us to significant fines, civil liabilities and criminal sanctions, requiring us to comply with costly restorative orders, the shutdown of operations, and revocation of permits and termination of concessions or similar contracts. In addition, we cannot assure you that future changes to existing laws and regulations, or stricter interpretation or enforcement

of existing laws and regulations, will not impair our ability to comply with such laws and regulations or increase our compliance costs.  Accordingly, existing or future regulation in our markets could have a material adverse effect on our business and financial performance.

339.    Graña highlighted its commitment to "corporate values of quality, professionalism, reliability, and efficiency," and reiterated its commitment to "abide by the highest corporate governance standards in Peru," stating, in pertinent part, as follows:

> With 80 years of operations, we have a long track record of successfully completing the engineering and construction of many of Peru's landmark private- and public-sector infrastructure projects, such as the Lima International Airport and the Peru LNG gas liquefaction plan, and we believe we have earned a reputation for operational excellence in our markets.  *We have developed a highly-experienced management team, a talented pool of more than 3,800 engineers and a skilled work force that share our corporate values of quality, professionalism, reliability, and efficiency.  As a company listed on the Lima Stock Exchange since 1997, we also abide by the highest corporate governance standards in Peru.*

340.    The 2013 Form 20-F continued to tout Graña's "shared corporate values" and "high corporate governance standards," stating, in pertinent part, as follows:

> We have been listed on the Lima Stock Exchange since 1997.  *We abide by the highest corporate governance standards in Peru*, and we are one of only 19 companies in Latin America, and one of only three in Peru, that form part of the Company's Circles, which recognizes companies for their *high corporate governance standards* and is responsible for the International Finance Corporation (IFC), the Organization for economic Co-operation and Development (OCED) and the Global Corporate Governance Forum.  In addition, *we have developed a strong corporate culture based on the principles of high-quality, professionalism, reliability and efficiency* . . . .

341.    The 2013 Form 20-F also stated that the Company had implemented a number of the corporate governance guidelines set forth in the "Principles of Good Governance for Peruvian Companies":

> The New York Stock Exchange's listing standards also require U.S. listed companies to adopt and disclose corporate governance guidelines.  In July 2002, the *Peruvian Securities Commission and a committee comprised of regulatory agencies and associations prepared and published a list of suggested non-mandatory corporate governance guidelines called the "Principles of Good Governance for Peruvian Companies.*"  These principles are disclosed on the

Peruvian Securities Commission web page http://www.smv.gob.pe and the Lima Stock Exchange web page http://www.bvl.com.pe.    Although *we have implemented a number of these measures and have been selected to form part of the Best Corporate Governance Practices Index of the Lima Stock Exchange*, we are not required to comply with the referred corporate governance guidelines by law or regulation.

342.    In addition, the 2013 Form 20-F referenced its code of ethics applicable to its directors, officers, and employees, and stated that "[d]uring the year ended December 31, 2013, no such amendment was made or waiver granted."

343.    The 2013 Form 20-F discussed Graña's "key strategies to achieve" their vision of becoming "the most reliable engineering services company in Latin America."  One of Graña's "key strategies" to becoming one of "the most reliable engineering services company in Latin America" was to "[c]ontinue fostering [its] core corporate values throughout the organization."

344.    Also in the 2013 Form 20-F, Graña discussed its creation of an "Audit and Process Committee" responsible for maintaining adequate internal controls: "Our Audit and Process Committee oversees our corporate accounting and financial reporting process."  Among other things, the Audit and Process Committee is charged with "reviewing our financial statements", "evaluating our internal controls, and procedures, and identifying deficiencies", "evaluating the company's compliance with the Board of Director's internal regulation, as well as with general principles of corporate governance," "informing our board of directors regarding any issues that arise with respect to the quality or integrity of our financial statements, [and] our compliance with legal or regulatory requirements".

345.    The Company informed investors that its CEO and CFO, *i.e.*, the Officer Defendants, evaluated Graña's disclosure controls and procedures, and concluded they were effective, stating, in pertinent part, as follows:

*As of the end of the period covered by this annual report, management, with the participation of the company's Chief Executive Officer and Chief Financial*

***Officer, performed an evaluation of the design and operation of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act***.  Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, to allow timely decisions regarding required disclosures.  Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objective.  Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2013, the design and operation of our disclosure controls and procedures were effective at a reasonable assurance level.

346.    The 2013 Form 20-F was signed by the Officer Defendants.

347.    The statements referenced in ¶¶296-346 were materially false and misleading when they were made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Defendants:

(a)    that the consolidated financial statements included in the Prospectus materially misstated the Company's net income based on Graña's payment of its proportional share of bribery to Odebrecht by means of differential dividend distributions;

(b)    that Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

(c)    that the unlawful practices perpetrated by Graña  and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations;

(d)    that the unlawful practices perpetrated by Graña  and the Director Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing contracts, risks associated with the Company's expansion efforts, risks associated with key employee retention,

and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

(e)     that Graña's financial statements had not been prepared in accordance with IFRS;

(f)     that the unlawful practices perpetrated by Graña and the Director Defendants were reasonably likely to have a material adverse effect on the Company's future operating results;

(g)     that the competitive bidding process described in the Prospectus failed to disclose that the bidding process was undermined by the corrupt payments made to elected officials;

(h)     that Defendants failed to disclose that Graña's "rapid growth" was due, in large part, to the bribery of government leaders, and misled investors into believing that the rapid growth was wholly organic and would continue on its upward trajectory;

(i)     that Graña failed to disclose that Peruvian governmental policies were being shaped, in a material way, by the bribes that were being paid to it;

(j)     that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy; and

(k)     that, based on the foregoing, Defendants lacked a reasonable basis for their positive statements about Graña's future financial prospects.

**B.    Fiscal Year 2014 False and Misleading Statements and Omissions**

**1.    1Q2014 Quarterly Results and Conference Call**

348.    On April 30, 2014, Graña issued a press release reporting its quarterly results for the first quarter of 2014 (the "1Q14 Press Release").  Graña reported net income of S/. 71.1 MM.

349.    According to the 1Q14 Press Release, the quarterly results were prepared in accordance with IFRS.

350.    Also on April 30, 2014, Graña's 1Q14 Consolidated Results Report was filed with the SEC on Form 6-K which repeated the same quarterly results.

351.    That same day, April 30, 2014, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly financial results as presented in the 1Q14 Press Release and the Consolidated Results Report.

352.    During the conference call, an analyst asked whether Graña's decision days earlier[20] to withdraw its bid for the Lima Metro Line 2 concession was a reflection of heightened competition in the bidding process.  In response, Defendant Alvarado stated:

> *We are seeing a lot of competition the same that we have seen in the last 20 years. It's [a] totally open market*.  Many companies come and go.  *And we are seeing the same kind of competition*.

### 2.    2Q14 Quarterly Results and Conference Call

353.    On July 24, 2014, Graña issued a press release reporting its quarterly results for the second quarter of 2014 (the "2Q14 Press Release").  Graña reported net income of S/. 135.1 million for the quarter.

354.    According to the 2Q14 Press Release, the quarterly results were prepared in accordance with IFRS.

---

[20]    On March 24, 2014, Graña announced in a Form 6-K filing with the SEC that the Consortium Metro de Lima – Linea 2 (in which Graña held a minority stake) was withdrawing its bid for the concession of the Lima Metro Line 2.  This is not the same project as the Lima Metro Line 1 concession which Graña and Odebrecht participated in.

- 89 -

355.    Also on July 24, 2014, Graña's Consolidated Results Report for the second quarter of 2014 was filed with the SEC on Form 6-K which repeated the financial results reported in the 2Q14 Press Release.

356.    The next day, July 25, 2014, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly financial results as presented in the 2Q14 Press Release and the Consolidated Results Report for the first semester of 2014.

### 3.    3Q14 Press Release and Conference Call

357.    On October 30, 2014, Graña issued a press release reporting its quarterly results for the third quarter of 2014 (the "3Q14 Press Release").  Graña reported net income increase of 15.4%, reaching S/. 235.3 million for the quarter.

358.    According to the 3Q14 Press Release, the quarterly results were prepared in accordance with IFRS.

359.    The next day, October 31, 2014, Graña hosted a conference call for investors and analysts, during which Defendant Hart repeated the quarterly results presented in the 3Q14 Press Release.

360.    On October 31, 2014, Graña filed its unaudited condensed interim financial statements with the SEC on Form 6-K.

361.    On November 3, 2014, Graña filed its complete quarterly results report with the SEC on Form 6-K.

### 4.    4Q14 Results Report and Conference Call

362.    On January 29, 2015, Graña issued a press release reporting its consolidated results for the fourth quarter of 2014 (the "4Q14 Press Release").  The Company reported S/. 299.6 million in net income, a decrease of 6% from the previous year.

363.    According to the 4Q14 Press Release, the consolidated quarterly results presented therein were prepared in accordance with IFRS.

364.    On February 2, 2015, Graña filed its consolidated results report for the year 2014 with the SEC on Form 6-K (the "FY14 Results Report").  The FY14 Results Report repeated the financial results as presented in the 4Q14 Press Release.

365.    That same day, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same consolidated financial results as presented in the 4Q14 Press Release.

### 5.    The 2014 Form 20-F

366.    On April 30, 2015, Graña filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2014, which was signed by the Officer Defendants (the "2014 Form 20-F").  Graña reported a net loss of S/. 20.1 million. Gross profit was $951.3 million, and diluted earnings per share on common shares was S/. 454.

367.    According to the 2014 Form 20-F, the "consolidated financial statements included in this annual report have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB")."

368.    The 2014 Form 20-F stated that the Company "face[s] significant competition from both local and international players," stating, in pertinent part, as follows:

*We face significant competition in each of our markets*

Each of the markets in which we operate is competitive. ***We compete on the basis of, among other factors, price, performance, product and service quality, skill and execution capability, client relations, reputation and brand, and health, safety and environmental record.  We face significant competition from both local and international players***.  Some of these competitors may have greater resources than us or specialized expertise in certain sectors.  In addition, a portion of our business is derived from open bidding processes which can be highly

competitive. Certain of our markets are highly fragmented with a large number of companies competing for market share. Our competitors may be more inclined to take greater or unusual risks or accept terms and conditions in a contract that we might not deem acceptable. Moreover, we cannot assure you that we will not face new competition from industry players entering or expanding their operations in our markets. If we are unable to compete effectively, our ability to continue to grow our business or maintain our market share would be affected. In addition, because one of the factors on which we generally compete is price, increased competition could impact our operating margins. Accordingly, our business and financial performance could be adversely affected by competition in our markets.

369.   In the section entitled "Project Selection and Bidding," the 2014 Form 20-F described several methods by which Graña is awarded public works projects, including competitive bidding, stating, in pertinent part, as follows:

**Project Selection and Bidding**

We win new engineering and construction contracts through public bidding processes or direct negotiation, from a variety of sources, including potential client requests, proposals from existing or former clients, opportunities sought by our commercial team and from requests by the Peruvian government. More than 80% of our 2014 revenues came from private-sector projects. The Peruvian government and its agencies typically award construction contracts through a public bidding process conducted in accordance with the Peruvian State Contracting Law (Ley de Contrataciones del Estado). In the private sector, in addition to obtaining new projects, another important source of revenue involves increases in the scope of work to be performed in connection with already existing projects. These arrangements are typically negotiated directly with the client, often during the course of the work we are already performing for that client.

370.   The 2014 Form 20-F provides a detailed description of the competitive bidding process, similar to the process described in ¶336.

371.   In the 2014 Form F-20, Graña stated that its "strategy is to continue to grow out operations," but cautioned that "[a] major change in Peruvian government policies could affect our business." It also noted that ***"[g]overnmental entities may terminate prematurely our concessions and similar contracts under various circumstances, some of which are beyond our control."***

- 92 -

372.    In the 2014 Form F-20, the Company represented that it believed it was "in compliance with all applicable concessions, other similar contracts, laws and regulations in all material aspects," similar to the representation quoted in ¶338.

373.    The 2014 Form 20-F stated that these "core corporate values" were a key component of its business model, and reiterated its commitment to "abide by the highest corporate governance standards in Peru," using language similar to that quoted in ¶339.

374.    Indeed, according to the 2014 Form 20-F, one of Graña's greatest "[s]trengths" was its "high corporate governance standards" and "strong corporate culture based on the principles of high-quality, professionalism, reliability and efficiency," similar to the language quoted in ¶340.

375.    The 2014 Form 20-F also stated that Graña had adopted "a number" of corporate governance guidelines set forth in the "Principles of Good Governance for Peruvian Companies."

376.    In addition, the 2014 Form 20-F referenced its code of ethics applicable to its directors, officers, and employees, and stated that "[d]uring the year ended December 31, 2014, no such amendment was made or waiver granted."

377.    The 2014 Form 20-F also touted Graña's "core corporate values" as an integral component of its "vision" of becoming "the most reliable engineering services company in Latin America":

> We will continue to instill our **core corporate values** throughout our organization, while also transmitting these values to surrounding communities. We will continue to attract and develop our human capital through various training, mentorship and reward programs in order to maintain our position as the best company in Peru to learn and work in the engineering and construction field. We also seek to promote social welfare by fostering relationships with the communities that surround our areas of operation. In 2012, the Inter-American Federation of the Construction Industry recognized us for our corporate strategy and promotion of citizenship with the Latin American Social Responsibility award. In addition, in 2014, KPMG ranked us eleventh among the most responsible companies and **with the best corporate governance in Peru. We strive to promote our corporate values to**

- 93 -

*strengthen our organization and improve our performance as well as to have a positive impact on the market where we operate.*

378.    Also in the 2014 Form 20-F, Graña discussed its creation of an "Audit and Process Committee" responsible for maintaining adequate internal controls:

Our Audit and Process Committee oversees our corporate accounting and financial reporting process. The Audit and Process Committee is responsible for . . . "reviewing our financial statements", "evaluating our internal controls, and procedures, and identifying deficiencies", "evaluating the company's compliance with the Board of Director's internal regulation, as well as with general principles of corporate governance," "informing our board of directors regarding any issues that arise with respect to the quality or integrity of our financial statements, [and] our compliance with legal or regulatory requirements".

379.    The 2014 Form 20-F stated that management evaluated Graña's disclosure controls and procedures and found them to be effective, stating, in pertinent part, as follows:

*Management is responsible for establishing and maintaining adequate internal control over financial reporting for our company as such term is defined by Exchange Act rules 13(a)-15(f) and 15(d)-15(f).*   In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, *management has conducted an assessment, including testing, using the 1992 criteria in Internal Control-Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)*.  Our company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.  Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate . . . .

*Based on its assessment, management has concluded that the Company maintained effective internal control over financial reporting as of December 31, 2014, based on the 1992 criteria in Internal Control-Integrated Framework, issued by the COSO*.

380.    The 2014 Form 20-F included signed certifications by Defendants Alvarado and Hart, representing that the financial information contained therein was accurate and that the

Company's internal and disclosure controls were effective.  Alvarado's and Hart's certifications stated, in pertinent part, as follows:

I, [Defendant Alvarado and Hart], certify that:

1.      I have reviewed this annual report on Form 20-F of Graña y Montero S.A.A.

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.      The company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

(a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)      evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)      disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect the company's internal control over financial reporting; and

5.      The company's and other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

(a)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting

381.    The statements referenced in ¶¶348-380 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Graña and the Officer Defendants:

(a)      that the Company's net income was materially misstated as a result of the dividend income Graña yielded to Odebrecht to compensate for its proportional share of the bribery;

(b)      that Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

(c)      that the unlawful practices perpetrated by Graña and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations;

(d)      that the unlawful practices perpetrated by Graña and the Director Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing contracts, risks associated with the Company's expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

(e)     that Graña's financial statements had not been prepared in accordance with IFRS;

(f)     that the unlawful practices perpetrated by Graña and the Director Defendants were reasonably likely to have a material adverse effect on the Company's future operating results;

(g)     that the competitive bidding process described in the Form 20-F failed to disclose that the bidding process was undermined by the corrupt payments made to elected officials;

(h)     that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy; and

(i)     that Defendants failed to disclose that Graña's "rapid growth" was due, in material part, to the bribery of government leaders, and misled investors into believing that the rapid growth was organic and would continue on its upward trajectory.

**C.     Fiscal Year 2015 False and Misleading Statement and/or Omissions**

**1.     1Q15 Press Release and Conference Call**

382.    On April 28, 2015, Graña issued a press release announcing its quarterly results for the first quarter of 2015 (the "1Q15 Press Release"). The Company reported a 75.2% decrease in net income, or S/. 17.9 million, for the quarter.

383.    According to the 1Q15 Press Release, the consolidated statements presented therein were prepared in accordance with IFRS.

384.    On April 30, 2015, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same quarterly financial results as presented in the 1Q15 Press Release.

### 2. 2Q15 Press Release and Conference Call

385.     On July 24, 2015, Graña issued a press release announcing its consolidated results for the second quarter of 2015 (the "2Q15 Press Release").  The Company reported a 70.3% decrease in net income, or S/. 39.9 million, for the quarter.

386.     According to the 2Q15 Press Release, the consolidated financial results presented therein, filed with the SEC on Form 6-K on July 23, 2015, were prepared in accordance with IFRS.

387.     That same day, July 24, 2015, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same quarterly financial results as presented in the 2Q15 Press Release and 2Q15 Results Report.

### 3. 3Q15 Press Release and Conference Call

388.     On October 30, 2015, Graña issued a press release announcing its consolidated results for the third quarter of 2015 (the "3Q15 Press Release").  The Company reported a 97.1% decrease in net income, or S/. 6.7 million, for the quarter.

389.     According to the 3Q15 Press Release, the consolidated financial results presented therein, filed with the SEC on Form 6-K on that same day, were prepared in accordance with IFRS.

390.     That same day, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same quarterly financial results as presented in the 2Q15 Press Release and 2Q15 Results Report.

391.     Defendant Hart also stated that the Southern Gas Pipeline project had been added to the Company's backlog, and represented an addition of $1 billion to its backlog.

### 4. 4Q15 Results Report and Conference Call

392.     On January 29, 2016, Graña issued a press release announcing its consolidated results for the fourth quarter of 2015 (the "4Q15 Press Release").  The Company reported a 70.3% decrease in net income, or S/. 89.1 million, for 2015.

393.    On February 1, 2016, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same financial results as presented in the 4Q15 Press Release.

### 5.    2015 Form 20-F

394.    On May 2, 2016, Graña filed its annual report of financial results on Form 20-F with the SEC for the fiscal year ended December 31, 2015, which was signed by the Officer Defendants (the "2015 Form 20-F").  Defendants reported a net profit of S/. 205.5 million ($41.5 million).  Gross profit was S/. 702.8 million ($205.9 million), and diluted earnings per share on common shares was S/. 0.134.

395.    According to the 2015 Form 20-F, the "consolidated financial statements included in this annual report have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB")."

396.    The 2015 Form 20-F cited as a "risk factor" that Graña's "reputation could be affected by [its] past and current consortia with Odebrecht's affiliates in Peru," stating:

> We have participated in the past, and are currently participating, in consortia controlled and operated by Odebrecht affiliates in Peru.  Our reputation may be affected due to the recent criminal convictions by Brazilian courts of the ex-president and other former executives of Odebrecht S.A. for charges of corruption, money laundering and criminal organization.  In addition, according to news reports, the Peruvian congress has initiated an investigation into the dealings of Odebrecht's affiliates in Peru.  We cannot assure you that these investigations will not be broadened to include other entities relating to Odebrecht's consortia in the country, including, among others, our subsidiary GyM.  Although we have not received any notification of this investigation, news reports indicate that the investigation includes the concessions for Interoceanica Norte and Interoceanica Sur highways, in which our subsidiary GyM held a minority non-operating participation in consortia led by Odebrecht affiliates from 2005 to 2011, when we sold our stakes.  We cannot assure you that our reputation will not be affected by our consortia with Odebrecht.

397.     The 2015 Form 20-F disclosed various factors that form the basis of competition, using language similar to the language quoted in ¶334.

398.     In the section entitled "Project Selection and Bidding," the 2015 Form 20-F describes several methods by which it is awarded public works projects, including competitive bidding, using language similar to the language quoted in ¶335.

399.     The 2015 Form 20-F then provided a detailed description of the competitive bidding process, similar to the process described in ¶336.

400.     In the 2015 Form 20-F, Graña and the Officer Defendants stated that Graña's "strategy is to continue to grow out operations," but cautioned that that "[a] major change in Peruvian government policies could affect our business."  It also noted that "*[g]overnmental entities may terminate prematurely our concessions and similar contracts under various circumstances, some of which are beyond our control.*"

401.     In the 2015 Form 20-F, Graña and the Officer Defendants represented that they believed they were "in compliance with all applicable concessions, other similar contracts, laws and regulations in all material aspects", similar to the representation quoted in ¶338.

402.     The 2015 Form 20-F stated that these "core corporate values" were a key component of Graña's business model, and reiterated its commitment to "abide by the highest corporate governance standards in Peru", using language similar to the language quoted in ¶339.

403.     Indeed, according to the 2015 Form 20-F, one of Graña's greatest "[s]trengths" was its "high corporate governance standards" and "strong corporate culture based on the principles of high quality, professionalism, reliability and efficiency," using language similar to the language quoted in ¶340.

404.    The 2015 Form 20-F also stated that Graña had adopted "a number" of corporate governance guidelines set forth in the "Principles of Good Governance for Peruvian Companies," with language similar to the language quoted in ¶341.

405.    In addition, the 2015 Form 20-F referenced Graña's code of ethics applicable to its directors, officers, and employees and stated that "[d]uring the year ended December 31, 2015, no such amendment was made or waiver granted."

406.    Critically, the 2015 Form 20-F announced Graña's adoption of an anti-corruption compliance program "as a preventative measure":

> *In 2015, we reinforced our ethics management system as a preventative measure. Our Board of Directors approved an anti-corruption compliance (FCPA) program, which establishes the leadership and commitment of senior management on this matter, defines supervisory bodies and the reporting lines, establishes new policies and procedures, identifies additional internal controls, and proposes training plans for the entire organization*.  This program applies to all companies in the group and to any third parties that may act on our behalf.

> *Within the program, the anti-corruption policy provides the guidelines required to avoid any act of corruption in our business or in our relations with any state entity, and reinforces the obligation to have precise accounting records and internal controls*.

407.    The 2015 Form 20-F also touted Graña's "core corporate values" as an integral component of its "vision" of becoming "the most reliable engineering services company in Latin America":

> *We will continue to instill our core corporate values throughout our organization, while also transmitting these values to surrounding communities*.  We will continue to attract and develop our human capital through various training, mentorship and reward programs in order to maintain our position as the best company in Peru to learn and work in the engineering and construction field.  We also seek to promote social welfare by fostering relationships with the communities that surround our areas of operation.  In 2012, the Inter-American Federation of the Construction Industry recognized us for our corporate strategy and promotion of citizenship with the Latin American Social Responsibility award.  In addition, in 2014, KPMG ranked us eleventh among the most responsible companies and with the best corporate governance in Peru.  *We strive to promote our corporate values*

> *to strengthen our organization and improve our performance as well as to have a positive impact on the markets where we operate.*

408.   Also in the 2015 Form 20-F, Graña discussed its "Audit and Process Committee" responsible for maintaining adequate internal controls, with duties similar to those described in ¶378

409.   The 2015 Form 20-F disclosed that Graña's Audit and Process Committee had identified one material weakness in the Company's internal controls, relating to "inadequate controls over segregation of duties in certain activities within four of our subsidiaries."

410.   Thus, the 2015 Form 20-F stated that management evaluated Graña's disclosure controls and procedures and found them to be ineffective, stating, in pertinent part, as follows:

> *Management is responsible for establishing and maintaining adequate internal control over financial reporting for our company as such term is defined by Exchange Act rules 13(a)-15(f) and 15(d)-15(f).*   In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the 1992 criteria in Internal Control-Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).   Our company's system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.   Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.   Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.
>
> In our assessment of the effectiveness of internal controls over financial reporting as of December 31, 2015, we determined that a control deficiency existed that constituted a material weakness, *as a result of inadequate controls over segregation of duties in certain activities within four of our subsidiaries* . . . .
>
> *As a result of the material weakness described above, management has concluded that we did not maintain effective internal control over financial reporting as of December 31, 2015, based on the 1992 criteria included in Internal Control-Integrated Framework, issued by COSO.*

411.   Despite this weakness, the 2015 Form 20-F stated that the financial statements fairly presented Graña's financial position, stating, in pertinent part, as follows:

> *Management has concluded that, regardless of the material weakness described above, the financial statements fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented in this report*.

412.   The 2015 Form 20-F further stated that there were "no other changes in our internal control" that affected its internal control over financial reporting, stating, in pertinent part, as follows:

> We identified a material weakness in our internal control as described in Item 15 B above. *There were no other changes in our internal control over financial reporting* (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) *that occurred during the year ended December 31, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*.

413.   The 2015 Form 20-F included signed certifications by Defendants Alvarado and Hart, similar to the certifications quoted in ¶380 above, representing that the information contained therein was accurate and that the Company's internal and disclosure controls were effective.

414.   The statements referenced in ¶¶382-413 were materially false and misleading when they were made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Graña and the Officer Defendants:

(a)     that the Company's net income was materially misstated as a result of the dividend income Graña yielded to Odebrecht to compensate for its proportional share of the bribery;

(b)     that, contrary to statements that Graña abides by the highest corporate governance standards, Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

(c)     that the unlawful practices perpetrated by Graña and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations;

(d)     that the unlawful practices perpetrated by Graña and the Director Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing contracts, risks associated with the Company's expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

(e)     that Graña's disclosure controls were either (1) inadequately designed and insufficient to ensure that Graña's participation in the bribery scheme was made known to Defendants, or (2) sufficient and Graña became aware of the bribery scheme, in which case Defendants knew about the improper payments but failed to disclose these material facts;

(f)     that Graña's financial statements had not been prepared in accordance with IFRS;

(g)     that the unlawful practices perpetrated by Graña and the Director Defendants were reasonably likely to have a material adverse effect on the Company's future operating results;

(h)     that the competitive bidding process described in the Form 20-F failed to disclose that the bidding process was undermined by the corrupt payments made to elected officials;

(i)      that Graña failed to disclose that its "rapid growth" was due, in material part, to the bribery of government leaders, and misled investors into believing that the rapid growth was organic and would continue on its upward trajectory;

(j)      that Graña failed to disclose that Peruvian governmental policies were being shaped, in a material way, by the bribes that were being paid to it;

(k)      that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy; and

(l)      that, based on the foregoing, Graña and the Officer Defendants lacked a reasonable basis for their positive statements about Graña's then-current business and future financial prospects.

**D.      Fiscal Year 2016 False and Misleading Statements and/or Omissions**

**1.      1Q16 Press Release and Conference Call**

415.    On April 28, 2016, Graña posted its consolidated results report for the first quarter of 2016 on its website (the "1Q16 Results Report").

416.    On April 29, 2016, Graña issued a press release reporting its quarterly results for the first quarter of 2016 (the "1Q16 Press Release").  The Company reported a net income of S/. 70.9 million.  According to the 1Q16 Press Release, the consolidated statements contained therein were prepared in accordance with IFRS.

417.    That same day, Graña filed its condensed interim financial statements for the first quarter of 2016 on a Form 6-K filed with the SEC (the "1Q16 Financial Statements").

418.    Also on April 29, 2016, Graña hosted a conference call with investors and analysts, during which the same financial results presented in the 1Q16 Press Release and the 1Q16 Financial Statements were repeated by Luis Diaz Olivero, Graña's Chief Operating Officer.

### 2.    2Q16 Press Release and Conference Call

419.    On July 25, 2016, Graña issued a press release in which it released its consolidated results for the second quarter of 2016. (the "2Q16 Press Release").  The Company reported net income of S/. 104.9 million.

420.    According to the 2Q16 Press Release, the consolidated statements contained therein were prepared in accordance with IFRS.

421.    On July 26, 2016, Graña filed its condensed interim consolidated financial statements for the second quarter of 2016 on a Form 6-K filed with the SEC (the "2Q16 Financial Statements").

422.    The same day, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same financial results.

### 3.    3Q16 Press Release and Conference Call

423.    On October 26, 2016, Graña issued a press release announcing its consolidated financial results for the third quarter of 2016 (the "3Q16 Press Release").  The Company reported net income of S/. 138.6 million.

424.    According to the 3Q16 Press Release, the consolidated financial statements presented therein were prepared in accordance with IFRS.

425.    That same day, Graña hosted a conference call with investors and analysts, during which Defendant Hart repeated the same financial results as presented in the 3Q16 Press Release.

426.    On November 1, 2016, Graña filed its consolidated results report for 3Q16 with the SEC on Form 6-K.

4.      **4Q16 Results Report and Conference Call**

427.    On January 27, 2017, Graña issued a press release reporting its consolidated financial results for the fourth quarter of 2016 (the "4Q16 Press Release").  The Company reported net income of S/.8.6 million.

428.    According to the 4Q16 Press Release, the financial results presented therein were prepared in accordance with IFRS.

429.    In addition, during the 4Q16 Conference Call, Defendant Hart repeated the financial results presented in the 4Q16 Press Release.  Defendant Alvarado also participated in the call.

430.    The statements referred to in ¶¶415-429 were materially false and misleading when they were made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Graña and the Officer Defendants:

        (a)     that Graña's disclosure about potential reputational harm to the Company as a result of Odebrecht's conviction failed to disclose that Graña participated in Odebrecht's bribery scheme;

        (b)     that the Company's net income was materially misstated as a result of the dividend income Graña yielded to Odebrecht to compensate for its proportional share of the bribery;

        (c)     that, contrary to statements that Graña abides by the highest corporate governance standards, Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

        (d)     that the unlawful practices perpetrated by Graña and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations;

- 107 -

(e)     that the unlawful practices perpetrated by Graña and the Director Defendants subjected the Company to numerous known, but undisclosed risks, including monetary risk, reputational risk, risks associated with retention and/or renewal of existing contracts, risks associated with the Company's expansion efforts, risks associated with key employee retention, and the imposition of civil and/or criminal sanctions, including the suspension of the Company's business activities;

(f)     that Graña's disclosure controls were either (1) inadequately designed and insufficient to ensure that Graña's participation in the bribery was made known to Defendants, or (2) sufficient and Graña became aware of the bribery, in which case Defendants knew about the improper payments but failed to disclose these material facts;

(g)     that Graña's financial statements had not been prepared in accordance with IFRS;

(h)     that the unlawful practices perpetrated by Graña and the Director Defendants were reasonably likely to have a material adverse effect on the Company's future operating results;

(i)     that the competitive bidding process described in the Form 20-F failed to disclose that the bidding process was undermined by the corrupt payments made to elected officials;

(j)     that Graña failed to disclose that its "rapid growth" was due, in large part, to the bribery of government leaders, and misled investors into believing that the rapid growth was organic and would continue on its impressive upward trajectory;

(k)     that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy;

(l)     that Graña failed to disclose that Peruvian governmental policies were being shaped, in a material way, by the bribes that were being paid to it; and

(m)     that, based on the foregoing, Graña and the Officer Defendants lacked a reasonable basis for their positive statements about Graña's then-current business and future financial prospects.

### E.     Fiscal Year 2017 Materially False and Misleading Statements and Omissions

#### 1.     The *Carretas* Interview

431.     On January 12, 2017, Defendant Alvarado, Graña's then-CEO, sat for an interview with Peruvian news magazine *Caretas* to discuss the Odebrecht scandal.  During the interview, Defendant Alvarado called the partnership with Odebrecht a "mistake," and disclaimed any knowledge or involvement in the bribery, stating that "we were never aware of any act of corruption that occurred in any of the projects."   *See* http://caretas.pe/sociedad/77912-la_respuesta_de_gym (last visited May 8, 2019).

432.     This statement was materially false and misleading because Graña and the Director Defendants were, in fact, involved in the bribery of top government officials to secure public works projects, and therefore, had actual knowledge of the corruption.  In light of this, Defendant Alvarado's statement was, at a minimum, reckless.

#### 2.     The *RPP Noticias* Interview

433.     On January 20, 2017, Defendant Alvarado, Graña's then-CEO, sat for an interview with Peruvian outlet *RPP Noticias*.  During the interview, Defendant Alvarado again stated that

the Company was "deceived" and that "[w]e were not aware of any acts of corruption in our projects," stating, in pertinent part, as follows:

> It is a shame to say that we have been deceived, banks and institutions of all kinds have been deceived in this process.  Do not think I feel good here saying what I'm saying, I do not feel good, I do not feel sharp, intelligent, capable, I feel very bad.
>
> *     *     *
>
> With the information we have today, we consider that it has been a very bad decision to have partnered with Odebrecht.  ***We were not aware of any acts of corruption in our projects***, our partnership with Odebrecht is affecting us a lot, for me it is very difficult to be here, representing more than 30,000 employees of the GyM Group.

434.    This statement was materially false and misleading because Graña and the Director Defendants were, in fact, involved in the bribery of top government officials to secure public works projects, and therefore, had actual knowledge of the corruption.  In light of this, Defendant Alvarado's statement was, at a minimum, reckless.

### 3.    The January 27, 2017 Conference Call

435.    On January 27, 2017, Graña hosted a conference call with investors and analysts. Defendant Alvarado opened the conference call, which was the first conference call since Odebrecht pled guilty to bribery charges in the United States, by stating the Company's position with respect to the Odebrecht case:

> First of all, let me explain the position taken by Graña y Montero in the Odebrecht case:
>
> ***It is important to note that the Graña y Montero Group does not authorize, recommend or make irregular payments of any kind because these conducts disobey the values and principles that have guided our behavior for more than 83 years***.
>
> ***In the 6 projects we developed in partnership with Odebrecht throughout our history, we have never seen, experienced, witnessed, or participated in any irregular actions related to the projects***.
>
> ***We could not imagine that there was a system specially designed to pay bribes.***

436.    This statement was materially false and misleading because Graña and the Director Defendants were, in fact, involved in the bribery of top government officials to secure public works projects, and therefore, had actual knowledge of the corruption.   In light of this, Defendant Alvarado's statement was, at a minimum, reckless.

437.    Graña also pointed to its Code of Ethics, Anti-Corruption Policy, and Ethics Charter as evidence that it was not involved in the Odebrecht bribery scheme:

> The Graña y Montero Group is listed on the Lima Stock Exchange since 1997 and is the only Latin American construction company to trade on the New York Stock Exchange since 2013, where *we are subject to the most demanding international standards.*

> *The United States Foreign Corrupt Practices Act (FCPA), to which we have voluntarily adhered to on the stock exchange, is very strict about compliance with anti-corruption and corporate governance policies.*

> *For the last 22 years, the Group has had different tools to encourage ethical principles at all organizational levels, including the Ethics Charter, the Code of Conduct and the Anti-Corruption Policy.*

> In addition, the Group has an Ethical Channel (toll free number) that has received more than 211 cases and none has been related to corruption with public workers. This channel is administered by an external and independent company and the cases are evaluated by an ethical committee.

> However, today we know that our efforts were not enough.  Following the problem with Odebrecht, we are strengthening our policies and procedures for the selection of partners.  We will be much more severe in our demands to integrate companies in the future.

### 4.    The *La República* Interview

438.    On January 29, 2017, Defendant Alvarado gave another interview to *La República*, which contained the following exchange:

> *Do you completely discard [the fact] that any Graña y Montero participated, or was aware of [the corruption], and that this was not an isolated incident*?

> We have different instruments to disseminate ethical principles to the entire organization, such as the Ethics Letter, Code of Conduct and Anticorruption Policy. We have an Ethics Channel, which is a free line for complaints.  We have received

over 211 complaints and none were related to corruption related to public employees.  This channel is administered by an outside and independent company and the cases are evaluated by an ethical committee.  Besides we provide courses to all annually.

### 5.       Form 6-K with Official Agenda

439.    On February 1, 2017, Graña announced on a Form 6-K with the SEC, that an Extraordinary Shareholder Meet would be held later that month to discuss, *inter alia*, the "[o]fficial position taken by the company [in response to] Odebrecht's corruption acts."  The Company simultaneously filed a formal Agenda for the Extraordinary Shareholder Meeting on a Form-6K with the SEC, which spelled out the Company's "[o]fficial position," and stated, in pertinent part, as follows:

### 1.       Official position taken by the Company facing Odebrecht's corruption acts

The Graña y Montero Group does not authorize, recommend or make irregular payments of any kind because these conducts disobey the values and principles that have guided our behavior for more than 83 years.

In the 6 projects we developed in partnership with Odebrecht throughout our history, we have never seen, experienced, witnessed, or participated in any irregular actions related to the projects.  We could not imagine that there was a system specially designed to pay bribes.

*       *       *

The Graña y Montero Group is listed on the Lima Stock Exchange since 1997 and is the only South American construction company to trade on the New York Stock Exchange since 2013, where we are subject to the most demanding international standards.

The United States Foreign Corrupt Practices Act (FCPA), to which we have voluntarily adhered to on the stock exchange, is very strict about compliance with anti-corruption and corporate governance policies.

For the last 22 years, the Group has had different tools to encourage ethical principles at all organizational levels, including the Ethics Charter, the Code of Conduct and the Anti-Corruption Policy.

- 112 -

440.    The statements referenced in ¶¶437-439 were materially false and misleading when they were made because they misrepresented and/or failed to disclose the following adverse facts, which were then known to, or recklessly disregarded by, Graña and the Officer Defendants:

(a)    that Graña's statement on January 27, 2017 was false and misleading because Graña did, in fact, participate in bribes related to the projects at issue;

(b)    that, contrary to statements that Graña abides by the highest corporate governance standards, Graña and the Director Defendants were involved in the bribery of top government officials to secure public works projects;

(c)    that the unlawful practices perpetrated by Graña and the Director Defendants were in direct violation of the Company's code of ethics, which Defendants represented guided their operations; and

(d)    that there was an inconsistent and inappropriate tone at the top at Graña that resulted in Graña violating IFRS, the Company's accounting policies, and the Company's Ethics Charter, Code of Conduct, and Anti-Corruption Policy.

## XI.    GRAÑA'S MATERIALLY FALSE AND MISLEADING FINANCIAL REPORTING

441.    Defendants represented that each of the financial statements, and the financial disclosures related thereto, issued by Graña during the Class Period (collectively referred to herein as the "Class Period financial statements") were presented in conformity with IFRS issued by the IASB.  These representations were materially false and misleading when made because the Class Period financial statements contained materially false and misleading representations and omissions of material fact associated with the unlawful bribery scheme perpetrated by Defendants.

442.    First, Graña's financial reporting related to the minority interests associated with IIRSA South and Lima Metro included in its financial statements were materially false and

- 113 -

misleading and presented in violation of IFRS, because the profit or loss associated with the operations of its minority interests in these projects were improperly consolidated in the Class Period financial statements under the captions "[s]hare of the profit or loss in associates and joint ventures under the equity method of accounting."

443.    Second, the Class Period financial statements were materially false and misleading because they failed to disclose, in accordance with IFRS, the potential fines, penalties and other contingent liabilities ensuing from the unlawful practices perpetrated by Graña's senior management.

444.    Compliance with applicable accounting standards is a basic fundamental obligation of publicly traded companies.   As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [IFRS] will be presumed to be misleading or inaccurate . . . ."  17 C.F.R. §210.4-01(a)(1).

445.    During the Class Period, Graña filed its annual financial statements with the SEC on Form 20-F for the years ended December 31, 2011, 2012, 2013, 2014, and 2015.  These annual financial statements falsely represented, in pertinent part, and in all material respects, the following:

> Our consolidated financial statements included in this annual report have been prepared in nuevos soles and in accordance with International Financial Reporting Standards ("IFRS") issued by the International Accounting Standards Board ("IASB").

446.    Similarly, during the Class Period, Graña published its interim financial results for the periods ended: March 31, 2012, 2013, 2014, 2015, 2016; June 30, 2012, 2013, 2014, 2015, 2016; September 30, 2012, 2013, 2014, 2015, 2016; and December 31, 2012, 2013, 2014, 2015, 2016.  These interim financial statements falsely represented, in pertinent part, and in all material respects, the following:

These results have been prepared in accordance with International Financial Reporting Standards ("IFRS") and are stated in nominal Peruvian Nuevos Soles (S/.).

447.     The representations in ¶¶445-446 above were materially false and misleading when made because, in violation of IFRS, Defendants knowingly or recklessly caused Graña to issue the financial statements that: (i) included materially misleading representations about Graña's profit or loss associated with the operations of the minority interests in its subsidiaries; and (ii) misrepresented Graña's contingent liabilities associated with the unlawful bribery scheme perpetrated by Graña's senior management.

A.     **Misleading Representations About Graña's Profit or Loss Associated with the Operations of the Minority Interests in Its Subsidiaries**

448.     During the Class Period, the Forms 20-F Graña filed with the SEC disclosed in, pertinent part:

Results of our subsidiaries, joint operations and associated companies are reflected in our financial results.

*     *     *

We consolidate the results of our subsidiaries in our financial statements and we reflect the profit corresponding to the minority interests in our subsidiaries under "net profit attributable to non-controlling interests" in our income statement.  With respect to our joint operations, we recognize in our financial statements the revenue and expenses including our share of any asset, liability, revenue or expense we hold jointly with partners.  We reflect the results of our associated companies under the equity method of accounting in our financial statements under the line item "share of the profit and loss in associates" in our income statement.

449.     As detailed herein, Graña, though its GyM S.A. subsidiary, owned a 33% interest in the Lima Metro concession and a 19% interest in IIRSA South concession.  Accordingly, Defendants represented to investors that Graña's financial reporting included the results of the Lima Metro and the IIRSA concessions in its financial statements in a manner consistent with the requirements of IFRS.

- 115 -

450.    These representations were materially false and misleading when made because, in violation of IFRS, the bribes paid to obtain the Lima Metro and IIRSA South concessions were not expensed when incurred.

451.    Specifically, the results of the Lima Metro concession, which was liquidated in May 2015, were falsely represented to have reported conformity with IFRS in Graña's annual financial statements for the years ended December 31, 2011, 2012, 2013, 2014 and in Graña's interim financial statements for the periods ended March 31, 2012, 2013, 2014, 2015; June 30, 2012, 2013, 2014, 2015; September 30, 2012, 2013, 2014; and December 31, 2012, 2013, 2014.  The results of the IIRSA South concession, which was sold in 2011, were falsely represented to have been reported in conformity with IFRS in Graña's annual financial statements for the year ended December 31, 2011.

452.    In 2010, the IASB issued *The Conceptual Framework for Financial Reporting* ("Conceptual Framework") setting forth the fundamental concepts upon which internal accounting standards and financial reporting are based.

453.    According to IASB's Conceptual Framework, financial performance is to be reported based upon accrual accounting, which depicts the effects of transactions and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period.

454.    IFRS, in International Accounting Standard ("IAS") 11, *Construction Contracts*, requires that, when the outcome of a construction contract can be estimated reliably, such as the Lima Metro and IIRSA South construction contracts, both construction contract revenue and costs are to be recognized by reference to the stage of completion of the contract activity at the end of each reporting period.  However, IAS 11 further provides that "general administration costs for

which reimbursement [by the customer] is not specified in the contract" are to be "excluded from the costs of the construction contract."

455.    Here, Graña's share of the bribes to obtain the Lima Metro and IIRSA South concessions were general administration type costs for which reimbursement by the Peruvian government was not specified in the contracts.  As such, the bribes paid by Graña were required to be expensed as incurred in accordance with accrual accounting.

456.    In violation of IFRS, Graña's share of the bribes it paid to secure favorable rulings on the Lima Metro and IIRSA South concessions were falsely and misleadingly reported by Graña in the financial statements set forth in ¶451 above as a reduction of its share of the profit distributions on the Lima Metro and IIRSA South concessions over the term of the arrangements.

457.    Indeed, on February 23, 2018, Judge Concepción, on a motion seeking to suspend the custody of Hernando Graña, found that Graña's financial statements were presented in violation of IFRS because the bribes paid on the IIRSA South concession were not immediately expensed, stating, as translated, and, in pertinent part, as follows:

> ***The accounting provision for said concept (additional risks) [bribes] was not recorded in 2011, despite being required, given that accounting and tax matters are governed by the accrual rule, in the sense that any expected loss must be recognized as such immediately***, in accordance with paragraph 22 of the International Accounting Standard IAS 11 Construction Contracts, and cited in the Accounting, Financial and Economic Expert Report No. 2-2017 Interoceánica Sur Tramo 2 and 3-IIRSA SUR.

458.    Thus, Graña materially misstated its financial results in the annual financial statements for the years ended December 31, 2011, 2012, 2013, 2014 and in the interim financial statements for the periods ended March 31, 2012, 2013, 2014, 2015; June 30, 2012, 2013, 2014, 2015; September 30, 2012, 2013, 2014; and December 31, 2012, 2013, 2014 by failing to report as an expense as incurred the bribes it paid to obtain the Lima Metro and IIRSA South concessions.

459.    As detailed herein, Graña's share of the bribes on the Lima Metro and IIRSA South concessions totaled approximately $10.4 million and $5.8 million, respectively.

460.    As set forth in the SEC's Staff Accounting Bulletin No. 99 ("SAB No. 99"), materiality in the context of financial information not only includes an assessment of the magnitude of the misstatement in numerical terms, but also requires an assessment of the factual context in which the user of financial statements would view the financial information (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

461.    Thus, SAB No. 99 notes, in pertinent part, that:

> The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions" in favor of an approach that takes into account all the relevant considerations.  In so doing, it made clear that - [M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.  [Footnotes omitted.]

462.    SAB No. 99 further provides "the staff [of the SEC] believes that there are numerous circumstances in which [financial] misstatements below 5% [of earnings] could well be material.  ***Qualitative factors*** may cause [financial] misstatements of quantitatively small amounts to be material." (emphasis added).

463.    In this regard, SAB No. 99 notes "***[w]hether the misstatement involves concealment of an unlawful transaction***" is a qualitative factor that may well render material a quantitatively small misstatement of a financial statement item.  As noted herein, Jorge Barata, former-Odebrecht executive-turned-whistleblower, testified that Graña was a willful participant with Odebrecht in the bribery scandal.

464.    Accordingly, the failure to properly account for approximately $16.2 million in bribes on the Lima Metro and IIRSA South concessions rendered the financial statements identified in ¶451 above materially false and misleading.

465.    Moreover, the financial statements set forth in ¶451 above, and Defendants' financial disclosures concerning the operations of Graña's minority interests, including Graña's minority interests in the Lima Metro and IIRSA South concessions, were materially false and misleading because, as Defendants knew, such representations failed to disclose material facts associated with the then on-going, multi-year bribery conspiracy perpetrated by the Company and its senior management.

466.    Once Defendants choose to speak about  the operations of Graña's minority interests, it had a duty to speak completely and truthfully, including speaking about the effects of the illegal bribery scheme on Graña's current and future operating results.

### B.    Misleading Representations About Graña's Contingencies

467.    IFRS, in IAS 37, Provisions, Contingent Liabilities and Contingent Assets, defines a "contingent liability" as a possible obligation arising from past events whose existence is to be confirmed only by the occurrence (or non-occurrence) of one or more uncertain future events not wholly within the control of the entity.

468.    IFRS requires financial statements to disclose contingent liabilities when the possibility of their settlement is greater than remote.  *See, e.g.*, IAS 37, *Provisions, Contingent Liabilities and Contingent Assets*.  This disclosure is to include a description of the nature of the obligations and "adequate information" and the "major assumptions" concerning the uncertain future events.

469.    The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X [17 C.F.R. §210.10-01], which provides that disclosures in interim-period financial statements may be abbreviated and need not duplicate the disclosure contained in the most-recent audited financial statements, ***except***

that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

470.    Defendants, in violation of IFRS, caused the Company to issue the Class Period financial statements that failed to disclose contingencies associated with the unlawful bribery scheme perpetrated by Graña's senior management.

471.    As detailed herein, the Company and its senior management engaged in a multi-year conspiracy whereby they bribed governmental officials to secure project rulings in Graña's favor.  These unlawful acts subjected Graña to massive contingent liabilities, including fines, criminal penalties and/or other sanctions which, in violation of IFRS, were not disclosed in the Class Period financial statements.

472.    As a result, the Class Period financial statements issued by Defendants were presented in violation of IFRS and included materially false and misleading representations and omissions of material fact associated with the unlawful bribery scheme described herein.

## XII.    DEFENDANTS ACTED WITH SCIENTER

473.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company (or in their own name) were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of such statements or documents as primary violations of the federal securities law.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Graña, their control over, and/or receipt and/or modification of Graña's materially false and misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

474.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The multi-year fraudulent activity alleged herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company.

475.    The Officer Defendants were executive officers at Graña and, at a minimum, should have been aware of key facts related to the Company's operations, while the Director Defendants are alleged to have been directly involved in the bribery scheme described herein.

476.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.

### A.    As a Key Member of the IIRSA South Consortium, Graña Was Involved in All Major Corporate Decisions

477.    As described in ¶¶105-106 above, the Shareholder Agreement for the IIRSA South concession required a supermajority vote of 82% for major corporate actions.  Although Graña originally held an 18% interest in the concession, it later orchestrated the gratuitous transfer of a 1% interest by its fellow minority stakeholder ICCGSA to it due to some unspecified "commercial and operational benefits" that Graña was to provide to the consortium.  After this transfer, it was impossible for the IIRSA South consortium to take any action without Graña's affirmative input and vote.

478.    Thus, contrary to Graña's claim that it was a passive minority stakeholder in the IIRSA South consortium, Graña was actually a key consortium member with the ability to unilaterally veto any proposed resolution or corporate action.

479.    Graña's status as a key member of the consortium with the authority to veto any corporate action contributes to a strong inference that Graña acted with scienter.

480.    This inference is bolstered by Marcelo Odebrecht's testimony that its partnerships with Graña were structured as "single body" consortia "where everyone can be on the same team." *See* ¶220(b).

481.    Moreover, the minority stakeholders in the IIRSA South consortium were granted the authority to appoint the Administration and Finance Manager for the consortium.  The minority stakeholders, which included Graña, ultimately appointed Fernando Almenara, a Graña employee, to fill that role.

482.    The fact that a senior Graña employee served as the Finance Manager for the entire consortium, coupled with the fact that the entire scheme rested on the improper accounting and diversion of corporate profits, support that Graña knew about the bribes all along.  This, too, strongly contributes to an inference of scienter.

### B.    Graña Knew About the Bribes, and Contributed Its Proportional Share

483.    Defendants were aware that Odebrecht made illicit payments to top public officials, including former President Alejandro Toledo and former Peruvian President Alan García, to win the concessions for the IIRSA South and Lima Metro projects.

484.    Graña then paid its proportional share of the bribes in the form of differential dividends.  The parties attempted to characterize these payments as legitimate payments for the "*additional risks*" Odebrecht allegedly incurred for the benefit of the concession.  The term

"additional risks" appears in numerous corporate documents in the context of the distribution of differential dividends in favor of Odebrecht, including:

(a)    the 2012 Profit Distribution Agreement of the Electric Train Consortium;

(b)    the 2015 Liquidation Agreement of the Electric Train Consortium; and

(c)    the June 1, 2011 Minutes of the General Meeting of Shareholders of the IIRSA South concession.

485.    These documents were signed by senior Graña employees that had personal knowledge of the bribes and understood the purpose of the "additional risks" language.

486.    The distribution agreements for the Electric Train Consortium, for example, were both signed by Hernando Graña and Lámbarri Hierro.  *See* Exhibits 2, 3.

487.    With respect to Hernando Graña's knowledge, the Peruvian appellate court determined that the theory that Hernando Graña used "additional risks" to dispose of the money was "viable."  *See* Ex. 7.  The appellate court left undisturbed Judge Concepción's determination that the term "additional risks," as used in the relevant agreements between Odebrecht and Graña, is a euphemism for bribery, and that there was no legitimate business reason for Graña to have yielded such a large part of its share of profits to Odebrecht.

488.    Moreover, Marcello Odebrecht testified before Peruvian prosecutors that he had met with José Graña and Hernando Graña, and that it was inconceivable that his Peruvian partners did not know about the bribes.  ¶220(e).

489.    As to Lámbarri Hierro, Carlos Nostre, the technical director of the Lima Metro project, testified that Lámbarri Hierro knew of Graña's obligation to contribute to the bribery, and understood that the "additional risks" concept was the mechanism by which Graña would reimburse Odebrecht for its share of the bribe.  ¶¶222-224.

490.    On February 23, 2018, it was judicially determined by Judge Concepción that the term "additional risks," as used in the relevant agreements between Odebrecht and Graña, is a euphemism for bribery, and that there was no legitimate business reason for Graña to have yielded such a large part of its share of profits to Odebrecht.

491.    Likewise, according to the reporting in Peruvian newspaper *Hildebrandt en sus trese* and Brazilian magazine *Piaui*, the term "additional risks" refers to bribery.

492.    These facts were corroborated by numerous insider sources, including Jorge Barata, Odebrecht's director of operations in Peru, and former Odebrecht CEO Marcelo Odebrecht.

493.    In total, Graña contributed approximately $7 million to the bribe which produced the IIRSA South concession and approximately $9 million to the bribe which produced the Metro Lima Concession.

494.    On April 23, 2019, Jorge Barata testified that José Graña knew about the bribes and was familiar with the concept of "additional risks."

### C.    Graña Executives Resign Within Three Days of the Disclosure of Graña's Role in the Bribery Scheme

495.    The resignation of three Graña executives just three days after its involvement in the bribery scheme was disclosed supports a strong inference of scienter.

496.    Although Graña attributed these resignations to "termination of the South Peru Gas Pipeline, the fall of share prices, and the false allegations made by the former representative of Odebrecht in Peru," that explanation does not withstand scrutiny.

497.    These three executives had been with Graña for decades and successfully listed the Company on the NYSE in 2013.  It strains credulity to claim that these coterminous and abrupt resignations were unrelated to the disclosure of their participation in the bribery.

- 124 -

**D.    The Ongoing Criminal Proceedings Against Graña, GyM S.A., and Former Graña Executives Contribute to an Inference of Scienter**

498.    As discussed, criminal charges have been formalized against Jose Graña, Hernando Graña, and Gonzalo Rey based on their involvement in the Odebrecht scandal.

499.    In addition, Graña and its construction subsidiary GyM S.A. have been incorporated as civilly responsible third parties in connection with the bribes paid for the Lima Metro and IIRSA South projects.

500.    GyM S.A. was incorporated as a civilly responsible third party in the Construction Club probe.

501.    A petition to incorporate Graña as a civilly responsible third party in the proceedings against Zevallos is currently pending.

502.    These ongoing criminal proceedings contribute to a strong inference of scienter.

**E.    Defendants Violated Graña's Ethics Charter, Code of Conduct, and Anti-Corruption Policy**

503.    Prior to the Class Period, Graña adopted an Ethics Charter and a Code of Conduct. According to the Company, the Ethics Charter embodied the "values [that] are the foundation of [Graña's] culture."

504.    The Ethics Charter prohibits bribery and "rejects any possibility of making payment in cash or in kind to obtain contracts or benefits that would otherwise not be theirs by moral right."

505.    Similarly, the Code of Conduct prohibits Graña and its employees from "offer[ing] bribes, payments, and in general, facilitat[ing] payment of any kind to public officers . . . to obtain benefits to which they are not entitled by moral right."  The Code of Conduct further cautions Graña to "avoid practices related to unfair competition."  Finally, the Code of Conduct "encourages transparency and compliance of accounting, financial, and legal standards."

- 125 -

506.    In 2015, Graña adopted an Anti-Corruption Policy which "emphatically reject[s] any form of bribery or corruption," and provides additional "Guidelines and Principles" as to which activities constitute bribery.

507.    In violation of their obligations under the Ethics Charter, the Code of Conduct, and the Anti-Corruption Policy, Defendants knew but failed to disclose that the Company was engaging in prohibited conduct, specifically, making improper payments to reimburse Odebrecht for its share of the illicit payments.  Moreover, the Director Defendants themselves were directly involved in the bribery scheme, and Defendant Hernando Graña signed several agreements (including the 2012 Profit Distribution Agreement and 2015 Liquidation Agreement) which illegally diverted the Company's proportional share of the bribe to Odebrecht.

## XIII.   GRAÑA'S OFFICIAL POSITION REGARDING THE ODEBRECHT SCANDAL CONTINUES TO EVOLVE

508.    On January 12, 2017, Defendant Alvarado, Graña's then-CEO, was interviewed by Peruvian news magazine *Caretas* to discuss the Odebrecht scandal.  During the interview, Defendant Alvarado called the partnership with Odebrecht a "mistake," and disclaimed any knowledge or involvement in the bribery, stating that "we were never aware of any act of corruption that occurred in any of the projects."

509.    On January 20, 2017, the Peruvian authorities announced the first arrests in connection with the Odebrecht scandal.  In the midst of these developments, on January 20, 2017, Defendant Alvarado was interviewed by Peruvian outlet *RPP Noticias*.  During the interview, Defendant Alvarado again stated that the Company was "deceived" and that "[w]e were not aware of any acts of corruption in our projects," calling its partnership with Odebrecht "a very bad decision."

- 126 -

510.    On January 27, 2017, Graña hosted its first conference call for investors and analysts since the Odebrecht Plea Agreement was disclosed.   During the conference call, Defendant Alvarado unequivocally denied any knowledge of, or involvement in, the bribery, stating, in pertinent part, as follows:

> It is important to note that ***the Graña y Montero Group does not authorize, recommend or make irregular payments of any kind*** because these conducts disobey the values and principles that have guided our behavior for more than 83 years.

> In the 6 projects we developed in partnership with Odebrecht throughout our history, we have never seen, experienced, witnessed, or participated in any irregular actions related to the projects.   We could not imagine that there was a system specially designed to pay bribes.

511.    Defendant Alvarado reiterated the Company's position two days later when he was interview by *La República*, and categorically rejected even the possibility that any Graña employees were involved in the bribe, stating, in pertinent part, as follows:

> ***Do you completely discard [the fact] that any Graña y Montero participated, or was aware of [the corruption], and that this was not an isolated incident***?

> We have different instruments to disseminate ethical principles to the entire organization, such as the Ethics Letter, Code of Conduct and Anticorruption Policy. We have an Ethics Channel, which is a free line for complaints.   We have received over 211 complaints and none were related to corruption related to public employees.   This channel is administered by an outside and independent company and the cases are evaluated by an ethical committee.   Besides we provide courses to all annually.

512.    On February 2, 2017, Graña filed a Form 6-K with the SEC setting forth the Company's response to revelations that Odebrecht had paid bribes in connection with projects in which Graña was a partner, stating:

> The Graña y Montero Group does not authorize, recommend or make irregular payments of any kind because these conducts disobey the values and principles that have guided our behavior for more than 83 years.

> In the 6 projects we developed in partnership with Odebrecht throughout our history, ***we have never seen, experienced, witnessed, or participated in any***

- 127 -

*irregular actions related to the projects*.  We could not imagine that there was a system specially designed to pay bribes.

513.     On February 27, 2017, Graña filed a Form 6-K with the SEC responding to statements attributed to Jorge Barata indicating that Graña knew that Odebrecht paid bribes and that the Company agreed to repay Odebrecht for its proportional share, stating:

> *We categorically deny such statements and reiterate that our Company and executives were not aware of, participated in, nor made any payments in connection with any type of bribe or reimbursement of any such payments made by Odebrecht*.

514.     On February 28, 2017, despite Graña again dismissing the truth of the allegations, the Company filed a Form 6-K announcing that its top executives had resigned in connection with the bribery scandal, stating in relevant part:

> We hereby inform you that today, at Graña y Montero S.A.A.'s Board of Directors meeting, which was requested by its President, *Mr. José Graña Miro Quesada presented his resignation to his position as President of the Board of Directors, Mr. Hernando Graña Acuña presented his resignation to his position as Director and Mr. Mario Alvarado Pflucker presented his resignation to his position as Director and Chief Executive Officer*.  These decisions were made in the context of the termination of the contract of Gasoducto Sur Peruano*, the false imputations made by the former representative of Odebrecht in Peru* and the decline in the share price.  This is in order to prioritize the future of Graña y Montero and its more than 30,000 employees, and also with the objective to focus on demonstrating that the accusations towards the company are false.

515.     On May 10, 2017, Graña filed a Form 6-K responding to the reputational harm the Company was suffering following allegations that it was a knowing participant in the bribery scandal, stating in relevant part:

> Many fellow citizens wonder how a company like Graña y Montero could have been involved with a foreign company accused of corruption. . . .  *Although we do not have all the answers to this occurrence yet*, the Board of Directors feels obliged to inform you that the Graña y Montero Group deeply regrets that you may feel the Company has disappointed you.

516.     On May 16, 2017, Graña announced that the State Attorney had begun to investigate the Company's role in the bribery scheme, stating:

Today, Graña y Montero S.A.A. (hereinafter the "Company") has become aware through the media of a request made by the State Attorney (*Procuraduría Pública Ad Hoc*) *to initiate investigations against several companies* that participated jointly with the Odebrecht Group in the IIRSA project – Peru Brazil tranche 2 and 3 (*Proyecto Corredor Vial Interoceánico Sur – Perú Brasil tramos 2 y 3*), and their respective representatives, for the alleged commission of the crime of collusion against the Peruvian Government. *This request, as it is of public knowledge, includes the company Graña y Montero as well as its former director, for having participated, as minority non-controlling partners, in said project.*

Therefore, in order to provide more transparency to the market, we hereby clarify that the request made by the State Attorney must be evaluated by the District Attorney (Public Ministry), who has to determine whether or not initiates a preliminary investigation, in accordance with applicable laws. As of the date of this communication, no person or company linked to the Graña y Montero Group has been formally notified by the Public Ministry of having been included in an investigation.

517.    On May 17, 2017, Graña filed a Form 6-K confirming that: "The Company is continuing its ongoing internal investigation of its association with affiliates of Odebrecht S.A. ("Odebrecht") in certain projects in Peru."

518.    On October 4, 2017, Graña announced that its internal investigation was nearly complete and offered a preview of the investigation's purportedly exculpatory findings, stating in relevant part:

Graña's Risk, Compliance and Sustainability Committee is close to completing the internal investigation commissioned by Simpson Thacher & Bartlett relating to participation in consortia with Odebrecht in the IIRSA Sur Sections 1 and 2, IIRSA Norte, Construction of the Tranche 1 and 2 of the Electric Train Platform, Chavimochic and Peruvian Southern Gas Pipeline. G&M´s investigation has included the review of hundreds of thousands of documents and communications, numerous witness interviews, and comprehensive forensic accounting analysis, among other steps.

*To date, the Risk Committee has identified no evidence that would lead it to conclude that any of the Company's current or former directors, officers, or employees knowingly participated in, or was aware of, any act of bribery or corruption of public officials in relation to Odebrecht-related projects*.

519.    On November 3, 2017, Graña filed a Form 6-K discussing the results of its internal investigation, again claiming no evidence of misconduct was found, stating in relevant part:

- 129 -

The investigation of whether any current or former director, officer or employee of the Company ("Company personnel") was aware of or knowingly participated in any corrupt payments made in relation to the Projects is now complete.

The Investigation involved interviews of former directors and current and former officers and employees of the Company, document collection and review, and review of the financial records of the Company and available financial records for the Projects, but did not include interviews of employees of Odebrecht or the consortia or a review of Odebrecht's or the consortia's internal documents or financial information. . . .

***The Investigation identified no evidence to conclude that any Company personnel was aware of or knowingly participated in any corrupt payments made in relation to the Projects.***

***The Investigation identified no evidence to conclude that any Company personnel knew or believed that payment of leadership fees or the use of differential dividends was related to corruption.***

520.   The November 3, 2017 Form 6-K, however, revealed that Graña never received from Odebrecht any detailed information supporting the appropriateness of the payments to Odebrecht, stating in relevant part:

The Company was ***unable to secure from Odebrecht documentation or support for its costs, expenses and risks that were the basis for the increased dividend payments to Odebrecht***. The Company received only very summary descriptions for these costs claimed by Odebrecht.

521.   On November 13, 2017, Graña filed a Form 6-K responding to new evidence that former Graña executives knowingly participated in the bribery scheme, stating in relevant part:

We refer to the press releases published today regarding the statements made by Mr. Marcelo Odebrecht before officials of the Public Ministry of Peru.

In this regard, we must indicate that we do not have official and certain information about the content of the statements made by Mr. Marcelo Odebrecht before officials of the Public Ministry of Peru.

We reiterate what has been previously indicated by our company, in the sense that ***an exhaustive independent investigation has been carried out, which has not identified any evidence that allows us to assume that executives or former employees of our group have known or knowingly participated in acts of corruption related to the projects in which we participated as minority partners of Odebrecht***.

It is important to specify that the process of collecting all the information of the relevant persons in the independent investigation was done before February 23, 2017, that is, before the statements made by Mr. Jorge Barata were made public, indicating that the Peruvian construction companies would have known about the illicit practices of Odebrecht in the Project of Sections II and III of Carretera Interoceánica Sur.  This guarantees the integrity of the information delivered by our company for the purposes of the independent investigation.

We also reiterate that, without prejudice to the foregoing, in the event that any evidence should appear that proves that company officials have been involved in acts of corruption, the company will adopt the pertinent legal measures with the greatest firmness.

522.    On November 14, 2017, Graña released yet another Form 6-K stating that, despite allegations the Company contributed to the bribes, the Company had not received any formal notice that it was under investigation by the Public Prosecutor's Office, stating in relevant part:

. . . through various means of communication, *we became aware of the statements made by Prosecutors Hamilton Castro and Pablo Sanchez, in which they point out that Graña y Montero is being investigated by the Public Prosecutor's Office as part of the corroboration investigations of the statements made by Mr. Jorge Henrique Simones Barata, regarding the acts of corruption confessed by the Odebrecht company*.

In this regard, we believe it necessary to specify that, to date, we have not received any notification in which we are formally and officially informed of the inclusion of the company or any of its directors, executives and/or collaborators in the aforementioned investigations.

Notwithstanding the foregoing, we wish to record our deep interest in the knowledge of the truth and our willingness to collaborate fully in the investigations and in everything that the Public Prosecutor's Office may need for the correct clarification of the facts; always based on the principles and rights of our constitution and respect for the rule of law.

523.    On December 27, 2017, Graña filed a Form 6-K describing the Company's worsening legal position while continuing to deny the Company was knowingly involved in the bribery scheme, stating in relevant part:

[W]e have received *a request from the Adhoc Attorney's Office to include the company in the investigation as a civilly responsible third party* within the framework of the process followed by the Public Prosecutor's Office for the Interoceanic Project Section 2 and Section 3.

- 131 -

*Our company considers that it has not incurred in any irregularity, so we will exercise our right of defense in this case.*

We hope that the due process will be followed.  If as a result of it, the company is found responsible for a civil liability we want to ensure that the company will comply with it as we have done with all of our creditors and suppliers throughout the 84 years of existence.

We are a company that is upright and committed with the truth, where there is no room for irregular practices or fraud and we believe that the total clarification of the facts constitute the best defense for the company.

524.    On January 31, 2018, Graña filed a Form 6-K announcing that it had been summoned to appear in connection with the Peruvian government's IIRSA investigation, stating in relevant part:

By means of this letter, we comply with communicating as a Relevant Information Communication, that today *we have received a notification from Judge Richard Concepción Carhuancho for which he summons our company Graña y Montero S.A.A. and our subsidiary GyM S.A. – as well as other companies – to a Hearing of Incorporation of Legal Entities, for February 16 of this year*.  This summoning is in response to the request of the Public Ministry to incorporate the companies as investigated subjects in the investigation followed in relation to the IIRSAs.  The company indicates its willingness to collaborate with the investigations that the Public Prosecutor's Office is carrying out.

*However, it is important to ratify that the company will exercise its right of defense and categorically rejects that that concept applies to Graña y Montero S.A.A or GyM S.A., since these companies are not organizations designed to corrupt officials, but on the contrary, we are an organization where there is no room for irregular practices or fraud.  We reiterate, furthermore, that the Graña y Montero Group is not aware of any executive or former executive having participated in acts of corruption* and, if it were otherwise, it will not hesitate to take the corresponding actions.

525.    On February 20, 2018, Graña filed a Form 6-K announced that GyM S.A. was subject to becoming a civilly responsible party to the bribery conspiracy but continued to deny responsibility, stating in relevant part:

[W]e have been notified of a request submitted by the Adhoc Procurator's Office to the First Court of National Preparatory Investigation that seeks to include our subsidiary GyM S.A. as a civilly responsible third party in the framework of the process held by the Public Ministry for the Public Works tendered for the

- 132 -

Construction of Tranche 1 and 2 of Line 1 of the Lima Metro.  In this regard, *our company ratifies its position of not having incurred in any irregularity, for which we will exercise our legitimate right of defense.*  However, if in the framework of this process we are held responsible for a civil reparation, we will comply with it, as we have done with all our other obligations throughout our 84 years of existence

526.    On March 7, 2018, Graña filed a Form 6-K stating that the Company was now

subject to a formal criminal investigation, stating in relevant part:

The Peruvian First National Preparatory Investigation Court (Primer Juzgado de Investigación Preparatoria Nacional) has notified us of *its resolution incorporating four companies, including Graña and Montero S.A.A. and GyM S.A., as defendants in the criminal investigation in respect of the IIRSA South project (tranches II and III)*.  As the resolution itself indicates, this decision simply constitutes a summons and incorporates these entities into the investigation. It does not constitute the imposition of any damages or sanctions.  The resolution does enable Graña and Montero S.A.A. and GyM S.A. to exercise their rights of defense, including to present evidence and reach the truth in criminal proceedings. Notwithstanding the foregoing, we believe that the court has not evaluated the necessary requirements for incorporation into the investigation, nor has the court analyzed any of the arguments presented in their defense; as a result, we will appeal the decision.

527.    On March 14, 2018, Graña filed a Form 6-K describing the obligations imposed on

the Company for its potential involvement in the bribery scheme following the passage of a new

Peruvian law, stating:

On March 12, 2018, Law No. 30737, which replaces Urgent Decree No. 003, was published.

In this regard, according to an evaluation carried out by our company, we have concluded that *Graña y Montero S.A.A. and GYM S.A. are included within the scope of article 9 of the aforementioned law*.  Graña y Montero S.A.A is included due to its participation in the construction of tranches 2 and 3 of the "Initiative for the Integration of Regional South American Infrastructure" (IIRSA) project, while GYM S.A. is included for participating in the construction of tranches 1 and 2 of the "Metro de Lima - Line 1" project, in each case as a result of having been partners in these projects with ODEBRECHT (a company that expressly admitted its culpability for corruption cases relating to those projects).

Once the regulation implementing this law is published, we will be able to conclude our analysis of the main requirements that we must comply with pursuant to this law, which are: *(i) the creation of trusts as collateral to ensure the payment of potential damages to the Government, (ii) the presentation of compliance*

- 133 -

*programs, which are in process of being implemented for both companies, (iii) continuing collaboration with the public prosecutor's office, and (iv) the suspension of funds transfers abroad unless expressly authorized by the Ministry of Justice.*

528.    On April 17, 2018, Graña filed a Form 6-K disclosing that PwC would not be auditing the Company's 2016 fiscal results due to the bribery scandal, and would not authorize the use of its 2015 audit opinion without conducting substantial additional procedures, stating in relevant part:

> Graña y Montero S.A.A. (the "Company") has announced that, as of today, Moore Stephens Perú – Vizcarra y Asociados S. Civil de R. L (a member firm of Moore Stephens International) ("Moore Stephens") is in the process of completing its audit of the Company's consolidated financial statements for the 2016 fiscal year.  To file its Form 20-F for the 2016 fiscal year (the "2016 Form 20-F"), including 2016 audited consolidated financial statements, the Company needs authorization from the Company's prior auditor for the use of previously issued audit opinions with respect to the 2015 and 2014 consolidated financial statements.  The prior auditor is Gaveglio, Aparicio y Asociados S.C. de R.L. ("PwC"), a member firm of PricewaterhouseCoopers International Limited.

> 2015 Financial Statements

> On or about March 23, 2018, *PwC informed the Company that it would not authorize the use of its 2015 audit opinion without conducting substantial additional procedures*, which represents a difference in understanding from what the Company has had since October 2017 when PwC ceased to be the Company's auditor.  PwC could not give any assurance as to when it could complete such additional procedures and stated it could take several months.

> \*      \*      \*

> PwC informed the Company that professional standards required the performance of additional procedures with respect to the 2015 consolidated financial statements *because of publicly reported procedural developments since October 2017 concerning the cumulative effect of the decision of the Peruvian court to include three former executives of the Company and the Company in its ongoing criminal investigation* relating to projects involving Odebrecht*, coupled with a prior 2015 agreement that was first provided to PwC in May 2017*.

529.    On May 16, 2018, Graña belatedly filed its Form 20-F for FY 2016, in which the Company again denied knowingly participating in the bribery scheme, stating:

- 134 -

On March 30, 2018, the Board of Directors created a Risk, Compliance and Sustainability Committee who was in charge of the oversight of the investigation independent from management.  The investigation was entrusted to Simpson, Thatcher and Bartlett that reported exclusively to the Risk, Compliance and Sustainability Committee to preserve its independence.

***The independent investigation concluded on November 2, 2017, and found no evidence that the Group or any of its former or current directors or executives had intentionally or knowingly participated in acts of corruption related to the 6 projects developed in association with Odebrecht***.

530.    On July 2, 2018, Graña belatedly filed its Form 20-F for FY 2017, which included

the following disclosures regarding the ongoing criminal investigation and the negative impact it

was having, and could have in the future, on Graña's operations, stating as follows:

Moreover, as a result, our company and certain of our former directors and executive officers have been the subject of congressional and criminal investigations related to corruption investigations.  These investigations are ongoing.

\*        \*        \*

***We cannot assure you that other of our former or current board members and executive officers will not be included in the foregoing proceedings as criminal defendants or civilly-responsible third parties as well, or that the company will not be included in other investigations***.

\*        \*        \*

Public and private investment in Peru, Colombia and Chile slowed significantly during 2016 and 2017 as a result of market conditions and, in the case of Peru, as a result of corruption investigations and political uncertainty.

\*        \*        \*

Pursuant to recent amendments to the Public Procurement Law, companies sentenced for corruption charges, among other criminal offences, or companies whose representatives have admitted committing corruption acts, will be prohibited from participating in public procurement processes.

531.    On February 4, 2019 Graña filed a Form 6-K with the SEC in which it summarized

the findings of the Simpson Thacher Report, as follows:

On January 9, 2017, the Board of Directors approved a plan to conduct an internal investigation related to six projects executed in association with Odebrecht.

On March 30, 2017, the Board of Directors created a Risk, Compliance and Sustainability Committee who was in charge of the oversight of the investigation independent from management.  The investigation was conducted by outside counselor reported to the Risk, Compliance and Sustainability Committee.

The independent investigation concluded on November 2, 2017 and found no evidence for determining that the Group or any of its former or current directors or executives had intentionally or knowingly participated in acts of corruption related to the six projects developed in association with Odebrecht.

532.    On March 11, 2019 Graña filed a Form 6-K discussing the ongoing investigations into the Company and contingency measures being put in place.  Graña's previously resolute denial of the bribery allegations began to soften, as follows:

*The Company´s Management does not rule out the possibility of finding adverse evidence, nor rules out that authorities or third parties will find adverse evidence not currently known, during the investigations being conducted*.  As at December 31, 2018 the Company has recorded the amount of S/73.5 million as a provision of the possible contingencies related to the cases described previously.  We are not able to anticipate the final result of these investigations and the possible contingencies which may arise.

Nonetheless, the Company, through its external attorneys, continues to conduct a permanent evaluation of the information related to the criminal investigations described in this Note 1 in order to keep its defense prepared in the event of any new charges arises during said investigations.  *In conducting the aforementioned evaluation, the Company does not dismiss the possibility of finding incriminatory evidence nor that the authorities or third parties find incriminatory evidence that is not known to date.*

533.    On April 23, 2019, in response to Jorge Barata's testimony that Graña was aware of and participated in the bribes for the Lima Metro project, Graña announced that "it cannot corroborate or contradict statement from Barata."

534.    On April 29, 2019, Peruvian news outlets reported that Jorge Barata had testified that Graña itself paid a $3 million bribe to President García.  Graña disputed the media's characterization of Barata's testimony in a Form 6-K filed with the SEC, stating:

It has been mentioned in several articles that appeared in various media over the past week that Jorge Barata had declared that Graña y Montero directly paid US$3 million in bribes in connection to the construction of the Lima Metro.

What Barata really said in Curitiba is that he asked for the reimbursement of the bribe payment and that he increased by US$3 million the amount Odebrecht was supposed to receive.

We regret that inaccurate information has been filtered out from a reserved hearing, and that the media have used such inaccurate information despite that it cannot be corroborated faithfully until the audios and transcriptions of Barata's declarations are of public knowledge.

535.    Importantly, Graña did not dispute Barata's testimony that he asked Graña for the reimbursement of Odebrecht's bribe payment in the amount of $3 million.

536.    On April 30, 2019 Graña filed a Form 20-F for fiscal year 2018 and therein discussed the Company's connection to Odebrecht, stating in relevant part:

According to news reports, former senior officers of Odebrecht's affiliate in Peru have indicated to Peruvian prospectors (sometimes in apparent contradiction with prior statements) that certain of our former directors and senior management were aware that Odebrecht had made corrupt payments to government officials in connection with certain projects in which we participated. *We have undertaken an internal investigation and we continue to review and assess the past practices of our company, to determine whether there has been any wrongdoing on the part of our former or current directors, officers and employees*. In addition, a former secretary of the IIRSA South project recently asserted that *a former executive of our company was present at a meeting in 2011 in which the need to reimburse illicit payments previously made by Odebrecht was mentioned*. We continue to review and assess the past practices of our company *to determine whether there has been any wrongdoing on the part of our former or current officers and employees*.

## XIV.  LOSS CAUSATION

537.    As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the price of Graña ADSs and operated as a fraud or deceit on Class Period purchasers of Graña ADSs.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the trading price of Graña ADSs fell precipitously as the artificial inflation was removed.

538.    As a result of their purchases of Graña ADSs during the Class Period, Plaintiffs and other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

Defendants' false and misleading statements throughout the Class Period had the intended effect and caused Graña ADSs to trade at artificially inflated levels throughout the Class Period, reaching a Class Period high of more than $22 per ADS on September 19, 2013.

539.    On December 21, 2016, Odebrecht pled guilty to bribery charges in the United States in connection with, among other projects, its tender for the IIRSA South and Lima Metro concessions in Peru.  On this news, the price of Graña ADSs began to decline precipitously, closing down at $5.02 per ADS by January 11, 2017.

540.    On January 12, 2017, Graña announced that it was withdrawing from its partnership with corruption-plagued Odebrecht, calling the partnership a "mistake."  On this news, the price of Graña ADSs continued to decline, falling $0.61 per ADS, or 12%, on January 12, 2017.

541.    On January 20, 2017, Graña disclosed that the GSP consortium would miss a key upcoming financing deadline of January 23, 2017.

542.    On January 25, 2017, citing the loss of the Odebrecht partnership, Graña disclosed it would ask its Board of Directors to approve the sale of $300 million in assets to help it meet its obligations.  Thereafter, on January 27, 2017, Graña reported its fourth quarter and fiscal 2016 financial results for the year ended December 31, 2016, reporting revenues of S/. 6,055.3 million for fiscal 2016, a 22.7% decrease compared to fiscal 2015.

543.    On February 24, 2017, local news magazine *Hildebrandt* released four pages of Jorge Barata's testimony before Prosecutor Hamilton Castro, in which he alleged that Graña knew about the bribery and had committed to paying its proportional share of the bribe.

544.    On this news, the price of Graña's ADSs declined precipitously again, falling approximately 35%, from a close of $5.09 per ADS on February 23, 2017, to a close of $3.32 per

ADS on February 24, 2017, a decline of $1.77 per ADS, on unusually high trading volume of more than 1.9 million shares traded.

### A.    Additional Loss Causation Allegations

545.    On May 16, 2017, shares fell 11% to 3.26 after prosecutors filed a criminal complaint against Graña and José Graña.   *See* https://gestion.pe/economia/canon-minero-sera-usado-operacion-mantenimiento-proyectos-anuncia-mef-264310 (last visited May 8, 2019).

546.    On November 29, 2017, Judge Concepción ruled that Barata must be excluded from the criminal probe into the bribe for the IIRSA South project, thereby clearing the way for Barata to resume his collaboration efforts.   Shares of Graña fell 8.2% intraday.   *See* https://gestion.pe/economia/mercados/acciones-grana-y-montero-caen-minimo-3-meses-medio-investigacion-caso-odebrecht-219752 (last visited May 8, 2019).

## XV.    APPLICABILITY OF PRESUMPTION OF RELIANCE

547.    Plaintiffs will rely upon the presumption of reliance established by the fraud on the market doctrine as enunciated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*") and the presumption of reliance for omissions as enunciated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

548.    With respect to the *Basic* presumption, a presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the ADSs traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the ADSs; and

(e)     Plaintiffs and other members of the Class purchased the ADSs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

549.    At all relevant times, the market for the ADSs was efficient for the following reasons, among others:

(a)     the ADSs met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Graña filed periodic public reports with the SEC and the NYSE;

(c)     Graña regularly communicated with public investors via established market communications mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Graña was followed by stock analysts employed by major brokerage firms who wrote reports distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

550.    As a result of the foregoing, the market for Graña ADSs promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Graña ADSs.  Under these circumstances, all purchasers of Graña ADSs during the Class Period suffered similar injury through their purchase of such ADSs at artificially inflated prices, and a presumption of reliance applies.

551.    In addition to the *Basic* presumption, a class-wide presumption of reliance is also applicable in this action under the Supreme Court's holding in *Affiliated Ute*, because the claims

alleged are grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding Graña's business operations and financial prospects and performance – information Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.

552.    Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the facts withheld would be material in a sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XVI.   CLASS ACTION ALLEGATIONS

553.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Graña ADSs during the Class Period, and who were damaged thereby (the "Class").   Excluded from the Class are Defendants and their families, as well as the officers and directors of the Company and the members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

554.    The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, Graña ADSs were actively traded on the NYSE.  While the exact number of class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe there are hundreds, if not thousands of members of the proposed Class. Record owners and other members of the Class may be identified from records maintained by Graña or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

555.     Plaintiffs' claims are typical of the claims of members of the Class because all Class members are and were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

556.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

557.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> (a)     whether the Exchange Act was violated by Defendants as alleged herein;

> (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and practices of Graña;

> (c)     whether the trading price of Graña ADSs was artificially inflated during the Class Period; and

> (d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

558.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XVII.  NO SAFE HARBOR

559.     The statutory safe harbor provided for certain forward-looking statements under certain circumstances does not apply to any of the false statements alleged.  Many of the statements herein were not identified as "forward-looking statements" when made.  To the extent there were

any forward-looking statements, no meaningful cautionary statements identified important factors that could cause any actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer and/or director of the Company who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and
### Rule 10b-5 Against Graña y Montero

560.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-559 as if set forth in full herein.

561.    During the Class Period, Graña knowingly or recklessly made, participated in the preparation of and/or caused to be disseminated, false and misleading statements of material fact, and omitted material facts necessary to make the statements about Graña's financial results, operations, and legal compliance, in light of the circumstances in which they were made, not misleading.  Plaintiffs specifically refer to statements identified in the sections entitled: "Defendants' False and Misleading Statements During the Class Period" and "Graña's Materially False and Misleading Financial Reporting."

562.    In addition to the duties of full disclosure imposed on the Company as a result of its affirmative statements and reports, Graña had a duty to promptly disseminate truthful information that would be material to investors, including truthful, complete, and accurate information with respect to the Company's operations and financial results.

- 143 -

563.    Graña had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them, or made those misrepresentations and omissions of material fact without a reasonable belief in their accuracy.  Graña's misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing Graña's operating condition and financial status from the investing public, and supporting the artificially inflated price of its ADS shares.

564.    As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Graña ADSs was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's ADSs was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's ADSs traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Graña, but not disclosed in Graña's public statements during the Class Period, Plaintiffs and other Class members purchased Graña ADSs during the Class Period at artificially high prices and were ultimately damaged thereby.

565.    At the time of said misrepresentations and omissions, Plaintiffs and other Class members were ignorant of their falsity, and believed them to be true.  Had Plaintiffs or other Class members and the marketplace known the truth regarding Graña, which Graña did not disclose, Plaintiffs and other Class members would not have purchased Graña ADSs, or, if they had purchased Graña ADSs during the Class Period, would not have done so at the artificially inflated prices which they paid.

566.     As a direct and proximate result of Graña's false and misleading statements, Plaintiffs and the other Class members suffered losses and damages in connection with their Class Period purchases of Graña ADSs.

567.     By reason of the foregoing, Graña has violated §10(b) of the Exchange Act and Rule 10b-5.

## COUNT II

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Against the Individual Defendants

568.     Plaintiffs repeat and reallege the allegations set forth in ¶¶1-567 as if set forth in full herein.

569.     During the Class Period, the Individual Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

570.     The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the Company as specified herein.

571.     The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)       made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)       engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Graña ADSs during the Class Period.

572.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Graña ADSs.  Plaintiffs and the Class would not have purchased Graña ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Individual Defendants' misleading statements.

573.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Graña ADSs during the Class Period and the Individual Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder

## COUNT III

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

574.    Plaintiffs repeat and reallege the allegations set forth in ¶¶1-573 as if set forth in full herein.

575.    During the Class Period, the Individual Defendants participated in the operation and management of Graña, and conducted and participated, directly and indirectly, in the conduct of Graña's business affairs.  Because of their senior positions, they knew the adverse non-public

information about Graña's false statements and omissions, as well as its materially weak internal controls.

576.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Graña's financial condition and results of operations, and to correct promptly any public statements issued by Graña that had become materially false or misleading.

577.    Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings that Graña disseminated in the marketplace during the Class Period.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Graña to engage in the wrongful acts complained of herein.  The Individual Defendants, therefore, were "controlling persons" of Graña within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Graña ADSs.

578.    Each of the Individual Defendants, therefore, acted as a controlling person of Graña.  By reason of their senior management positions and/or being directors of Graña, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Graña to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Graña and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

579.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Graña.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.      Determining that this action is a proper class action, and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED:  May 10, 2019                     ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         DAVID A. ROSENFELD
                                         ALAN I. ELLMAN
                                         MOSHE O. BOROOSAN


                                         _____
                                              */s/ David A. Rosenfeld*
                                         DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
aellman@rgrdlaw.com
mboroosan@rgrdlaw.com

HOLZER & HOLZER, LLC
COREY D. HOLZER
MARSHALL P. DEES
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)
cholzer@holzerlaw.com

*Lead Counsel for Plaintiffs*

LAW OFFICES OF CURTIS V. TRINKO, LLP
CURTIS V. TRINKO, ESQ.
16 West 46th Street, 7th Floor
New York, NY  10036
Telephone:  212/490-9550
212/986-0158 (fax)
ctrinko@trinko.Com

*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such public filing to all counsel registered to receive such notice.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 10, 2019.

_____
*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD